# 11-2610-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

ALAN NEWTON,

*Plaintiff-Appellant,*

—against—

CITY OF NEW YORK, MARIO MEROLA, DISTRICT ATTORNEY, individually and in his official capacity, ROBERT T. JOHNSON, DISTRICT ATTORNEY, individually and in his official capacity, ANDREA FREUND, individually and in her official

(*caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME I OF XIII
## (Pages A-1 to A-283)

MICHAEL A. CARDOZO
 *Corporation Counsel of
 the City of New York*
DRAKE COLLEY
 *Assistant Corporation Counsel*
NEW YORK CITY LAW DEPARTMENT
100 Church Street, 6th Floor
New York, New York 10007
(212) 788-0800

*Attorneys for Defendants-Appellees*

JOHN F. SCHUTTY III
LAW OFFICE OF JOHN F. SCHUTTY, P.C.
445 Park Avenue, 9th Floor
New York, New York 10022
(212) 836-4796

DAVID T. GOLDBERG
DONAHUE & GOLDBERG, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 334-8813

ERIC HECKER
JULIE B. EHRLICH
CUTI HECKER WANG LLP
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2600

*Attorneys for Plaintiff-Appellant*

capacity, JOHN DOES, individually and in their official capacity as employees of NEW YORK CITY who are/were ASSISTANT DISTRICT ATTORNEYS within the OFFICE OF THE DISTRICT ATTORNEY, BRONX COUNTY, JANE DOES, individually and in their official capacity as employees of NEW YORK CITY who are/were ASSISTANT DISTRICT ATTORNEY'S within the OFFICE OF THE DISTRICT ATTORNEY, BRONX COUNTY, JOANNE NEWBERT, DETECTIVE, PHILLIP GALLIGAN, DETECTIVE, HARTFIELD, DETECTIVE, BERNARD RYAN, DETECTIVE, ROLAND HARRIS, DETECTIVE, DOUGLAS LEHO, POLICE OFFICER, WILLIAM SEAN O'TOOLE, POLICE OFFICER, MICHAEL SHEEHAN, LT., PATRICK J. MCGUIRE, SERGEANT, TRACY HASKINS, POLICE OFFICER, GERALDINE KIELY, JACK TRABITZ, INSPECTOR, JOHN DOES, individually and in their official capacity as employees of the CITY OF NEW YORK who are/were members of the POLICE DEPARTMENT OF THE CITY OF NEW YORK, JANE DOES, individually and in their official capacity as employees of the CITY OF NEW YORK who are/were members of the POLICE DEPARTMENT OF THE CITY OF NEW YORK, STACEY EDELBAUM, JOHN F. CARROLL, ROBERT L. MOORE, RAFAEL CURBELO, PATRICK BUFFALINO, JOHN AND JANE DOES, individually and in their official capacities as employees of the CITY OF NEW YORK and Members of the OFFICE OF THE CHIEF MEDICAL EXAMINER, JOHN P. HIGGINS, DEPUTY INSPECTOR, BRUCE J. MAJOR, DEPUTY INSPECTOR, DONALD HACKSON, CAPTAIN, JEROME NATHANSON, CAPTAIN, GEORGE KUTTLER, SERGEANT, BRUCE KESSLER, SERGEANT, ADRIAN MERRICK, COLLEEN DUNDAS, SERGEANT, PATRICIA BRANDOW, SERGEANT, WALTER SMITH, LIEUTENANT, PATRICK MCKEON, LIEUTENANT, ANTHONY RUSSO, LIEUTENANT, DAVID DEANGELIS, LIEUTENANT, PATRICIA RYAN,

*Defendants-Appellees.*

**JOINT APPENDIX**
**TABLE OF CONTENTS**

PAGE

**Volume I of XIII**

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Complaint, dated July 2, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-36

Answer, dated September 28, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-152

Transcript of February 26, 2008 Conference before the
Hon. Shira A. Scheindlin (re: Defendants' Request for
Protective Order & Plaintiff's Request for *Monell* Discovery) . . . . . . A-184

Transcript of March 11, 2009 Conference before the
Hon. Shira A. Scheindlin (re: Plaintiff's Malicious
Prosecution Claims & "Access to Evidence" Claims) . . . . . . . . . . . . . . A-201

Notice of Motion, dated April 9, 2009 (re: Defendants' Fed. R. Civ.
P. 56 Motion for Summary Judgment Seeking a Dismissal of
Plaintiff's False Arrest and Malicious Prosecution Claims) . . . . . . . . . A-226

Defendants' Rule 56.1 Statement of Material Facts,
dated April 9, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-228

Declaration of Arthur G. Larkin, dated April 16, 2009 . . . . . . . . . . . . . . . . A-242

Exhibit A to Larkin Declaration—
Grand Jury Minutes, *People v. Alan Newton* (Ind. No.2441/84),
June 29, 1984 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-244

Exhibit B to Larkin Declaration—
V.J.'s *Wade* Hearing Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-260

**Volume II of XIII**

Exhibit C to Larkin Declaration—
V.J.'s Trial Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-284

Exhibit D to Larkin Declaration—
Aurea Gonzalez's *Wade* Hearing Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-306

Exhibit E to Larkin Declaration—
Aurea Gonzalez's Trial Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-318

Exhibit F to Larkin Declaration—
P.O. Douglas Leho's Trial Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-325

Exhibit G to Larkin Declaration—
Dr. Charles' Trial Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-330

Exhibit H to Larkin Declaration—
NYPD Reports re: VJ Assault,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-335

Exhibit I to Larkin Declaration—
Joanne Newbert *Wade* Hearing Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-349

Exhibit J to Larkin Declaration—
Joanne Newbert Trial Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-389

Exhibit K to Larkin Declaration—
Joanne Newbert Deposition Excerpts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-409

Exhibit L to Larkin Declaration—
Gonzalez Deposition Excerpts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-417

PAGE

Exhibit M to Larkin Declaration—
Decision on *Wade* motion,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-433

Exhibit N to Larkin Declaration—
Indictment,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-439

Exhibit O to Larkin Declaration—
Galligan Trial Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-444

Exhibit P to Larkin Declaration—
Newton *Wade* Hearing Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-455

Exhibit Q to Larkin Declaration—
Galligan *Wade* Hearing Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-457

Exhibit R to Larkin Declaration—
O'Toole *Wade* Hearing Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-459

Exhibit S to Larkin Declaration—
Fillers' *Wade* Hearing Testimony,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-460

Exhibit T to Larkin Declaration—
ADA Freund Deposition Excerpt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-461

Exhibit U to Larkin Declaration—
Minutes of Arraignment,
*People v. Alan Newton* (Ind. No.2441/84), 6/29/84 . . . . . . . . . . . . . . . . . A-466

Exhibit V to Larkin Declaration—
Trial Transcript Excerpt,
*People v. Alan Newton* (Ind. No.2441/84) . . . . . . . . . . . . . . . . . . . . . . . . A-469

PAGE

Plaintiff's Rule 56.1 Counterstatement Filed in
   Opposition to Defendants' Motion for Summary Judgment,
      dated April 23, 2009 .......................................... A-473

Opposition Declaration of Alan Newton, dated April 22, 2009 .......... A-522

Opposition Declaration of Thomas Streed, PhD, dated April 22, 2009 ... A-527

Opposition Declaration of John F. Schutty, Esq.,
      dated April 22, 2009 .......................................... A-551

**Volume III of XIII**

Exhibit A to Schutty Declaration—
Excerpts from the *Wade* Hearing/Trial,
*People v. Alan Newton* (Ind. No.2441/84) ........................ A-558

Exhibit B to Schutty Declaration—
NYPD Complaint Report & Complaint Follow Ups
(B1 thru B10) re: VJ Assault .................................... A-723

Exhibit C to Schutty Declaration—
Handwritten Notes Composed by
Det. J. Newbert on June 23, 1984 re: VJ Assault................... A-736

Exhibit D to Schutty Declaration—
Excerpts from the NYPD "Patrol Guide" & "Detective's Guide".... A-740

Exhibit E to Schutty Declaration—
Excerpts from Defendant J. Newbert's Deposition Transcript....... A-753

Exhibit F to Schutty Declaration—
Excerpts from Defendant W. O'Toole's Deposition Transcript...... A-771

Exhibit G to Schutty Declaration—
Excerpts from Defendant R. Harris's Deposition Transcript ........ A-780

Exhibit H to Schutty Declaration—
Excerpts from Witness Aurea Gonzalez's Deposition Transcript.... A-788

PAGE

Exhibit I to Schutty Declaration—
Excerpts from Witness Miguel Gonzalez's Deposition Transcript... A-801

Exhibit J to Schutty Declaration—
Excerpts from Rule 30(b)(6) Witness' (Lt. A. King)
Deposition Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-807

Exhibit K to Schutty Declaration—
NYPD Complaint Report composed by Det. Newbert re Newton
Att. Rape Charge, dated May 29, 1984 . . . . . . . . . . . . . . . . . . . . . . . A-816

Exhibit L to Schutty Declaration—
Arrest Record of Det. Joanne Newbert "Starting 01/01/70" . . . . . . . . A-818

Exhibit M to Schutty Declaration—
NYPD "Investigator's Summary Report" dated May 27, 1982
(re: Det. Newbert's lack of investigation experience) . . . . . . . . . . . . . A-823

Exhibit N to Schutty Declaration—
NYPD Property Voucher B744556 (re: Newton Sneakers)
dated July 3, 1984 (stating: "Property listed above was
removed from deft. To have soles analized [sic] to determine
is [sic] traces of blood") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-826

Exhibit O to Schutty Declaration—
NYPD Police Laboratory Analysis Report dated July 30, 1984
(re: contents and testing on contents of Vitullo rape kit)
re: VJ Assault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-828

## Volume IV of XIII

Reply Declaration of Arthur G. Larkin, Esq., dated May 11, 2009 . . . . . . . A-830

Exhibit W to Larkin Declaration—
Newbert Deposition Excerpts (52, 59-60,
72-73, 79, 103, 107-8, 113-15, 186-7) . . . . . . . . . . . . . . . . . . . . . . . . A-864

Exhibit X to Larkin Declaration—
Freund Deposition Excerpts (108-9, 123) . . . . . . . . . . . . . . . . . . . . . . . A-879

PAGE

Exhibit Y to Larkin Declaration—
Criminal Proceeding – Excerpts
(pp. 43, 273-43, 310-13, 325, 483, 580-81) . . . . . . . . . . . . . . . . . . . . . . . A-883

Exhibit Z to Larkin Declaration—
Letter from Plaintiff's Counsel to Court (excerpt) . . . . . . . . . . . . . . . . A-899

Exhibit AA to Larkin Declaration—
Aurea Gonzalez Deposition Excerpts
(10, 22, 52-53, 73-74, 83-84, 98-99) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-901

Exhibit BB to Larkin Declaration—
Lt. Alfred King Deposition Excerpt (108-113) . . . . . . . . . . . . . . . . . . . . A-912

Exhibit CC to Larkin Declaration—
Miguel Gonzalez Deposition
Excerpts (7-11, 13-19, 24-25, 28) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-919

Exhibit DD to Larkin Declaration—
Plaintiff's Brief on Appeal (Excerpt, pp.32-34) . . . . . . . . . . . . . . . . . . . A-935

Exhibit EE to Larkin Declaration—
Plaintiff's Rule 30(b)(6) Notice (Excerpted) . . . . . . . . . . . . . . . . . . . . . . A-942

Exhibit FF to Larkin Declaration—
Harris Deposition Excerpt (190-200) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-944

Exhibit GG to Larkin Declaration—
Letter to Plaintiff's Counsel, dated March 6, 2009 . . . . . . . . . . . . . . . . A-956

Exhibit HH to Larkin Declaration—
NYPD Memorandum Regarding Document Search . . . . . . . . . . . . . . . . A-958

Exhibit II to Larkin Declaration—
Letter to Plaintiff's Counsel, dated February 11, 2009 . . . . . . . . . . . . . A-959

Notice of Motion, dated June 5, 2009 (re: Defendants' Fed. R. Civ. 56
Motion for Summary Judgment Seeking a Dismissal of
Plaintiff's "Access to Evidence" Claims) . . . . . . . . . . . . . . . . . . . . . . . . A-960

Defendants' Rule 56.1 Statement, dated June 5, 2009 . . . . . . . . . . . . . . . . . A-962

PAGE

Declaration of Fred Weiler Esq., dated June 5, 2009 ................... A-971

Exhibit A to Weiler Declaration—
Affidavit of Alan Newton in *People v. Alan Newton* (Ind. No. 2441/84) in Support of CPL § 440 Motion, dated August 16, 1994 .. A-973

Exhibit B to Weiler Declaration—
Excerpts from Deposition Transcript
of Former ADA John Carroll ..................................... A-974

Exhibit C to Weiler Declaration—
Affirmation of John Carroll in Opposition
to CPL § 440 Motion, dated November 1, 1994 ................... A-991

Exhibit D to Weiler Declaration—
Order of Justice John N. Byrne in *People v. Alan Newton*
(Ind. No.2441/84), dated November 17, 1994 .................... A-994

Exhibit E to Weiler Declaration—
Letter from Alan Newton to Jorge Guttlein, Esq.,
dated March 24, 1997 .......................................... A-995

Exhibit F to Weiler Declaration—
Excerpts from Deposition Transcript of
former ADA Robert Moore ...................................... A-996

Exhibit G to Weiler Declaration—
Letter from Robert Moore to Magistrate Judge Sharon E. Grubin
in *Newton v. Coombe*, 95 CV 9437, dated April 23, 1997 ......... A-1005

Exhibit H to Weiler Declaration—
Letter from Robert Moore to Lt. LaBarbara of NYPD
Property Clerk Division, dated April 23, 1997 ................... A-1007

Exhibit I to Weiler Declaration—
Notice of CPL § 440 motion in *People v. Alan Newton*
(Ind. No.2441/84), dated July 9, 1998 .......................... A-1008

Exhibit J to Weiler Declaration—
Excerpts from Deposition Transcript of ADA Rafael Curbelo ..... A-1010

PAGE

Exhibit K to Weiler Declaration—
Affirmation of Rafael Curbelo in Opposition to CPL § 440
Motion, dated August 17, 1998, *People v. Alan Newton*
(Ind. No.2441/84). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1033

Exhibit L to Weiler Declaration—
Letter from NYPD's Sgt. Patrick Maguire to Rafael Curbelo,
dated August 26, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1037

Exhibit M to Weiler Declaration—
Letter from Rafael Curbelo to Commanding Officer of NYPD
Property Clerk Facility at Pearson Place, dated August 25, 1998. . . A-1038

Exhibit N to Weiler Declaration—
Order of Justice John N. Byrne in *People v. Alan Newton*
(Ind. No. 2441/84), dated September 9, 1998 . . . . . . . . . . . . . . . . . . . A-1039

Exhibit O to Weiler Declaration—
Excerpts from Deposition Transcript of Sgt. Patrick Maguire. . . . . . A-1040

Exhibit P to Weiler Declaration—
Excerpts from Deposition Transcript of Geraldine Kiely . . . . . . . . . . A-1061

**Volume V of XIII**

Plaintiff's Rule 56.1 Counterstatement, dated June 25, 2009 . . . . . . . . . . A-1068

Opposition Declaration of Alan Newton, dated June 25, 2009. . . . . . . . . . A-1150

Opposition Declaration of Shannon Turner, dated June 25, 2009 . . . . . . . A-1160

Opposition Declaration of John F. Schutty, Esq.,
dated June 25, 2009. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1177

Exhibit A to Schutty Declaration—
Copy of Original Yellow NYPD Invoice No. B744483
(for Rape Kit) Found by the NYPD in February 2009
(with attachments – as found) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1182

PAGE

Exhibit B to Schutty Declaration—
Copy of Original Yellow NYPD Invoice No. B744512
(for VJ's soiled clothing) Found by the NYPD in February 2009
(with attachments – as found) .................................. A-1197

Exhibit C to Schutty Declaration—
Copy of Original Yellow NYPD Invoice No. B744556
(for Newton Sneakers) Found by the NYPD in February 2009
(with attachments – as found) ................................. A-1202

Exhibit D to Schutty Declaration—
Excerpts from NYPD Property Clerk's Division's
"Property Guide" ........................................... A-1207

Exhibit E to Schutty Declaration—
Declaration of Sgt. Thomas O'Connor dated April 13, 2009 ....... A-1230

Exhibit F to Schutty Declaration—
Excerpt from NYPD's Request for Proposals for "Property
Evidence Tracking System (PETS)," dated April 27, 2007......... A-1232

Exhibit G to Schutty Declaration—
Excerpt from the "Automated Management of Property System"
("AMPS") Proposal presented by CGI Consulting,
dated May 13, 1991.......................................... A-1236

Exhibit H to Schutty Declaration—
Letter from ADA Elisa Koenderman to
Defendant Jack Trabitz, dated July 15, 2005..................... A-1251

Exhibit I to Schutty Declaration—
Affirmation of Rafael Curbelo filed in Supreme Court,
Bronx County, in *People v. Alan Newton* (Ind. No.2441/84),
dated August 17, 1998 ....................................... A-1253

Exhibit J to Schutty Declaration—
Excerpt from OCME "Property Clerk Log Book"
Showing Delivery of Rape Kit to PCD on 12/22/88 ............... A-1257

PAGE

Exhibit K to Schutty Declaration—
Fax from ADA Rafael Curbelo to Mr. Pat Buffalino
of OCME, dated April 12,1999 ................................. A-1258

Exhibit L to Schutty Declaration—
Excerpts from Deposition Transcript of Defendant Jack Trabitz ... A-1260

Exhibit M to Schutty Declaration—
Excerpts from Deposition Transcript of
Defendant Patrick McGuire ................................... A-1297

Exhibit N to Schutty Declaration—
Excerpts from Deposition Transcript of
Defendant Geraldine Kiely ................................... A-1310

Exhibit O to Schutty Declaration—
Excerpts from Deposition Transcript of Patricia Ryan (OCME).... A-1313

Exhibit P to Schutty Declaration—
Excerpts from Deposition Transcript of ADA John Carroll ........ A-1322

Exhibit Q to Schutty Declaration—
Excerpts from Deposition Transcript of ADA Robert Moore....... A-1331

Exhibit R to Schutty Declaration—
Excerpts from Deposition Transcript of ADA Rafael Curbelo ..... A-1333

Exhibit S to Schutty Declaration—
Excerpts from Deposition Transcript
of Defendant Stacy Haskins ................................... A-1338

Exhibit T to Schutty Declaration—
Photocopy of NYPD Invoice No. B744512
Received from the DA's Office................................. A-1345

Exhibit U to Schutty Declaration—
Photocopy of NYPD Invoice No. B744483
Received from the DA's Office................................. A-1346

Exhibit V to Schutty Declaration—
OCME Log Entry Showing Inquiry from ADA Carroll
as to Whereabouts of Rape Kit................................. A-1347

PAGE

Reply Declaration of Arthur G. Larkin, Esq., dated July 13, 2009 . . . . . . A-1348

Exhibit A to Larkin Declaration—
Copy of an Excerpt from the Brief filed by the
Innocence Project on behalf of the respondent in the
matter *District Attorney's Office v. Osborne,* --- U.S. ---,
2009 U.S. LEXIS 4536 (Jun. 18, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1350

Exhibit B to Larkin Declaration—
Excerpt of Testimony from Chief Robert Gianelli Before a State
Legislative Committee, Concerning the Loss of White Invoices
Relating to Evidence Vouchered in Bronx County prior to 1988,
dated October 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1354

Exhibit C to Larkin Declaration—
Excerpt from Transcript of a Discovery Conference
before the District Court on Feb. 26, 2008, (pp. 11-13). . . . . . . . . . . . A-1359

Notice of Motion, dated November 16, 2009 (for Reargument
of the District Court's October 13, 2009 Opinion and
Order filed by the Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1364

**Volume VI of XIII**

Transcript of February 3, 2010 Conference before the
Hon. Shira Scheindlin (re: Plaintiff's "Access to Evidence"
Claim & Defendants' Motion for Reargument
dated Nov. 16, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1366

Stipulation & Order, dated March 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . A-1377

Amended Complaint, dated May 11, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . A-1379

Answer to Amended Complaint, dated May 25, 2010 . . . . . . . . . . . . . . . . . A-1481

PAGE

Order, dated May 28, 2010 (Requiring City to Produce Rape Kit &
 Microscope Slides Collected from, or Created from, Evidence in
 *People v. Newton*, Ind. No. 2441/84 (Bronx Co.) to Plaintiff's
 Forensic Expert by June 11, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1513

Transcript of June 21, 2010 Conference before the Hon. Shira
 Scheindlin (re: Plaintiff's Request for Discovery from the City
 Regarding his "Access to Evidence" Claim) . . . . . . . . . . . . . . . . . . . . . A-1515

Transcript of July 23, 2010 Conference before the Hon. Shira
 Scheindlin (re: Plaintiff's Request that Court's Prior Dismissal
 of Defendant Patricia Ryan Be Reconsidered) . . . . . . . . . . . . . . . . . . . A-1527

Order, dated July 30, 2010 (Reinstating Claims Asserted
 Against Defendant Patricia Ryan). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1583

Notice of Motion, dated August 4, 2010 (re: Defendants'
 Fed. R. Civ. P. 12 Motion to Dismiss Claims Asserted Against
 Defendant Patricia Ryan). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1586

Declaration of Arthur G. Larkin, Esq., dated August 4, 2010. . . . . . . . . . . A-1588

 Exhibit A to Larkin Declaration—
 Transcript of Proceedings before the District Court
 on July 23, 2010 (Excerpt, pp.6-38). . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1590

 Exhibit B to Larkin Declaration—
 E-mail Exchange between Counsel (7/30/10) . . . . . . . . . . . . . . . . . . . . . A-1624

 Exhibit C to Larkin Declaration—
 Report of Dr. Edward Blake (w/o exhibits) (Relevant Excerpts) . . . A-1625

 Exhibit D to Larkin Declaration—
 Notice of Motion and Affirmation dated January 29, 1988,
 Filed by Newton for Testing on Rape Kit, and Order Issued
 for Testing on Rape Kit, dated April 6, 1988 . . . . . . . . . . . . . . . . . . . . A-1628

 Exhibit E to Larkin Declaration—
 Letter to Court (w/o exhibits), dated July 22, 2010. . . . . . . . . . . . . . . A-1638

PAGE

Exhibit F to Larkin Declaration—
Trial Testimony of Valerie Burke, M.D. in
*People v. Alan Newton* (Ind. No.2441/84) ........................ A-1642

Defendants' Memorandum of Law in Support of Rule 12 Motion,
dated August 4, 2010 ......................................... A-1645

## Volume VII of XIII

Plaintiff's Proposed Jury Charges and Verdict Sheet,
dated August 6, 2010 ......................................... A-1663.1

Defendants' Proposed Jury Charges, dated August 6, 2010 ......... A-1663.41

Opposition Declaration of John F. Schutty, Esq.,
dated August 13, 2010 ........................................ A-1664

Exhibit A to Schutty Declaration—
Email from Dr. Edward Blake to John F. Schutty, Esq.
re: ABO testing dated August 2, 2010 .......................... A-1676

Exhibit B to Schutty Declaration—
Schutty's first letter to Arthur G. Larkin, Esq.
dated August 9, 2010 re: blood testing requested
of Alan Newton .............................................. A-1677

Exhibit C to Schutty Declaration—
Larkin's August 9, 2010 response to Schutty's
August 9 letter re: blood testing on Mr. Newton ................. A-1680

Exhibit D to Schutty Declaration—
Schutty's second August 9, 2010 letter to Larkin
re: blood testing on Mr. Newton ............................... A-1682

Exhibit E to Schutty Declaration—
Larkin's August 10, 2010 letter to Schutty denying offer of ABO
blood testing on Newton, but insisting on Rule 37 sanctions....... A-1683

PAGE

Exhibit F to Schutty Declaration—
Arthur G. Larkin's letter to Hon. Shira A. Scheindlin dated May
24, 2010 presenting a claim that PCR-DNA testing was
unavailable in 1994 to perform testing on the VJ rape kit ......... A-1685

Exhibit G to Schutty Declaration—
Excerpts from the Declaration of Dr. Edward Blake dated July
19, 2010. .................................................. A-1689

Exhibit H to Schutty Declaration—
Excerpts from Transcript of Deposition of Patricia Ryan taken on
March 31, 2009 ............................................ A-1714

Exhibit I to Schutty Declaration—
OCME Serology Lab Report (reporting no spermatozoa) signed
by Patricia Ryan on September 2, 1988 ......................... A-1747

Plaintiff's Memorandum of Law in Opposition to Motion, dated
August 13, 2010 ............................................ A-1748

Reply Declaration of Arthur G. Larkin, Esq., dated August 20, 2010 ... A-1778

Exhibit G to Larkin Declaration—
Patricia Ryan's Deposition, viz., pp.5-9, 35, 58-59 (Excerpts) ..... A-1780

Exhibit H to Larkin Declaration—
Copy of Letter from Dr. Edward Blake's laboratory
with Rape Kit .............................................. A-1789

Exhibit I to Larkin Declaration—
Copy of Email request to Plaintiff's counsel that
Dr. Blake Return the Rape Kit ................................. A-1822

Defendants' Reply Memorandum of Law in Support of Motion,
dated August 20, 2010 ....................................... A-1823

Plaintiff's Sur-Reply Memorandum of Law in Opposition
to the Motion, dated August 26, 2010 .......................... A-1843

PAGE

**Volume VIII of XIII**

Proposed Joint Pre-Trial Order, dated August 6, 2010 . . . . . . . . . . . . . . . . . A-1849

Transcript of September 17, 2010 Conference before the Hon. Shira
    Scheindlin (re: Plaintiff's Motion to Preclude the City from
    Offering Evidence that Newton Might Have, In Fact, Committed
    the Crime for which He Was Subsequently Exonerated) . . . . . . . . . . . A-1906

Transcript of September 21, 2010 Conference before the Hon. Shira
    Scheindlin (re: Parties' *Motions in Limine)* . . . . . . . . . . . . . . . . . . . . . . . A-1933

Trial Transcript, dated September 23, 2010 to September 27, 2010 . . . . . A-2004

**Volume IX of XIII**

Trial Transcript, dated September 29, 2010 to October 6, 2010 . . . . . . . . A-2142

**Volume X of XIII**

Trial Transcript, dated October 7, 2010 to October 19, 2010 . . . . . . . . . . A-2435

**Plaintiff's Trial Exhibits**

PX1—
Joint Motion to Vacate Alan Newton's Conviction Under Bronx
County Indictment No. 2441/84 filed by the Bronx County
District Attorney's Office and Mr. Newton's attorneys
(dated June 5, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2727

PX2—
Order of Justice John Byrne dated July 6, 2006 Vacating
Alan Newton's Conviction & Dismissing Bronx County
Indictment No. 2441/84 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2733

**Volume XI of XIII**

PX3—
NYPD Property Clerk's Invoice B744483 (Yellow Copy) showing that the following evidence was registered by Detective Newbert on June 23, 1984: (1) one Vitullo Rape Kit; (2) one container of blood samples; (3) one piece of mirrored glass, and (4) one Newport cigarette pack. (Bates Nos. 07130 - 07131). [Dup. Bates Nos.]............................................... A-2734

PX4—
NYPD Property Clerk's Invoice B744512 (Yellow Copy) showing that the following evidence was registered by Detective Newbert on June 26, 1984: (1) one pink blouse "JN"; (2) one maroon/multicolored sweater with tie "JN"; and (3) one pair of jeans. (Bates Nos. 07147 -07148) .............................. A-2736

PX5—
NYPD Property Clerk's Invoice B744556 (Yellow Copy) showing that the following evidence was registered by Detective Newbert on July 3, 1984: one pair of men's sneakers. (Bates Nos. 07143 - 07144). [Dup. Bates Nos.] ................... A-2740

PX6—
Blank original NYPD Property Clerk's Invoice (undated) ......... A-2744

PX7—
Package of documents produced to Plaintiff at the Deposition of Jack Trabitz on Feb. 4, 2009 that were found with NYPD Property Clerk's Invoice B744483 (Yellow Original) in 2009 by Sergeant Thomas O'Connor ................................ A-2750

PX8—
Package of documents produced to Plaintiff at the Deposition of Jack Trabitz on Feb. 4, 2009 that were found with NYPD Property Clerk's Invoice B744556 (Yellow Original) in 2009 by Sergeant Thomas O'Connor ................................ A-2767

PAGE

PX9—
Package of documents produced to Plaintiff at the Deposition
of Jack Trabitz on Feb. 4, 2009 that were found with NYPD
Property Clerk's Invoice B744512 (Yellow Original) in 2009
by Sergeant Thomas O'Connor ................................. A-2773

PX10—
NYPD Property Clerk "Out to Court Log Book" entry
dated May 11, 1988 showing rape kit was delivered to
ADA Stacey Edelbaum (Bates No. 01391)........................ A-2778

PX11—
Letter from NYPD Sgt. Patrick J. McGuire to ADA Curbelo
dated August 26, 1998, advising that victim's clothing had been
located at the Pearson Place Warehouse, but that Newton's
sneakers (Voucher No. B744556), and Vitullo Rape Kit, mirror,
cigarette box (Voucher No. B744483), could not be located. ...... A-2779

PX12—
Letter from ADA Elisa Koenderman, Chief-Child Abuse/Sex
Crimes Bureau, Office of District Attorney, Bronx County, to
Inspector Jack Trabitz, Commanding Officer of the NYPD's
PCD, dated July 15, 2005, requesting rape kit and forwarding
copy of NYPD Invoice #B744483 (Invoice contains storage
location of rape kit: "DOA Barrel#22 1989") .................... A-2780

PX13—
NYPD PCD Memorandum: Guidelines for Destruction of
Property, from Commanding Officer, PCD, to All Property Clerk
Personnel (Signed Jack J. Trabitz) (dated Sept. 5, 2006) .......... A-2782

PX14—
Serology Lab Report Prepared by NYC Office of Chief Medical
Examiner (Patricia Ryan, Director) dated September 2, 1988
(indicating that testing on Vitullo Rape Kit had failed to find
presence of semen—type of testing performed on Kit is not
described and Dr. Shaler apparently was not consulted, nor was
he present during the testing) (Bates No. 02811).................. A-2784

PAGE

PX15—
NYPD PCD Property Guide - Full Text
(Produced by City on July 14, 2010) ........................... A-2785

PX16—
NYPD Patrol Guide Excerpt re: Processing Vitullo Evidence Kits
in Sex Offense Cases (dated Nov. 12, 1984) (Bates No. 00622).... A-3031

## Volume XII of XIII

PX17—
Copy of Invoice B744483 from DA's File - "DOA Barrell #22
1989" (dated June 23, 1984) (Bates No. 01388)................... A-3032

PX18—
OCME File No. FB98-1426 (Bates Nos. 2452 - 2691)............. A-3033

PX20—
OCME File No. 585/88 (Bates Nos. 2809 - 2820)................. A-3273

PX22—
Order issued by Justice Burton Roberts dated April 6, 1988
requiring independent lab testing on, among other things, the
Vitullo Rape Kit, (Dr. Shaler of Lifecodes Inc. "is authorized to
supervise and perform the testing.") ........................... A-3285

PX23—
Letter from Barry Scheck and Peter Neufeld to Commissioner
Kelly re: request to NYPD for investigation into unexplained loss
of criminal evidence by NYPD in a large number of IP cases
(dated July 17, 2006) ......................................... A-3288

PX24—
Fax from Rafael Curbelo to Pasquale Buffalino re: chain of
custody documents for missing rape kit requested by Tina
Kansas, Esq. Letter was faxed on April 12, 1999. (Kansas letter
dated Apr. 9, 1999) (Bates Nos. 02552 - 02553) ................. A-3292

PAGE

PX26—
NYPD Crime Lab "Analysis Report", re: testing performed on
rape kit and determining that spermatozoa was found in two
microscopic slides and human blood was found to be of "O" type
(dated July 30, 1984) ........................................ A-3294

PX27—
NYS Supreme Court, Bronx County Indictment No. 2441/84
(dated July 2, 1984)......................................... A-3295

PX30—
Motion filed by Counsel for Alan Newton (Phillip Weinstein,
Esq.) in Supreme Court, Bronx County, requesting independent
lab testing on, among other things, the Vitullo Rape Kit, to
determine if perpetrator was a secretor or non-secretor and
perpetrator's blood type (dated Jan. 29, 1988) .................... A-3300

PX31—
Affidavit of Alan Newton sworn to on March 11, 1988 (regarding
Newton's repeated requests to his attorney to request tests on
semen collected from the victim) ............................... A-3308

PX32—
Pro Se Motion filed by Alan Newton in Supreme Court for
the State of New York, County of Bronx, requesting DNA
testing on the victim's clothing and the Vitullo Rape Kit
(dated Aug. 16, 1994)....................................... A-3310

PX33—
Order of Justice John J. Byrne dated November 17, 1994
(denying Newton's August 16, 1994 motion and referring only
generally to the Affirmation in Opposition as the basis for the
denial)..................................................... A-3312

PX34—
Written Request for DNA testing of material in Vitullo Rape Kit
made by Alan Newton dated October 12, 1996 in Habeas Corpus
Proceeding filed in U.S. District Court for the SDNY (*Newton v.
Coombe*, 95 Civ. 9437)....................................... A-3313

PX35—
Letter from ADA Robert L. Moore to Alan Newton dated October
30, 1996, advising that the rape kit "cannot be located at this
date, as you were advised in a prior state proceeding." . . . . . . . . . . . . A-3314

PX38—
Letter from ADA Robert L. Moore (0812) to United States
Magistrate Judge Sharon E. Grubin dated April 23, 1997,
advising that Newton's sneakers (Voucher No. B744556), and
Vitullo Rape Kit, mirror, cigarette box (Voucher No. B744483)
could not be located, but that victim's clothing (Voucher No.
B744512) had been located. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3316

PX39—
Motion filed by Alan Newton's attorney, Jorge Guttlein, Esq., in
Supreme Court, Bronx County, dated July 9, 1998, requesting
DNA testing on "(a) defendant's sneakers, (b) cigarette box,
(c) mirror, (d) Vitullo kit, (e) the victim's clothing." . . . . . . . . . . . . . A-3318

## Volume XIII of XIII

PX40—
Affirmation in Opposition of Rafael Curbelo
dated August 17, 1998, filed in response to Newton's July 9
motion and advising that "numerous telephone calls" with
Ms. Kiely and P.O. Haskins established that the sneakers,
cigarette pack, mirror and rape kit could not be located and
that rape kits were "preserved starting in 1988." . . . . . . . . . . . . . . . . . A-3330

PX42—
Supplemental Affirmation in Opposition of ADA Rafael Curbelo
dated August 25, 1998, regarding the NYPD's failure to locate
the sneakers, cigarette case, mirror and rape kit . . . . . . . . . . . . . . . . . A-3334

PX45—
Order of Justice John J. Byrne dated September 9, 1998, granting
Newton's July 9, 1998 motion, but only ordering DNA testing
on the Victim's clothing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3339

PAGE

PX46—
Laboratory Report of the Office of the Chief Medical Examiner
dated October 23, 1998, indicating that no semen was found
on the victim's blouse, sweater and jeans......................... A-3340

PX50—
Letter from Alan Newton to the District Attorney's Office, Bronx
County, under the Public Officer's Law, dated April 23, 2002,
requesting, among other things, the Vitullo Rape Kit.............. A-3341

PX51—
Letter from the Bronx District Attorney's Office to Alan Newton
dated June 21, 2002, responding to Newton's April 23 FOIL
request and advising that the "folder" for Indictment No. 2441/84
"has still not been located"; the Vitullo Rape Kit request is
not addressed............................................... A-3342

PX52—
Letter from Alan Newton to NYC Medical Examiner (FOIL
Request) dated June 21, 2002, requesting the Vitullo Rape Kit
tested by OCME in 1988 ..................................... A-3343

PX53—
Letter from NYC Office of Chief Medical Examiner (Ellen
Borakove) dated July 9, 2002, responding to Newton's
June 21, 2002 FOIL request and denying the request on the
ground that OCME records are not open to public inspection. ..... A-3344

PX56—
Email from Vanessa Potkin, Esq. of the IP to ADA Elisa S.
Koenderman dated May 20, 2005, requesting a fresh search for
the rape kit ................................................ A-3346

PX58—
Email from ADA Elisa S. Koenderman to Vanessa Potkin, Esq.
dated November 10, 2005 ("They found it [the rape kit] in a
barrel at Pearson Place—luckily, the copy of the voucher I gave
them had a barrel # on it—so they looked there, not expecting to
find it, and there it was"). ................................... A-3348

PAGE

PX101—
Affirmation in Response of John F. Carroll, in response to
Newton's request for DNA testing on rape kit and victim's
clothing (dated Nov. 1, 1994)................................... A-3350

PX105—
OCME Property Clerk Log Book Page for rape kit
(dated Dec. 1988) (Bates No. 7154)............................. A-3354

PX134—
Response to Petitioner's Letter to Cease Destruction of Evidence
from ADA Robert Moore to Hon. Sharon Grubin, stating that the
Vitullo Rape Kit cannot be located after being sent to the
OCME's office for analysis (dated Apr. 13, 1997) ............... A-3355

PX169—
Documents concerning the police department's 2006-2007
review of requests for evidence by the IP in old cases
(dated Dec. 22, 2008) (Bates Nos. 6871 - 7013).................. A-3357

PX180—
Email from David Loftis and Vanessa Potkin to Sgt. McNeil
thanking him for his commitment to start fresh in reviewing and
undergoing an evidence search of the 19 cases attached to email
(dated Nov. 7, 2006) .......................................... A-3438

PX187—
Letter from Deputy Chief Jack Trabitz to David Loftis and
Vanessa Potkin, containing a detailed list of individual vouchers
identified in their search for evidence and its disposition
(dated Feb. 5, 2008) .......................................... A-3444

PX188—
Letter to Deputy Chief Trabitz from David Loftis and Vanessa
Potkin inquiring about the progress of the evidence searches for
clients Donald Strong and Clarence Byrdsong. Letter requests
documentation concerning the operating protocol for when items
were sent to court. Also, attached is a list with specific questions
pertaining to the missing evidence in each client's case
(dated May 22, 2008) .......................................... A-3450

PAGE

PX194—
Alan Newton's Associate Degree Diploma in Applied Science
received from Dutchess Community College on May 21, 1989..... A-3467

PX195—
Alan Newton's Bachelor Degree Diploma in Applied Science
received from Dutchess Community College in
June 2008 ................................................. A-3468

PX265—
Color Photograph of Alan Newton as a child with his two
brothers and two of his sisters ................................. A-3469

PX268—
Color Photograph of a young Alan Newton and his mother and
brothers and sisters .......................................... A-3470

PX275—
Black & White Photograph of Alan Newton with two of his
sisters on the day of his exoneration ........................... A-3471

PX277—
Black & White Photograph of Alan Newton with several family
members on the day of his exoneration......................... A-3472

PX279—
Color Photograph of Alan Newton with his former fiancé (1984),
Marva Weston ............................................... A-3473

PX288—
Color Photograph of Alan Newton with the President of Medgar
Evers College at Newton's graduation ceremony in 2008.......... A-3474

PX466—
Memorandum of Law filed by the People in *People v. Curry* ...... A-3475

PX467—
Stipulation & Order, dated September 26, 2010 (re: Results of
DNA Testing Performed on Rape Kit & Alan Newton). ........... A-3481

**Defendants' Trial Exhibits**

DXDD—
NYPD Property Clerk's Invoice # B744512 (victim's clothing).... A-3484

DXEE—
Reverse side of NYPD Property Clerk's Invoice # B413349 and
Property Clerk's Notice to Officer .............................. A-3485

DXFF—
NYPD Property Clerk's Invoice # B326875 ...................... A-3487

DXGG—
NYPD Property Clerk's Invoice # D538483 ...................... A-3488

DXHH—
Page from NYPD MISD Log reflecting storage numbers and
dates of destruction of items of property (N.Y. County) ........... A-3489

DXII—
NYPD Property Clerk's safe log reflecting storage numbers and
disposition dates of items of property (N.Y. County)............... A-3490

DXJJ—
Page from NYPD MISD Log reflecting storage numbers and
dates of destruction of items of property (N.Y. County) ........... A-3491

DXKK—
Letter from Assistant District Attorney Robert L. Moore to
Lt. LaBarbera, NYPD, dated April 23, 1997 ..................... A-3492

DXLL—
Letter from Assistant District Attorney Robert L. Moore to
Amy Maher, Esq., dated May 14, 1997 .......................... A-3494

DXMM—
Letter from Assistant District Attorney Robert L. Moore to
Thomas Doepfner, NYPD, dated May 14, 1997 ................... A-3496

PAGE

## **Court Trial Exhibits**

CT1—
Note, dated October 14, 2010, from Jury requesting definitions
of "access to the courts" and "due process." ...................... A-3497

CT2—
Note, dated October 14, 2010, from Jury advising of their
decision to recess till following Monday......................... A-3498

CT3—
Note, dated October 14, 2010, from Jury advising that they would
like the testimony of two witnesses (Geraldine Kiely & Stacy
Haskins) read back to them. ................................... A-3499

CT4—
Note, dated October 15, 2010, from Jury advising that they have
reached a liability verdict...................................... A-3500

CT5—
Jury's Liability Verdict Sheet (Phase I), dated October 18, 2010... A-3501

CT6—
Note, dated October 19, 2010, from Jury advising that they
have reached a damages verdict................................. A-3504

CT7—
Jury's Damages Verdict Sheet (Phase II),
dated October 19, 2010 ....................................... A-3505

Stipulation & Order, dated September 26, 2010 (re: Results of
DNA Testing Performed on Rape Kit & Alan Newton)............ A-3508

Judgment, dated November 2, 2010 ................................ A-3511

Notice of Motion, dated November 30, 2010 (re: Defendants' Fed. R.
Civ. P. 50 and 59 Motion for Entry of Judgment as a Matter of
Law and/or for a New Trial).................................... A-3512

PAGE

Declaration of Arthur G. Larkin, Esq., dated November 30, 2010 ...... A-3514

Exhibit A to Larkin Declaration—
Copy of Larkin letter to Court dated September 2, 2010........... A-3515

Exhibit B to Larkin Declaration—
Copy of Larkin letter to Court dated September 14, 2010.......... A-3521

Exhibit C to Larkin Declaration—
Excerpt from 2/26/08 Conference Transcript .................... A-3526

Declaration of John F. Schutty, Esq., dated December 14, 2010........ A-3529

Exhibit A to Schutty Declaration—
Letter of John F. Schutty, Esq. to the Hon. Shira Scheindlin
dated October 4, 2010........................................ A-3530

Exhibit B to Schutty Declaration—
Letter of John F. Schutty, Esq. to the Hon. Shira Scheindlin
dated October 20, 2010 ...................................... A-3532

Judgment, dated May 27, 2011.................................... A-3535

Notice of Appeal, dated June 23, 2011 ............................. A-3536

# A-1

CLOSED, APPEAL, CASREF, ECF

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:07-cv-06211-SAS**

Newton v. The City of New York et al                Date Filed: 07/03/2007
Assigned to: Judge Shira A. Scheindlin            Date Terminated: 11/02/2010
Referred to: Magistrate Judge Theodore H. Katz    Jury Demand: Both
(Settlement)                                       Nature of Suit: 440 Civil Rights: Other
Cause: 42:1983 Civil Rights Act                    Jurisdiction: Federal Question

**Plaintiff**

**Alan Newton**                      represented by   **John Francis Schutty , III**
                                                      Law Office of John F. Schutty
                                                      445 Park Avenue
                                                      9th Floor
                                                      New York, NY 10022
                                                      (212) 836-4796
                                                      Fax: (917) 322-2105
                                                      Email: john@johnschutty.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **David Thomas Goldberg**
                                                      Donahue & Goldberg, L.L.P.
                                                      99 Hudson Street
                                                      8th Floor
                                                      New York, NY 10013
                                                      (212) 334-8813
                                                      Fax: (212) 965-9084
                                                      Email: david@donahuegoldberg.com
                                                      *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The City of New York**              represented by   **Arthur Gabriel Larkin , III**
                                                      The New York City Law Department
                                                      100 Church Street
                                                      New York, NY 10007
                                                      (212)-788-1599
                                                      Fax: (212)-788-9776
                                                      Email: alarkin@law.nyc.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Maurice L Hudson**

# A-2

New York City Law Department
100 Church Street
New York, NY 10007
(212)-788-8684
Fax: (212)-788-9776
Email: mhudson@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meghan Ann Cavalieri**
NYC Law Department
100 Church Street Rm. 3-187
New York, NY 10007
(212) 788-6405
Fax: (212) 788-9776
Email: mcavalieri@lskdnylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fred Michael Weiler**
New York City Law Department
100 Church Street
New York, NY 10007
(212)-788-1817
Fax: (212)-788-9776
Email: fweiler@law.nyc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**D.A. Mario Merola**                    represented by   **Arthur Gabriel Larkin , III**
*individually*                                           (See above for address)
*TERMINATED: 05/13/2010*

                                                          **Fred Michael Weiler**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**D.A. Mario Merola**                    represented by   **Arthur Gabriel Larkin , III**
*and in their official capacity*                         (See above for address)
*TERMINATED: 05/13/2010*

                                                          **Fred Michael Weiler**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**D.A. Robert T. Johnson**               represented by   **Arthur Gabriel Larkin , III**
*individually*                                           (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

# A-3

Meghan Ann Cavalieri
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Fred Michael Weiler
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**District Attorney Robert T. Johnson**          represented by   Arthur Gabriel Larkin , III
*and in their official capacity*                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 Fred Michael Weiler
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**Andrea Freund**                                represented by   Arthur Gabriel Larkin , III
*individually*                                                   (See above for address)
*TERMINATED: 03/31/2009*                                         *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 Fred Michael Weiler
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**Andrea Freund**                                represented by   Arthur Gabriel Larkin , III
*in their official capacity*                                     (See above for address)
*TERMINATED: 03/31/2009*                                         *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 Fred Michael Weiler
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**Various John Does**
*individually*

**Defendant**

**Various John Does**
*in their official capacity as employees*
*of the N.Y.C. who are/were assistant*
*D.A.'s within the office of the D.A.,*
*County of Bronx*

# A-4

**Defendant**

**Various Jane Does**
*individually*

**Defendant**

**Various Jane Does**
*in their official capacity as employees
of NYC who are/were assistant district
attorneys within the office of the D.A,
County of Bronx*

**Defendant**

**Detective Joanne Newbert**                    represented by **Arthur Gabriel Larkin , III**
                                                (See above for address)
                                                *LEAD ATTORNEY
                                                ATTORNEY TO BE NOTICED*

                                                **Meghan Ann Cavalieri**
                                                (See above for address)
                                                *LEAD ATTORNEY
                                                ATTORNEY TO BE NOTICED*

                                                **Fred Michael Weiler**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Detective Phillip Galligan**                  represented by **Fred Michael Weiler**
*TERMINATED: 05/13/2010*                         (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Detective (John Doe) Hartfield**              represented by **Fred Michael Weiler**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Detective Bernard Ryan**                      represented by **Arthur Gabriel Larkin , III**
                                                (See above for address)
                                                *LEAD ATTORNEY
                                                ATTORNEY TO BE NOTICED*

                                                **Meghan Ann Cavalieri**
                                                (See above for address)
                                                *LEAD ATTORNEY
                                                ATTORNEY TO BE NOTICED*

                                                **Fred Michael Weiler**
                                                (See above for address)

# A-5

*ATTORNEY TO BE NOTICED*

**Defendant**

**Detective Roland Harris**                represented by   **Arthur Gabriel Larkin , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meghan Ann Cavalieri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fred Michael Weiler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer Douglas Leho**            represented by   **Arthur Gabriel Larkin , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meghan Ann Cavalieri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fred Michael Weiler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer William Sean O'Toole**    represented by   **Arthur Gabriel Larkin , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meghan Ann Cavalieri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fred Michael Weiler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lt. Michael Sheehan**                    represented by   **Arthur Gabriel Larkin , III**
(See above for address)

# A-6

> *LEAD ATTORNEY*
> *ATTORNEY TO BE NOTICED*
>
> **Meghan Ann Cavalieri**
> (See above for address)
> *LEAD ATTORNEY*
> *ATTORNEY TO BE NOTICED*
>
> **Fred Michael Weiler**
> (See above for address)
> *ATTORNEY TO BE NOTICED*

**Defendant**

**Sergeant Patrick J. McGuire**                    represented by **Arthur Gabriel Larkin , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fred Michael Weiler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Officer Tracy Haskins**                   represented by **Arthur Gabriel Larkin , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meghan Ann Cavalieri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fred Michael Weiler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Geraldine Kiely**                                represented by **Arthur Gabriel Larkin , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meghan Ann Cavalieri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fred Michael Weiler**
(See above for address)

# A-7

*ATTORNEY TO BE NOTICED*

**Defendant**

**Deputy Chief Jack J. Trabitz**                represented by   **Arthur Gabriel Larkin , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fred Michael Weiler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Various John Does**
*individually*

**Defendant**

**Various Jane Does**
*individually*

**Defendant**

**Various Jane Does**
*individually*

**Defendant**

**Various John Does**
*in their official capacity as employees of
the City of NY who are/were members
of the Police Department of the City of
NY*

**Defendant**

**Various Jane Does**
*in their official capacity as employees of
the City of NY who are/were members
of the Police Department of the City of
NY*

**Defendant**

**Stacey Edelbaum**

**Defendant**

**John F. Carroll**

**Defendant**

**Robert L. Moore**

**Defendant**

**Rafael Curbelo**

# A-8

**Defendant**

**Patrick Buffalino**

**Defendant**

**Various John/Jane Does**
*Individually and in their official capacities as employees of the City of New York and Members of the Office of the Chief Medical Examiner*

**Defendant**

**Deputy Inspector John P. Higgins**

**Defendant**

**Deputy Inspector Bruce J. Major**

**Defendant**

**Captain Donald Hackson**
*TERMINATED: 05/13/2010*

**Defendant**

**Captain Jerome Nathanson**

**Defendant**

**Sergeant George Kuttler**

**Defendant**

**Sergeant Bruce Kessler**

**Defendant**

**Sergeant Adrian Merrick**

**Defendant**

**Sergeant Colleen Dundas**

**Defendant**

**Sergeant Patricia Brandow**

**Defendant**

**Lieutenant Walter Smith**

**Defendant**

**Lieutenant Patrick McKeon**

**Defendant**

**Lieutenant Anthony Russo**

**Defendant**

# A-9

**Lieutenant David Deangelis**

**All Defendants**

**Ms. Patricia Ryan**
106-20 Shore Front Parkway
Apt. 2C
Rockaway Park, NY 11694

| Date Filed | # | Docket Text |
|---|---|---|
| 07/03/2007 | 1 | COMPLAINT against Andrea Freund(in their official capacity), Various John Does(individually), Various John Does(in their official capacity as employees of the N.Y.C. who are/were assistant D.A.'s within the office of the D.A., County of Bronx), Various Jane Does(individually), Various Jane Does(in their official capacity as employees of NYC who are/were assistant district attorneys within the office of the D.A, County of Bronx), Joanne Newbert, Phillip Galligan, (John Doe) Hartfield, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (John Doe) Haskins, (Jane Doe) Kiely, Jack Trabitz, Various John Does(in their official capacity as employess of the City of NY who are/were members of the Police Department of the City of NY), Various Jane Does(in their official capacity as employess of the City of NY who are/were members of the Police Department of the City of NY), The City of New York, Mario Merola(individually), Mario Merola(and in their official capacity), Robert T. Johnson, Robert T. Johnson, Andrea Freund(individually). (Filing Fee $ 350.00, Receipt Number 619840)Document filed by Alan Newton.(laq) Additional attachment(s) added on 7/10/2007 (tro) (Entered: 07/09/2007) |
| 07/03/2007 | | SUMMONS ISSUED as to Andrea Freund(in their official capacity), Various John Does(individually), Various John Does(in their official capacity as employees of the N.Y.C. who are/were assistant D.A.'s within the office of the D.A., County of Bronx), Various Jane Does(individually), Various Jane Does(in their official capacity as employees of NYC who are/were assistant district attorneys within the office of the D.A, County of Bronx), Joanne Newbert, Phillip Galligan, (John Doe) Hartfield, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (John Doe) Haskins, (Jane Doe) Kiely, Jack Trabitz, Various John Does(in their official capacity as employess of the City of NY who are/were members of the Police Department of the City of NY), Various Jane Does(in their official capacity as employess of the City of NY who are/were members of the Police Department of the City of NY), The City of New York, Mario Merola(individually), Mario Merola(and in their official capacity), Robert T. Johnson, Robert T. Johnson, Andrea Freund (individually). (laq) (Entered: 07/09/2007) |
| 07/03/2007 | | Magistrate Judge Henry B. Pitman is so designated. (laq) (Entered: 07/09/2007) |
| 07/03/2007 | | Case Designated ECF. (laq) (Entered: 07/09/2007) |
| 07/31/2007 | 2 | NOTICE OF APPEARANCE by Arthur Gabriel Larkin, III on behalf of The |

## A-10

| | | |
|---|---|---|
| | | City of New York (Larkin, Arthur) (Entered: 07/31/2007) |
| 08/01/2007 | 3 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Arthur G. Larkin dated 7/31/07 re: dfts request that their time to answer, move or otherwise respond to the complant be extended to 9/30/07. ENDORSEMENT: Dft's request is granted Dfts time to answer, move or otherwise respond to the complaint is extended to 9/30/07. This extension will not affect the scheduling of the initial conference. So Ordered. (Signed by Judge Shira A. Scheindlin on 8/1/07) (pl) (Entered: 08/02/2007) |
| 09/28/2007 | 4 | ANSWER to Complaint with JURY DEMAND. Document filed by Andrea Freund(in their official capacity), Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson, Andrea Freund(individually).(Larkin, Arthur) (Entered: 09/28/2007) |
| 10/24/2007 | 5 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from John Schutty dated 10/23/07 re: counsel for plaintiff requests that Your Honor adjourn the preliminary conference scheduled for noon tomorrow. ENDORSEMENT: The party's request to adjourn the preliminary conference is hereby granted. The conference is rescheduled for 4:30 p.m. on November 7, 2007. So Ordered. (Signed by Judge Shira A. Scheindlin on 10/23/07) (dle) (Entered: 10/24/2007) |
| 11/07/2007 | 6 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. The City of New York served on 7/10/2007, answer due 7/30/2007. Service was accepted by Madelyn Santana, Legal Clerk, Office of Corporation Counsel. Document filed by Alan Newton. (Schutty, John) (Entered: 11/07/2007) |
| 11/08/2007 | 7 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Settlement. Referred to Magistrate Judge Henry B. Pitman. (Signed by Judge Shira A. Scheindlin on 11/7/2007) (jar) (Entered: 11/08/2007) |
| 11/08/2007 | 8 | SCHEDULING ORDER: Fact Discovery due by 6/30/2008. All Expert Discovery due by 9/30/2008. Depositions of defendants and non-parties will take place starting on 1/15/2008. The parties plan to exchange preliminary written requests for production of documents and things within the next twenty days (by 11/27/2007) and provide responses by 1/15/2008. Plaintiff will provide his expert witness reports by 7/30/2008 and Defendants will provide their expert witness reports by 8/30/2008. Plaintiff's expert witnesses will be deposed by 9/15/2008 and the Defendants' expert witnesses will be deposed by 9/30/2008. All Pretrial Order matters dates to be scheduled. Final Pretrial Conference set for 10/14/2008 at 04:30 PM before Judge Shira A. Scheindlin. (Signed by Judge Shira A. Scheindlin on 11/7/2007) (jar) (Entered: 11/08/2007) |
| 11/08/2007 | 9 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. Service was accepted by Madelyn Santana, Legal Clerk, Office of Corporation Counsel. Document filed by Alan Newton. (Schutty, John) (Entered: 11/08/2007) |
| 11/08/2007 | 10 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. Robert T. |

## A-11

| | | Johnson served on 7/9/2007, answer due 7/30/2007. Service was accepted by Latoya Williams, Co-Worker. Document filed by Alan Newton. (Schutty, John) (Entered: 11/08/2007) |
|---|---|---|
| 11/08/2007 | 11 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. Andrea Freund (individually) served on 7/9/2007, answer due 7/30/2007. Service was accepted by Pepra Parreno, Co-Worker. Document filed by Alan Newton. (Schutty, John) (Entered: 11/08/2007) |
| 11/08/2007 | 12 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. Michael Sheehan served on 9/17/2007, answer due 10/8/2007. Service was accepted by Jonathan David, Co-Worker. Document filed by Alan Newton. (Schutty, John) (Entered: 11/08/2007) |
| 11/08/2007 | 13 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. Jack Trabitz served on 7/10/2007, answer due 7/30/2007. Service was accepted by Ms. Kirksey, Co-Worker. Document filed by Alan Newton. (Schutty, John) (Entered: 11/08/2007) |
| 11/08/2007 | 14 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. (John Doe) Ryan served on 10/2/2007, answer due 10/22/2007. Service was accepted by Rebecca Chasen, Co-Worker. Document filed by Alan Newton. (Schutty, John) (Entered: 11/08/2007) |
| 11/08/2007 | 15 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. William Sean O'Toole served on 9/14/2007, answer due 10/4/2007. Service was accepted by P.O. Mejia (#627), Co-Worker. Document filed by Alan Newton. (Schutty, John) (Entered: 11/08/2007) |
| 11/08/2007 | 16 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. (John Doe) Harris served on 9/24/2007, answer due 10/15/2007. Service was accepted by Officer Martinez (#8318), Co-Worker. Document filed by Alan Newton. (Schutty, John) (Entered: 11/08/2007) |
| 11/08/2007 | 17 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. Patrick J. McGuire served on 9/17/2007, answer due 10/8/2007. Service was accepted by Jonathan David, Co-Worker. Document filed by Alan Newton. (Schutty, John) (Entered: 11/08/2007) |
| 11/08/2007 | 18 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,. (Jane Doe) Kiely served on 9/27/2007, answer due 10/17/2007. Service was accepted by Paa Gill, Co-Worker. Document filed by Alan Newton. (Schutty, John) (Entered: 11/08/2007) |
| 03/07/2008 | 19 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Arthur G. Larkin dated 3/7/08 re: Request for an extension of time until 3/12/08 to file a Proposed Protective Order. ENDORSEMENT: Request Granted. A Proposed Protective Order must be submitted by 3/12/08. SO ORDERED. (Signed by Judge Shira A. Scheindlin on 3/7/08) (db) (Entered: 03/07/2008) |
| 03/14/2008 | 20 | PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material.... (Signed by Judge Shira A. Scheindlin on 3/13/08) (cd) (Entered: 03/14/2008) |

# A-12

| | | |
|---|---|---|
| 03/14/2008 | 21 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Arthur Larkin dated 3/12/08 re: Concerning the protective order in this matter. ENDORSEMENT: The plaintiff's additions to the protective order regarding the confidentiality of personnel files is acceptable to the court and is hereby "so ordered". However the rape shield law continues to protect the identities of the rape victim. (Signed by Judge Shira A. Scheindlin on 3/13/08) (cd) (Entered: 03/17/2008) |
| 03/18/2008 | 22 | TRANSCRIPT of proceedings held on 2/26/2008 before Judge Shira A. Scheindlin. (ama) (Entered: 03/18/2008) |
| 04/22/2008 | 23 | NOTICE OF REASSIGNMENT OF A REFERRAL TO ANOTHER MAGISTRATE JUDGE. The referral in the above entitled action has been reassigned to Magistrate Judge Debra C. Freeman, for settlement. Magistrate Judge Henry B. Pitman no longer referred to the case. (mbe) (Entered: 05/02/2008) |
| 05/02/2008 | 24 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Discovery and Settlement. Referred to Magistrate Judge Debra C. Freeman. (Signed by Judge Shira A. Scheindlin on 5/2/2008) (jpo) (Entered: 05/05/2008) |
| 05/13/2008 | 25 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Arthur G. Larkin dated 5/13/08 re: Defendants request that the filing deadline for their Motion to Dismiss be extended to 5/23/08; response to 6/6/08; reply to 6/17/08. ENDORSEMENT: Request granted, but NO further adjournments. Motion to be made no later than 5/23/08, response by 6/6/08 and reply by 6/17/08. SO ORDERED. (Motions due by 5/23/2008. Responses due by 6/6/2008, Replies due by 6/17/2008.) (Signed by Judge Shira A. Scheindlin on 5/13/08) (db) (Entered: 05/13/2008) |
| 05/23/2008 | 26 | MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*. Document filed by Andrea Freund(in their official capacity), Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson, Andrea Freund (individually). Responses due by 6/6/2008(Larkin, Arthur) (Entered: 05/23/2008) |
| 05/23/2008 | 27 | MEMORANDUM OF LAW in Support re: 26 MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*. MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*.. Document filed by Andrea Freund(in their official capacity), Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson, Andrea Freund(individually). (Larkin, Arthur) (Entered: 05/23/2008) |
| 05/23/2008 | 28 | DECLARATION of Arthur G. Larkin, Esq. in Support re: 26 MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*. MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*.. Document filed by Andrea Freund(in |

# A-13

| | | |
|---|---|---|
| | | their official capacity), Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson, Andrea Freund(individually). (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibits C, D, E, F, # 4 Exhibits G, H, # 5 Exhibits I, J, # 6 Exhibits K, L, # 7 Exhibits M, N, O, P, Q, # 8 Exhibits R, S, T, U)(Larkin, Arthur) (Entered: 05/23/2008) |
| 06/06/2008 | 29 | MEMORANDUM OF LAW in Opposition re: 26 MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*. MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*.. Document filed by Alan Newton. (Schutty, John) (Entered: 06/06/2008) |
| 06/12/2008 | | Minute Entry for proceedings held before Magistrate Judge Debra C. Freeman: Status Conference held on 6/12/2008. In person conf. re: discovery disputes-6/16@ 11:00. (js) (Entered: 07/09/2008) |
| 06/12/2008 | | Set Deadlines/Hearings: Telephone Conference set for 6/16/2008 at 11:00 AM before Magistrate Judge Debra C. Freeman. (js) (Entered: 07/09/2008) |
| 06/16/2008 | | Minute Entry for proceedings held before Magistrate Judge Debra C. Freeman: Status Conference held on 6/16/2008. discovery disputes Judge made some rulings from the bench. Pltf. to submit letter briefs for requests 26 & 45 (and Sok municipal law issues if Pltf. wants) by end of day June 19th, Deft. to respond by end of June 24th & Pltf to reply, if at all, by end of June 25th. (js) (Entered: 07/09/2008) |
| 06/17/2008 | 30 | REPLY MEMORANDUM OF LAW in Support re: 26 MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*. MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*.. Document filed by Andrea Freund(in their official capacity), Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson, Andrea Freund(individually). (Larkin, Arthur) (Entered: 06/17/2008) |
| 07/07/2008 | 31 | ENDORSED LETTER addressed to Magistrate Judge Debra C. Freeman from John F. Schutty dated 6/18/2008 re: Counsel for Plaintiff writes inform the Court that Plaintiff seeks an order compelling defendants to respond to plaintiff's document requests and to respond to the requests without objection, advise whether any documents exist that are responsive to the request and, if so, produce the documents. ENDORSEMENT: The Court having reviewed the within letter, as well as defendants' response dated 6/24/2008 and plaintiff's replies dated 6/25/2007 and 7/3/2008, it is hereby Ordered as follows: (1) Defendants are directed to respond to plaintiff's document request NO. 26 within the time dictated by the Federal Rules. If defendants claim that any document is protected from disclosure based on the deliberative process privilege, such document shall be duly listed on a privilege log, and described with enough speciality to enable plaintiff to raise a challenge to the claim of privilege. (2) Defendants are also directed to respond to plaintiffs document request NO. 45, as the documents requested are plainly related to plaintiff's claims in this action (see e.g. plaintiff's third cause of action, at 148(f)(g)) and |

# A-14

| | | |
|---|---|---|
| | | are discoverable pursuant to Fed.R.Civ.P. 26(b)(1). While defendants asset that any claim based on an alleged failure to test evidence cannot be sustained, this is properly a challenge to the merits of plaintiffs claims, not to the discoverability of the requested documents. SO ORDERED. (Signed by Magistrate Judge Debra C. Freeman on 7/7/2008) (tve) (Entered: 07/07/2008) |
| 07/16/2008 | 32 | OPINION AND ORDER #96243: For the foregoing reasons, plaintiff's claims for failure to investigate and abuse of process and his claims under the New York State Constitution are dismissed. The motion to dismiss the remaining counts is denied. A conference is scheduled for July 31, 2008 at 4:30 p.m. (Signed by Judge Shira A. Scheindlin on 7/16/2008) Copies Mailed By Chambers.(jpo) (Entered: 07/16/2008) |
| 07/21/2008 | 33 | ENDORSED LETTER addressed to Arthur G. Larkin from John F. Schutty dated 7/1/08 Counsel writes regarding information that was to be produced. ENDORSEMENT: Counsel for defendants is directed to confer in good faith with counsel for plaintiff on all outstanding issues and to submit to the court, no later than 7/24/08 a jointly-proposed schedule for the production of all information and documents that the court has already ordered defendants to produce. Counsel shall jointly initiate a telephone conference with the court on 7/29/08 at 3:00 p.m. (Telephone Conference set for 7/29/2008 at 03:00 PM before Magistrate Judge Debra C. Freeman.) (Signed by Magistrate Judge Debra C. Freeman on 7/21/08) (mme) (Entered: 07/21/2008) |
| 07/25/2008 | 34 | ENDORSED LETTER addressed to Magistrate Judge Debra Freeman from Arthur G. Larkin dated 7/24/2008 re: Counsel writes in accordance with Your Honor's most recent memo endorsement, in order to report that counsel's have conferred in good faith with plaintiff's counsel and have agreed upon the scheduled set forth within. ENDORSEMENT: The within scheduled is adopted. So ordered. (Signed by Magistrate Judge Debra C. Freeman on 7/25/2008) (jfe) (Entered: 07/25/2008) |
| 07/29/2008 | | MEMORANDUM TO THE DOCKET CLERK: Pretrial discovery status telephone conference held. Follow-up T/C re: Discovery status 8/19 at 11:00 a.m. (djc) (Entered: 08/04/2008) |
| 08/05/2008 | 35 | TRANSCRIPT of proceedings held on 5/02/08 before Judge Shira A. Scheindlin. (ama) (Entered: 08/05/2008) |
| 08/15/2008 | 36 | ENDORSED LETTER addressed to Magistrate Judge Debra Freeman from Arthur Larkin dated 8/14/08 re: Request to adjourn the telephone conference set for 8/19, at 11:00 am and to respond to plaintiff's third request for documents etc. ENDORSEMENT: The parties are directed to contact my chambers to set a new conference date. The requested extension for the production of documents referred to herein is granted--no further extensions. (Signed by Magistrate Judge Debra C. Freeman on 8/15/08) (cd) (Entered: 08/15/2008) |
| 09/11/2008 | 37 | ORDER: According to the Court's oral rulings on 9/4/08, Defendants shall respond to, produce and (directed to) provide materials listed as items 1-9, on the dates provided in said Order. Defendants may reopen plaintiffs deposition on a date to be agreed upon by the parties. The parties may agree in writing |

## A-15

| | | |
|---|---|---|
| | | (with a copy provided to the Court) to modify any of the dates contained in this Order, without need for prior Court approval. (Signed by Magistrate Judge Debra C. Freeman on 9/11/08) Copies Mailed by Chambers.(db) (Entered: 09/11/2008) |
| 10/29/2008 | | Minute Entry for proceedings held before Magistrate Judge Debra C. Freeman: Telephone Conference held on 10/29/2008 re: discovery disputes. Judge made Oral Rulings on 30(b)(6) witnesses (11 separate issues)30(b)(6) depositions shall be conducted during November. (tro) (Entered: 10/31/2008) |
| 11/05/2008 | 41 | TRANSCRIPT of proceedings held on 7/31/08 4:10 p.m. before Judge Shira A. Scheindlin. (bw) (Entered: 12/16/2008) |
| 11/14/2008 | 38 | ENDORSED LETTER addressed to Magistrate Judge Debra C. Freeman from John F. Schutry dated 11/14/08. re: Accordingly, we seek a conference with Your Honor and/or leave to file a motion to compel (and seek sanctions) against The City and the DA's Office for their failure to produce documents and information in disregard of this Court's Orders and failure to respond in a timely manner to Plaintiff's Rule 30(b)(6) deposition notices and Fourth Request for Production of Documents (both dated September 21,2008) ENDORSEMENT: Plaintiff is directed to submit a list to the Court of each of the Court's specific directives that allegedly have not been complied with by Defendants. List to be submitted by 11/17/08, response by Defendants by 11/18/08. So Ordered. ( Responses due by 11/18/2008) (Signed by Magistrate Judge Debra C. Freeman on 11/14/08) (js) (Entered: 11/17/2008) |
| 11/20/2008 | 39 | ENDORSED LETTER addressed to Magistrate Judge Debra C. Freeman from John F. Schutty dated 11/17/08 re: Counsel for Plaintiff Alan Newton write in response to an Endorsed Order of this Court dated 11/14/08. 1) The Defendants have failed to Comply with Your Honor's Sept. 11, 2008 Order. 2) The City & the DA"s Office have yet to identify and Offer Rule 30(b)(6) Witnesses. 3) The City has not yet responded to Plaintiff's Fourth Request for Production. ENDORSEMENT: Having reviewed the parties' submissions, the Court is persuaded that Defendants have failed to comply fully with the Court's Discovery Order of 9/11/08. Plaintiff may move for Rule 37(b) sanctions, setting out the specific sanctions he believes would be appropriate, with authority for his position. Plaintiff is cautioned, however, that no sanction will be imposed for Defendants' non-disclosure of any documents or information that fails outside the time frame limits or other parameters set in the Court's 9/11/08 Order. The Court fully expects that Defendants will make Rule 30(b)(6) witnesses available for deposition within the next two weeks. Defendants' request for leave to serve responses to Plaintiff's 4th Request for Production of Documents no later than Dec. 6, 2008, is granted. (Signed by Magistrate Judge Debra C. Freeman on 11/20/08) (tro) (Entered: 11/21/2008) |
| 12/08/2008 | 40 | SCHEDULING ORDER: The date of the conference and the appearance for the parties; 12/8/08. All Depositions (Fact) to be completed by 2/28/09. Dates by which (i) expert's reports will be supplied to the adverse side and (ii) each expert's deposition will be completed; (i) 4/15/09, with Rebuttal Expert Reports, if any, by 5/1/09. (ii) Expert Depositions by 5/21/09. The parties will submit a pretrial order together with trial briefs and either (1) proposed findings of fact and conclusions of law for a non-jury trial, or (2) proposed |

## A-16

| | | voir dire questions and proposed jury instructions, for a jury trial due by 6/15/09. Final Pretrial Conference set for 3/6/2009 at 04:30 PM before Judge Shira A. Scheindlin. A Statement of any limitation to be placed on discovery, including any protective or confidentiality orders; (See Protective Order previously entered). Magistrate Judge Debra Freeman is currently supervising the remaining discovery issues. Anticipated length of trial is 4-5 weeks. (Signed by Judge Shira A. Scheindlin on 12/8/08) (tro) (Entered: 12/09/2008) |
|---|---|---|
| 01/14/2009 | 42 | NOTICE OF APPEARANCE by Fred Michael Weiler on behalf of Andrea Freund(in their official capacity), Joanne Newbert, Phillip Galligan, (John Doe) Hartfield, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (John Doe) Haskins, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Mario Merola (individually), Mario Merola(and in their official capacity), Robert T. Johnson, Robert T. Johnson, Andrea Freund(individually) (Weiler, Fred) (Entered: 01/14/2009) |
| 01/21/2009 | 43 | ORDER: A seemingly minor dispute between the parties regarding the length and scheduling of previously-noticed Rule 30(b)(6) depositions (which have already been the subject of rulings by this Court) has now spawned several letters from counsel, of ever-increasing volume. The most recent submission, a letter from Plaintiffs counsel dated January 20, 2009, is 16 pages long, in a small-font and single-spaced. At this point, the Court will not accept any more letters from counsel on any outstanding discovery disputes. Rather, the Court will expect both counsel to appear for an in-person conference before the Court tomorrow, January 22, 2009, at 2:00 p.m. The conference will be held in Courtroom 17A. All other provisions as set forth in this order. (Signed by Magistrate Judge Debra C. Freeman on 1/21/09) (js) (Entered: 01/21/2009) |
| 01/26/2009 | 44 | TRANSCRIPT of proceedings held on December 7, 2008 before Judge Shira A. Scheindlin. (mro) (Entered: 01/30/2009) |
| 02/04/2009 | 45 | ORDER: It is hereby ordered that, following a discovery conference on January 22, 2009, depositions shall proceed according to following schedule as set forth herein. ENDORSEMENT: Except that the Court expects counsel to work cooperatively and in good faith to resolve any minor disputes regarding the derivative of any of these depositions. In other words, if a deposition limited above to 3 hours can be completed in 3 hours and 10 minutes, the Court does not expect counsel to have to return to the Court to argue about 10 minutes. Counsel should be able to work this out. (Signed by Magistrate Judge Debra C. Freeman on 2/3/2009) (jpo) Modified on 3/1/2009 (jpo). (Entered: 02/04/2009) |
| 02/27/2009 | 46 | ORDER re the Court having received a series of letters from counsel (dated 2/13,20,22,24,and 27/09) raising a number of discovery disputes. To the extent these disputes have not already been mooted by the actions of the parties or prior rulings by the Court, they are resolved as further set forth in this document......except for any matter specifically set forth herein, fact discovery in this case is closed. (Signed by Magistrate Judge Debra C. Freeman on 2/27/09) Copies sent by chambers(cd) (Entered: 03/02/2009) |
| 03/31/2009 | 47 | ORDER: On March 25,2009, John F. Schutty, counsel for plaintiff Alan |

## A-17

| | | |
|---|---|---|
| | | Newton, sent a letter to the court stating that "Plaintiff is, this date, agreeing to discontinue both the federal and state claims asserted against [defendant Andrea] Freund. Plaintiffs claims against Freund are therefore dismissed with prejudice. SO ORDERED. (Signed by Judge Shira A. Scheindlin on 3/30/2009) (tve) (Entered: 03/31/2009) |
| 03/31/2009 | 54 | TRANSCRIPT of proceedings held on 3/11/09 before Judge Shira A. Scheindlin. (tro) (Entered: 04/16/2009) |
| 04/01/2009 | 48 | ORDER: (1) No later than one week from the date of this Order, Defendants are directed to produce a sworn affidavit or declaration under penalty of perjury from Sgt. O'Connor, stating (a) exactly when and where he found the previously-missing yellow invoice, No. B744483, and any other original invoices or related documents regarding Plaintiff's case; (b) how he knew to look in the location where these documents were found; and (c) if he knows of any reason why this location may not have been searched (or why the documents could not be found) between 1989 and 2009. Within two days from the date of this Order, Plaintiff is directed to submit to the Court, for in camera review, (a) the memorandum from which Plaintiffs counsel read aloud during Mr. Gonzalez's deposition, and (b) any other documents that purport to memorialize or summarize what was said by Mr. Gonzalez during counsel's prior meeting/interview with him. SO ORDERED. (Signed by Magistrate Judge Debra C. Freeman on 4/1/2009) Copies Mailed By Chambers. (tve) Modified on 4/1/2009 (tve). (Entered: 04/01/2009) |
| 04/09/2009 | 49 | MOTION for Partial Summary Judgment. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, The City of New York. Responses due by 4/23/2009(Larkin, Arthur) (Entered: 04/09/2009) |
| 04/09/2009 | 50 | DECLARATION of Arthur G. Larkin in Support re: 49 MOTION for Partial Summary Judgment.. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, The City of New York. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit)(Larkin, Arthur) (Entered: 04/09/2009) |
| 04/09/2009 | 51 | RULE 56.1 STATEMENT. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, The City of New York. (Larkin, Arthur) (Entered: 04/09/2009) |
| 04/09/2009 | 52 | MEMORANDUM OF LAW in Support re: 49 MOTION for Partial Summary Judgment.. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, The City of New York. (Larkin, Arthur) (Entered: 04/09/2009) |
| 04/10/2009 | 53 | ORDER: that the memorandum shall be produced in redacted form to protect against the disclosure of such core work product. Moreover, to the extent the document, which was apparently sent to Plaintiff by e-mail, contains counsels legal advice to Plaintiff, such advice should also be redacted, to protect |

# A-18

| | | |
|---|---|---|
| | | against disclosure of privileged communications. Also before the Court is a request by Plaintiff that Defendant be compelled (1) to produce a copy of defendant Trabitzs file regarding Plaintiffs claim sufficiently in advance of defendant Trabitzs continued deposition date to enable adequate deposition preparation by Plaintiffs counsel, (2) to produce the original of this file for inspection at the deposition, and (3) to compel Defendants to produce a copy of the report that Sergeant O'Connor prepared regarding his investigation into Plaintiffs claim. The first two of these requests are granted. If defendant Trabitz's file has not already been produced, Defendants are directed to provide it to Plaintiffs counsel at least two business days before the rescheduled deposition, and Defendants are also directed to produce the original file at the deposition. As for Plaintiffs third request, unless the Court hears an objection from Defendants by the close of business on April l3, 2009, Defendants shall produce Sergeant O'Connor's report to Plaintiff no later than April 15, 2009. SO ORDERED. (Signed by Magistrate Judge Debra C. Freeman on 4/10/2009) Copies Sent By Chambers.(tve) (Entered: 04/10/2009) |
| 04/16/2009 | 55 | DECLARATION of Arthur G. Larkin in Support re: 49 MOTION for Partial Summary Judgment.. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, The City of New York. (Attachments: # 1 Exhibit A - Grand Jury Minutes (certified copy), # 2 Exhibit B - VJ Wade hearing testimony excerpts, # 3 Exhibit C - VJ trial testimony excerpts, # 4 Exhibit D - Gonzalez Wade hearing testimony excerpts, # 5 Exhibit E - Gonzalez trial testimony excerpts, # 6 Exhibit F - Leho trial testimony excerpt, # 7 Exhibit G - Dr. Charles trial testimony excerpt, # 8 Exhibit H - police reports, # 9 Newbert Wade hearing testimony excerpts, # 10 Exhibit J - Newbert trial testimony excerpts, # 11 Exhibit K - Newbert deposition excerpts, # 12 Exhibit L - Gonzalez deposition excerpts, # 13 Exhibit M - Decision on Wade motion, # 14 Exhibit N - Indictment, # 15 Exhibit O - Galligan trial testimony excerpts, # 16 Exhibit P - Newton Wade hearing testimony excerpts, # 17 Exhibit Q - Galligan Wade hearing testimony excerpt, # 18 Exhibit R - intentionally omitted, # 19 Exhibit S - intentionally omitted, # 20 Exhibit T - Freund deposition excerpt, # 21 Exhibit U - Minutes of Arraignment, # 22 Exhibit V - Trial excerpt (619-22))(Larkin, Arthur) (Entered: 04/16/2009) |
| 04/20/2009 | 56 | AMENDED ANSWER to 1 Complaint,,,, with JURY DEMAND. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (John Doe) Haskins, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson. (Larkin, Arthur) (Entered: 04/20/2009) |
| 04/23/2009 | 57 | RESPONSE in Opposition re: 49 MOTION for Partial Summary Judgment. *Plaintiff's Rule 56.1 Statement in Opposition to the Defendants' Motion for Summary Judgment..* Document filed by Alan Newton. (Schutty, John) (Entered: 04/23/2009) |
| 04/23/2009 | 58 | DECLARATION of Schutty in Opposition re: 49 MOTION for Partial Summary Judgment.. Document filed by Alan Newton. (Attachments: # 1 Exhibit A, Part I, Excerpts frrom Wade Hearing & Criminal Trial (0- 299), # |

# A-19

|  |  |  |
|---|---|---|
|  |  | 2 Exhibit A, Part II, Excerpts frrom Wade Hearing & Criminal Trial (235-521), # 3 Exhibit A, Part III, Excerpts frrom Wade Hearing & Criminal Trial (522-950), # 4 Exhibit Exhibits "B," "C" & "D", # 5 Exhibit Exhibits "E" & "F", # 6 Exhibit Exhibits "G" & "H", # 7 Exhibit Exhibits "I," "J," "K," "L," "M," "N" & "O")(Schutty, John) (Entered: 04/23/2009) |
| 04/23/2009 | 59 | DECLARATION of Newton in Opposition re: 49 MOTION for Partial Summary Judgment.. Document filed by Alan Newton. (Schutty, John) (Entered: 04/23/2009) |
| 04/23/2009 | 60 | DECLARATION of Streed in Opposition re: 49 MOTION for Partial Summary Judgment.. Document filed by Alan Newton. (Schutty, John) (Entered: 04/23/2009) |
| 04/23/2009 | 61 | MEMORANDUM OF LAW in Opposition re: 49 MOTION for Partial Summary Judgment.. Document filed by Alan Newton. (Schutty, John) (Entered: 04/23/2009) |
| 04/28/2009 | 62 | DECLARATION of Schutty in Opposition re: 49 MOTION for Partial Summary Judgment.. Document filed by Alan Newton. (Attachments: # 1 Exhibit Exhibit A, Excerpts from Criminal Court Transcripts, Part 1 (pp. 18-229), # 2 Exhibit Exhibit A, Excerpts from Criminal Court Transcripts, Part II (pp. 235-521), # 3 Exhibit Exhibit A, Excerpts from Criminal Court Transcripts, Part III (pp. 554-950), # 4 Exhibit Exhibits B, C & D, # 5 Exhibit Exhibits E & F, # 6 Exhibit Exhibits G & F, # 7 Exhibit Exhibits I, J, K, L, M, N & O)(Schutty, John) (Entered: 04/28/2009) |
| 05/11/2009 | 63 | DECLARATION of Arthur G. Larkin in Support re: 49 MOTION for Partial Summary Judgment.. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, The City of New York. (Attachments: # 1 Exhibit W - J. Newbert deposition excerpts, # 2 Exhibit X - A. Freund deposition excerpts, # 3 Exhibit Y - Criminal proceedings (excerpts), # 4 Exhibit Z - Plaintiff letter to court (excerpt), # 5 Exhibit AA - A. Gonzalez deposition excerpts, # 6 Exhibit BB - Lt. King deposition excerpt, # 7 Exhibit CC - M. Gonzalez deposition excerpt, # 8 Exhibit DD - Plaintiff appeal brief (excerpt), # 9 Exhibit EE - Rule 30(b)(6) notice (excerpted), # 10 Exhibit FF - R. Harris deposition excerpt, # 11 Exhibit GG - Letter to plaintiff's counsel 3/6/09, # 12 Exhibit HH - NYPD memo re document search, # 13 Exhibit II - Letter to Plaintiff's counsel 2/11/09)(Larkin, Arthur) (Entered: 05/11/2009) |
| 05/11/2009 | 64 | REPLY MEMORANDUM OF LAW in Support re: 49 MOTION for Partial Summary Judgment.. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, The City of New York. (Larkin, Arthur) (Entered: 05/11/2009) |
| 05/20/2009 | 65 | ENDORSED LETTER addressed to Magistrate Judge Debra C. Freeman from Dennis J. Lamb dated 5/14/09 re: Assistant counsel Dennis J. Lamb produced parole records maintained by the Division regarding Mr. Newton. ENDORSEMENT: The parties are directed to address whether, in their view, the Court should order the production of these documents for use in this case. (Signed by Magistrate Judge Debra C. Freeman on 5/20/09) (sac) (Entered: |

# A-20

| | | 05/20/2009) |
|---|---|---|
| 05/26/2009 | | Minute Entry for proceedings held before Magistrate Judge Debra C. Freeman: Telephone Conference held on 5/26/2009 regarding discovery. (mbe) (Entered: 06/11/2009) |
| 06/02/2009 | 66 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Arthur G. Larkin dated 6/2/2009 re: Counsel writes to request a one week extension of the dates by which defendants' motion for partial summary judgment is due. ENDORSEMENT: Defendants' request is hereby denied. As the Court expressed at the time this briefing schedule was established, there will be no extensions. So Ordered. (Signed by Judge Shira A. Scheindlin on 6/2/2009) (jfe) (Entered: 06/03/2009) |
| 06/04/2009 | 67 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Settlement. Referred to Magistrate Judge Debra C. Freeman. (Signed by Judge Shira A. Scheindlin on 6/4/2009) (jfe) (Entered: 06/04/2009) |
| 06/05/2009 | 68 | MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case*. Document filed by Patrick J. McGuire, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Mario Merola(individually), Mario Merola(and in their official capacity), Robert T. Johnson, Robert T. Johnson. Responses due by 6/26/2009(Larkin, Arthur) (Entered: 06/05/2009) |
| 06/05/2009 | 69 | DECLARATION of Fred M. Weiler in Support re: 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case..* Document filed by Patrick J. McGuire, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson. (Attachments: # 1 Exhibit A - Newton motion, # 2 Exhibit B - Carroll dep. excerpts, # 3 Exhibit C - Carroll Aff., # 4 Exhibit D - Byrne decision, # 5 Exhibit E - Newton letter to Guttlein, # 6 Exhibit F - Moore dep. excerpts, # 7 Exhibit G - Moore letter to court, # 8 Exhibit H - Moore letter to NYPD, # 9 Exhibit I - Newton motion (1998), # 10 Exhibit J - Curbelo dep. excerpts, # 11 Exhibit K - Curbelo Aff., # 12 Exhibit L - McGuire letter, # 13 Exhibit M - Curbelo letter to NYPD, # 14 Exhibit N - Byrne order (1998), # 15 Exhibit O - McGuire dep. excerpts, # 16 Exhibit P - Kiely dep. excerpts) (Larkin, Arthur) (Entered: 06/05/2009) |
| 06/05/2009 | 70 | MEMORANDUM OF LAW in Support re: 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case..* Document filed by Patrick J. McGuire, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson. (Larkin, Arthur) (Entered: 06/05/2009) |
| 06/05/2009 | 71 | RULE 56.1 STATEMENT. Document filed by Patrick J. McGuire, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson. (Larkin, Arthur) (Entered: 06/05/2009) |
| 06/10/2009 | 72 | NOTICE OF REASSIGNMENT OF A REFERRAL TO ANOTHER MAGISTRATE JUDGE. The referral in the above entitled action has been reassigned to Magistrate Judge Theodore H. Katz, for Settlement ONLY. (ldi) |

# A-21

| | | |
|---|---|---|
| | | Modified on 6/11/2009 (ldi). (Entered: 06/10/2009) |
| 06/16/2009 | 73 | FIRST MOTION to Add Party(ies) Alan Newton. Document filed by Alan Newton.(Schutty, John) (Entered: 06/16/2009) |
| 06/16/2009 | 74 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU (DECLARATION) - FIRST MOTION to Add Party(ies) Alan Newton. Document filed by Alan Newton. (Attachments: # 1 Exhibit Ex. A, Letter from john F. Schutty, Esq. to Judge Shira Scheindlin dated March 9, 2009, # 2 Exhibit Ex. B, Interrogatories served by Plaintiff dated May 12, 2009, # 3 Exhibit Letter to MJ Freeman dated May 8, 2009, # 4 Exhibit Ex. D, Letter to MJ Freeman dated May 16, 2009, # 5 Exhibit Ex. E, Letter to M.J. Freeman dated May 27, 2009, # 6 Exhibit Ex. F, Letter to M.J. Freeman dated June 10, 2009, # 7 Exhibit Ex. G, Proposed Amended Complaint)(Schutty, John) Modified on 6/17/2009 (jar). (Entered: 06/16/2009) |
| 06/16/2009 | 75 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU (MEMORANDUM OF LAW) - FIRST MOTION to Add Party(ies) Alan Newton *Memorandum of Law*. Document filed by Alan Newton.(Schutty, John) Modified on 6/17/2009 (jar). (Entered: 06/16/2009) |
| 06/16/2009 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney John Schutty to RE-FILE Document 74 FIRST MOTION to Add Party(ies) Alan Newton.FIRST MOTION to Add Party(ies) Alan Newton.FIRST MOTION to Add Party(ies) Alan Newton. Use the event type Declaration in Support found under the event list Replies, Oppositions, Supporting Documents. (jar) (Entered: 06/17/2009) |
| 06/16/2009 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney John Schutty to RE-FILE Document 75 FIRST MOTION to Add Party(ies) Alan Newton *Memorandum of Law*. Use the event type Memorandum of Law in Support found under the event list Replies, Oppositions, Supporting Documents. (jar) (Entered: 06/17/2009) |
| 06/17/2009 | 76 | DECLARATION of John F. Schutty, Esq. in Support re: 73 FIRST MOTION to Add Party(ies) Alan Newton.. Document filed by Alan Newton. (Attachments: # 1 Exhibit A, Letter to judge Shira Schendlin dated March 9, 2009, # 2 Exhibit B, Interrogatories served by Plaintiff dated May 12, 2009, # 3 Exhibit C, Letter to M.J. Freeman dated May 8, 2009, # 4 Exhibit D, Letter to MJ Freeman dated May 16, 2009, # 5 Exhibit E, Letter to MJ Freeman dated May 27 2009, # 6 Exhibit F, Letter to MJ Freeman dated June 10 2009, # 7 Exhibit G, Proposed Amended Complaint)(Schutty, John) (Entered: 06/17/2009) |
| 06/17/2009 | 77 | MEMORANDUM OF LAW in Support re: 73 FIRST MOTION to Add Party(ies) Alan Newton.. Document filed by Alan Newton. (Schutty, John) (Entered: 06/17/2009) |
| 06/24/2009 | 78 | ORDER, that, no later than June 26, 2009, the parties shall submit the following documents to the court that are listed in this Order. That, as Defendant has apparently not provided the supplemental declaration of Sergeant Thomas O'Connor that, in the May 26 conference, the Court directed Defendant to provide (see Letter to the Court from John F. Schutty, Esq., |

# A-22

| | | |
|---|---|---|
| | | dated June 22, 2009), Plaintiffs request for leave to depose Sergeant O'Connor is granted, such deposition to be held no later than July 17, 2009, and to last no more than two hours. As Defendant has not complied with the Court's May 26 directive to submit to the Court, for ill camera review, the memorandum from Sergeant O' Connor to Chief Trabitz regarding a search for evidence in Plaintiffs attempted rape case (see id,). Defendant shall either submit that memorandum to the Court for review by the close of business on June 25, 2009, or, if it fails to do so, produce the memorandum to Plaintiff no later than two business days prior to Sergeant O'Connor's deposition. ( Deposition due by 7/17/2009.) (Signed by Magistrate Judge Debra C. Freeman on 6/24/09) Copies Mailed by Chambers.(pl) (Entered: 06/24/2009) |
| 06/26/2009 | 79 | DECLARATION of John F. Schutty, Esq. in Opposition re: 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case*.. Document filed by Alan Newton. (Attachments: # 1 Exhibit A, Copy of Original Yellow NYPD Invoice # B744483, # 2 Exhibit B, Original NYPD Invoice # B744512 and attachments from NYPD, # 3 Exhibit C, Original NYPD Invoice # B744556 and Attachments from NYPD, # 4 Exhibit D, Excerpts from NYPD Property Clerk Division's "Property Guide", # 5 Exhibit Declaration of Thomas O'Connor dated April 13, 2009, # 6 Exhibit F, Excerpt from NYPD's Request for Proposals for PETS dated April 27, 2007, # 7 Exhibit G, Excerpt from AMPS Proposal made by CGI Consulting, Inc dated May 13, 1991, # 8 Exhibit Letter from ADA Koenderman to NYPD's Trabitz dated July 15, 2005 re search for Newton rape kit, # 9 Exhibit I, Affirmation of ADA Rafael Curbelo dated August 17, 1998 filed in SCt Bx Co, # 10 Exhibit J, Excerpt from OCME "Property Clerk Log Book" showing rape kit delivery to NYPD on 12/22/88, # 11 Exhibit K, Fax from ADA Curbelo to OCME's Buffalino of April 12, 1999, # 12 Exhibit L, Excerpts from Depo Transcript of Deft Jack Trabitz, # 13 Exhibit M, Excerpts from Depo Transcript of Deft Patrick McGuire, # 14 Exhibit N, Excerpts from Depo Transcript of Deft Geraldine Kiely, # 15 Exhibit O, Excerpts from Depo Transcript of Patricia Ryan of OCME, # 16 Exhibit P, Excerpts from Depo Transcript of ADA John Carroll, # 17 Q, Excerpts from Depo Transcript of ADA Robert Moore, # 18 Exhibit R, Excerpts from Depo Transcript of ADA Rafael Curbelo, # 19 Exhibit S, Excerpts from Depo Transcript of Deft Stacy Haskins, # 20 Exhibit T, Photocopy of NYPD Yelow Invoice # B744512 rec'd from DA's Office, # 21 Exhibit U, Photocopy of NYPD Yellow Invoice # B744483 rec'd from DA's Office, # 22 Exhibit V, OCME Log Entry Showing Inquiry from ADA Carroll re rape kit on 9/28/94)(Schutty, John) (Entered: 06/26/2009) |
| 06/26/2009 | 80 | DECLARATION of Alan Newton in Opposition re: 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case*.. Document filed by Alan Newton. (Schutty, John) (Entered: 06/26/2009) |
| 06/26/2009 | 81 | DECLARATION of Shannon Turner in Opposition re: 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case*.. Document filed by Alan Newton. (Attachments: # 1 Exhibit CV of Shannon Turner (Expert Witness))(Schutty, John) (Entered: 06/26/2009) |

## A-23

| | | |
|---|---|---|
| 06/26/2009 | 82 | FILING ERROR - WRONG PDF FILE ASSOCIATED WITH DOCKET ENTRY - RESPONSE to Motion re: 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case. Plaintiff's Rule 56.1 Counter-Statement of Facts*. Document filed by Alan Newton. (Schutty, John) Modified on 6/29/2009 (kco). (Entered: 06/26/2009) |
| 06/26/2009 | 83 | MEMORANDUM OF LAW in Opposition re: 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case.*. Document filed by Alan Newton. (Schutty, John) (Entered: 06/26/2009) |
| 06/29/2009 | 84 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - RESPONSE in Opposition re: 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case. Plaintiff's Rule 56.1 Counter-Statement*. Document filed by Alan Newton. (Schutty, John) Modified on 6/29/2009 (kco). (Entered: 06/29/2009) |
| 06/29/2009 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney John F. Schutty to RE-FILE Document 84 Response in Opposition to Motion,. Use the event type COUNTER STATEMENT TO RULE 56.1 found under the event list OTHER ANSWERS. (kco) (Entered: 06/29/2009) |
| 06/29/2009 | 85 | RULE 56.1 STATEMENT. Document filed by Alan Newton. (Schutty, John) (Entered: 06/29/2009) |
| 06/29/2009 | 88 | ORDER: If any portion of this case survives summary judgment, defendants must file their opposition within two weeks of this Court's decision. Plaintiff will then have one week to file a reply. (Signed by Judge Shira A. Scheindlin on 6/26/2009) (jpo) (Entered: 06/30/2009) |
| 06/30/2009 | 86 | ENDORSED LETTER addressed to Magistrate Judge Debra Freeman from Arthur G. Larkin dated 6/25/09 re: counsel for Defendants enclose for in camera review is the memorandum prepared at the direction of Sgt. Thomas O'Connor concerning the search for evidence relating to Invoice # B697694. We submit that the memorandum is not discoverable. ENDORSEMENT: The memorandum submitted to the Court for in camera review with this letter need not be produced, as it is not relevant to the claims or defenses raised in this case, nor does it demonstrates any bias against the plaintiff. As for defendants remarks regarding the Courts prior ruling, if Defendants wish to ask clarification of that ruling, they should do so promptly, as the Court fully expects that Sgt. OConnors deposition will go forward prior to July 17, 2009, as directed. (Signed by Magistrate Judge Debra C. Freeman on 6/30/09) (pl) (Entered: 06/30/2009) |
| 06/30/2009 | 87 | ORDER,it is hereby ORDERED as follows: 1. No later than July 2, 2009, Defendants are directed to provide substantive responses to: a. Plaintiffs Interrogatory No.3, as supplemented by Plaintiffs letter dated May 27, 2009, requesting that Defendants identify the two female employees of the Bronx Borough office of the Property Clerk Division, about whom Assistant District Attorney John Carroll testified at his deposition; b. Plaintiffs Interrogatory |

# A-24

| | | |
|---|---|---|
| | | No.4, requesting that Defendants identify all individuals who held the position of "Integrity Control Officer" with the Property Clerk Division between May 11, 1988, and November, 2005; and Although the first page of this letter bears the date of June 16, 2009, this is evidently a typographical error, as can be seen by the date at the top of the following pages. Defendants have suggested that they may not be able to provide these identifications, given that the two female employees in question were said to have worked for the Property Clerk Division some time ago, and the descriptions given of them by Mr. Carroll were not very detailed. Defendants are directed to make good faith, diligent inquiries to attempt to answer this interrogatory. Plaintiffs Interrogatory No.7, requesting that Defendants identify the individual who wrote "DOA Barrel #22 1989" on the face of the yellow invoice. 2. Plaintiff's request to compel Defendants to respond to the interrogatories set forth in Plaintiff's letters dated May 8, May 16, May 27, and June 26, 2009, is otherwise denied, as the Court finds that Plaintiff has not shown good cause for failing to seek this discovery during the lengthy period allowed for fact discovery in this case. (Signed by Magistrate Judge Debra C. Freeman on 6/30/09) Copies Mailed by Chambers.(pl) (Entered: 06/30/2009) |
| 06/30/2009 | 91 | TRANSCRIPT of proceedings held on 5/14/09 before Judge Shira A. Scheindlin. (pl) (Entered: 07/02/2009) |
| 07/01/2009 | 89 | ENDORSED LETTER addressed to Judge Debra Freeman from John F. Schutty dated 7/1/2009 re: Requesting that the above qualifiers, as set forth herein, be made to Your Honor's June 30 Order. ENDORSEMENT: The within application is denied for the reasons argued in the City's letter of this date, addressing the application. (Signed by Magistrate Judge Debra C. Freeman on 6/30/2009) (jpo) (Entered: 07/01/2009) |
| 07/01/2009 | 90 | ENDORSED LETTER addressed to Magistrate Judge Debra Freeman from Aurthur G. Larkin dated 7/1/2009 re: Requesting that the Court reconsider the order of June 30, 2009, to the extent that the Court appears not to have considered defendants' submission of June 26, 2009, prior to issuing that order. ENDORSEMENT: The within application are both denied. As to the O'Connor declaration, the Court found that the declaration did not set forth all matters that the Court had directed Sgt. O'Connor to address, directed the City to provide a supplemental declaration and the City did not act on that direction for a month. The deposition should go forward, limited to two hours. As to the Courts 6/30/2009 Order, the Court in fact considered all submissions that were before it, including the City's submission and is not persuaded that it overlooked any material facts or governing law. (Signed by Magistrate Judge Debra C. Freeman on 6/30/2009) (jpo) (Entered: 07/01/2009) |
| 07/06/2009 | 92 | SECOND MOTION to Add Party(ies) Alan Newton. Document filed by Alan Newton.(Schutty, John) (Entered: 07/06/2009) |
| 07/06/2009 | 93 | DECLARATION of John F. Schutty, Esq. in Support re: 92 SECOND MOTION to Add Party(ies) Alan Newton.. Document filed by Alan Newton. (Attachments: # 1 Exhibit A, Letter from Arhtur Larkin dated July 2, 2009 with attached Answers to Pltf's Supp'l Interrogatories, # 2 Exhibit B, Proposed Amended Complaint)(Schutty, John) (Entered: 07/06/2009) |

# A-25

| 07/06/2009 | 94 | MEMORANDUM OF LAW in Support re: 92 SECOND MOTION to Add Party(ies) Alan Newton.. Document filed by Alan Newton. (Schutty, John) (Entered: 07/06/2009) |
|---|---|---|
| 07/07/2009 | 95 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Arthur G. Larkin dated 7/6/09 re: counsel for defendants write in order to request permission to file a reply brief in further support of plaintiff's motion for partial summary judgment no longer than fifteen (15) pages in length, rather than ten (l0) pages as Your Honor's rules normally provide. ENDORSEMENT: Request Granted. The City may have fifteen (15) pages in reply which remains due on 7/13/09. (Signed by Judge Shira A. Scheindlin on Arthur G. Larkin) (pl) (Entered: 07/07/2009) |
| 07/13/2009 | 96 | REPLY AFFIDAVIT of Arthur G. Larkin in Support re: 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case.*. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (John Doe) Haskins, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson. (Larkin, Arthur) (Entered: 07/13/2009) |
| 07/13/2009 | 97 | REPLY MEMORANDUM OF LAW in Support re: 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case.*. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (John Doe) Haskins, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson. (Larkin, Arthur) (Entered: 07/13/2009) |
| 07/13/2009 | 98 | MOTION for Discovery *to Compel Production of "O'Connor Memorandum".* Document filed by Alan Newton.(Schutty, John) (Entered: 07/13/2009) |
| 07/13/2009 | 99 | DECLARATION of John F. Schutty, Esq. in Support re: 98 MOTION for Discovery *to Compel Production of "O'Connor Memorandum".*. Document filed by Alan Newton. (Attachments: # 1 Exhibit Ex. A, Excerpts from Depo of Defendant Jack Trabitz, # 2 Exhibit Ex. B, Letter from John F. Schutty, Esq. to Magistrate Judge Debra Freeman dated March 23, 2009, # 3 Exhibit Ex. C, Letter from John F. Schutty, Esq. to Magistrate Judge Debra Freeman dated April 6, 2009, # 4 Exhibit Ex. D, Letter from Arthur Larkin, Esq. to John F. Schutty, Esq. dated April 13, 2009, # 5 Exhibit Ex. E, Letter from John F. Schutty, Esq. to Magistrate Judge Debra Freeman dated April 15, 2009, # 6 Exhibit Ex. F, Letter from Arthur Larkin, Esq. to Magistrate Judge Debra Freeman dated June 25, 2009, # 7 Exhibit Ex. G, Letter from John F. Schutty, Esq. to Magistrate Judge Debra Freeman dated June 30, 2009, # 8 Exhibit Ex. H, Endorsed Order of MJ Freeman dated June 30, 2009, # 9 Exhibit Ex. I, Excerpt from Transcript of Jan 22, 2009 Conference Before MJ Freeman)(Schutty, John) (Entered: 07/13/2009) |
| 07/13/2009 | 100 | MEMORANDUM OF LAW in Support re: 98 MOTION for Discovery *to Compel Production of "O'Connor Memorandum".*. Document filed by Alan Newton. (Schutty, John) (Entered: 07/13/2009) |

## A-26

| 07/21/2009 | | Minute Entry for proceedings held before Magistrate Judge Theodore H. Katz: Settlement Conference held on 7/21/2009. (mro) (Entered: 07/21/2009) |
|---|---|---|
| 07/23/2009 | 101 | DECLARATION of Arthur G. Larkin in Opposition re: 98 MOTION for Discovery *to Compel Production of "O'Connor Memorandum"..* Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (John Doe) Haskins, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson. (Larkin, Arthur) (Entered: 07/23/2009) |
| 07/23/2009 | 102 | MEMORANDUM OF LAW in Opposition re: 98 MOTION for Discovery *to Compel Production of "O'Connor Memorandum"..* Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (John Doe) Haskins, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson. (Larkin, Arthur) (Entered: 07/23/2009) |
| 07/28/2009 | 103 | DECLARATION of John F. Schutty, Esq. in Support re: 98 MOTION for Discovery *to Compel Production of "O'Connor Memorandum"..* Document filed by Alan Newton. (Schutty, John) (Entered: 07/28/2009) |
| 07/31/2009 | 104 | OPINION AND ORDER:#97824 For the foregoing reasons, defendants' motion for partial summary judgment is granted. Claims one, two, four, eleven, and twelve are dismissed in their entirety. Claims six, eight, nine, and fifteen are dismissed in part, insofar as they claim harms resulting from investigatory activities. Newton still maintains numerous constitutional and tort claims against both the City and individual defendants concerning the loss of the rape kit after trial. The Clerk of the Court is directed to close this motion (docket no. 49). (Signed by Judge Shira A. Scheindlin on 7/31/2009) (jpo) Modified on 8/3/2009 (eef). (Entered: 07/31/2009) |
| 10/13/2009 | 105 | OPINION AND ORDER: For the foregoing reasons, defendants' motion for summary judgment dismissing plaintiff s fourth, sixth, seventh, eighth, and fifteenth causes of action is granted. The City's motion for summary judgment dismissing plaintiffs ninth cause of action is denied. In addition, plaintiffs state-based causes of action against all defendants - claims fourteen and sixteen - remain. If Newton does not withdraw his motions for leave to amend the complaint, without prejudice to refile, he shall notify the Court in writing by October 19, 2009. Alternatively, if Newton withdraws his motions, he shall do so no later than October 19, 2009. If Newton renews his motion to amend, he shall do so no later than November 2, 2009. Defendants shall file their opposition to the renewed motion to amend by November 16, 2009 and Newton shall file a reply by November 23, 2009. The Clerk of the Court is directed to close this motion (docket no. 68). (Signed by Judge Shira A. Scheindlin on 10/13/2009) (jfe) (Entered: 10/13/2009) |
| 10/13/2009 | 106 | MEMORANDUM OPINION AND ORDER: Therefore, Newton's motion is denied and the June 30, 2009 Order is affirmed. The Clerk of the Court is directed to close this motion (docket no. 98). (Signed by Judge Shira A. Scheindlin on 10/13/2009) (jfe) (Entered: 10/13/2009) |
| 10/13/2009 | | Set/Reset Deadlines: Motions due by 11/2/2009. (jfe) (Entered: 11/20/2009) |

# A-27

| 11/03/2009 | 107 | MOTION for Certificate of Appealability *and for an order certifying this court's decision and order of Oct. 13, 2009, for interlocutory appeal, pursuant to 28 U.S.C. sec. 1292(b)*. Document filed by The City of New York.(Larkin, Arthur) (Entered: 11/03/2009) |
|---|---|---|
| 11/03/2009 | 108 | DECLARATION of Arthur G. Larkin in Support re: 107 MOTION for Certificate of Appealability *and for an order certifying this court's decision and order of Oct. 13, 2009, for interlocutory appeal, pursuant to 28 U.S.C. sec. 1292(b)..* Document filed by The City of New York. (Attachments: # 1 Exhibit A (decision and order of Oct. 13, 2009 (DE 105))(Larkin, Arthur) (Entered: 11/03/2009) |
| 11/03/2009 | 109 | MEMORANDUM OF LAW in Support re: 107 MOTION for Certificate of Appealability *and for an order certifying this court's decision and order of Oct. 13, 2009, for interlocutory appeal, pursuant to 28 U.S.C. sec. 1292(b)..* Document filed by The City of New York. (Larkin, Arthur) (Entered: 11/03/2009) |
| 11/10/2009 | 110 | ORDER...Accordingly, plaintiff does not meet the standard for reconsideration and plaintiff's request is denied. (Signed by Judge Shira A. Scheindlin on 11/10/09) (cd) (Entered: 11/10/2009) |
| 11/10/2009 | 111 | TRANSCRIPT of proceedings held on 11/3/2009 at 4:10 p.m. before Judge Shira A. Scheindlin. (mbe) (Entered: 11/13/2009) |
| 11/13/2009 | 112 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Arthur G. Larkin dated 11/13/09 re: we respectfully request leave to serve a brief on Monday no longer than fifteen (15) pages, rather than ten (l0) pages, mainly because the court has requested that the City brief not only the question of municipal liability under Young v, County of Fulton, 160 F3d 899 (2d Cir. 1998), but also the question whether plaintiff can assert claims against the City based on an unconstitutional policy. ENDORSEMENT: Defendants requests to submit a 15 page brief is hereby denied. Defendants need not devote substantial space to Young v. County of Fulton. Defendants may make requests for additional pages on reply if necessary to address points raised by plaintiff with regard to Young v. County of Fulton. (Signed by Judge Shira A. Scheindlin on 11/13/09) (pl) (Entered: 11/13/2009) |
| 11/16/2009 | 113 | ORDER TO SHOW CAUSE: Accordingly, plaintiff is HEREBY ORDERED TO SHOW CAUSE why the claims against the district attorney and assistant district attorney defendants in the above captioned action should not be dismissed in their entirety. Plaintiff may submit a brief totaling no more than five (5) pages nolater than November 30,2009. Defendants may submit a brief totaling no morethan five (5) pages no later than December 11, 2009 in response, if necessary.Defendants and plaintiff are additionally directed to address Warneyin their opposition and reply, respectively, to plaintiffs motions to amend theComplaint to add, among others, additional assistant district attorneys. So Ordered (Signed by Judge Shira A. Scheindlin on 11/13/09) (js) (Entered: 11/16/2009) |
| 11/16/2009 | 114 | MOTION for Reconsideration *of the court's opinion and order of Oct. 13, 2009*. Document filed by The City of New York. (Attachments: # 1 Exhibit |

# A-28

| | | |
|---|---|---|
| | | (Order and Opinion dated Oct. 13, 2009))(Larkin, Arthur) (Entered: 11/16/2009) |
| 11/16/2009 | 115 | MEMORANDUM OF LAW in Support re: 114 MOTION for Reconsideration *of the court's opinion and order of Oct. 13, 2009.*. Document filed by The City of New York. (Larkin, Arthur) (Entered: 11/16/2009) |
| 11/24/2009 | 116 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from John F. Schutty dated 11/24/09 re: counsel for plaintiff requests that the Court allow plaintiff to file opposition to the defendants' motion for reconsideration on December 2 and that the defendants then receive an additional two days until 12/13/09 to serve their reply papers. ENDORSEMENT: Plaintiff's request for a two day extension to submit his opposition to defendants' motion for reconsideration is hereby granted. Plaintiff shall have until 12/2/09 to submit his opposition and defendants shall have until 12/13/09 to submit their reply. So ordered. (Signed by Judge Shira A. Scheindlin on 11/24/09) (dle) (Entered: 11/25/2009) |
| 11/24/2009 | | Set/Reset Deadlines as to 114 MOTION for Reconsideration *of the court's opinion and order of Oct. 13, 2009.*. Responses due by 12/2/2009 Replies due by 12/13/2009. (dle) (Entered: 11/25/2009) |
| 11/30/2009 | 117 | DECLARATION of Arthur G. Larkin in Opposition re: 92 SECOND MOTION to Add Party(ies) Alan Newton.. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (John Doe) Haskins, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson. (Attachments: # 1 Exhibit A (reverse side of voucher, out to court logbook page), # 2 Exhibit B (Ryan OCME report), # 3 Exhibit C (3/20/08 letter to plaintiff's counsel), # 4 Exhibit D (4/17 letter to plaintiff's counsel, with Bates 2552-53), # 5 Exhibit E (Affirmation of John F. Caroll, Esq.), # 6 Exhibit F (11/13/09 letter to court, w/o attachments), # 7 Exhibit G (plaintiff's notice of claim))(Larkin, Arthur) (Entered: 11/30/2009) |
| 11/30/2009 | 118 | MEMORANDUM OF LAW in Opposition re: 92 SECOND MOTION to Add Party(ies) Alan Newton.. Document filed by Joanne Newbert, (John Doe) Ryan, (John Doe) Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, (John Doe) Haskins, (Jane Doe) Kiely, Jack Trabitz, The City of New York, Robert T. Johnson, Robert T. Johnson. (Larkin, Arthur) (Entered: 11/30/2009) |
| 11/30/2009 | 119 | BRIEF re: 113 Order,, *Regarding Applicability of Warney v. Monroe County to Claims Asserted by Plaintiff Against the District Attorney and Assistant District Attorney Defendants*. Document filed by Alan Newton.(Schutty, John) (Entered: 11/30/2009) |
| 12/02/2009 | 120 | MEMORANDUM OF LAW in Opposition re: 114 MOTION for Reconsideration *of the court's opinion and order of Oct. 13, 2009.*. Document filed by Alan Newton. (Schutty, John) (Entered: 12/02/2009) |
| 12/07/2009 | 122 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from John F. Schutty dated 12/3/2009 re: Plaintiff respectfully request leave to file an amended Memorandum. ENDORSEMENT: Plaintiff's request to file an |

## A-29

| | | |
|---|---|---|
| | | Amended Memorandum to correct the citation error 13 hereby granted. So Ordered. (Signed by Judge Shira A. Scheindlin on 12/4/2009) (jfe) (Entered: 12/11/2009) |
| 12/10/2009 | 121 | BRIEF re: 119 Brief *concerning the Second Circuit decision in Warney v. Monroe County, and in opposition to plaintiff's brief re same*. Document filed by The City of New York.(Larkin, Arthur) (Entered: 12/10/2009) |
| 12/14/2009 | 123 | AMENDED MEMORANDUM OF LAW in Opposition re: 114 MOTION for Reconsideration *of the court's opinion and order of Oct. 13, 2009.*. Document filed by Alan Newton. (Schutty, John) (Entered: 12/14/2009) |
| 12/14/2009 | 124 | DECLARATION of John F. Schutty, Esq. in Support re: 92 SECOND MOTION to Add Party(ies) Alan Newton.. Document filed by Alan Newton. (Attachments: # 1 Exhibit A, Discovery Timeline)(Schutty, John) (Entered: 12/14/2009) |
| 12/14/2009 | 125 | REPLY MEMORANDUM OF LAW in Support re: 92 SECOND MOTION to Add Party(ies) Alan Newton.. Document filed by Alan Newton. (Schutty, John) (Entered: 12/14/2009) |
| 12/15/2009 | 126 | REPLY MEMORANDUM OF LAW in Support re: 114 MOTION for Reconsideration *of the court's opinion and order of Oct. 13, 2009.*. Document filed by The City of New York. (Larkin, Arthur) (Entered: 12/15/2009) |
| 12/16/2009 | 127 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Arthur Larkin dated 12/14/09 re: Request for an additional 3 days on their reply brief. ENDORSEMENT: Defendants' request for a 3 page extension for their reply brief is hereby granted. (Signed by Judge Shira A. Scheindlin on 12/14/09) (cd) (Entered: 12/16/2009) |
| 12/22/2009 | 128 | ORDER: It is hereby ordered that defendants are to produce former employees Major, Dundas, and Brandow by January 20,2010. No further extensions will be granted. Defendants are directed to provide plaintiff with sufficient notice prior to producing these witnesses and plaintiff is directed to make himself available to take their deposition. Defendants cannot be ordered to produce Higgins, Hackson, or Nathason because defendants cannot produce individuals whom they cannot identify. Plaintiff has been asked repeatedly to produce additional identifying information regarding these individuals. Either plaintiff refuses to do so or none exists. If plaintiff can supply additional identifying information, defendants are directed to produce these individuals as well to the extent such information leads to their identification. That this action has required an inordinate amount of the Court's time to resolve discovery issues demonstrates that the parties are not cooperating as contemplated by the discovery rules. I This Court will no longer tolerate letters from either side squabbling over discovery issues. Counsel are directed to undertake all reasonable efforts to resolve future discovery disputes in good faith prior to seeking relief from this Court. Any evidence to the contrary will result in sanctions against the culpable party. (Signed by Judge Shira A. Scheindlin on 12/21/2009) (jpo) (Entered: 12/22/2009) |
| 01/05/2010 | 129 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from John F. |

## A-30

| | | |
|---|---|---|
| | | Schutty dated 12/31/2009 re: Requesting that plaintiff be allowed to cross-examine Major, et al., on the training and supervision that was provided to NYPD Property Clerk Division personnel so that the state law claims asserted against these gentlemen may be explored. ENDORSEMENT: Whether the fifteenth cause of action was dismissed in error in the October 13, 2009 opinion will be addressed in this Court's decision on defendants' motion for reconsideration. Defendants are hereby directed to permit questioning at depositions on plaintiff's claims of training and supervision. (Signed by Judge Shira A. Scheindlin on 1/5/2010) (jpo) (Entered: 01/05/2010) |
| 01/27/2010 | 130 | MEMORANDUM OPINION AND ORDER re: #98496 114 MOTION for Reconsideration *of the court's opinion and order of Oct. 13, 2009*. filed by The City of New York, 107 MOTION for Certificate of Appealability *and for an order certifying this court's decision and order of Oct. 13, 2009, for interlocutory appeal, pursuant to 28 U.S.C. sec. 1292(b)*. filed by The City of New York. The Opinion and Order filed October 13, 2009 is hereby withdrawn and replaced with an Amended Opinion and Order filed January 27, 2010. The October 13, 2009 Opinion and Order is amended as follows: Parts III.E and IV.C are amended in accordance with this Memorandum Opinion and Order. In addition, Parts II.B, C, and E, III.D and F, and IV.A, B, and D were amended or added, and former Part IV.D. was deleted, to reflect recent developments in this case and Second Circuit law. The Clerk of the Court is directed to withdraw the October 13, 2009 Opinion (Docket no. 105) and close this motion (Docket no. 114). The Clerk of the Court is also directed to close defendants' motion for a certificate of appealability as moot (Docket no. 107). SO ORDERED (Signed by Judge Shira A. Scheindlin on 1/27/2010) (jmi) Modified on 1/28/2010 (ajc). (Entered: 01/28/2010) |
| 01/27/2010 | 131 | AMENDED MEMORANDUM OPINION AND ORDER: #97824 For the foregoing reasons, defendants' motion for summary judgment dismissing plaintiffs fourth, sixth, seventh, eighth, and fifteenth causes of action is granted. The City's motion for summary judgment dismissing plaintiffs ninth cause of action is denied. In addition, plaintiffs state-law claims against all defendants - claims fourteen and sixteen - remain. The Clerk of the Court is directed to close this motion (docket no. 68). A conference is scheduled for February 3, 2010 at 3:00 p.m. in Courtroom l5C. (Signed by Judge Shira A. Scheindlin on 1/27/2010) (jmi) Modified on 1/28/2010 (ajc). (Entered: 01/28/2010) |
| 01/27/2010 | 132 | Document stricken pursuant to Order dated 4/1/10, docmt #136. (Entered: 01/28/2010) |
| 01/27/2010 | | ***STRICKEN DOCUMENT. Deleted document number 132 from the case record. The document was stricken from this case pursuant to 136 Order. (djc) (Entered: 04/22/2010) |
| 03/09/2010 | | Minute Entry for proceedings held before Magistrate Judge Theodore H. Katz: Settlement Conference held on 3/9/2010. (mro) (Entered: 03/11/2010) |
| 03/10/2010 | 133 | TRANSCRIPT of proceedings held on 2/3/2010 before Judge Shira A. Scheindlin. (jfe) (Entered: 03/12/2010) |
| | | |

# A-31

| | | |
|---|---|---|
| 03/31/2010 | 134 | STIPULATION AND ORDER OF VOLUNTARY DISMISSAL It is hereby stipulated and agreed by and between the parties and/or their respective counsel(s) that the above-captioned action is voluntarily dismissed, WITH prejudice against the defendant(s) (John Doe) Ryan pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. (Signed by Judge Shira A. Scheindlin on 3/31/2010) (js) (Entered: 04/01/2010) |
| 04/01/2010 | 135 | AMENDED MEMORANDUM OPINION AND ORDER. #98497 For the foregoing reasons, Newton's motions for leave to amend the complaint are granted as to Newton's federal claims. Newton also seeks to deposit all New Defendants. The other extent those depositions have not yet occurred, Newton's request is granted, but the scope is limited to the remaining claims. The Clerk of the Court is directed to close these motions (Docket nos. 73 and 92). (Signed by Judge Shira A. Scheindlin on 4/1/10) (djc) Modified on 4/5/2010 (ajc). (Entered: 04/02/2010) |
| 04/01/2010 | 136 | ORDER re: 132 Memorandum & Opinion. The Clerk of the Court is directed to strike from the docket of the captioned action this Court's January 27, 2010 Memorandum Opinion and Order regarding plaintiff's motions for leave to amend the complaint (Docket No. 132). This January 27, 2010 Memorandum Opinion and Order is hereby withdrawn. (Signed by Judge Shira A. Scheindlin on 4/1/10) (djc) (Entered: 04/02/2010) |
| 04/06/2010 | 137 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Arthur G. Larkin dated 4/6/2010 re: Counsel request that the court "so order" this letter in order to memorialize the parties' agreement concerning further fact depositions in this case. ENDORSEMENT: Plaintiff may depose the five agreed upon witnesses (Kessler, Koenderman, Buffalino, and two NYPD Integrity Control Officers) as outlined in Defendants' letter. If plaintiff seeks additional depositions, he must seek this Court's permission. (Signed by Judge Shira A. Scheindlin on 4/6/2010) (tro) (Entered: 04/07/2010) |
| 05/13/2010 | 138 | AMENDED COMPLAINT amending 1 Complaint, against Various John Does(individually), Various John Does(in their official capacity as employees of the N.Y.C. who are/were assistant D.A.'s within the office of the D.A., County of Bronx), Various Jane Does(individually), Various Jane Does(in their official capacity as employees of NYC who are/were assistant district attorneys within the office of the D.A, County of Bronx), Joanne Newbert, (John Doe) Hartfield, Ryan Bernard, Roland Harris, Douglas Leho, William Sean O'Toole, Michael Sheehan, Patrick J. McGuire, Tracy Haskins, Geraldine Kiely, Jack Trabitz, Various John Does(in their official capacity as employess of the City of NY who are/were members of the Police Department of the City of NY), Various Jane Does(in their official capacity as employess of the City of NY who are/were members of the Police Department of the City of NY), Stacey Edelbaum, John F. Carroll, Robert L. Moore, Rafael Curbelo, Patrick Buffalino, Various John/Jane Does, John P. Higgins, Bruce J. Major, Jerome Nathanson, George Kuttler, Bruce Kessler, Adrian Merrick, Colleen Dundas, Patricia Brandow, Walter Smith, Patrick McKeon, Anthony Russo, David Deangelis, The City of New York, Robert T. Johnson, Robert T. Johnson.Document filed by Alan Newton. Related document: 1 Complaint, filed by Alan Newton.(rdz) (Entered: 05/17/2010) |

# A-32

| 05/13/2010 | | AMENDED SUMMONS ISSUED as to Stacey Edelbaum, John F. Carroll, Rafael Curbelo, Patrick Buffalino, John P. Higgins, Bruce J. Major, George Kuttler, Bruce Kessler, Colleen Dundas, Patricia Brandow. (rdz) (Entered: 05/17/2010) |
|---|---|---|
| 05/25/2010 | 139 | ANSWER to Amended Complaint with JURY DEMAND. Document filed by Patrick J. McGuire, Tracy Haskins, Geraldine Kiely, Jack Trabitz, The City of New York. Related document: 138 Amended Complaint,,,,, filed by Alan Newton.(Larkin, Arthur) (Entered: 05/25/2010) |
| 05/28/2010 | 140 | ORDER: IT IS HEREBY ORDERED that the City of New York shall make available to plaintiff's forensic science expert any and all microscope slides collected from, or created from, evidence in the case People v. Alan Newton, Indictment # 2441/84 (Bronx County) (the "Criminal Case"), which remain in the City's possession, custody or control at this time (three sets of slides were created according to reports prepared by the City's employees). The slides shall be delivered to the laboratory, or other address designated by plaintiffs expert, on or before June 11, 2010. Plaintiff's forensic expert will serve his written report and all other disclosures required by Rule 26(a) of the Federal Rules of Civil Procedure thirty (30) days after receipt of the slides, and will return the slides to the City's attorneys on or before the date the report and disclosures are served. The City shall make available to plaintiff's expert the rape kit collected in the Criminal Case and vouchered under Voucher # B744483, upon request, and in no event later than forty-eight (48) hours prior to any testimony by the expert either at deposition or trial. Inspection of the rape kit shall take place at a location agreed upon by the parties. The parties may modify the deadlines in this order without prior court approval. (Signed by Judge Shira A. Scheindlin on 5/28/2010) (jfe) (Entered: 05/28/2010) |
| 07/16/2010 | 141 | TRANSCRIPT of proceedings held on June 21, 2010 11:35 a.m. before Judge Shira A. Scheindlin. (ajc) (Entered: 07/20/2010) |
| 07/16/2010 | 142 | TRANSCRIPT of proceedings held on June 21, 2010 11:35 a.m. before Judge Shira A. Scheindlin. (ajc) (Entered: 07/20/2010) |
| 07/30/2010 | 143 | ORDER: Pursuant to Rules 54(b) and/or 60(b)(1), (3) of the F.R.C.P., and for the reasons stated on the record at the 7/23/2010 hearing, plaintiff's third and sixth causes of action against Patricia Ryan are hereby reinstated due to plaintiff's discovery of new evidence. This Court's prior order dismissing Ryan from this action is hereby withdrawn, but only as to Ryan. (Signed by Judge Shira A. Scheindlin on 7/26/2010) (tro) (Additional attachment(s) added on 8/2/2010: # 1 Main Document) (ae). Modified on 8/6/2010 (tro). (Entered: 07/26/2010) |
| 07/30/2010 | 144 | TRANSCRIPT of proceedings held on July 23, 2010 4:00 p.m. before Judge Shira A. Scheindlin. (ajc) (Entered: 08/02/2010) |
| 08/04/2010 | 145 | MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*. Document filed by The City of New York. Responses due by 8/13/2010(Larkin, Arthur) (Entered: 08/04/2010) |

## A-33

| | | |
|---|---|---|
| 08/04/2010 | 146 | DECLARATION of Arthur G. Larkin in Support re: 145 MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*. MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*.. Document filed by The City of New York. (Attachments: # 1 Exhibit A (Transcript of proceedings 7/23) (excerpt), # 2 Exhibit B (E-mails between counsel), # 3 Exhibit C (Blake report excerpts), # 4 Exhibit D (notice of motion, aff., order), # 5 Exhibit E (7/22 Ltr. w/o exhibits), # 6 Exhibit F (Burke testimony excerpt))(Larkin, Arthur) (Entered: 08/04/2010) |
| 08/04/2010 | 147 | MEMORANDUM OF LAW in Support re: 145 MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*. MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*.. Document filed by The City of New York. (Larkin, Arthur) (Entered: 08/04/2010) |
| 08/06/2010 | 148 | PRETRIAL STATEMENT *(Joint Pretrial Order) as required by Court's individual rules*. Document filed by The City of New York.(Larkin, Arthur) (Entered: 08/06/2010) |
| 08/06/2010 | 149 | Exhibit List *with objections (plaintiff and defendants)*. Document filed by The City of New York.(Larkin, Arthur) (Entered: 08/06/2010) |
| 08/06/2010 | 150 | PROPOSED JURY INSTRUCTIONS. Document filed by The City of New York.(Larkin, Arthur) (Entered: 08/06/2010) |
| 08/06/2010 | 151 | TRIAL BRIEF. Document filed by Alan Newton.(Schutty, John) (Entered: 08/06/2010) |
| 08/06/2010 | 152 | PROPOSED VOIR DIRE QUESTIONS. Document filed by Alan Newton. (Schutty, John) (Entered: 08/06/2010) |
| 08/06/2010 | 153 | PROPOSED JURY INSTRUCTIONS. Document filed by Alan Newton. (Schutty, John) (Entered: 08/06/2010) |
| 08/11/2010 | 154 | MOTION in Limine *to exclude certain evidence, and admit certain evidence*. Document filed by The City of New York.(Larkin, Arthur) (Entered: 08/11/2010) |
| 08/11/2010 | 155 | MEMORANDUM OF LAW in Support re: 154 MOTION in Limine *to exclude certain evidence, and admit certain evidence*.. Document filed by The City of New York. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit)(Larkin, Arthur) (Entered: 08/11/2010) |
| 08/12/2010 | 156 | MOTION in Limine *Notice of Motion*. Document filed by Alan Newton. (Schutty, John) (Entered: 08/12/2010) |

# A-34

| | | |
|---|---|---|
| 08/12/2010 | 157 | AMENDED MOTION in Limine *Amended Notice of Motion*. Document filed by Alan Newton.(Schutty, John) (Entered: 08/12/2010) |
| 08/12/2010 | 158 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - MOTION in Limine *to Preclude the Defendants from Offering Speculative Testimony that Challenges Plaintiff's Criminal Court Exoneration*. Document filed by Alan Newton.(Schutty, John) Modified on 8/16/2010 (db). (Entered: 08/12/2010) |
| 08/12/2010 | 159 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - MOTION in Limine *for an Adverse Inference Jury Charge for the Defendants' Loss of Material Evidence*. Document filed by Alan Newton. (Schutty, John) Modified on 8/16/2010 (db). (Entered: 08/12/2010) |
| 08/12/2010 | 160 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - MOTION in Limine *to Preclude the Defendants from Offering Evidence of Plaintiff's Prior (25 Year Old) Conviction & Sentence*. Document filed by Alan Newton. (Attachments: # 1 Appendix Inmate Inormation for Alan Newton on NYS Dept of Corrections Website)(Schutty, John) Modified on 8/16/2010 (db). (Entered: 08/12/2010) |
| 08/12/2010 | 161 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - MOTION in Limine *to Preclude Defendants form Offering Evidence re: Plaintiff's Filing of an Action Against the State of New York in the Court of Claims*. Document filed by Alan Newton.(Schutty, John) Modified on 8/16/2010 (db). (Entered: 08/12/2010) |
| 08/12/2010 | 162 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - MOTION in Limine *for an Order Determining that the City of New York May Be Held Liable for the Tortious Acts of Its Employees, Including Defendant Patricia Ryan*. Document filed by Alan Newton.(Schutty, John) Modified on 8/16/2010 (db). (Entered: 08/12/2010) |
| 08/12/2010 | 163 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - MOTION in Limine *to Obtain Leave of the Court to Ask Leading Questions, under Fed. R. Evid. 611 (c), of Employees of the Defendant City of New York as "Adverse Witnesses"*. Document filed by Alan Newton.(Schutty, John) Modified on 8/16/2010 (db). (Entered: 08/12/2010) |
| 08/12/2010 | 164 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - MOTION in Limine *Declaration of John F. Schutty, Esq*. Document filed by Alan Newton. (Attachments: # 1 Exhibit Joint Motion to Vacate Conviction & Dismiss Indictment dated July 5, 2006, filed in people v. Newton. Bx. Co. Ind. 2441/84, # 2 Exhibit July 6, 2006 Order Vacating Conviction & Dismissing Indictment, People v. Newton, Bx. Co. Ind. No. 2441/84, # 3 Exhibit Report of Plaintiff's "Forensic" Expert, Joseph Galdi, dated June 28, 2010, # 4 Exhibit Excerpt from newton Criminal Trial Transcript, Bx. Co. Ind. No. 2441/84, Testimony of VJ re Assailant's Ejaculation, # 5 Exhibit Excerpt from Newton Criminal Trial, Bx. Co. Ind. No. 2441/84, testimony of Dr. Valerie Burke, # 6 Exhibit Excerpts from the Declaration of Dr. Edward Blake dated July 19, 2010 (plaintiff's forensic expert))(Schutty, John) Modified on 8/16/2010 (db). (Entered: 08/12/2010) |

## A-35

| 08/12/2010 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney John Francis Schutty to RE-FILE Document 158 MOTION in Limine *to Preclude the Defendants from Offering Speculative Testimony that Challenges Plaintiff's Criminal Court Exoneration.*, 160 MOTION in Limine *to Preclude the Defendants from Offering Evidence of Plaintiff's Prior (25 Year Old) Conviction & Sentence.* MOTION in Limine *to Preclude the Defendants from Offering Evidence of Plaintiff's Prior (25 Year Old) Conviction & Sentence.*, 161 MOTION in Limine *to Preclude Defendants form Offering Evidence re: Plaintiff's Filing of an Action Against the State of New York in the Court of Claims.*, 162 MOTION in Limine *for an Order Determining that the City of New York May Be Held Liable for the Tortious Acts of Its Employees, Including Defendant Patricia Ryan.*, 159 MOTION in Limine *for an Adverse Inference Jury Charge for the Defendants' Loss of Material Evidence.*, 163 MOTION in Limine *to Obtain Leave of the Court to Ask Leading Questions, under Fed. R. Evid. 611 (c), of Employees of the Defendant City of New York as "Adverse Witnesses".* MOTION in Limine *to Obtain Leave of the Court to Ask Leading Questions, under Fed. R. Evid. 611 (c), of Employees of the Defendant City of New York as "Adverse Witnesses".* Use the event type Memorandum in Support of Motion found under the event list Replies, Opposition and Supporting Documents. ***REMINDER*** - 6 separate Memorandum of Law in Support shall be filed, each one to be linked to the 157 Amended Motion in Limine. (db) (Entered: 08/16/2010) |
| 08/13/2010 | 165 | MEMORANDUM OF LAW in Opposition re: 145 MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*. MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)..* Document filed by Alan Newton. (Schutty, John) (Entered: 08/13/2010) |
| 08/13/2010 | 166 | DECLARATION of John F. Schutty, Esq. in Opposition re: 145 MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*. MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)..* Document filed by Alan Newton. (Attachments: # 1 Exhibit A - Email from Dr. Edward Blake to john F. Schutty re ABO blood type testing dated Aug. 2, 2010, # 2 Exhibit B - Letter from Schutty to Arthur G. Larkin dated Aug. 9, 2010 re blood testing requested of Alan Newton, # 3 Exhibit C - Larkin's Aug. 9, 2010 response to Schutty's letter of Aug. 9, 2010 re: blood testing requested of Newton, # 4 Exhibit D - Schutty's second letter to Larkin re: blood testing requested of Newton, # 5 Exhibit E - Larkin's letter to Schutty dated Aug. 10, 2010 denying offer of Newton blood testing, # 6 Exhibit F - Arthur G. Larkin's letter to the Hon. Shira A. Scheindlin presenting a false expert witness opinion re: state of PCR-DNA testing in 1994, # 7 Exhibit G - Excerpts from the Declaration of Dr. Edward Blake dated July 19, 2010, # 8 Exhibit Excerpts from the Transcript of Deposition of Defendant Patricia Ryan taken on March 31, 2009, # 9 Exhibit I - OCME Serology Lab Report (reporting no |

# A-35.1

| | | |
|---|---|---|
| | | spermatozoa) signed by defendant Patricia Ryan on Sept. 2, 1988)(Schutty, John) (Entered: 08/13/2010) |
| 08/13/2010 | 167 | TRIAL MEMORANDUM. Document filed by The City of New York. (Larkin, Arthur) (Entered: 08/13/2010) |
| 08/17/2010 | 168 | FIRST MEMORANDUM OF LAW in Support re: 157 AMENDED MOTION in Limine *Amended Notice of Motion. Motion to Preclude Defendants from Offering Any Evidence re: Plaintiff's Prior (25 Year Old) Conviction & Sentence*. Document filed by Alan Newton. (Attachments: # 1 Exhibit A - Inmate Information for Alan Newton Published on the NYS Dept. of Corrections Website)(Schutty, John) (Entered: 08/17/2010) |
| 08/17/2010 | 169 | SECOND MEMORANDUM OF LAW in Support re: 157 AMENDED MOTION in Limine *Amended Notice of Motion. Motion to Preclude the Defendants from Offering Speculative Testimony that Challenges Plaintiff's Criminal Court Exoneration*. Document filed by Alan Newton. (Schutty, John) (Entered: 08/17/2010) |
| 08/17/2010 | 170 | THIRD MEMORANDUM OF LAW in Support re: 157 AMENDED MOTION in Limine *Amended Notice of Motion. Motion for an Adverse Inference Jury Charge for the Defendants' Loss of Material Evidence*. Document filed by Alan Newton. (Schutty, John) (Entered: 08/17/2010) |
| 08/17/2010 | 171 | FOURTH MEMORANDUM OF LAW in Support re: 157 AMENDED MOTION in Limine *Amended Notice of Motion. Motion for an Order Determining that the City of NY May Be Held Liable for the Tortious Acts of Its Employees, Including Defendant Patricia Ryan*. Document filed by Alan Newton. (Schutty, John) (Entered: 08/17/2010) |
| 08/17/2010 | 172 | FIFTH MEMORANDUM OF LAW in Support re: 157 AMENDED MOTION in Limine *Amended Notice of Motion. Motion to Preclude Defendants from Offering Evidence re: Plaintiff's Filing of an Action Against the State of NY in the NY Court of Claims*. Document filed by Alan Newton. (Schutty, John) (Entered: 08/17/2010) |
| 08/17/2010 | 173 | SIXTH MEMORANDUM OF LAW in Support re: 157 AMENDED MOTION in Limine *Amended Notice of Motion. Motion for Leave of Court to Ask Leading Questions of Employees of City of NY, under Fed. R. Evid. 611 (c), as "Adverse Witnesses"*. Document filed by Alan Newton. (Schutty, John) (Entered: 08/17/2010) |
| 08/17/2010 | 174 | DECLARATION of John F. Schutty, Esq. in Support re: 157 AMENDED MOTION in Limine *Amended Notice of Motion.*. Document filed by Alan Newton. (Attachments: # 1 Exhibit A - Joint Motion to Vacate Conviction &Dismiss Indictment dated July 5, 2006, filed in People v. Newton. Bx. Co. Ind. 2441/84, # 2 Exhibit B - July 6, 2006 Order Vacating Conviction &Dismissing Indictment, filed in People, # 3 Exhibit C - Report of Plaintiff's "Forensic" Expert, Joseph Galdi, dated June 28, 2010, # 4 Exhibit D -Excerpt from Newton Criminal Trial Transcript, Bx. Co. Ind. No. 2441/84, Testimony of VJ re Assailant's Ejaculation, # 5 Exhibit E - Excerpt from Newton Criminal Trial, Bx. Co. Ind. No. 2441/84, Testimony of Dr. Valerie Burke, # 6 Exhibit F - Excerpts from the Declaration of Dr. Edward Blake dated July |

# A-35.2

| | | |
|---|---|---|
| | | 19, 2010 (plaintiff's forensic expert))(Schutty, John) (Entered: 08/17/2010) |
| 08/18/2010 | 175 | MEMORANDUM OF LAW in Opposition re: 157 AMENDED MOTION in Limine *Amended Notice of Motion*.. Document filed by The City of New York. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit (1 of 2), # 4 Exhibit (1 of 2), # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit) (Larkin, Arthur) (Entered: 08/18/2010) |
| 08/18/2010 | 176 | DECLARATION of John F. Schutty, Esq. in Opposition re: 154 MOTION in Limine *to exclude certain evidence, and admit certain evidence*.. Document filed by Alan Newton. (Attachments: # 1 Exhibit A - NYPD Summary of Findings Regarding Criminal Cases Investigated by the Property Clerk Division at the Request of the Innocence Project)(Schutty, John) (Entered: 08/18/2010) |
| 08/18/2010 | 177 | MEMORANDUM OF LAW in Opposition re: 154 MOTION in Limine *to exclude certain evidence, and admit certain evidence*.. Document filed by Alan Newton. (Schutty, John) (Entered: 08/18/2010) |
| 08/19/2010 | 178 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Arthur G. Larkin dated 8/19/10 re: I request until Wednesday, September 1, 2010, to submit reply papers. ENDORSEMENT: The City's reply papers must be submitted on 9/1/10. Plaintiff's reply papers are due as scheduled. If plaintiff's counsel needs an additional extension he must submit his own request., (Replies due by 9/1/2010.) (Signed by Judge Shira A. Scheindlin on 8/19/10) (rjm) (Entered: 08/20/2010) |
| 08/20/2010 | 179 | NOTICE OF APPEARANCE by Maurice L Hudson on behalf of The City of New York (Hudson, Maurice) (Entered: 08/20/2010) |
| 08/20/2010 | 180 | REPLY MEMORANDUM OF LAW in Support re: 145 MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*. MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*.. Document filed by The City of New York. (Larkin, Arthur) (Entered: 08/20/2010) |
| 08/20/2010 | 181 | DECLARATION of Arthur G. Larkin in Support re: 145 MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*. MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*.. Document filed by The City of New York. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit) (Larkin, Arthur) (Entered: 08/20/2010) |
| 08/25/2010 | 182 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from John F. Schutty dated 8/23/10 re: counsel for plaintiff writes that last Friday, Your Honor issued an "Endorsed. Order" that allows the defendants Wednesday, September 1, 2010 to file reply papers in support of their motions in limine based on the vacation schedule of defense counsel. ENDORSEMENT: |

# A-35.3

| | | |
|---|---|---|
| | | Plaintiff's request for an extension to file reply papers in support of their motions in limine is hereby granted. The submission date for Plaintiffs reply papers are now September 1, 2010. (Signed by Judge Shira A. Scheindlin on 8/24/10) (pl) (Entered: 08/25/2010) |
| 08/26/2010 | 183 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from John F. Schutty dated 8/24/2010 re: Requesting that the Court reject the new arguments set forth in the defendants' reply brief. If the Court deems it necessary to consider these new arguments, then plaintiff requests permission to submit a sur-reply brief. ENDORSEMENT: Plaintiff's request to submit a sur-reply brief regarding Defendants' motion to dismiss is hereby granted. Plaintiff's sur-reply brief is not to exceed five pages double spaced, and must be submitted no later than August 30, 2010. No further submissions will be accepted on this motion. The parties are hereafter prohibited from contacting Chambers in regards to this motion via phone, email, personal visits, fax, morse code or any other means of communication that they might attempt. Their consistent bickering has usurped on inordinate amount of the Court's time. (Signed by Judge Shira A. Scheindlin on 8/25/2010) (jpo) (Entered: 08/26/2010) |
| 08/26/2010 | 184 | SUPPLEMENTAL MEMORANDUM OF LAW in Opposition re: 145 MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*. MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c). Sur-Reply*. Document filed by Alan Newton. (Schutty, John) (Entered: 08/26/2010) |
| 09/01/2010 | 185 | DECLARATION of John F. Schutty, Esq. in Support re: 157 AMENDED MOTION in Limine *Amended Notice of Motion*.. Document filed by Alan Newton. (Schutty, John) (Entered: 09/01/2010) |
| 09/01/2010 | 186 | DECLARATION of Robert Dennison in Support re: 157 AMENDED MOTION in Limine *Amended Notice of Motion*.. Document filed by Alan Newton. (Attachments: # 1 Exhibit A, Expert Witness Report of Robert Dennison (Parole Expert) dated June 30, 2010 (with attachments))(Schutty, John) (Entered: 09/01/2010) |
| 09/01/2010 | 187 | REPLY MEMORANDUM OF LAW in Support re: 157 AMENDED MOTION in Limine *Amended Notice of Motion*.. Document filed by Alan Newton. (Schutty, John) (Entered: 09/01/2010) |
| 09/01/2010 | 188 | REPLY MEMORANDUM OF LAW in Support re: 154 MOTION in Limine *to exclude certain evidence, and admit certain evidence*.. Document filed by The City of New York. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit) (Larkin, Arthur) (Entered: 09/01/2010) |
| 09/14/2010 | 189 | AFFIDAVIT OF SERVICE of Summons and Amended Complaint,,,,,. Patricia Ryan served on 8/26/2010, answer due 9/16/2010. Service was made by Mail. Document filed by Alan Newton. (Schutty, John) (Entered: |

# A-35.4

| | | |
|---|---|---|
| | | 09/14/2010) |
| 09/14/2010 | 190 | MEMORANDUM AND OPINION #99422 re: 145 MOTION to Dismiss and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c). MOTION to Dismiss and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c). filed by The City of New York. For the foregoing reasons, defendants' motion to dismiss the reinstated claims regarding plaintiff s third, sixth, and ninth causes of action is granted. The Clerk of the Court is directed to close this motion (docket no. 145). SO ORDERED. (Signed by Judge Shira A. Scheindlin on 9/14/2010) (jmi) Modified on 9/17/2010 (ajc). (Entered: 09/14/2010) |
| 09/21/2010 | 191 | NOTICE OF APPEARANCE by Meghan Ann Cavalieri on behalf of Ryan Bernard, Roland Harris, Tracy Haskins, Robert T. Johnson, Geraldine Kiely, Douglas Leho, Joanne Newbert, William Sean O'Toole, Michael Sheehan, The City of New York (Cavalieri, Meghan) (Entered: 09/21/2010) |
| 09/21/2010 | 192 | OPINION AND ORDER accordingly, plaintiff does not meet the standard for reconsideration, and his request for leave to file a motion for reconsideration is denied. (Signed by Judge Shira A. Scheindlin on 9/20/10) (cd) (Entered: 09/21/2010) |
| 09/21/2010 | 193 | ORDER: For the reasons stated on the record at the telephone conference on September 17, 2010 and in Court on September 21, 2010, both plaintiffs and defendants' motions in limine are granted in part and denied in part. The Clerk of the Court is directed to close these motions [Docket Nos. 154, 156, 157]. (Signed by Judge Shira A. Scheindlin on 9/21/2010) (jfe) (Entered: 09/22/2010) |
| 09/21/2010 | | Minute Entry for proceedings held before Magistrate Judge Theodore H. Katz: Settlement Conference held on 9/21/2010. (eef) (Entered: 09/23/2010) |
| 09/27/2010 | 194 | STIPULATION AND ORDER REGARDING STIPULATED FACTS CONCERNING THE DNA TESTING PERFORMED ON THE V.J. RAPE KIT AND ALAN NEWTON: On July 6, 2006, Justice John J. Byrne of the Supreme Court for the State of New York, County of Bronx, issued an order in Mr. Newton's criminal action entitled "Decision and Order Vacating Conviction and dismissing Indictment" This order states: "The motion to vacate the judgment and conviction and to dismiss the indictment under Section 440.10(1)(g) is hereby granted. the foregoing constitutes the decision and order of the Court. So Ordered (Signed by Judge Shira A. Scheindlin on 9/26/2010) (js) (Entered: 09/27/2010) |
| 10/04/2010 | 195 | TRANSCRIPT of proceedings held on 9/17/2010 before Judge Shira A. Scheindlin. (jn) (Entered: 10/05/2010) |
| 10/13/2010 | 196 | TRANSCRIPT of proceedings held on September 21, 2010 11:15 a.m. before Judge Shira A. Scheindlin. (ajc) (Entered: 10/13/2010) |
| 10/14/2010 | 197 | ORDER; that Defendants' Letter dated October 11, 2010 and Plaintiff's Reply Letter dated October 13, 2010 are hereby ordered docketed. (Signed by Judge |

# A-35.5

| | | |
|---|---|---|
| | | Shira A. Scheindlin on 10/14/10) (pl) (Entered: 10/15/2010) |
| 10/14/2010 | 198 | LETTER addressed to Judge Shira A. Scheindlin from Aruthur G. Larkin dated 10/11/10 re: counsel for defendants write to request the modifications to the court's proposed jury charge that are set forth in this Letter.(pl) (Entered: 10/15/2010) |
| 10/14/2010 | 199 | LETTER addressed to Judge Shira A. Scheindlin from John F. Schutty dated 10/13/10 re: counsel for plaintiff writes referring to Arthur G. Larkin Esq.'s October 11, 2010 letter requesting further changes to the Court's proposed jury charges. Document filed by Alan Newton.(pl) (Entered: 10/15/2010) |
| 10/22/2010 | 200 | OPINION AND ORDER, #99586 that for the foregoing reasons, defendants' Rule 50 motion to dismiss plaintiffs negligence claim is granted, and plaintiffs cross-motion is denied. All other Rule 50 motions, made at the close of plaintiff's case, are denied in their entirety. (Signed by Judge Shira A. Scheindlin on 10/22/10) (pl) Modified on 10/22/2010 (pl). Modified on 10/25/2010 (ajc). Modified on 11/4/2010 (pl). (Entered: 10/22/2010) |
| 10/22/2010 | | Transmission to Judgments and Orders Clerk. Transmitted re: 200 Memorandum & Opinion, to the Judgments and Orders Clerk. (pl) (Entered: 10/22/2010) |
| 11/01/2010 | 202 | TRANSCRIPT of proceedings held on September 23, 24, 27, 28, 29, 30 2010 before Judge Shira A. Scheindlin. (ajc) (Entered: 11/03/2010) |
| 11/01/2010 | 203 | TRANSCRIPT of proceedings held on October 1,4,5,6, 2010 before Judge Shira A. Scheindlin. (ajc) (Entered: 11/03/2010) |
| 11/01/2010 | 204 | TRANSCRIPT of proceedings held on October 14, 18, 19, 2010 before Judge Shira A. Scheindlin. (ajc) (Entered: 11/03/2010) |
| 11/01/2010 | 205 | TRANSCRIPT of proceedings held on 10/07,12,13,/2010 before Judge Shira A. Scheindlin. (ama) (Entered: 11/03/2010) |
| 11/02/2010 | 201 | JUDGMENT #10,1922 That the plaintiff have judgment in the sum of $18,000,000.00 as against The City of New York; $500,000.00 as against Jack J. Trabitz; $92,000.00 as against Sergeant Patrick J. McGuire; and judgment is entered in favor of defendants Kiely and Haskins as to plaintiff's IIED claims. (Signed by Judge Shira A. Scheindlin on 11/2/10) (Attachments: # 1 NOTICE OF RIGHT TO APPEAL)(ml) (Entered: 11/02/2010) |
| 11/10/2010 | 206 | ORDER. It is hereby ORDERED that defendants submit their post-trial motion and supporting briefs by November 30, 2010. Plaintiff's opposition papers are due by December 14, 2010. Defendants' reply papers, if any, are due by December 21, 2010. IT IS FURTHER ORDERED that Plaintiff's 42 U.S.C. § 1988 application for attorney's fees is due two weeks after entry of the order deciding defendants' post-trial motions; defendants' opposition is due two weeks thereafter; and plaintiff's reply, if any, is due one week after defendants' opposition is filed. (Post-Trial Motions due by 11/30/2010. Responses due by 12/14/2010, Replies due by 12/21/2010.) (Signed by Judge Shira A. Scheindlin on 11/9/10) (rjm) (Entered: 11/10/2010) |
| 11/30/2010 | 207 | MOTION to Set Aside Verdict *and for other relief*. Document filed by |

# A-35.6

|  |  |  |
|---|---|---|
|  |  | Patrick J. McGuire, The City of New York, Jack Trabitz.(Larkin, Arthur) (Entered: 11/30/2010) |
| 11/30/2010 | 208 | DECLARATION of Arthur G. Larkin in Support re: 207 MOTION to Set Aside Verdict *and for other relief.*. Document filed by Patrick J. McGuire, The City of New York, Jack Trabitz. (Attachments: # 1 Exhibit A (Letter to court 9/2/10), # 2 Exhibit B (Letter to court 9/14/10), # 3 Exhibit C (2/26/08 conference transcript excerpt))(Larkin, Arthur) (Entered: 11/30/2010) |
| 11/30/2010 | 209 | MEMORANDUM OF LAW in Support re: 207 MOTION to Set Aside Verdict *and for other relief.*. Document filed by Patrick J. McGuire, The City of New York, Jack Trabitz. (Larkin, Arthur) (Entered: 11/30/2010) |
| 12/14/2010 | 210 | NOTICE OF APPEARANCE by David Thomas Goldberg on behalf of Alan Newton (Goldberg, David) (Entered: 12/14/2010) |
| 12/14/2010 | 211 | DECLARATION of John F. Schutty, Esq. in Opposition re: 207 MOTION to Set Aside Verdict *and for other relief.*. Document filed by Alan Newton. (Attachments: # 1 Exhibit A: Letter from John F. Schutty, Esq to the Hon. Shira Scheindlin dated October 4, 2010, # 2 Exhibit B: Letter from John F. Schutty, Esq to the Hon. Shira Scheindlin dated September 20, 2010)(Schutty, John) (Entered: 12/14/2010) |
| 12/14/2010 | 212 | MEMORANDUM OF LAW in Opposition re: 207 MOTION to Set Aside Verdict *and for other relief.*. Document filed by Alan Newton. (Schutty, John) (Entered: 12/14/2010) |
| 12/21/2010 | 213 | REPLY MEMORANDUM OF LAW in Support re: 207 MOTION to Set Aside Verdict *and for other relief.*. Document filed by Patrick J. McGuire, The City of New York, Jack Trabitz. (Larkin, Arthur) (Entered: 12/21/2010) |
| 01/19/2011 | 214 | TRANSCRIPT of proceedings held on October 29, 2008 before Magistrate Judge Debra C. Freeman. (jab) (Entered: 01/19/2011) |
| 01/19/2011 | 215 | TRANSCRIPT of proceedings held on September 4, 2008 before Magistrate Judge Debra C. Freeman. (jab) (Entered: 01/19/2011) |
| 01/19/2011 | 216 | TRANSCRIPT of proceedings held on January 22, 2009 before Magistrate Judge Debra C. Freeman. (jab) (Entered: 01/19/2011) |
| 02/18/2011 |  | Minute Entry for proceedings held before Magistrate Judge Theodore H. Katz: Settlement Conference held on 2/18/2011. (eef) (Entered: 02/24/2011) |
| 05/12/2011 | 217 | OPINION AND ORDER,#100332 re: 207 MOTION to Set Aside Verdict. filed by The City of New York, Patrick J. McGuire, Jack Trabitz. For the foregoing reasons, the City's motion to set aside the verdict is granted in its entirety. The Clerk of the Court is directed to close this motion [Docket No. 207] and this case. (Signed by Judge Shira A. Scheindlin on 5/12/11) (pl) Modified on 5/18/2011 (ajc). (Entered: 05/12/2011) |
| 05/27/2011 | 218 | CLERK'S JUDGMENT That for the reasons stated in the Court's Opinion and Order dated May 12, 2011, the City's motion to set aside the verdict is granted in its entirety; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 5/27/11) (Attachments: # 1 notice of right to appeal)(ml) (Entered: |

## A-35.7

| | | |
|---|---|---|
| | | 05/27/2011) |
| 06/23/2011 | 219 | NOTICE OF APPEAL from 218 Clerk's Judgment, 217 Opinion & Order. Document filed by Alan Newton. Filing fee $ 455.00, receipt number 465401009959. (nd) (Entered: 06/24/2011) |
| 06/24/2011 | | Transmission of Notice of Appeal to the District Judge re: 219 Notice of Appeal. (nd) (Entered: 06/24/2011) |
| 06/24/2011 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 153 Proposed Jury Instructions filed by Alan Newton, 207 MOTION to Set Aside Verdict *and for other relief.* filed by The City of New York, Patrick J. McGuire, Jack Trabitz, 166 Declaration in Opposition to Motion,,,,,, filed by Alan Newton, 129 Endorsed Letter,, 58 Declaration in Opposition to Motion,, filed by Alan Newton, 53 Order,,,,,, 100 Memorandum of Law in Support of Motion filed by Alan Newton, 199 Letter, filed by Alan Newton, 155 Memorandum of Law in Support of Motion,, filed by The City of New York, 20 Protective Order, 208 Declaration in Support of Motion, filed by The City of New York, Patrick J. McGuire, Jack Trabitz, 109 Memorandum of Law in Support of Motion, filed by The City of New York, 13 Affidavit of Service Complaints filed by Alan Newton, 211 Declaration in Opposition to Motion, filed by Alan Newton, 131 Memorandum & Opinion,, 188 Reply Memorandum of Law in Support of Motion, filed by The City of New York, 78 Order, Set Deadlines/Hearings,,,,,,,, 60 Declaration in Opposition to Motion filed by Alan Newton, 81 Declaration in Opposition to Motion, filed by Alan Newton, 110 Order, 15 Affidavit of Service Complaints filed by Alan Newton, 184 Memorandum of Law in Opposition to Motion, filed by Alan Newton, 96 Reply Affidavit in Support of Motion, filed by Patrick J. McGuire, Geraldine Kiely, Robert T. Johnson, Joanne Newbert, Jack Trabitz, Tracy Haskins, The City of New York, Douglas Leho, Ryan Bernard, William Sean O'Toole, Roland Harris, Michael Sheehan, 34 Endorsed Letter, 113 Order,, 107 MOTION for Certificate of Appealability *and for an order certifying this court's decision and order of Oct. 13, 2009, for interlocutory appeal, pursuant to 28 U.S.C. sec. 1292(b).* filed by The City of New York, 10 Affidavit of Service Complaints filed by Alan Newton, 97 Reply Memorandum of Law in Support of Motion, filed by Patrick J. McGuire, Geraldine Kiely, Robert T. Johnson, Joanne Newbert, Jack Trabitz, Tracy Haskins, The City of New York, Douglas Leho, Ryan Bernard, William Sean O'Toole, Roland Harris, Michael Sheehan, 63 Declaration in Support of Motion,,, filed by Joanne Newbert, The City of New York, Douglas Leho, Ryan Bernard, William Sean O'Toole, Roland Harris, Michael Sheehan, 51 Rule 56.1 Statement filed by Joanne Newbert, The City of New York, Douglas Leho, Ryan Bernard, William Sean O'Toole, Roland Harris, Michael Sheehan, 24 Order Referring Case to Magistrate Judge, 172 Memorandum of Law in Support of Motion, filed by Alan Newton, 177 Memorandum of Law in Opposition to Motion filed by Alan Newton, 175 Memorandum of Law in Opposition to Motion, filed by The City of New York, 93 Declaration in Support of Motion, filed by Alan Newton, 121 Brief filed by The City of New York, 117 Declaration in Opposition to Motion,,, filed by Patrick J. McGuire, Geraldine Kiely, Robert T. Johnson, Joanne Newbert, Jack Trabitz, Tracy |

## A-35.8

Haskins, The City of New York, Douglas Leho, Ryan Bernard, William Sean O'Toole, Roland Harris, Michael Sheehan, 217 Memorandum & Opinion, 181 Declaration in Support of Motion,, filed by The City of New York, 148 Pretrial Statement filed by The City of New York, 76 Declaration in Support of Motion,, filed by Alan Newton, 213 Reply Memorandum of Law in Support of Motion filed by Patrick J. McGuire, Jack Trabitz, The City of New York, 125 Reply Memorandum of Law in Support of Motion filed by Alan Newton, 64 Reply Memorandum of Law in Support of Motion, filed by Joanne Newbert, The City of New York, Douglas Leho, Ryan Bernard, William Sean O'Toole, Roland Harris, Michael Sheehan, 37 Order,, 206 Order, Set Deadlines/Hearings,,,, 55 Declaration in Support of Motion,,,,, filed by Joanne Newbert, The City of New York, Douglas Leho, Ryan Bernard, William Sean O'Toole, Roland Harris, Michael Sheehan, 165 Memorandum of Law in Opposition to Motion, filed by Alan Newton, 33 Endorsed Letter, Set Hearings,,,, 69 Declaration in Support of Motion,,, filed by Patrick J. McGuire, Geraldine Kiely, Robert T. Johnson, Jack Trabitz, The City of New York, 179 Notice of Appearance filed by The City of New York, 136 Order, 119 Brief filed by Alan Newton, 104 Memorandum & Opinion,, 198 Letter filed by Various Jane Does, Patrick Buffalino, Geraldine Kiely, Robert T. Johnson, Adrian Merrick, Jack Trabitz, Ryan Bernard, William Sean O'Toole, Various John Does, Bruce J. Major, Robert L. Moore, Bruce Kessler, The City of New York, Douglas Leho, Patricia Brandow, Roland Harris, Walter Smith, John F. Carroll, Patrick McKeon, Rafael Curbelo, David Deangelis, Tracy Haskins, George Kuttler, Anthony Russo, Colleen Dundas, Various John/Jane Does, (John Doe) Hartfield, Patrick J. McGuire, Stacey Edelbaum, Joanne Newbert, Jerome Nathanson, Michael Sheehan, John P. Higgins, 143 Order,, 132 Memorandum & Opinion, 176 Declaration in Opposition to Motion, filed by Alan Newton, 9 Affidavit of Service Complaints filed by Alan Newton, 56 Amended Answer to Complaints, filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Ryan Bernard, William Sean O'Toole, The City of New York, Douglas Leho, Roland Harris, Tracy Haskins, Patrick J. McGuire, Joanne Newbert, Michael Sheehan, 65 Endorsed Letter, 103 Declaration in Support of Motion filed by Alan Newton, 28 Declaration in Support of Motion,, filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Ryan Bernard, William Sean O'Toole, Andrea Freund, The City of New York, Douglas Leho, Roland Harris, Patrick J. McGuire, Joanne Newbert, Michael Sheehan, 21 Endorsed Letter, 99 Declaration in Support of Motion,,,, filed by Alan Newton, 108 Declaration in Support of Motion, filed by The City of New York, 2 Notice of Appearance filed by The City of New York, 185 Declaration in Support of Motion filed by Alan Newton, 156 MOTION in Limine *Notice of Motion.* filed by Alan Newton, 151 Trial Brief filed by Alan Newton, 1 Complaint,,,, filed by Alan Newton, 146 Declaration in Support of Motion,,, filed by The City of New York, 200 Memorandum & Opinion, 167 Trial Memorandum filed by The City of New York, 197 Order, 194 Stipulation and Order, Set Deadlines/Hearings,,,, 128 Order,,,,, 145 MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*. MOTION to Dismiss *and/or Preclude Pursuant to Rule 37(b)(2), for Reconsideration Pursuant to Local Civil Rule 6.3, and to Dismiss all Reinstated Claims Pursuant to Rule 12(c)*.

## A-35.9

filed by The City of New York, 210 Notice of Appearance filed by Alan Newton, 112 Endorsed Letter,,, 150 Proposed Jury Instructions filed by The City of New York, 218 Clerk's Judgment, 12 Affidavit of Service Complaints filed by Alan Newton, 135 Memorandum & Opinion,, 11 Affidavit of Service Complaints filed by Alan Newton, 61 Memorandum of Law in Opposition to Motion filed by Alan Newton, 46 Order, 42 Notice of Appearance, filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Ryan Bernard, William Sean O'Toole, Mario Merola, Phillip Galligan, Andrea Freund, The City of New York, Douglas Leho, Roland Harris, Tracy Haskins, Patrick J. McGuire, (John Doe) Hartfield, Joanne Newbert, Michael Sheehan, 40 Scheduling Order,,,, 31 Endorsed Letter,,,,,, 212 Memorandum of Law in Opposition to Motion filed by Alan Newton, 6 Affidavit of Service Complaints filed by Alan Newton, 180 Reply Memorandum of Law in Support of Motion, filed by The City of New York, 73 FIRST MOTION to Add Party(ies) Alan Newton. filed by Alan Newton, 140 Order,,,,, 186 Declaration in Support of Motion, filed by Alan Newton, 62 Declaration in Opposition to Motion,, filed by Alan Newton, 70 Memorandum of Law in Support of Motion, filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, The City of New York, Patrick J. McGuire, 57 Response in Opposition to Motion filed by Alan Newton, 43 Order, Set Deadlines/Hearings,,,,,, 183 Endorsed Letter, Set Deadlines/Hearings,,,,,, 123 Memorandum of Law in Opposition to Motion filed by Alan Newton, 106 Memorandum & Opinion, 19 Endorsed Letter, 102 Memorandum of Law in Opposition to Motion, filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Ryan Bernard, William Sean O'Toole, The City of New York, Douglas Leho, Roland Harris, Tracy Haskins, Patrick J. McGuire, Joanne Newbert, Michael Sheehan, 85 Rule 56.1 Statement filed by Alan Newton, 66 Endorsed Letter, 5 Endorsed Letter, Set Deadlines/Hearings,, 30 Reply Memorandum of Law in Support of Motion,, filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Ryan Bernard, William Sean O'Toole, Andrea Freund, The City of New York, Douglas Leho, Roland Harris, Patrick J. McGuire, Joanne Newbert, Michael Sheehan, 3 Endorsed Letter, Set Deadlines/Hearings,, 149 Exhibit List filed by The City of New York, 68 MOTION for Partial Summary Judgment *dismissing all federal claims related to the rape kit in plaintiff's criminal case.* filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Mario Merola, The City of New York, Patrick J. McGuire, 114 MOTION for Reconsideration *of the court's opinion and order of Oct. 13, 2009.* filed by The City of New York, 168 Memorandum of Law in Support of Motion, filed by Alan Newton, 39 Endorsed Letter,,,,, 36 Endorsed Letter, 189 Affidavit of Service Complaints filed by Alan Newton, 50 Declaration in Support of Motion,, filed by Ryan Bernard, William Sean O'Toole, The City of New York, Douglas Leho, Roland Harris, Joanne Newbert, Michael Sheehan, 27 Memorandum of Law in Support of Motion,, filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Ryan Bernard, William Sean O'Toole, Andrea Freund, The City of New York, Douglas Leho, Roland Harris, Patrick J. McGuire, Joanne Newbert, Michael Sheehan, 122 Endorsed Letter, 80 Declaration in Opposition to Motion filed by Alan Newton, 52 Memorandum of Law in Support of Motion filed by Ryan Bernard, William Sean O'Toole, The City of New York, Douglas Leho, Roland Harris, Joanne Newbert, Michael Sheehan, 79 Declaration in Opposition to Motion,,,,,,, filed by Alan Newton, 38 Endorsed Letter, Set

# A-35.10

Deadlines/Hearings,,,,,, 118 Memorandum of Law in Opposition to Motion, filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Ryan Bernard, William Sean O'Toole, The City of New York, Douglas Leho, Roland Harris, Tracy Haskins, Patrick J. McGuire, Joanne Newbert, Michael Sheehan, 137 Endorsed Letter,, 90 Endorsed Letter,,, 59 Declaration in Opposition to Motion filed by Alan Newton, 95 Endorsed Letter, Set Deadlines,,,, 157 AMENDED MOTION in Limine *Amended Notice of Motion*. filed by Alan Newton, 101 Declaration in Opposition to Motion, filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Ryan Bernard, William Sean O'Toole, The City of New York, Douglas Leho, Roland Harris, Tracy Haskins, Patrick J. McGuire, Joanne Newbert, Michael Sheehan, 178 Endorsed Letter, Set Deadlines/Hearings,, 115 Memorandum of Law in Support of Motion filed by The City of New York, 14 Affidavit of Service Complaints filed by Alan Newton, 83 Memorandum of Law in Opposition to Motion filed by Alan Newton, 127 Endorsed Letter, 88 Order, 47 Order, Add and Terminate Parties,, 77 Memorandum of Law in Support of Motion filed by Alan Newton, 71 Rule 56.1 Statement filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, The City of New York, Patrick J. McGuire, 120 Memorandum of Law in Opposition to Motion filed by Alan Newton, 138 Amended Complaint,,,,, filed by Alan Newton, 8 Scheduling Order,,, 193 Order on Motion in Limine,,,,, 182 Endorsed Letter, Set Scheduling Order Deadlines,,,, 86 Endorsed Letter,,, 191 Notice of Appearance, filed by Geraldine Kiely, Robert T. Johnson, Ryan Bernard, William Sean O'Toole, The City of New York, Douglas Leho, Roland Harris, Tracy Haskins, Joanne Newbert, Michael Sheehan, 190 Memorandum & Opinion,,, 72 Notice of Reassignment of Referral to Magistrate Judge, 139 Answer to Amended Complaint filed by Geraldine Kiely, Jack Trabitz, The City of New York, Tracy Haskins, Patrick J. McGuire, 48 Order,,,, 7 Order Referring Case to Magistrate Judge, 92 SECOND MOTION to Add Party(ies) Alan Newton. filed by Alan Newton, 126 Reply Memorandum of Law in Support of Motion filed by The City of New York, 49 MOTION for Partial Summary Judgment. filed by Ryan Bernard, William Sean O'Toole, The City of New York, Douglas Leho, Roland Harris, Joanne Newbert, Michael Sheehan, 17 Affidavit of Service Complaints filed by Alan Newton, 26 MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*. MOTION for Judgment on the Pleadings *pursuant to Rule 12(c)*. filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Ryan Bernard, William Sean O'Toole, Andrea Freund, The City of New York, Douglas Leho, Roland Harris, Patrick J. McGuire, Joanne Newbert, Michael Sheehan, 4 Answer to Complaint, filed by Geraldine Kiely, Robert T. Johnson, Jack Trabitz, Ryan Bernard, William Sean O'Toole, Andrea Freund, The City of New York, Douglas Leho, Roland Harris, Patrick J. McGuire, Joanne Newbert, Michael Sheehan, 94 Memorandum of Law in Support of Motion filed by Alan Newton, 147 Memorandum of Law in Support of Motion, filed by The City of New York, 130 Memorandum & Opinion,,,, 32 Memorandum & Opinion, 173 Memorandum of Law in Support of Motion, filed by Alan Newton, 116 Endorsed Letter, Set Deadlines/Hearings,,,, 192 Memorandum & Opinion, 219 Notice of Appeal filed by Alan Newton, 67 Order Referring Case to Magistrate Judge, 174 Declaration in Support of Motion,,, filed by Alan Newton, 45 Order, Set Deadlines/Hearings,,,, 87 Order,,,,,,, 105 Memorandum & Opinion, Set

# A-35.11

| | | |
|---|---|---|
| | | Deadlines,,,,,,,,, 25 Endorsed Letter, Set Deadlines,,,, 16 Affidavit of Service Complaints filed by Alan Newton, 154 MOTION in Limine *to exclude certain evidence, and admit certain evidence.* filed by The City of New York, 201 Judgment, 209 Memorandum of Law in Support of Motion filed by Jack Trabitz, The City of New York, Patrick J. McGuire, 29 Memorandum of Law in Opposition to Motion filed by Alan Newton, 169 Memorandum of Law in Support of Motion, filed by Alan Newton, 171 Memorandum of Law in Support of Motion, filed by Alan Newton, 18 Affidavit of Service Complaints filed by Alan Newton, 152 Proposed Voir Dire Questions filed by Alan Newton, 134 Stipulation and Order of Voluntary Dismissal, 98 MOTION for Discovery *to Compel Production of "O'Connor Memorandum".* filed by Alan Newton, 170 Memorandum of Law in Support of Motion, filed by Alan Newton, 124 Declaration in Support of Motion filed by Alan Newton, 187 Reply Memorandum of Law in Support of Motion filed by Alan Newton, 89 Endorsed Letter, were transmitted to the U.S. Court of Appeals. (nd) (Entered: 06/24/2011) |
| 10/19/2011 | 220 | ORDER: The Clerk of the Court is ORDERED to accept the attached documents for filing, add them to the docket sheet for this case, and transmit them to the United States Court of Appeals for the Second Circuit, forthwith. (Signed by Judge Shira A. Scheindlin on 10/18/2011) (jfe) (Entered: 10/19/2011) |
| 10/19/2011 | | Transmission to Docket Assistant Clerk. Transmitted re: 220 Order,, to the Docket Assistant Clerk for case processing. (jfe) (Entered: 10/25/2011) |
| 10/19/2011 | 221 | Letter addressed to Judge Shira A. Scheindlin from Arthur G. Lerkin dated 11/3/2009 re: Counsel writes to apprise the Court of controlling Second Circuit authority that requires dismissal of plaintiff's last remaining federal claim, his Monell claim arising out of the City's inability to produce the rape kit. (jfe) (Entered: 10/25/2011) |
| 10/19/2011 | 222 | Letter addressed to Judge Shira A. Scheindlin from Arthur G. Lerkin dated 6/15/2010 re: Counsel request that plaintiff's request for relief should be denied in its entirety. (jfe) (Entered: 10/25/2011) |
| 10/19/2011 | 223 | Letter addressed to Judge Shira A. Scheindlin from Arthur G. Lerkin dated 6/17/2010 re: Counsel writes in order to apprise the Court that defendants withdraw the following objections set forth within to plaintiff's latest documents request. (jfe) (Entered: 10/25/2011) |
| 10/19/2011 | 224 | Letter addressed to Judge Shira A. Scheindlin from Arthur G. Lerkin dated 7/22/2010 re: Counsel request that plaintiff's application for relief, or to file a formal motion for relief, under 60 (b), should be denied. (jfe) (Entered: 10/25/2011) |
| 10/19/2011 | 225 | Letter addressed to Judge Shira A. Scheindlin from Arthur G. Lerkin dated 8/23/2010 re: Counsel request permission, nunc pro tunc, to file the attached reply memorandum which exceed Your Honor's page limits for replies. (jfe) (Entered: 10/25/2011) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X
ALAN NEWTON,               :

                                :

               Plaintiff,       :

         -against-            :      **COMPLAINT**

                                :

                                :

THE CITY OF NEW YORK; DISTRICT ATTORNEYS MARIO  :
MEROLA AND ROBERT T. JOHNSON, INDIVIDUALLY,  :
AND IN THEIR OFFICIAL CAPACITY; ANDREA FREUND  :      **JURY TRIAL**
AND VARIOUS JOHN/JANE DOES, INDIVIDUALLY AND  :      **DEMANDED**
IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES OF THE  :
CITY OF NEW YORK WHO ARE/ WERE ASSISTANT  :
DISTRICT ATTORNEYS WITHIN THE OFFICE OF THE  :
DISTRICT ATTORNEY, COUNTY OF BRONX; DETECTIVE  :
JOANNE NEWBERT, DETECTIVE PHILLIP GALLIGAN,  :
DETECTIVE [JOHN DOE] HARTFIELD, DETECTIVE  :
[JOHN DOE] RYAN, DETECTIVE [JOHN DOE] HARRIS,  :
POLICE OFFICER DOUGLAS LEHO, POLICE OFFICER  :
WILLIAM SEAN O'TOOLE, LIEUTENANT MICHAEL  :
SHEEHAN, SERGEANT PATRICK J. McGUIRE, POLICE  :
OFFICER [JOHN DOE] HASKINS, POLICE OFFICER  :
[JANE DOE] KIELY, INSPECTOR JACK J. TRABITZ  :
AND VARIOUS JOHN/JANE DOES, INDIVIDUALLY  :
AND IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES  :
OF THE CITY OF NEW YORK WHO ARE/ WERE MEMBERS  :
OF THE POLICE DEPARTMENT OF THE CITY OF NEW  :
YORK,                                        :

                                :

            Defendants.       :
------------------------------------------------------------------------------X

       Plaintiff, Alan Newton, by and through his attorney, John F. Schutty of the Law

Office of John F. Schutty, P.C., complaining of the Defendants, alleges, as follows:

**JURISDICTION & VENUE**

       1.     This action arises under the Constitution of the United States, particularly

the Fourth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United

States through the Civil Rights Act, Title 42 U.S.C. §§ 1983 and 1988, as well as Article

I, §§ 6 and 11 of the New York State Constitution, for the violation of Plaintiff Alan Newton's civil rights.

2. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

3. This Court also has supplemental, ancillary and pendant jurisdiction to adjudicate all claims asserted under state law herein under 28 U.S.C §§ 1367.

4. The acts and transactions constituting the civil rights violations occurred in the County of the Bronx, in the Southern District of New York. In addition, Defendants reside, are found, have agents, or transact their affairs in the Southern District of New York. Venue is therefore, proper in this district pursuant to 28 U.S.C. §§ 1391 (b).

**THE PARTIES**

5. Plaintiff Alan Newton was, at the time of most of the acts alleged herein, a citizen of the United States and resident of the County of Bronx at 1330 Webster Avenue, Apt. 21K. At the time of some of the acts alleged herein he was housed at various correctional facilities within the State of New York. Plaintiff presently resides at 1624 Remsen Avenue, Brooklyn, New York 11216.

6. At all times referred to herein, Defendant The City of New York ("The City") was and still is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York, and situated within the Southern District of New York.

7. At all times referred to herein, the Police Department of the City of New York (hereinafter "NYPD") was and still is an agency or instrumentality of The City,

situated within the Southern District of New York. The NYPD did not and does not have a legal identity separate and apart from Defendant The City.

8. At all times referred to herein, Defendants Mario Merola and Robert T. Johnson were the elected District Attorneys of Bronx County for The City (hereinafter referred to, respectively, as "DA Merola" and "DA Johnson"), and Defendant Andrea Freund, Esq. (hereinafter "ADA Freund"), John F. Carroll, Esq. (hereinafter "ADA Carroll"), Robert Moore, Esq. (hereinafter "ADA Moore"), Rafael Curbello, Esq. (hereinafter "ADA Curbello"), and various John/Jane Doe Assistant District Attorneys (hereinafter "ADA John/Jane Does"), were Assistant District Attorneys in the Office of the District Attorney, County of Bronx.

9. Upon information and belief, at all relevant times, Defendants DA Merola, DA Johnson, ADA Freund, and ADA Carroll, ADA Moore, ADA Curbello, and various ADA John/Jane Does, were acting within the scope of their employment as District Attorneys or Assistant District Attorneys for the State of New York.

10. Upon information and belief, at all relevant times, Defendants DA Merola, DA Johnson, ADA Freund, and ADA Carroll, ADA Moore, ADA Curbello, and various ADA John/Jane Does, were acting under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the City and State of New York and under the authority of the Bronx District Attorney's Office.

11. At all times referred to herein, Defendant The City, by its agents, servants, and representatives, was responsible for the operation, maintenance and control of the NYPD and the Bronx County District Attorney's Office and the selection, training,

supervision, evaluation and disciplining of NYPD personnel and Assistant District Attorneys in the Bronx County District Attorney's Office.

12.     At all times referred to herein, Defendants DA Merola and DA Johnson, as the District Attorneys for Bronx County, were the responsible policy makers for Defendant The City and the State of New York with respect to the management of the Bronx County District Attorney's Office.

13.     At all times referred to herein, Defendants DA Merola, DA Johnson, ADA Freund, and ADA Carroll, ADA Moore, ADA Curbello, and various ADA John/Jane Does, acted on behalf of Defendant The City and the State of New York as municipal policymakers with the granted authority to: (a) determine what exculpatory information and records should be gathered and disclosed during the investigation and prosecution of individuals suspected or accused of crimes; (b) determine what evidence and testimony should be gathered presented at grand jury proceedings, hearings and at trial; (c) ensure that criminal investigations are conducted thoroughly and diligently;  (d) ensure that evidence is not withheld or falsified; (e) ensure that witnesses do not commit perjury or give inaccurate testimony; (f) ensure that criminal proceedings are handled ethically and in accordance with the laws and Constitutions of the State of New York and the United States; (g) assert arguments that have a basis in fact and law, (h) conduct thorough and diligent investigations to protect the rights of the innocent, and (i) ensure that criminal evidence is properly registered, stored, preserved, maintained and produced in a timely manner to a criminal defendant and his/her attorneys.

14. At all times referred to herein, Defendant Detective Joanne Newbert (Shield 2604) (hereinafter "Newbert") was employed by the Defendant The City as a police officer.

15. At all times referred to herein, Defendant Detective Phillip Galligan (Shield 614) (hereinafter "Galligan") was employed by the Defendant The City as a police officer.

16. At all times referred to herein, Defendant Detective [John Doe] Hartfield (hereinafter "Hartfield") was employed by the Defendant The City as a police officer.

17. At all times referred to herein, Defendant Detective [John Doe] Ryan (hereinafter "Ryan") was employed by the Defendant The City as a police officer.

18. At all times referred to herein, Defendant Detective [John Doe] Harris (hereinafter "Harris") was employed by the Defendant The City as a police officer.

19. At all times referred to herein, Defendant Police Officer Douglas Leho (Shield 21937) (hereinafter "Leho") was employed by the Defendant The City as a police officer.

20. At all times referred to herein, Defendant Police Officer William Sean O'Toole (Shield 1836) (hereinafter "O'Toole") was employed by the Defendant The City as a police officer.

21. At all times referred to herein, Defendant Lieutenant Michael Sheehan (hereinafter "Sheehan") was employed by the Defendant The City as a senior police officer and a supervisor, policy maker and Commanding Officer of the NYPD's Bronx Sex Crimes Unit.

22. At all times referred to herein, Defendant Sergeant Patrick J. Maguire (hereinafter "McGuire") was employed by the Defendant The City as a police officer.

23. At all times referred to herein, Defendant Police Officer [John Doe] Haskins (hereinafter "Haskins") was employed by the Defendant The City as a police officer.

24. At all times referred to herein, Defendant Police Officer [Jane Doe] Kiely (hereinafter "Kiely") was employed by the Defendant The City as a police officer.

25. At all times referred to herein, Defendant Inspector Jack J. Trabitz (hereinafter "Trabitz") was employed by the Defendant The City as a senior police officer and a supervisor, policy maker and Commanding Officer of the NYPD's Property Clerk's Division.

26. At all times referred to herein, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz and various NYPD John/Jane Does, individually and in their official capacities as employees of the City of New York, who are/were members of the NYPD, were employed by the Defendant The City as police officers and were involved in acts and/or omissions relating to the arrest of Plaintiff Alan Newton and/or the registration and/or maintenance and/or storage and/or control of evidence relating to Plaintiff's arrest and conviction under Bronx Indictment No. 2441/84.

27. Upon information and belief, and at all relevant times, Defendants Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz and various NYPD John/Jane Does, individually and in their official capacities as employees of the City of New York who are/were members of

the Police Department of the City of New York, acted within the scope of their employment as police officers for Defendant The City.

28. At all times referred to herein, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz and various NYPD John/Jane Does, individually and in their official capacities as employees of The City who are/were members of the NYPD, were acting under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the City and State of New York and under the authority of Defendant The City.

29. At all times referred to herein, Defendant The City, through its agents, servants and representatives, including Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz and various NYPD John/Jane Does, individually and in their official capacities as employees of The City who are/were members of the NYPD, were responsible for the unbiased investigation of crimes, the apprehension of proper suspects, the weighing of eyewitness evidence against alibi evidence, the pursuit and study of physical evidence, and the providing of accurate information for prosecution to the Bronx District Attorney's Office and other prosecutorial authorities; these Defendants were also responsible for other functions, including giving truthful evidence, revealing exculpatory evidence (and refraining from withholding or falsifying evidence), making further inquiry when reasonable in a criminal investigation (and not deviating from accepted practices in that regard), and preserving and properly storing critical evidence resulting from a criminal investigation and/or conviction; these Defendants were obliged to perform all these functions in accordance

with the Constitutions and laws of the State of New York and the United States to ensure that innocent people are not arrested, prosecuted, convicted and incarcerated unjustly.

## NOTICE OF CLAIM & ARTICLE 50(H) HEARING

30. Plaintiff Alan Newton served written Notice of Claim upon The City and NYPD on September 29, 2006. More than thirty (30) days have passed since the service and filing of said Notice and the claim has not been settled or otherwise resolved.

31. On December 19, 2006, Plaintiff Alan Newton appeared and answered questions posed by counsel for The City at a hearing held pursuant to Section 50-H of the General Municipal Law.

32. Plaintiff Alan Newton has satisfied all conditions precedent for the filing of the within action.

## INTRODUCTION TO THE CLAIM

33. Plaintiff Alan Newton was released from prison on July 6, 2006 after an incarceration of more than twenty-two years for a crime that he did not commit. The People of the State of New York alleged that he assaulted, robbed and raped a 25-year old woman (hereinafter referred to as "VJ" to protect her identity) on June 23, 1984 (Bronx Indictment No. 2441/84). Plaintiff was convicted of this crime based solely on questionable eyewitness identifications. No other evidence corroborated the questionable witness identifications created, cultivated and shaped by NYPD investigators and the Bronx District Attorney's Office.

34. Throughout twenty-two plus years of incarceration, Mr. Newton steadfastly maintained that he was innocent and, in refusing to admit guilt for the crime, he was denied parole on three separate occasions. He endured a lengthier imprisonment

to avoid any admission of guilt that might hinder a future opportunity to establish his innocence.

35.    With advancements in forensic (DNA) evidence after his conviction, and after exculpatory evidence lost or secreted by the NYPD was located, Mr. Newton was finally exonerated of the assault, robbery and rape charges brought against him under Bronx County Indictment No. 2441/84.  See Justice John J. Byrne's July 6, 2006 Order vacating the latter conviction (and dismissing the accusatory instrument).

## FACTUAL AND PROCEDURAL BACKGROUND

36.    On May 27, 1984, Plaintiff was twenty-two (22) years old.  He was then employed by New York Telephone Company as a business representative trainee.  He had been previously and consistently employed since graduating high school as a bank teller – first, at the Dime Savings Bank, and then, at Manufacturer's Hanover Trust Co. He was living with his mother, two brothers and a sister (four other sisters lived elsewhere) in a five bedroom apartment at 1330 Webster Avenue, Bronx, New York.

37.    On June 23, 1984, a 25-year old woman, "VJ" [although VJ is now deceased, her name has been abbreviated to protect her family's privacy], was horrifically beaten and raped at 4:00 a.m. after exiting a convenience store in the Bronx.  The rapist, in an apparent effort to prevent a subsequent identification, cut the victim's face with a box cutter, blinding her in the left eye.  VJ, an epileptic and admitted alcoholic, had taken her epilepsy medication and then consumed at least ten or eleven glasses of beer before encountering her assailant.  She initially told police his name was "Willie" and she offered only a vague description of him.  After Mr. Newton's mug shot photograph was shown to VJ, however, she misidentified Mr. Newton as her assailant and began to use

Mr. Newton's features to describe her assailant. Despite a solid alibi, Mr. Newton was indicted for the horrific June 23, 1984 rape, robbery and assault.

38. Under separate counts of Bronx Indictment No. 2441/84, Plaintiff Alan Newton was accused of raping, robbing and assaulting VJ, twice, between 4:00 and 5:00 a.m. on June 23, 1984. Plaintiff adamantly denied that he was the assailant and he presented an alibi defense that was supported by two other witnesses.

39. By the end of June, 1984, the criminal charges filed against Plaintiff developed increasing momentum: the victim, initially uncertain about her identification of Mr. Newton, grew increasingly confident after further, tainted meetings with NYPD investigators and ADA Freund; NYPD investigators and ADA Freund, who became unreasonably and increasingly convinced that they had arrested the correct man, ceased their investigation into other likely suspects, failed to follow leads that would have taken them away from Plaintiff, and failed to test physical evidence that might have proved Plaintiff was innocent; the District Attorney's Office aggressively prosecuted Mr. Newton as a sex offender, even after the complaining witnesses expressed an admitted lack of confidence in their identifications.

40. The first positive thing that happened to Mr. Newton in twenty-two years was that the Bronx District Attorney's Office located a long-missing "rape kit" containing semen collected from the victim of the June 23, 1984 rape; Mr. Newton had requested this evidence eleven years earlier. A DNA test on the semen evidence conclusively established that: (1) Mr. Newton was not the rapist, and (2) Mr. Newton had been misidentified by the victim (and another witness).

41. On July 6, 2006, Justice John Byrne vacated Mr. Newton's conviction for rape, assault and robbery under Bronx County Indictment No. 2441/84 and dismissed the underlying accusatory instrument.

42. We now know that Plaintiff was unjustly convicted of rape, robbery and assault under Bronx Indictment No. 2441/84 due to a gross disregard for Plaintiff's constitutional rights by NYPD investigators and members of the Bronx District Attorney's Office. The investigation and prosecution of the crime by the Defendants was woefully tainted and flawed, and material evidence was withheld from Plaintiff and his attorneys. The pre-conviction taints and flaws were only enhanced by the separate, wrongful post-conviction acts of certain Defendants while he was incarcerated – the intentional withholding and/or reckless loss of critical exculpatory evidence in violation of Plaintiff's constitutional rights. The Defendants' conduct demonstrates that the Defendants acted with a reckless disregard for Plaintiff's constitutional rights -- during their investigation of the crime, during their prosecution of Plaintiff at pretrial hearings and trial, and during Plaintiff's subsequent incarceration.

### The Robbery, Rape & Assault of VJ

43. The victim of the alleged crime, VJ, began the evening of June 22, 1984 by visiting her mother and her mother's boyfriend at an apartment on 158th Street in the Bronx. The trio spent the evening consuming five quarts of beer of "Old English" beer. VJ, an admitted alcoholic, drank at least eight or nine glasses of beer at that time. She fell asleep, woke up after midnight, and walked to a friend's apartment at 169th Street and Third Avenue, where she drank more beer – at least two more glasses. VJ then decided to visit her ex-boyfriend Robert Lee Dwight at his apartment at 180th Street.

44.     VJ had begun to suffer from epileptic seizures after a beating at the hands of her then-boyfriend, Mr. Dwight, in 1979 or 1980.  To control her seizures, she had been taking Phenobarbital (30 milligrams) and Dilantin (20 milligrams) every day.  Phenobarbital is a barbiturate with anticonvulsant effects; it is used to treat and prevent seizures; it acts by slowing down the brain and nervous system, thereby reducing the spread of seizure activity.  Dilantin, the brand name for Phenytoin, is also an anticonvulsant that acts on the motor cortex to inhibit seizure activity.  Epilepsy patients are regularly warned that alcohol should not be consumed after taking Phenobarbital or Dilantin because alcohol enhances the effects of the drugs – extreme drowsiness, motor impairment, dizziness, lightheadedness and unsteadiness increase and intensify.

45.     Though VJ had been warned not to mix her epilepsy medication with alcohol, she was still taking her daily epilepsy medication and drinking beer in June, 1984.  In fact, she began the evening of June 22, 1984 by taking her epilepsy medication (Dilantin and Phenobarbital) and then consuming, admittedly, a substantial amount of alcohol -- *at least* ten or eleven glasses of beer -- in direct violation of her doctor's instructions.  Since VJ was a very petite woman (she was 5' foot tall and weighed about 100 pounds), the consumption of ten or eleven glasses of potent beer, coupled with the epilepsy medication, would have caused her to be in an undeniable state of intoxication/inebriation late that evening and early the next morning.

46.     At approximately 4:00 a.m., VJ entered a bodega/superette located at 4373 Third Avenue (at 180th Street) intending to purchase yet more alcohol -- another quart of "Old English" beer.  Only one other person was present in the store at that time – the store clerk, Ms. Aurea Gonzalez.  Ms. Gonzalez had begun her shift at 7:00 p.m. and had

been working nine hours already by 4:00 a.m. Ms. Gonzalez heard a car horn honk just before VJ entered the store, and then she observed VJ enter the store followed immediately by a black man. As VJ was approaching the front counter with her quart of Old English beer, the black man also approached the front counter where the clerk was positioned. As VJ spoke with the store clerk, VJ saw the black man's face only for a few seconds.

47. Although VJ claimed at trial that she had never seen this black man before, he entered the bodega moments after VJ, and the clerk heard him say "hurry up" as he left the front counter where VJ and the store clerk were talking. This man was in the store for only a few moments; he departed shortly after purchasing a pack of cigarettes; VJ followed after him moments later; the two patrons were in the store just for a few minutes.

48. Leaving the store, VJ allegedly decided not to visit Mr. Dwight and began to look for a cab. Ms. Gonzalez testified at trial that she observed the man, and then VJ, enter the car parked just outside the store – with no sign of a struggle. VJ, on the other hand, claimed that "a man" suddenly grabbed her from behind after she left the superette; he allegedly grabbed her by the mouth, put a silver box cutter razor to her throat, and forced her, first, into a two-door blue and white Pontiac Grand Prix.

49. In the car, VJ allegedly recognized the man as the customer she had seen moments earlier in the bodega. He drove to Southern Boulevard, made a right turn, and drove a few more blocks. As the man made another right turn, the car stalled on a hill. VJ, who had been in the car for two minutes, allegedly could not get out because the door latch on the passenger door was missing.

50. The man dragged VJ out of the car and took her to a nearby park. He threw her on the grass, called her a "bitch," and sodomized her. He then raped her, took her cigarettes and money, and left. VJ followed him and pleaded with him to return her money. After he returned her money and cigarettes, she went back to look for her shoes.

51. VJ headed towards Southern Boulevard, but "he came back." She believed that the same man that had sodomized and raped her in the park had returned and grabbed her from behind; he dragged her back up the hill and took her into a "dark," abandoned building. With the razor again in his hand he took her up to the third floor landing. There were no lights inside the building and there were no street lights nearby. She nevertheless believes that it was the same man who had sodomized and raped her in the park because, when the man sat on her chest, she saw his face briefly in the dark.

52. In the landing area, the man raped her again, called her "bitch," and cut her face and chest repeatedly with the box cutter. He ejaculated inside of her. He took her money and fled. VJ passed out. When she came to, she left the abandoned building, went to a call box, and requested police assistance. According to VJ, the entire incident -- from when she was first forced into the car until she called the police -- took approximately forty-five minutes.

### The NYPD Investigation of the Crime

**A.    Initial Contact with VJ**

53. On June 23, 1984, between 5:13 and 5:21 a.m., Police Officer Douglas Leho arrived at the call box located at 176th Street and Marmian Avenue in response to VJ's call for assistance. When he arrived, VJ was hysterical and was bleeding profusely from wounds on her face and chest. She told Officer Leho that she had been abducted,

slashed and raped; she was able to supply only the most minimal description of her attacker: "a male black approximately 27 years of age wearing a beige shirt, pants. That is about it." She also advised him that her assailant had used a blue and white Grand Prix automobile to abduct her. Officer Leho transported VJ immediately to Jacobi Hospital.

54.     At the hospital, a "rape kit" was used to collect critical physical evidence from VJ's body. The "rape kit," containing among other things, blood, semen and hairs collected from VJ's body, was delivered to NYPD investigators for processing and testing. Ultimately, an NYPD serologist, Detective Harris, was assigned the task of testing the physical evidence within the rape kit. For some unexplained reason, NYPD investigators, including Detective Harris, failed to: (a) determine the blood type of VJ's assailant from the collected semen, or (b) compare the head, body and/or pubic hair to those of the victim or any suspect. The rape kit was "vouchered" and soon otherwise dismissed as irrelevant with regards to the police and DA Office investigation.

55.     VJ underwent lengthy surgery on June 23; she was in serious condition and was unable to convey much substantive information to the NYPD investigation team assigned to her case that day. Detective Joanne Newbert did, however, speak briefly with the VJ at 12:30 p.m., just prior to her surgery on June 23.

**B.     The Crime Scene Investigation**

56.     After speaking briefly with VJ at Jacobi Hospital, Detective Newbert then went with an NYPD investigation team to the call box which VJ had used early that morning. Following a trail of blood, NYPD investigators (Newbert, Galligan, Hartfield and O'Toole) went into an abandoned building located at 861 Crotona Park North. A

piece of a mirror and a pack of cigarettes were found on the third floor landing, but no "useful" fingerprints allegedly were found or recovered.

57. According to Detective Newbert, the crime scene in the abandoned building (the third floor landing where the second attack took place) "was not sealed off"; no attempt was made to secure any fingerprints (by her or the crime scene unit) because the walls in that location were "filthy" and there was, in any event, likely to "be a slew" of fingerprints according to Newbert. Upon information and belief, NYPD investigators conducted no search, cursory or otherwise, of Crotona Park where the first attack occurred.

**C.** **"Willie" Is the First Suspect**

58. Detective Newbert testified that, during the earliest stage of the NYPD investigation on June 23, VJ told her that a man named "Willie" had attacked her. Based upon that information, NYPD investigators (Detectives Galligan, Newbert, Hartfield and Police Officer O'Toole) canvassed the area around Crotona Park North on the afternoon of June 23 looking for witnesses; they found a woman who knew someone named "Willie." This woman stated that she knew a "Willie" who drove a blue and white Pontiac and that he lived on the third floor of the abandoned building where the second attack took place. Detectives Newbert and Galligan, however, discounted the reliability of this seemingly relevant information claiming that Ms. Chamberlin was a "drug addict" who had been arrested several times. Ms. Chamberlin also allegedly provided the NYPD investigators with a "bogus" name and home address. Her real name and arrest record were never produced to Mr. Newton or his attorneys.

59.     When Detective Galligan returned to the vicinity of 861 Crotona Park North the next day (June 24), he allegedly was unsuccessful in his attempts to find either Ms. Chamberlin or the blue and white Pontiac.   Detective Galligan testified that Ms. Chamberlin had ten prior arrests and that she had previously used five different names. Detective Galligan admitted that he stopped looking for Ms. Chamberlin after June 25 because Alan Newton became the "target" of the NYPD investigation -- to the exclusion of all others -- based on VJ's "identification."

60.     Detectives Newbert and Galligan ultimately reached the summary conclusion that Ms. Chamberlin could no longer be located and, in any event, they decided that she would be an unreliable and irrelevant witness in light of their belief that Alan Newton was VJ's assailant.   They took this action despite the fact that they learned that three "Willies" lived or had lived in the building where the second assault occurred. Finally, the NYPD investigators also testified that, with respect to the blue and white Pontiac, "we had information that the car was stolen."   This latter bit "information" was totally unreliable layered hearsay; the "information" was from VJ who told them that "Willie had told her that the car was stolen."

61.     Detective Galligan claimed that he had placed notes in a notebook concerning his conversation with Ms. Chamberlin.   However, he no longer had those notes at the time of Mr. Newton's criminal trial.   Detective Galligan claimed that he turned the notes over to Detective Newbert, but when he looked in her file for the case he could not find them.   Those notes have never been turned over to Mr. Newton or his attorneys and apparently they have never been found.   No further particulars were

supplied to Mr. Newton or his defense attorney about "Willie," Ms. Chamberlin, or the blue and white Pontiac.

### E. The NYPD's Tainted & Flawed "Identification" Procedures

### 1. VJ

62. VJ claimed that the man who attacked her in the abandoned building was the same man who was in the bodega and the same man who abducted her with his car. She admitted, however, that saw his face in the bodega only "for about five seconds" (or less than "60 seconds"); that she saw his face in the car for "a minute, maybe a minute and a half," and that she was never able to observe his face clearly in the park, on the street, or in the abandoned building because of the darkness and the poor lighting. In sum, she was medicated, intoxicated and she readily admitted that she was never able to obtain a good look at her assailant.

63. VJ initially told the police that someone known as "Willie" had attacked her. Her description of her assailant then changed over time. VJ initially described her assailant only in the most general of terms to NYPD investigators. First, to Police Officer Leho, in her hysterical state shortly after reporting the crime, she described her assailant only as a "male black approximately twenty-seven years of age wearing a beige shirt, pants. That is about it."

64. To Detective Newbert on June 23, VJ first described her assailant as a black man named "Willie" who was about 5'4" tall; she then inexplicably changed her estimation of his height to 5'9" and her estimation of his weight to 180 pounds claiming that he was "large." Still later, after viewing photographs and a physical lineup containing Mr. Newton, she told Detective Newbert that her assailant was 5'7" to 5'8"

tall, and weighed 150 to 160 pounds. VJ initially admitted that she did not know whether her assailant had a light or dark complexion "because it was so dark out," but then she later claimed confidently that he had a dark complexion.

65. VJ was an admitted alcoholic taking epilepsy medication; she defied her doctor's instructions and had consumed a substantial amount of alcohol just prior to the crime – at least ten or eleven glasses of "Old English" beer from quart-sized bottles. The inconsistencies in VJ's description of her assailant, therefore, should have been questioned by NYPD investigators, especially in light of her admitted physical condition at the time of the attacks; unfortunately, the description inconsistencies were never questioned by NYPD investigators (or the Bronx District Attorney's Office).

66. On June 25, 1984, VJ was shown a group of mug shot photographs at Jacobi Hospital while she was still recovering from her surgery (and loss of one eye); she was asked to tell NYPD investigators if anyone was "similar looking" to the man who had assaulted her. It was only after VJ reviewed about 200 hundred mug shot photographs that she identified Mr. Newton. Unfortunately, before the display of photographs, NYPD investigators (Newbert, Galligan, *et al.*) did not ask VJ about her assailant's features, *viz.*, his hair, eyes, nose, mouth, etc.

67. VJ's description of her assailant only became conveniently consistent after she viewed Mr. Newton's photograph and conferred with NYPD investigators about him. It is only then that she begins to describe her assailant as a black male, with short cut hair, a mustache, 5'7" to 5'8" tall, and weighing 150 to 160 pounds. NYPD investigators, specifically Defendants Leho, Newbert, Galligan, Hartfield, Ryan, and O'Toole should

have elicited a more complete description of the assailant from her first, as a check to determine how well she could recall him, before showing mug shot photographs to her.

68. As VJ recovered from her injuries in the days following the attacks, and after she was shown Mr. Newton's photograph, she downplayed any reference that she had made previously to a "Willie"; in fact, she later denied that she ever knew the name of her attacker.

69. On June 28, 1984, VJ viewed a lineup at a police station. Mr. Newton was seated in the number 5 position. VJ testified that she wasn't sure her assailant was in the number 5 position "right away." Though NYPD investigators claimed that VJ identified Mr. Newton as her assailant from simply seeing him in the lineup, Detectives Newbert and Galligan admitted in their trial testimony that VJ asked them to have each lineup participant repeat the phrase "I'll fix you so you don't identify me you bitch" -- a phrase that had been uttered by her attacker -- before a positive identification was recorded. In other words, VJ could not make an immediate identification of Mr. Newton when she first observed him in a lineup.

70. Three very flawed attempts at a voice identification were then conducted. During the first procedure, each member of the lineup remained seated and, in numerical order, they repeated the phrase *while the shade was up in the viewing room*. VJ claimed that she could not hear Mr. Newton's voice, alleging that he had spoken the phrase too softly. Mr. Newton then was asked to repeat the phrase a second time; according to Detective Newbert, every other member of the lineup had repeated the phrase once. Detective Galligan and VJ, on the other hand, testified that each member of the lineup

repeated the phrase a second time while standing "five or six inches" in front of the viewing window.

71.     Following Mr. Newton's repeat of the phrase a second time at the viewing window with the shade up, VJ told Detective Newbert that she still was unable to hear number 5, and she left the viewing room "shaking her head"; the men then were told to go to a side door of the lineup room, which was slightly ajar, where they again repeated the phrase while VJ stood on the other side of the door.  Following the third procedure, VJ told the police that number 5 was the person who attacked her.  Mr. Newton was arrested shortly after the third voice identification procedure.

72.     During the first two voice identification procedures, NYPD Investigators impermissibly (a) advised the lineup members each to speak in the numerical order in which they had been viewed by VJ, while (b) allowing VJ to view the lineup participants as they spoke.  Detective Galligan admitted that there was a shade on the one-way mirror, which, if pulled down, would have prevented VJ from seeing the men as they spoke; the shade nevertheless remained up during the first two voice identification procedures. Detective Newbert recalled that VJ was viewing the one-way mirror as the lineup participants spoke.  During the third voice identification procedure, which took place at the side door, VJ was unable to see the men as they spoke.  However, during this final procedure, the lineup participants were still speaking in the numerical order in which they had been sitting (one through six).

73.     Police Officer O'Toole, who was inside the lineup room, recalled that the five fillers thought the voice identification procedure was a "big joke."  At least one of the fillers, who regularly participated in lineups at the Precinct in question, testified that

this lineup was "different" because lineup members had to approach the viewing glass, speak, and show their mouths and teeth. From his vantage point, O'Toole could not see whether the shade was up or down on the one-way mirror during the voice identification procedures, but he believed that the shade should have been down if they were testing only for a voice identification.

74. With respect to the reliability of VJ's identification of Mr. Newton as her assailant, perhaps the most egregious conduct occurred when VJ telephoned the Bronx District Attorney's Office (ADA Freund) a few days prior to start of the criminal trial and advised that she was no longer "positive" that Mr. Newton was her assailant. ADA Freund advised the trial judge: "I cannot state to the Court the exact words she used."

75. The importance of the precise substance of that discussion between ADA Freund and VJ cannot be overstated; nevertheless, ADA Freund withheld exactly what VJ said from the court, Mr. Newton and his attorney. Under these circumstances, ADA Freund and the Bronx District Attorney's Office showed a callous disregard for Mr. Newton's constitutional rights; ADA Freund had an obligation to disclose precisely what VJ had said in recanting prior to trial. Moreover, ADA Freund also should have requested that the Wade Hearing be reopened to take evidence on the subject of VJ's identification confidence as she remained in exclusive control of this vital evidence (instead, ADA Freund and the Bronx District Attorney's Office opposed defense counsel's request that the Wade Hearing be reopened).

76. At trial (before the jury), VJ subsequently claimed that her "identification" recantation was due only to a generalized fear of reprisal; significantly, however, she offered no evidence that any threats had been made to her or her family. In front of the

jury, she admitted only that, following additional pre-trial discussions with the Bronx District Attorney's Office, she became re-convinced that Mr. Newton was the right man. In short, after an improper pleading, coaching and rehabilitation session engineered by ADA Freund and the Bronx District Attorney's Office, VJ suddenly was able to point out Mr. Newton confidently again – this time to the jury. DNA evidence has proven that VJ had, in fact, misidentified him; that her doubt as to Mr. Newton was legitimate, and that she should not have been persuaded to testify otherwise by ADA Freund and the Bronx District Attorney's Office.

### 2. Ms. Aurea Gonzalez

77. The superette clerk, Ms. Aurea Gonzalez, reluctantly offered the only other evidence against Plaintiff Alan Newton at the criminal trial.

78. Ms. Gonzalez was the sole person working at the bodega at the corner of 180th Street and Third Avenue at 4:00 a.m. on June 23, 1984. She was nearing the end of her twelve hour shift when the critical events unfolded. She admitted that the black man that she observed with VJ that night was in her store a total of "more or less one to two minutes"; that he was in front of her at the counter for a fraction of that time, and that she had never seen him before.

79. Notwithstanding the fact that Ms. Gonzalez admittedly viewed VJ's assailant, for the first time, for less than a minute or so, she somehow identified Alan Newton as the perpetrator from a photo array. DNA evidence has proven now that she misidentified him. Again, NYPD investigators failed to compel Ms. Gonzalez to provide a complete description of the black man she observed in her store before showing her a limited array of six mug shot photos (one of the photos was of Alan Newton).

80.     Ms. Gonzalez claimed that she "more or less" described the black man to NYPD investigators as "black, tall, slender"; she doesn't recall giving any further details about his physical description. Detective Newbert has admitted that she didn't ask Ms. Gonzalez for any description of the man before asking her to examine the limited six-person photo array. At trial, Ms. Gonzalez described VJ's assailant only in the most general of terms: "Black man, short hair, little moustache. He was neither too tall nor too short. He was average and he wasn't heavyset."

81.     Ms. Gonzalez was asked to look at the six-person photo array and advise only "if there was someone who looked like the person that was there at the time in the store." Ms. Gonzalez allegedly picked Alan Newton's photo from the array (his photo was in position number 2). Again, she admitted that she was asked just to pick out a person "who looked like the person" that she had seen in the store. She then subsequently was asked by NYPD investigators to pick Mr. Newton out of a lineup (he was again in position number 2 in the lineup) and she allegedly accomplished that task. Mr. Newton was offered only position number 2 in the lineup, the same position he was in within the photo array.

82.     Interestingly, and most importantly, Ms. Gonzalez, when not surrounded by NYPD investigators, was not able to point out Mr. Newton in a courtroom when asked to do so by ADA Freund -- when Ms. Gonzalez appeared for a [Wade] hearing just prior to trial. After a subsequent improper pleading, coaching and rehabilitation session engineered by ADA Freund and the Bronx District Attorney's Office, Ms. Gonzalez suddenly was able to point out Plaintiff confidently again -- to the jury at trial just a few days later. Ms. Gonzalez explained that her previous inability to make an in-court

identification was due to a "nervous condition." She conceded, however, that nobody had threatened her.

83. DNA evidence has proven that Ms. Gonzalez had, in fact, misidentified Mr. Newton; that her inability to point out Mr. Newton was highly significant, and that she should not have been persuaded to testify otherwise by ADA Freund and the Bronx District Attorney's Office.

**F. The Alibi Presented By Alan Newton**

84. Through his own testimony and that of two other witnesses, Alan Newton presented an alibi. The gist of the defense was that he was at his girlfriend's home in Queens at the time of the offense: the early morning of June 23, 1984. This information was conveyed to NYPD investigators, ADA Freund and the Bronx District Attorney's Office shortly after Mr. Newton's arrest.

85. On the evening of June 22, 1984, Alan Newton testified that he went to a movie in Brooklyn with Ms. Marva Weston and her two children. He stayed overnight at Ms. Weston's home; he denied that he was in the Bronx on either the evening of Friday, June 22, or Saturday, June 23, 1984. He strenuously denied that he had attacked VJ.

86. Ms. Marva Weston testified that on the evening on June 22, 1984, Mr. Newton went with her and her two children to a movie. Afterwards, they visited Ms. Weston's sister. Mr. Newton, Ms. Weston, and the children then returned to Ms. Weston's two-family home in Queens at 8:45 p.m. They watched television until approximately 10:00 p.m., when the children went to bed. The children got up at midnight to watch "Hottracks," a show her children routinely watched on Friday nights.

They all watched the show until 2:00 a.m., when the children went back to bed. Ms. Weston's 13-year old daughter, Lori Weston, testified in a similar manner.

87. Ms. Marva Weston and Mr. Newton slept together from 2:00 a.m. until 7:00 a.m. on June 23, 1984. At about 3:00 a.m. that morning, Ms. Weston's parents, who had been playing cards at a neighbor's house, rang the doorbell. Ms. Weston went downstairs and let her parents in. At that time, Mr. Newton was still asleep in Ms. Weston's room. According to Ms. Weston, Mr. Newton could not have left the house without her knowledge, because he would have awakened her; he could not have returned alone because he did not have a key to her home.

### G. Defendants Made No Attempt to Corroborate The Questionable Eyewitness Identifications

88. NYPD investigators (Newbert, Galligan, Hartfield, Ryan, Harris, Leho and O'Toole) and ADA Freund improperly, but admittedly, focused on Alan Newton as the "target" of their criminal investigation within forty-eight hours of the crime. They soon (along with the Bronx District Attorney's Office) failed to pursue leads to other suspects and they ignored or refused to examine evidence that would prove definitively whether Mr. Newton was guilty or innocent.

89. Mr. Newton advised the aforementioned NYPD investigators and the Bronx District Attorney's Office very early in their investigation that he had an alibi that several witnesses would support. These NYPD investigators and ADA Freund, however, callously ignored this information and failed to interview a single one of the alibi witnesses.

90. No physical evidence was ever found that linked Mr. Newton to the crime, yet there was physical evidence collected that indicated that he was not VJ's assailant.

NYPD investigators and the Bronx District Attorney's Office failed, however, to pursue the testing of this evidence or, worse, failed to disclose the results of testing that indicated that Mr. Newton was not the assailant.

91. For example, NYPD investigators had VJ's clothing in their possession following the crime. VJ had been savagely slashed and stomped by her assailant; her splattered blood would, no doubt, would have been on her assailant's clothing and footwear. In fact, Mr. Newton was told that sneaker prints were seen on her clothing. When Mr. Newton was approached for questioning, NYPD investigators seized his sneakers so that the NYPD could determine: (a) if the treads on his sneakers matched those on VJ's clothing, and (b) if any blood belonging to VJ was on his sneakers. For some unexplained reason, the blood tests were never performed (according to Detective Newbert), and the results of the sneaker tread print comparison were never disclosed to Mr. Newton or his attorney. The sneakers themselves were never returned to Mr. Newton although he has sought their return for over two decades.

92. Along these same lines, no search warrant was ever sought or issued to determine: (a) whether the clothing on the assailant described by VJ might be found within Mr. Newton's apartment, or (b) whether any clothing found within Mr. Newton's apartment had VJ's blood on it.

93. NYPD investigators (along with the Bronx District Attorney's Office) also callously refused to test the physical evidence collected from VJ's body to determine if any of it connected Mr. Newton to the crime. Specifically, the semen collected from VJ could have been tested for blood type; the head and pubic hairs collected from VJ could have been compared to Mr. Newton's head and pubic hair.

## The Suppression Hearing

94. Even though VJ was no longer convinced that Mr. Newton was her assailant, ADA Freund wrongfully opposed the reopening of the Wade Hearing to allow for questioning on VJ's post-Hearing recantation; the trial judge sided with ADA Freund and refused to reopen the Hearing stating cavalierly "Whatever happens at trial happens at trial." Unfortunately, the "whatever" did happen at trial -- an innocent man was unjustly convicted.

## The Trial Verdict

95. Jury deliberations commenced at 3:05 p.m. on May 20, 1985. At the jury's request, numerous portions of the testimony of VJ and Ms. Gonzalez were read back to the jury. Deliberations adjourned at 10:45 p.m. and resumed the following morning. Following requested "readbacks" of testimony referring to "Willie," the jury reached a verdict at 4:30 p.m. on May 21.

96. Mr. Newton was acquitted of the rape and sodomy charges that stemmed from the incident in the park. However, he was convicted of rape, assault, and robbery (all in the first degree) in connection with the attack in the abandoned building.

## Sentencing

97. On May 31, 1985, the court sentenced Mr. Newton to concurrent prison terms of 8 1/3 to 25 years for the rape and robbery charges followed by a consecutive prison term of 5 to 15 years for the assault.

## Mr. Newton's Claim of Innocence & Pursuit of Exoneration

98. Following his arrest, and throughout his trial, and twenty-two (22) years of incarceration, Mr. Newton steadfastly maintained his innocence. He repeatedly asked

agents, servants and representatives of the NYPD (specifically, Defendants Haskins, Kiely, McGuire and various John/Jane Does), and agents, servants and representatives of the Bronx District Attorney's Office (specifically, ADA Carroll, ADA Moore and ADA Curbello and John/Jane Does) commencing on August 16, 1994, to produce the DNA evidence relevant to his conviction (along with other evidence, including his confiscated sneakers). He repeatedly requested the rape kit that was used by NYPD investigators to collect semen from VJ so that DNA testing might be performed to establish his innocence.

99. The aforementioned Defendants repeatedly advised in reply that "extensive searches were conducted" at the NYPD's Property Clerk's Office, but that the rape kit (and other evidence) could not be located. In fact, the rape kit was right where it was supposed to be the entire time; in November 2005, more than eleven (11) years after it was first requested for DNA testing, the rape kit was located in the evidence barrel/bin (84B19041) specified on the evidence voucher referred to by Mr. Newton – the rape kit was right where it was supposed to be throughout those eleven years.

**The Rape Kit Is "Lost" by the NYPD Property Clerk**

100. Mr. Newton's trial for the rape of VJ occurred over two weeks in May, 1985. During the trial, People's Exhibit 13 (the rape kit) was introduced into evidence. This piece of evidence was first entered into the NYPD Property Clerk system by the NYPD Police Laboratory on June 30, 1984; at that time, it was assigned an NYPD storage bin (84B19041), and became attached to a "locator" -- Precinct Voucher Number B744483.

101. Mr. Newton first requested post-conviction DNA testing, *pro se*, on August 16, 1994. In response to this motion, ADA John F. Carroll stated:

> Intending to consent to defendant's request, your affirmant undertook an extensive investigation in order to determine the whereabouts of the aforementioned physical evidence. It now appears, however, that the physical evidence was never returned to … the New York City Police Department Property Clerk's Office … extensive searches were conducted at the New York City Police Department Property Clerk's Office … The physical evidence was not located.

Affirmation of John F. Carroll, Esq. Submitted in Opposition to Alan Newton's Request for Post-Conviction DNA Testing, dated November 1, 1994.

102. The Supreme Court of the State of New York, Bronx County, denied Mr. Newton's August 16, 1994 request for post-conviction DNA testing on November 3, 1994, but only because the rape kit, Mr. Newton's sneakers and VJ's clothing allegedly could not be located by the NYPD Property Clerk, the NYPD and the Bronx District Attorney's Office. At this point in time (1994), DNA testing was readily available, and if the rape kit had been located and the slides tested, Mr. Newton would have been exonerated of VJ's rape.

103. On March 24, 1997, Mr. Newton, again acting *pro se*, submitted renewed discovery requests to Magistrate Judge Sharon E. Grubin, including one for the allegedly lost rape kit, in connection with a *habeas corpus* petition Mr. Newton had filed with the United States District Court for the Southern District of New York. Again, Mr. Newton requested the following items:

1. Voucher # B744556-Storage # 84B24723-1, pair of men's Sneakers
2. Voucher # B744483-Storage # 84B19041, cigarette box, mirror, Vitulo Kit
3. Voucher# B744512-Storage # 85B696, victim's clothing (jeans, maroon sweater, blouse)

104.     Mr. Newton also submitted separate Freedom of Information Law (FOIL) requests to the NYPD for certain items of evidence relating to his case, including the above three items.

105.     On April 23, 1997, in response to the aforementioned requests for the evidence, ADA Robert L. Moore wrote to Judge Grubin and stated the following:

> Upon information and belief, property retained as evidence by the New York City Police Department (for cases prosecuted in Bronx County) is either stored within the Property Clerk's facility at 4715 Pearson Place, Queens New York, or in the facility located within the Bronx County Criminal Court at 215 East 161st Street, Bronx, New York. *According to a representative of the Police Department Property Clerk at the Queens facility, items (1) and (2), listed above, were not found at the location following a search on this date and records of disposition are not available. According to a representative of the Bronx Borough Property Clerk, those items were not found in the Bronx facility following a search on this date, and records of disposition are not available. As previously noted, the petitioner has been advised, in prior state proceedings, that the Rape Kit (as listed above), could not then be located.* I have been advised that item (3), as listed above, is presently stored at the Pearson Place facility. I have requested on this date, by fax, that the property (item [3]) be maintained, pending final disposition of this petition.

Letter from ADA Moore to Magistrate Judge Grubin dated April 23, 1997 (emphasis added).

106.     No documentation has ever been produced to support ADA Moore's statement that a "search" was, in fact, performed by the NYPD for the three items of evidence, but ADA Moore's letter provides the first official statement of the NYPD, the Bronx District Attorney's Office and The City that the rape kit and sneaker evidence (and the records relating to their disposition) had been lost. Some John or Jane Doe in the NYPD's Property Clerk's Office apparently advised ADA Moore that a "search" had been performed for the evidence and his/her transfer of this information to Magistrate

Judge Grubin and Mr. Newton now began to build a false and inaccurate record relating to the rape kit and sneaker evidence.

107. The NYPD officials in charge of the Pearson Place Warehouse should have known that it would be odd for the Property Clerk to keep VJ's soiled clothing, but discard or destroy other important pieces of evidence relating to the same case. The Bronx District Attorney's Office also should have found this peculiar. Nevertheless, due to the callous disregard of the Defendants, an actual physical search for the rape kit and sneaker evidence was apparently never requested or performed.

108. On July 9, 1998, Mr. Newton's attorneys filed a new motion requesting DNA testing (based on improved DNA testing techniques) on VJ's clothing, including her jeans; in connection with this motion, Mr. Newton's attorneys also renewed Mr. Newton's request for the production of the rape kit and his sneakers.

109. As to the renewed request for the rape kit and sneakers, the result of the previous "search" for the evidence (that it could not be found) was reiterated and reinforced in an Affirmation signed by ADA Rafael Curbelo dated August 25, 1998:

> . . . numerous conversations with Ms. Kiely and Police Officer Haskins of the Property Clerk's Office at Pearson Place, Queens County, none of the above items [including the rape kit] could be located. Upon information and belief, the source being the same, Vitulo [rape] Kits were preserved starting in 1988, and other items were likely destroyed in accordance with standard Police Department procedure.

Affirmation of ADA Rafael Curbelo in Opposition to Alan Newton's Renewed Motion for DNA Testing, dated August 25, 1998.

110. One week later, ADA Curbelo dispatched a letter to Mr. Newton's attorneys advising, however, that he had received a telephone call from a Ms. Kiely of the NYPD Property Clerk's Office at Pearson Place who had advised him, contrary to the

advice he had previously been given and that he had provided to the court, that VJ's clothing had been located. Letter from ADA Rafael Curbelo to Jorge Guttlein, Esq. dated September 1, 1998. ADA Curbelo's September 1 letter attached a letter from Sergeant Patrick J. McGuire of the NYPD dated August 26, 1998 (responding to ADA Rafael Curbelo's request for the clothing, rape kit and sneaker evidence). Sergeant McGuire advised:

> Storage # 85B696
> Preprint #B744512 [this is the same as the voucher #]
> Type: clothing
>
> The above voucher is currently in storage at the Property Clerk Storehouse located at Pearson Place (Bin # 2002-1)
>
> storage # 84B24723          storage #84B19041
> preprint#B744556           preprint # B744423
> [pair of men's sneakers]    [cigarette box, mirror and rape kit]
>
> *The above two vouchers are currently not in its [sic] last listed storage location.* Property generally is removed from its storage location for one of two reasons. The first is "out to court," and the second is destruction. Items that go out to court are indicated on the original invoice which is stored in the active files. Currently there is no original voucher in the active file, therefore it must have been destroyed. Items that are destroyed are indicated on the original voucher and then filed in the closed files. Unfortunately there was a fire in our facility during the summer of 1995 which destroyed these files. *This makes it impossible to say when and if the above property was destroyed. The only other means of researching the final disposition of these vouchers is through the Bronx Property Clerk office. Unfortunately, this is also a dead end. The N.Y.P.D. Records Section in connection with the Legal Bureau authorizes the Property Clerk to destroy inactive records more than six (6) years old.* As you well know, the Bronx Property Clerk Office has a lack of space and therefore they keep to that procedure.

Letter from Sergeant Patrick J. McGuire (NYPD) to ADA Rafael Curbelo dated August 26, 1998 (emphasis added).

111. Sergeant McGuire's letter contains many inconsistencies and illogical claims. Sergeant McGuire's explanation implies that (1) since the two relevant vouchers

were not in the "active" file and (2) since the "closed" files are destroyed after six years, then, (3) the evidence itself was destroyed. Sergeant McGuire suggests that evidence necessarily disappeared with the original voucher/receipt/paper marker of the evidence. His reasoning suggests that he may have never physically searched the Pearson Place Warehouse for the missing rape kit and sneakers (without a person physically searching the original storage location, and with no written indication of the kit's destruction, there was no way of knowing whether the evidence was truly destroyed).

112. On September 9, 1998, the Court granted a portion of Mr. Newton's July 9, 1998 motion, and pursuant to court order, the NYPD delivered VJ's clothing to the New York County Medical Examiner's Office ("OCME"). The OCME performed an initial screening of the clothing on October 16, 1998, without the knowledge of Mr. Newton or his counsel. On October 27, 1998, the prosecutor informed the Bronx Supreme Court that the OCME test result was "negative" for semen on the clothing. Mr. Newton then requested that he be permitted to have his own experts test the clothing. The Court granted this request, and Mr. Newton's experts also returned a "negative" result: neither test found any usable semen on the jeans. Sergeant McGuire's letter thereafter served to delay a true search for the missing rape kit for another seven years.

### Mr. Newton's Renewed FOIL Requests to the NYPD

113. In June 2002, frustrated by his then futile attempts to secure the rape kit evidence from the NYPD, Mr. Newton filed a *pro se* Freedom of Information Law ("FOIL") request with the OCME for the rape kit in the hope that the OCME had retained it after some early testing (even though Mr. Newton knew that the rape kit was supposed to be in the storage facility at Pearson Place). His FOIL request was denied because of an

exemption from disclosure that applies to the records of the OCME. Mr. Newton then, nevertheless filed similar FOIL requests for the rape kit with the NYPD and the Bronx District Attorney's Office. These requests also proved futile.

### The Pearson Place Warehouse Routinely Loses Critical Evidence

114. A veritable plethora of New York City criminal cases have been thwarted by shoddy practices at the NYPD's Pearson Place Warehouse. The Pearson Place Warehouse is currently operated (and has been operated for many years) under the supervision of Defendant Jack J. Trabitz; he is in charge of the NYPD's Property Clerk Division.

115. In addressing individual cases of lost evidence from the NYPD's Pearson Place Warehouse (in cases remarkably similar to Mr. Newton's), the Innocence Project, the entity known for obtaining hundreds of post-conviction exonerations based on DNA evidence, states the following on its website:

> In New York City, 50% of cases the Innocence Project closed in the last 10 years were closed because of reports that evidence was lost or destroyed (according to a preliminary study of Innocence Project cases from 1996 to 2006) at Pearson Place Warehouse, which stores evidence for all crimes in the five boroughs of New York City.

> Several of these closed cases involve Sergeant Patrick McGuire, who notified the Innocence Project in writing that evidence in the cases did not exist at Pearson Place Warehouse – just as he did in Alan Newton's case before the evidence was finally located at the facility, eventually leading to his exoneration.

> Following are details on six of the Innocence Project's closed cases in New York City, including three where Sgt. McGuire claimed in writing that evidence no longer exists. (Names of clients and victims in these cases have been omitted to protect their privacy.) These are among the cases for which the Innocence Project is now asking NYPD Commissioner Ray Kelly to conduct new evidence searches at Pearson Place Warehouse.

> **John Doe #1 (Bronx)**

In 1989, Doe was convicted of raping and robbing a woman in the Bronx in 1987. The perpetrator grabbed the victim from behind while she was walking home from the bus stop, dragged her into a nearby apartment building, and raped her on the rooftop. An ambulance then took her to a hospital where a rape kit was collected. The victim was allowed to go to the bathroom and clean herself before the rape kit was taken. Doe was convicted, based largely on the victim's identification of him.

The Innocence Project took the case and spent nearly four years trying to locate the rape kit and the victim's clothing to determine whether DNA testing could prove Doe's innocence. Bronx Assistant District Attorney Eliza Koenderman worked with the Innocence Project to try to locate the evidence. She requested the evidence from every agency that might have it, and secured documentation from all of the agencies claiming that they did not have custody of the evidence. The case was closed in 2005 due to lack of evidence for DNA testing.

**John Doe #2 (New York)**

In 1985, Doe was convicted of rape and robbery. He was incarcerated for 14 years, and is currently serving the remainder of his sentence on parole.

The case against Doe was based primarily on the victim's identification of him. During the trial, the prosecution also submitted testimony that biological evidence was identified in the rape kit taken from the victim immediately following the attack. The Police Laboratory Serology Section, however, did not test the samples to determine the blood type (DNA testing was not available at the time).

The Innocence Project took Doe's case in 1995. As a result of the Innocence Project's litigation, the Manhattan District Attorney's Office conducted a search for biological evidence in the case. The DA's office worked directly with officials at several NYPD units involved in the case – including the serologist from Doe's trial, the lab that examined hair evidence for the trial, and the evidence division that is responsible for receiving and returning all evidence examined in the NYPD lab – and each of them formally claimed that they no longer had the evidence from the case.

The Innocence Project ultimately closed the case after pursuing the evidence for eight years.

**John Doe #3 (Queens)**

In 1987, a woman was assaulted on the Long Island Railroad as she was returning to her home from Manhattan. The victim was raped in the train's bathroom and was unable to see her assailant because the lights in the bathroom were not working. Prior to the assault, the victim had interacted with Doe because he was the train's conductor.

The victim's sister picked her up at the train station and took her to the police station. The victim then went to the hospital, where a rape kit was collected. Two days after the assault, the victim identified Doe as the man who attacked her on the train. Although she signed a complaint identifying Doe as her assailant, in court the victim conceded that she could not have seen her attacker, and that she had misunderstood the complaint she signed.

No biological evidence was admitted at Doe's trial. He was convicted and sentenced to 4 to 12 years in prison. Doe's conviction was overturned, but later reinstated.

The Innocence Project took Doe's case in 1995. Although Thomas was out of prison on parole, he asked the Innocence Project to continue seeking DNA testing that could clear his name. In response to an Innocence Project motion, the court ordered the hospital, the MTA police, and Pearson Place Warehouse to conduct searches for biological evidence in the case. Neither the police nor the hospital had any biological evidence, and the Innocence Project subsequently secured a court order for any documents the hospital or police had relating to the case. Those documents did not provide any information about biological evidence in the case. In 2000, after nearly a decade seeking evidence, the Innocence Project closed Doe's case.

**Cases Involving Sgt. Patrick McGuire:**

**John Doe #4 (Bronx)**

In 1980, a woman was raped in the lobby of her apartment building. The perpetrator stole the victim's ID card and several of her other belongings, and he later made threatening phone calls to her. Later, he returned to her home and cut her head with a piece of glass.

The victim identified Doe as her attacker. Although biological evidence was collected during the police investigation, it was not tested or admitted at Doe's trial. In 1981, Doe was convicted of rape and sodomy.

The Innocence Project took Doe's case in 2001. Along with Doe's court-appointed attorney, the Innocence Project sought access to physical evidence in the case from the hospital and police. No biological evidence was located, and Sgt. McGuire officially notified the Innocence Project that the evidence was destroyed in a fire.

**John Doe #5 (Kings)**

Doe was convicted in January 1984 of rape in the first degree, sodomy in the first degree, and assault in the third degree. His conviction was based largely on the

victim's identification during a police lineup. Although there was a rape kit taken after the attack, it apparently was not presented as evidence in Doe's trial.

The Innocence Project took Doe's case in 1995. Knowing that if evidence from Doe's case still existed, it would be stored at Pearson Place Warehouse, the Innocence Project pursued the evidence at the facility. Sgt. McGuire helped search for the evidence. After no evidence was recovered from the on-site visit, Sgt. McGuire contacted the lab where the evidence may have been sent. The lab did not have the evidence. Sgt. McGuire had consistently maintained that the evidence was probably destroyed during a mass destruction of unclaimed property in 1992. Finally, in a 1997 letter, Sgt. McGuire officially notified the Innocence Project that the evidence in Doe's case had been destroyed. (Sgt. McGuire said that, complying with police procedure, his letter about the evidence was reviewed and approved by his supervisor.) Based on Sgt. McGuire's letter claiming that the evidence was destroyed, the Innocence Project closed Doe's case in 1997.

**John Doe #6 (Kings)**

In July of 1985, Doe was convicted of murder, rape, sodomy, and several weapons possessions charges. When a man and two women who were sitting in a park in East New York, a man armed with a gun approached them and demanded their money and oral sex from one of the women. The perpetrator tied up the man. The woman struggled with the perpetrator, who shot and killed her. The assailant then raped the other woman.

When Doe was arrested, he was wearing underwear that were bloodstained (he said that this was because he suffers from a kidney infection). The Innocence Project took Doe's case and sought testing on his underwear, as well as on the victim's rape kit and clothing. In 1997, after a search for evidence, the Innocence Project received written notification from McGuire's that the biological evidence from Doe's case was destroyed, and the case was closed.

Innocence Project Website, http://www.innocenceproject.org/Content/397.php.

116.    It is widely known that NYPD's inventory and storage operations at the Pearson Place are, and have been for many years, beyond crude and outdated.  Despite widespread criticism of the condition of the Pearson Place warehouse, and internal reports suggesting the need for remedial measures, none have been undertaken to modernize the system for finding old (pre-1990's) evidence.

117. It is also widely known that the NYPD employed questionable policies and practices with regard to the registration, storage, control and production of evidence to criminal defendants. Some of these questionable practices and procedures have been detailed by the Innocence Project in the quoted material above.

**The Rape Kit Is Finally Found at the Pearson Place Warehouse – 11 Years Later**

118. Mr. Newton eventually convinced the Innocence Project to assist him in one final quest for the long lost rape kit. Attorney Vanessa Potkin of the Innocence Project dispatched an e-mail to ADA Elisa Koenderman requesting that the Bronx District Attorney's Office and NYPD make one last, good-faith effort to locate the rape kit. The NYPD Property Clerk's office was asked to assign someone who would individually search for and retrieve the rape kit from its storage bin; this request advised the District Attorney's Office and NYPD of the same evidence bin/barrel number that Mr. Newton had been providing since 1994.

119. This time, rather than cite merely to the voucher, ADA Koenderman requested a direct physical examination of storage bin number 84B19041. This time, the Property Clerk's office found the missing rape kit -- exactly where it was supposed to be for the last eleven years -- in storage bin number 84B19041. The rape kit apparently had never been moved from its original storage bin location. Instead of making a direct physical search of the Pearson Place Warehouse storage bin where the evidence was designated to be, agents, servants and representatives of NYPD (including, but not limited to, Kiely, Haskins, McGuire *et al.*) had previously and wrongfully reported back to the Bronx District Attorney's Office that the loss of the paper vouchers indicated that the evidence had been destroyed.

120. Considering the information supplied by NYPD personnel (including Kiely, Haskins, and McGuire), it seems clear that no NYPD official ever actually took the step of looking for the missing evidence beyond looking up a bare file entry connected to the voucher numbers; they performed merely a cursory review of the existing records and files attached to voucher number B744483, found nothing, and concluded that the evidence had been destroyed. The fact that the jeans evidence from the case still existed should have alerted any number of people to the possibility that the rape kit had not been destroyed in accordance with any specific policy on dated evidence: under any such policy, all of the evidence from the case would have been destroyed contemporaneously and, therefore, the existence of some parts of the evidence implied the existence of the rest.

121. Because the NYPD acts as the final gatekeeper of evidence at Pearson Place, any representations its members made to the Bronx District Attorney's Office effectively set the final status of the evidence. Between 1994 and 2005, had the NYPD made an in-person search of storage bin number 84B19041, rather than a cursory search for the voucher (number B744483) associated with the storage location, they would have found VJ's rape kit. Mr. Newton's request for DNA testing could have led to his exoneration for the rape of VJ twelve years earlier – in 1994.

**Mr. Newton's Conviction Is Vacated**

122. The rape kit, once found, was submitted to the New York City Office of the Chief Medical Examiner, Department of Forensic Biology ("OCME"), and the evidence was split to enable replicate testing by an independent laboratory. In April 2006, Forensic Science Associates ("FSA") obtained a full male STR DNA profile from

the testing of the vaginal and cervical swabs. The OCME's testing of the cervical swab, completed in March 2006, yielded a partial profile, consistent with FSA's result. New reference samples were collected from Mr. Newton and both FSA and the OCME generated Mr. Newton's DNA profile; it was compared to the profile obtained from the spermatozoa in the rape kit. The DNA testing conclusively excluded Mr. Newton as the source of the spermatozoa recovered from the victim immediately after the rape.

123. On July 6, 2006, Justice John Byrne of the Supreme Court of the State of New York (Criminal Term), County of Bronx, granted the joint motion of the Bronx County District Attorney's Office and defense counsel and vacated Mr. Newton's conviction pursuant to CPL § 440.10 (1) [newly discovered evidence], and dismissed the underlying accusatory instrument.

### Mr. Newton's Damages

124. Alan Newton suffered substantial injuries and/or damages as a result of his unjust conviction and imprisonment, including but not limited to the following: twenty-two (22) years of physical suffering, pain, mental anguish, emotional distress, nervousness, depression, sleep disturbance, shame, embarrassment and humiliation caused by his arrest, conviction and the loss of his freedom; loss of enjoyment of life; injury to his reputation; loss of friends; the loss of his family's company during his incarceration (both of his parents died during his incarceration); psychological injury caused by his lengthy incarceration; loss of earnings/ pecuniary loss, and the reasonable and necessary expenses associated with the defense he was compelled to present in the criminal action (including, but not limited to, his attorney's fees).

**LEGAL CLAIMS**

**FEDERAL LAW CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**AGAINST INDIVIDUAL NYPD DEFENDANTS FOR THEIR**
**WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL RIGHTS UNDER**
**COLOR OF STATE LAW (UNDULY SUGGESTIVE I.D. PROCEDURES)**

125.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 124, inclusive, with the same force and effect as if set forth at length herein.

126.    Defendants Newbert, Galligan, Hartfield, Ryan, Leho, O'Toole and various NYPD John/Jane Does, acting within the scope of their employment and under color of state law, conducted unduly suggestive identification procedures that were highly likely to, and in fact did, lead two eyewitnesses to misidentify Plaintiff, including without limitation:

a.    Failing to determine the VJ's competency to describe and/or identify her assailant in light of her condition at the time of the alleged crime (she was medicated and intoxicated);

b.    Failing to elicit detailed descriptions of VJ's assailant from the two eyewitnesses before showing them photographs and exposing them to lineups;

c.    Showing the eyewitnesses photo arrays in which Plaintiff's photograph was noticeably different from all other photographs;

d.    Showing the eyewitnesses photo arrays including Plaintiff's photograph at their homes and work places (or a hospital) prior to the eyewitnesses viewing Plaintiff in a physical lineup;

e. Pressuring the eyewitnesses to make an identification of Plaintiff in spite of eyewitness statements that they "were not sure";

f. Informing the eyewitnesses of Plaintiff's identity, address, and other identifying characteristics before obtaining a full description of VJ's assailant from them (and before the physical lineup and display of photographs);

g. Informing the eyewitnesses that Plaintiff, a prime suspect in the rape of VJ, would be one of the people in the physical lineup;

h. Informing the eyewitnesses that Plaintiff, a prime suspect in the rape of VJ, had been charged with another assault in the County of Bronx;

i. Conducting a woefully defective voice identification procedure with VJ that permitted her to view each of the participants as they spoke;

j. Conducting a woefully defective voice identification procedure with VJ that required Plaintiff, and Plaintiff alone, to speak a requested phrase several times more than the other participants;

k. Purposely provoking Plaintiff during the voice identification procedure with VJ so that VJ would see and hear Plaintiff, and Plaintiff alone, speak in an angry and loud tone; and

l. Engaging in post-identification suggestion by telling the eyewitnesses who had tentatively identified Plaintiff that the eyewitnesses had selected the right person and that "the other" witness also had identified him.

127. Defendants Newbert, Galligan, Hartfield, Ryan, Leho, O'Toole and various NYPD John/Jane Does committed these and other unduly suggestive acts

intentionally and/or with reckless disregard to Mr. Newton's clearly established constitutional rights and the obvious risks of inducing the eyewitnesses to misidentify. These actions were taken despite other evidence indicating that Mr. Newton was innocent. No reasonable police officer would have believed these procedures were lawful or would produce a reliable identification.

128.   As a direct and proximate result of these unduly suggestive procedures, two eyewitnesses misidentified Mr. Newton as VJ's assailant both before and at trial, in violation of Mr. Newton's constitutional right to a fair trial and right not to be deprived of liberty without due process of law.

129.   The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment. Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

130.   Due to the unconstitutional misconduct of Defendants Newbert, Galligan, Hartfield, Ryan, Leho, O'Toole and various NYPD John/Jane Does, Alan Newton suffered decades of wrongful imprisonment and endured substantial physical, emotional and pecuniary injuries detailed above.

131. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

132. Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Leho, O'Toole, and various NYPD John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**SECOND CAUSE OF ACTION
AGAINST INDIVIDUAL NYPD DEFENDANTS
FOR THEIR WRONGFUL VIOLATION OF
PLAINTIFF'S CIVIL RIGHTS UNDER COLOR OF STATE LAW
(FALSE ARREST & IMPRISONMENT & MALICIOUS PROSECUTION)**

133. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 132, inclusive, with the same force and effect as if set forth at length herein.

134. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, acting within the scope of their employment and under color of state law, wrongfully arrested and detained Mr. Newton pursuant to legal process knowing: (a) that the only evidence -- two eyewitness identifications -- linking Mr. Newton to the crime alleged were highly suspect; (b) that they had collected physical evidence that they failed or refused to test, and then "lost" the evidence so no one else could test it; (c) that VJ had originally identified another man named "Willie" as her assailant; (d) that a man named "Willie" might be linked to the crime scene and the type of automobile used by the assailant; (e) that Mr. Newton had an apparent alibi, and (f) that there was an absolute absence of any physical evidence linking Mr. Newton to the

victim or the crime scene. In short, the aforementioned NYPD police officers knew or should have known that they did not have probable cause for an arrest, detention and prosecution of Plaintiff Alan Newton.

135. First, neither eyewitness provided anything close to a satisfactory identification as seen above. VJ was intoxicated, medicated and, by her own admission, did not obtain a good and clear look at her assailant. The only other witness, Ms. Gonzalez, saw VJ's assailant for less than a minute or so at the front counter of her store.

136. Second, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does collected physical evidence from two crime scenes, but failed to perform or ensure follow up testing to confirm Mr. Newton's guilt or innocence. In particular, these Defendants collected blood, semen and hairs from the victim, and sneakers from Mr. Newton, but failed to perform testing on these items to determine whether any links existed between the victim, Mr. Newton or some third person. These same Defendants then proceeded to hide, secrete or lose this physical evidence in reckless disregard of Mr. Newton's constitutional rights.

137. Third, Defendants Newbert, Galligan, Hartfield, Ryan, O'Toole, and various NYPD John/Jane Does met with and interviewed a witness (Ms. Deborah Chamberlin) who offered information about a named "Willie" who may have been VJ's true assailant. These Defendants, however, wrongfully and with reckless disregard for Mr. Newton's constitutional rights, dismissed the information offered by Ms. Chamberlin as "unreliable" and failed to reveal the true identity of this witness and her potentially exculpatory information from Mr. Newton and his attorneys. In fact, these Defendants,

individually or collectively, purposely lost, destroyed or secreted notes made by NYPD investigators during their interview of Ms. Chamberlin.

138. Fourth, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, never gave Mr. Newton's alibi any weight whatsoever. They never even bothered to interview the people Mr. Newton was with at the times of the alleged crime.

139. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, maliciously and/or without probable cause initiated the prosecution against Mr. Newton by wrongfully pressuring eyewitnesses into falsely identifying him as the rapist, by submitting deliberate fabrications about the results of tests performed (or not) on physical evidence and the credibility of third-party witnesses, by ignoring exculpatory alibi information and omitting (and thereafter destroying) other exculpatory information.

140. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, misled the District Attorney's Office for Bronx County which authorized the arrest of Mr. Newton by presenting deliberate fabrications and making material omissions of exculpatory evidence.

141. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, maliciously continued the prosecution by improperly and wrongfully pressuring the eyewitnesses into falsely identifying Mr. Newton as the rapist, by deliberately (or with reckless disregard) failing to investigate any of the information that led away from Mr. Newton, as well as by hiding their misconduct and destroying evidence.

142. The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment. Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

143. The intentional conduct and/or reckless disregard of Mr. Newton's constitutional rights by Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, makes these Defendants liable to Mr. Newton under 42 U.S.C. § 1983.

144. As a direct and proximate result of the wrongful conduct of Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole and various NYPD John/Jane Does, Mr. Newton was falsely arrested, falsely imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction and then wrongfully imprisoned for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

145. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

146. Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**THIRD CAUSE OF ACTION
AGAINST INDIVIDUAL NYPD DEFENDANTS
FOR THEIR WRONGFUL VIOLATION OF PLAINTIFF'S
CIVIL RIGHTS UNDER COLOR OF STATE LAW (FAILURE TO
INVESTIGATE & DELIBERATE SUPPRESSION OF EVIDENCE)**

147. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 146, inclusive, with the same force and effect as if set forth at length herein.

148. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, acting within the scope of their employment and under color of state law, deliberately failed to conduct a constitutionally adequate investigation of the crime of which Alan Newton was charged (and/or acted with reckless disregard of Plaintiff's constitutional rights), including without limitation the following:

    a.    Failing to obtain a full and complete description of VJ's assailant from the two eyewitnesses before beginning photo displays and physical lineups;

    b.    Failing to question the vague and "evolving" description of the rapist offered by VJ;

    c.    Failing to investigate fully and then disclose to Mr. Newton and his attorneys that VJ was an epileptic who had consumed a substantial

amount of alcohol on the evening in question in direct contravention of her doctor's instructions (very unreliable witness);

d.      Failing to investigate VJ's original claim that a man named "Willie," who drove a blue and white Pontiac Grand Prix, raped her;

e.      Failing to investigate the claims of a third-party witness, Deborah Chamberlin, that a "local" man named "Willie" could be linked to the crime scene and a blue and white Pontiac Grand Prix automobile and, thereafter, failing to turn over any exculpatory materials relating to the Chamberlin interview and Chamberlin background check to Mr. Newton or his attorneys;

f.      Failing to test the blood, semen and hair recovered from the victim's body to determine whether any of this physical evidence confirmed the guilt or innocence of Mr. Newton;

g.      Failing to perform tests on sneakers taken from Mr. Newton at or around the time of his arrest to determine: (i) whether the treads on those sneakers matched the sneaker tread marks found on the victim's body and clothing, and (ii) whether there was any blood on the sneakers that could be traced to the victim (the sneakers were allegedly lost by the NYPD and the results of testing, if any, on the sneakers was never disclosed to Mr. Newton or his attorneys);

h. Failing to "seal off" the crime scene in the building where the second rape occurred to ensure that the scene was not contaminated by investigators (and to ensure that fingerprints could be found; no fingerprints allegedly were collected at the scene)

i. Failing to record the level of confidence of the eyewitnesses in their identifications of Mr. Newton after they allegedly selected his photo in arrays and picked him out of lineups;

j. Failing to conduct fair, proper and untainted visual and voice identification procedures for the two eyewitnesses (who offered the only evidence in support of the charges asserted against Mr. Newton);

k. Failing to investigate the merits of Mr. Newton's alibi defense by interviewing those allegedly with him at or around the times the crimes were committed; and

l. Failing to seek or obtain a search warrant to determine: (i) whether the clothing on the assailant described by VJ might be found within Mr. Newton's apartment, or (ii) whether any clothing found within Mr. Newton's apartment had VJ's blood on it.

149. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, acting within the scope of their employment and under color of state law, deliberately failed to disclose to the Bronx District Attorney's Office material information that:

a. They had had repeatedly employed unduly suggestive conduct to induce the two eyewitnesses to misidentify Alan Newton at physical and photographic identification procedures, *viz*:

 i. Showing the two eyewitnesses photographs and photo arrays in which Mr. Newton's photograph was noticeably different from all other photographs;

 ii. Showing the two eyewitnesses photographs and photo arrays, including Mr. Newton's photograph, prior to their viewing him in a physical lineup (where he became the only common denominator);

 iii. Deliberately failing to document such repeated displays of Mr. Newton's photograph to the two eyewitnesses;

 iv. Pressuring the two eyewitnesses to make an identification of Mr. Newton;

 v. Providing the two eyewitnesses with suggestive information about Mr. Newton prior to the physical lineups including his identity, his address and arrest history;

 vi. Advising the two eyewitnesses that one of the people in the physical lineup, Mr. Newton, was the prime suspect and that the other eyewitness had already identified him

 vii. Engaging in post-identification suggestion by telling the

two eyewitnesses that they had selected the right person and, further, that the other eyewitness also had identified Mr. Newton;

b.      Failing to advise that they had not fully investigated the claims of a third-party witness, Deborah Chamberlin, that a "local" man named "Willie" could be linked to the crime scene and a blue and white Pontiac Grand Prix automobile and, thereafter, failing to turn over any exculpatory materials relating to the Chamberlin interview;

c.      Failing to advise that they had not tested the blood, semen and hair recovered from the victim's body to determine whether any of this physical evidence confirmed the guilt or innocence of Mr. Newton; and

d.      Failing to advise that they had not tested the sneakers taken from Mr. Newton at or around the time of his arrest to determine: (i) whether the treads on those sneakers matched the sneaker tread marks found on the victim's body and clothing, and (ii) whether there was any blood on the sneakers that could be traced to the victim (and that the sneakers were lost by the NYPD).

150.    The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly

detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment. Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

151. As a direct result of the deliberate (or reckless) failure to conduct a constitutionally adequate investigation and the deliberate (or reckless) suppression of material favorable evidence to Mr. Newton, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, caused Mr. Newton to endure a wrongful arrest and an unfair trial in violation of his clearly established constitutional rights; Mr. Newton was maliciously prosecuted, forced to endure a wrongful conviction and then wrongfully imprisoned for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

152. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

153. Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

## FOURTH CAUSE OF ACTION
### AGAINST INDIVIDUAL DEFENDANTS
### FOR THEIR WRONGFUL VIOLATION OF
### PLAINTIFF'S CIVIL RIGHTS UNDER COLOR OF STATE
### LAW (LOSS OF MATERIAL, CRITICAL CRIMINAL EVIDENCE)

154.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 153, inclusive, with the same force and effect as if set forth at length herein.

155.     Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, acting within the scope of their employment and under color of state law, deliberately failed to register, store, preserve, maintain and control material and critical evidence relating to the crimes of which Alan Newton was charged (*i.e.*, they acted with reckless disregard of Plaintiff's constitutional rights).

156.     While Plaintiff Alan Newton was incarcerated (and/or while any conviction against him remained on file), all of the Defendants had a constitutional obligation, as officers and agents of The City and/or State of New York, to register, store, preserve, maintain and control material and critical evidence relating to the crimes of which Alan Newton was charged and convicted.  See, e.g., De Shaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989) ("when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being").

157. In fact, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, acting within the scope of their employment and under color of state law, took an extraordinarily cavalier attitude with respect to their constitutional obligation to preserve material and critical evidence relating to their investigation, prosecution and post-conviction incarceration of Alan Newton.

158. With reckless disregard for Alan Newton's constitutional rights, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, lost and/or misplaced and/or secreted the following material and critical evidence relating to Alan Newton's convictions under Bronx County Indictment No. 2441/84:

   a. A rape kit containing, among other things, semen taken from the body of VJ after her rape (this kit was first discovered "lost" by the NYPD Property Division in 1994 and was not produced to Mr. Newton until 2005);

   b. Mr. Newton's sneakers, taken from him in June of 1984 by NYPD investigators, were "lost" and never returned to him despite repeated requests;

   c. The notes taken by Defendants Newbert, Galligan, et al., relating to their interview of a third-party witness, Deborah Chamberlin,

that a "local" man named "Willie" could be linked to the crime scene and a blue and white Pontiac Grand Prix automobile;

d. The "criminal background" information on Deborah Chamberlin that allegedly allowed Defendants Newbert, Galligan, et al., to claim that Ms. Chamberlin was an "unreliable" witness; and

e. The notes compiled by Defendants Newbert, Galligan, et al., regarding their search of the Department of Motor Vehicles database for information about "blue and white Pontiac Grand Prix" vehicles in New York State.

159. If the aforementioned evidence had been properly registered, stored, preserved, maintained and controlled by Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, and had it been produced to Mr. Newton and his attorneys in a timely manner, Mr. Newton would not have been convicted of the crime described above, or his incarceration would have been terminated more than a decade ago.

160. The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be

free from cruel and unusual punishment. Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

161. As a direct result of the deliberate (or reckless) failure to register, store, preserve, maintain and control material and critical evidence relating to the crime of which Alan Newton was charged and convicted, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, Mr. Newton endured a wrongful arrest and an unfair trial in violation of his clearly established constitutional rights; he was maliciously prosecuted; he was forced to endure a wrongful conviction, and then wrongfully imprisoned for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

162. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

163. Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**FIFTH CAUSE OF ACTION
AGAINST ADA ANDREA FREUND FOR HER
WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL
RIGHTS UNDER COLOR OF STATE LAW (FAILURE TO
INVESTIGATE & DELIBERATE FABRICATION OF EVIDENCE)**

164.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 163, inclusive, with the same force and effect as if set forth at length herein.

165.     Defendant ADA Freund and various ADA John/Jane Does are personally liable for damages because of their unwarranted, unreasonable and unconstitutional acts during the investigation phase of the criminal case including, but not limited to: (a) ignoring evidence of Plaintiff's innocence during the investigation phase of the case; (b) failing to reveal exculpatory evidence to the defense during the investigation phase of the case; (c) fabricating evidence during the investigation phase of the case; (d) failing to investigate and follow up on leads that indicated the guilt of others and the innocence of Plaintiff during the investigation phase of the case; (e) pressuring eyewitnesses to make an identification of Plaintiff despite their independent inability to do so or despite statements that they "were not sure" of their previous identifications during the investigation phase of the case; (f) failing to order tests on physical evidence collected by the NYPD (and/or failing to reveal the results of any such testing) during the investigation phase of the case; (g) losing or secreting critical exculpatory evidence either during the investigation phase of the case or post-conviction, and (h) otherwise acting with reckless disregard of Plaintiff's constitutional rights.

166.     Upon information and belief, Defendants ADA Freund, and various ADA John/Jane Does, acting within the scope of their employment and under color of state

law, supervised NYPD investigators during the investigation phase of the criminal case and deliberately failed to conduct a constitutionally adequate investigation of the crimes of which Alan Newton was charged (*i.e.*, ADA Freund, *et al.,* supervised investigators who acted with reckless disregard of Plaintiff's constitutional rights), including without limitation the following:

a. Failing to obtain a full and complete description of VJ's assailant from the two eyewitnesses before beginning photo displays and physical lineups;

b. Failing to question the vague and "evolving" description of the rapist offered by VJ;

c. Failing to investigate fully and then disclose to Mr. Newton and his attorneys that VJ was an epileptic who had consumed a substantial amount of alcohol on the evening in question in direct contravention of her doctor's instructions (very unreliable witness);

d. Failing to investigate VJ's original claim that a man named "Willie," who drove a blue and white Pontiac Grand Prix, raped her;

e. Failing to investigate the claims of a third-party witness, Deborah Chamberlin, that a "local" man named "Willie" could be linked to the crime scene and a blue and white Pontiac Grand Prix automobile;

f.  Failing to test the blood, semen and hair recovered from the victim's body to determine whether any of this physical evidence confirmed the guilt or innocence of Mr. Newton;

g.  Failing to test sneakers taken from Mr. Newton at or around the time of his arrest to determine: (i) whether the treads on those sneakers matched the sneaker tread marks found on the victim's body and clothing, and (ii) whether there was any blood on the sneakers that could be traced to the victim (the sneakers were allegedly lost by the NYPD and the results of testing, if any, on the sneakers was never disclosed to Mr. Newton or his attorneys);

h.  Failing to record the confidence level of the eyewitnesses in their identifications of Mr. Newton after they allegedly selected his photo in arrays and picked him out of lineups;

i.  Failing to ensure that fair, proper and untainted visual and voice identification procedures were conducted for the two eyewitnesses (who offered the only evidence in support of the charges asserted against Mr. Newton);

j.  Failing to investigate the merits of Mr. Newton's alibi defense by interviewing those allegedly with him at or around the times the crimes were committed; and

k.  Failing to seek or obtain a search warrant to determine: (i) whether the clothing on the assailant described by VJ might be found

within Mr. Newton's apartment, or (ii) whether any clothing found within Mr. Newton's apartment had VJ's blood on it; and

l.  Improperly influencing eyewitnesses – one who could not identify Mr. Newton in open court, and the second, who recanted and advised after the Suppression Hearing that she could not confidently testify that Mr. Newton was her assailant.

167.  Upon information and belief, Defendant ADA Freund, and various NYPD John/Jane Does, acting within the scope of their employment and under color of state law, actively supervised NYPD investigators who employed procedures that violated Plaintiff's constitutional rights during the investigation phase of the criminal case:

a.  NYPD investigators had repeatedly employed unduly suggestive conduct to induce the two eyewitnesses to misidentify Alan Newton at physical and photographic identification procedures, *viz*:

    i.  Showing the two eyewitnesses photographs and photo arrays in which Mr. Newton's photograph was noticeably different from all other photographs;

    ii.  Showing the two eyewitnesses photographs and photo arrays, including Mr. Newton's photograph, prior to their viewing him in a physical lineup (where he became the only common denominator);

    iii.  Deliberately failing to document such repeated displays of Mr. Newton's photograph to the two eyewitnesses;

iv. Pressuring the two eyewitnesses to make an identification of Mr. Newton;

v. Providing the two eyewitnesses with suggestive information about Mr. Newton prior to the physical lineups including his identity, his address and arrest history;

vi. Advising the two eyewitnesses that one of the people in the physical lineup, Mr. Newton, was the prime suspect and that the other eyewitness had already identified him;

vii. Engaging in post-identification suggestion by telling the two eyewitnesses that they had selected the right person and, further, that the other eyewitness had already identified Mr. Newton;

168. Failing to advise Mr. Newton and his attorneys that the NYPD had not fully investigated the claims of a third-party witness, Deborah Chamberlin, that a "local" man named "Willie" could be linked to the crime scene and a blue and white Pontiac Grand Prix automobile (and, thereafter, failing to turn over any exculpatory materials relating to the Chamberlin interview and "background check");

169. Failing to advise Mr. Newton and his attorneys that the NYPD had not tested the blood, semen and hair recovered from the victim's body to determine whether any of this physical evidence confirmed the guilt or innocence of Mr. Newton;

170. Failing to advise Mr. Newton and his attorneys that the NYPD had not tested the sneakers taken from Mr. Newton at or around the time of his arrest to determine: (i) whether the treads on those sneakers matched the sneaker tread marks

found on the victim's body and clothing, and (ii) whether there was any blood on the sneakers that could be traced to the victim (and that the sneakers were lost by the NYPD).

171.    The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

172.    As a direct and proximate result of the deliberate (or reckless) failure to conduct a constitutionally adequate investigation and the deliberate (or reckless) suppression of material favorable evidence to Mr. Newton, Defendant ADA Freund and various ADA John/Jane Does, caused Mr. Newton to endure a wrongful arrest and an unfair trial in violation of his clearly established constitutional rights; Mr. Newton was maliciously prosecuted, forced to endure a wrongful conviction and then wrongfully imprisoned for over two decades.  During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

173.    Any "absolute prosecutorial immunity" that might otherwise apply was lost when ADA Freund and various ADA John/Jane Does became actively involved in the pre-Indictment and pretrial investigation aspects of the crime.  Records obtained from

the Bronx DA's Office indicate that ADA Freund involved herself in the criminal investigation as early as June 29, 1984 by, among other things, interviewing the two individuals who allegedly identified Mr. Newton as VJ's assailant (less than six days after the crime) and supervising the investigation performed by the NYPD.

174. ADA Freund and various ADA John/Jane Does are liable personally and in their official capacity for these acts which damaged Plaintiff.

175. Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendant ADA Freund, and various ADA John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**AGAINST DEFENDANTS SHEEHAN & TRABITZ FOR**
**WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL RIGHTS**
**UNDER COLOR OF STATE LAW (SUPERVISORY LIABILITY)**

176. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 172, inclusive, with the same force and effect as if set forth at length herein.

177. The acts of Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, were committed under their authority as NYPD Commanding Officers vested under and by virtue of the laws of the State of New York; their acts were, therefore, committed under the color of New York State law.

178. Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, knew or should have known of the need for additional screening, training, supervising and disciplining of NYPD personnel to: (a) refrain from ignoring evidence of a criminal

defendant's innocence; (b) refrain from misrepresenting withholding or falsifying evidence, (c) exercise care and thoroughness in the investigation and prosecution of a case of a crime involving no other evidence but identifications; (d) accurately identify and handle exculpatory material; (e) refrain from obtaining indictments in bad faith and without probable cause; and (f) record, inventory, protect, preserve and produce all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant.

179. Through an intentional and deliberate indifference and/or a reckless disregard of basic civil rights, Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, failed to provide adequate screening, training, supervising, and disciplining of NYPD personnel with respect to: (a) misrepresenting, withholding and falsifying evidence, (b) conducting a proper investigation, (c) obtaining indictments in bad faith without probable cause, (d) identifying and handling exculpatory material in a proper manner, and (e) protecting, preserving and producing all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant. This reckless disregard of basic constitutional rights is evidenced by prior decisions of the courts of the State of New York reporting that the NYPD engaged in various acts of police misconduct and constitutional violations including: withholding exculpatory evidence from accused individuals, acting in a manner to obtain conviction at all costs rather than seeking truth and justice and, generally, in failing to act in a constitutional manner.

180. Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, personally and/or through their authorized delegates, at all relevant times, had final,

discretionary authority to promulgate and implement policies and procedures, including policies and procedures as to personnel training and supervision, with respect to the performance of duties by NYPD personnel. Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, were NYPD "policy makers" on behalf of the NYPD and The City; Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, acted, however, with a reckless disregard to the constitutional rights of persons coming into contact with the NYPD in the manner set forth above.

181. Upon information and belief, NYPD personnel have not been disciplined by the NYPD for their misconduct, despite repeated judicial findings that NYPD personnel have engaged in misconduct. Such failure constitutes a reckless disregard toward the constitutional rights of the accused, and such misconduct includes, but is not limited to, withholding or secreting exculpatory evidence from the criminally accused.

182. Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, knew or should have known that the need for adequate screening, training, supervising, and disciplining of NYPD personnel was and is compelling because of the overriding credo of NYPD personnel to obtain and sustain convictions at all costs with deliberate and total disregard for the truth and the constitutional rights of the accused.

183. Specifically, with respect to the NYPD Defendants named in this action, Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, knew or should have known of the inherent risks of permitting the NYPD defendants named herein to handle this sex crime case and the resulting evidence.

184. Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, knew that Bronx Sex Crimes Unit of the NYPD and the Property Clerk's Department would do

all in their power to obtain and sustain a rape, robbery and assault conviction. This circumstance required an even more heightened and controlled level of supervision which should have been exercised or, alternatively, all conceivable steps should have been taken to ensure that the Bronx Sex Crimes Unit and Property Clerk's Division would act ethically and, specifically, in accordance with their duties as officers of the peace and, specifically under Brady v. Maryland and similar cases.

185. However, rather than providing more scrutiny and supervision to avoid such concerns, Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, actually fostered and instigated the wrongful conduct of NYPD personnel. Supervisory personnel and others were apparently directly involved and became aware of, but ignored, the evidence and strong indications that Plaintiff Alan Newton was innocent and that material evidence was being withheld from Mr. Newton and his attorneys.

186. In addition, during Mr. Newton's post-convictions proceedings and hearings, the NYPD and its management used every tool to prevent the disclosure of exculpatory evidence and hide the improper behavior of its employees. Upon information and belief, it did no investigation into the circumstances surrounding this improper behavior but sought only to protect the "integrity" of the NYPD.

187. But for the deliberate indifference of Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, in failing to adequately provide screening, training, supervision, and discipline of NYPD personnel, the innocent Plaintiff would not have been prosecuted nor convicted of the crime, nor would he have continued to suffer through the failure of his post-conviction motions.

188.    The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

189.    By reason of the aforesaid violations of Plaintiff's rights, Plaintiff is entitled to damages under 42 U.S.C. § 1983.

190.    The foregoing violations of Plaintiff's constitutional rights, his conviction, his sentence, his incarceration, and his resulting and continuing injuries were directly and proximately caused by the deliberate indifference of NYPD personnel to Plaintiff's constitutional rights.

191.    With respect to all of the wrongful actions and omissions alleged above, Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, knew to a moral certainty that NYPD personnel would confront situations requiring adequate screening, training, equipment, supervision, and discipline, and that there was a clear history of NYPD personnel mishandling such situations; these Defendants knew that wrong choices by NYPD personnel had previously resulted in the deprivation of various citizens' constitutional rights.

192.    Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, are responsible personally and in their official capacities in this instance for the violation of Mr. Newton's rights.

193.    Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Sheehan, Trabitz, and various NYPD John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**SEVENTH CAUSE OF ACTION
AGAINST THE DA DEFENDANTS FOR THEIR
WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL RIGHTS
UNDER COLOR OF STATE LAW (SUPERVISORY LIABILITY)**

194.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 190, inclusive, with the same force and effect as if set forth at length herein.

195.    The acts of ADA Freund, ADA Carroll, ADA Moore, ADA Curbello, and various ADA John/Jane Does, were committed under their authority as Assistant District Attorneys vested under and by virtue of the laws of the State of New York; these acts were, therefore, committed under the color of the state law.

196.    DA Merola and DA Johnson knew or should have known of the need for additional screening, training, supervising and disciplining of Assistant District Attorney's in the Office of the District Attorney of Bronx County to: (a) refrain from ignoring evidence of a criminal defendant's innocence; (b) refrain from misrepresenting withholding or falsifying evidence; (c) exercise care and thoroughness in the investigation and prosecution of a case of a crime involving no other evidence but

identifications; (d) accurately identify and handle exculpatory material; (e) refrain from obtaining indictments in bad faith and without probable cause; and (f) record, inventory, protect, preserve and produce all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant.

197. Through intentional and deliberate indifference and a reckless disregard of basic civil rights, DA Merola and DA Johnson failed to provide adequate screening, training, supervising, and disciplining of Assistant District Attorneys serving in the Office of the District Attorney of Bronx County with respect to (a) misrepresenting, withholding and falsifying evidence, (b) conducting a proper investigation, (c) obtaining indictments in bad faith without probable cause, (d) identifying and handling exculpatory material in a proper manner, and (e) protecting, preserving and producing all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant. This reckless disregard of basic constitutional rights is evidenced by decisions of the courts of the State of New York reporting that the Office of the District Attorney of Bronx County engaged in various acts of prosecutorial misconduct and constitutional violations including withholding exculpatory evidence from accused individuals, engaging in improper, disingenuous and factually vacant arguments, acting in a manner to obtain convictions at all costs rather than seeking truth and justice and, generally, in failing to act in a quasi-judicial capacity.

198. The District Attorneys of Bronx County, personally and/or through their authorized delegates, at all relevant times, had final, discretionary authority to promulgate and implement policies and procedures, including policies and procedures as to personnel training and supervision, with respect to the District Attorney's Office's performance of

its duties. The Defendant District Attorneys (and/or their authorized delegates) were City and State "policy makers"; they acted, however, with a reckless disregard to the constitutional rights of persons coming into contact with their Office in the manner set forth above.

199. Upon information and belief, prosecutors have not been disciplined by the Office of the District Attorney of Bronx County for their misconduct, despite repeated judicial findings that prosecutors from their Office engaged in misconduct and despite knowledge that innocent people were being convicted through aggressive prosecutorial misconduct. Such failure constitutes reckless disregard toward the constitutional rights of the criminally accused; such misconduct includes, but is not limited to, the withholding or secreting of exculpatory evidence from the accused.

200. DA Merola and DA Johnson knew that the need for adequate screening, training, supervising, and disciplining of Assistant District Attorneys was and is compelling because of the overriding credo of ADA Freund, and other prosecutors in the Office of the Bronx County District Attorney, to obtain convictions at all costs with deliberate and total disregard for the truth and the constitutional rights of the accused.

201. Specifically, with respect to ADA Freund, the Office of the District Attorney, through its management and supervisory personnel, knew or should have known of the inherent risks of permitting ADA Freund to handle this sex crime case.

202. DA Merola knew that ADA Freund would do anything to obtain a rape, robbery and assault conviction. This circumstance required a heightened and controlled level of supervision which should have been exercised or, alternatively, the taking of all conceivable steps to ensure that ADA Freund would act ethically and, specifically in

accordance with her duties as a quasi-judicial officer (and, specifically under <u>Brady v. Maryland</u> and similar cases).

203. DA Merola and DA Johnson also knew or should have known that evidence in a multitude of Bronx criminal cases was being lost or misplaced.

204. However, rather than providing more scrutiny and supervision to avoid such concerns, the Bronx District Attorney's Office actually fostered and/or instigated the foregoing misconduct. Supervisory personnel and others were apparently directly involved and became aware of, but ignored, the evidence and strong indications that Plaintiff Alan Newton was innocent and that evidence relating to his innocence was not being produced to him.

205. In addition, during Mr. Newton's post-convictions proceedings and hearings, the Bronx District Attorney's Office used every tool to prevent the disclosure of (or secrete) exculpatory evidence and hide the improper behavior of its employees. Upon information and belief, the Bronx District Attorney's Office did no investigation into the circumstances surrounding this improper behavior but sought only to protect the "integrity" of its office.

206. But for DA Merola's and DA Johnson's deliberate indifference to the inadequate screening, training, supervision, and discipline of Assistant District Attorneys for Bronx County, the innocent Plaintiff would not have been prosecuted nor convicted of the crime; nor would he have continued to suffer through the failure of his post-conviction motions.

207. The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established rights under the Fourth, Fifth, Sixth, Eighth and

Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment. Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

208. By reason of the aforesaid violations of Plaintiff's rights, Plaintiff is entitled to damages under 42 U.S.C. § 1983.

209. The foregoing violations of Plaintiff's constitutional rights, his conviction, his sentence, his incarceration, and his resulting and continuing injuries were directly and proximately caused by the deliberate indifference to Plaintiff's constitutional rights of persons by prosecutors in the District Attorney's Office of Bronx County.

210. With respect to all of the wrongful actions and omissions alleged above, DA Merola and DA Johnson knew to a moral certainty that their Assistant District Attorneys would confront situations requiring adequate screening, training, equipment, supervision, and discipline; that there was a clear history of Assistant District Attorneys mishandling such situations; and, finally, that wrong choices by their Assistant District Attorneys frequently resulted in the deprivation of a citizen's constitutional rights.

211. DA Merola and DA Johnson are, therefore, responsible personally and in their official capacities for the violation of Plaintiff's constitutional rights.

# A-110

212. Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants DA Merola and DA Johnson for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

### EIGHTH CAUSE OF ACTION
### AGAINST THE INDIVIDUAL DEFENDANTS FOR THEIR
### WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL RIGHTS
### UNDER COLOR OF STATE LAW (CONSPIRACY LIABILITY)

213. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 209, inclusive, with the same force and effect as if set forth at length herein.

214. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, acting within the scope of their employment and under color of state law, agreed amongst themselves and with other individuals to act in concert in order to deprive Mr. Newton of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.

215. In furtherance of this ongoing conspiracy each individual Defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

a. Repeatedly employing unduly suggestive conduct to induce the two eyewitnesses to misidentify Plaintiff at physical and photographic identification procedures;

b. Wrongfully pressuring eyewitnesses into falsely identifying Plaintiff as the rapist;

c. Submitting deliberate fabrications about the results of tests performed (or not) on physical evidence collected from the victim, the crime scene and Plaintiff and/or agreeing wrongfully not to test the evidence to ensure that exculpatory evidence was not produced;

d. Ignoring credible leads provided by third-party witnesses, and omitting (and thereafter destroying) exculpatory information provided by such witnesses;

e. Deliberately or recklessly losing and/or misplacing and/or secreting material and critical evidence (including files) relating to Plaintiff's criminal convictions; and

f. Deliberately (or with reckless disregard) failing to investigate any evidence that might tend to lead other investigators away from Mr. Newton.

216. The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment. Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

217. As a direct and proximate result of the conspiracy and actions in furtherance of the conspiracy by Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, Mr. Newton was falsely arrested and imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction and then wrongfully imprisoned for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

218. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

219. Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola,

DA Johnson, ADA Freund, and various ADA John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**NINTH CAUSE OF ACTION**
**AGAINST THE CITY FOR ITS POLICY MAKERS'**
**WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL**
**RIGHTS UNDER COLOR OF STATE LAW (MUNICIPAL LIABILITY)**

220.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 216, inclusive, with the same force and effect as if set forth at length herein.

221.    Municipalities and their subdivisions may be held liable to an individual if they enforce a policy or custom that causes the deprivation of the individual's constitutional rights.

222.    Municipal liability may be based upon:

    a.      a formally promulgated policy;

    b.      a well settled custom or practice;

    c.      a final decision by a municipal policymaker; or

    d.      deliberately indifferent training or supervision.

223.    Defendant The City, by and through its final policymakers, maintained the following unconstitutional customs, decisions, policies, and/or indifferent employee training or supervision practices that allowed for various constitutional violations:

    a.      NYPD personnel systematically conducted unduly suggestive identification procedures intended to and/or highly likely to cause misidentification of suspects;

b.  NYPD personnel systematically failed to disclose to prosecutors material information that was favorable to criminal defendants;

c.  NYPD personnel systematically fabricated falsely inculpatory evidence and/or committed perjury against suspects in order to secure arrests and close cases;

d.  NYPD personnel systematically abused process by presenting false evidence to courts reviewing investigations, arrests and detention of suspects;

e.  NYPD personnel systematically destroyed, lost or secreted evidence, or recklessly disregarded the rights of the accused in timely producing evidence, to further their personal goals of obtaining and sustaining convictions; and

f.  NYPD personnel acted with impunity in destroying criminal evidence, or by reporting it "lost" claiming that they had no duty to preserve and produce evidence once a conviction had been obtained and the criminal defendant's appeals had been "exhausted" (but while the criminal defendant was still incarcerated).

224.  The City's unconstitutional customs, decisions, policies and/or indifferent employee training or supervision practices were: (a) deliberately or recklessly indifferent to the obvious risks of inducing eyewitnesses to crimes to misidentify suspects, (b) deliberately or recklessly indifferent to the repeated destruction and/or loss of material criminal evidence, (c) deliberately or recklessly indifferent to a criminal defendant's

constitutional rights, and (d) deliberately or recklessly indifferent to the issue of whether innocent people were being convicted of crimes.

225.   The City's municipality liability here is premised upon, among other things, its failure to adopt proper and reasonable policies and practices in the face of an obvious need to do so.

226.   The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

227.   As a direct and proximate result of The City's unconstitutional customs, decisions, policies and/or indifferent employee training or supervision practices, Mr. Newton was falsely imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction and then wrongfully imprisoned for over two decades.  During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

228.   Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendant The City for compensatory damages totaling One Hundred

Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**TENTH CAUSE OF ACTION
AGAINST THE INDIVIDUAL DEFENDANTS FOR
THEIR WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL
RIGHTS UNDER COLOR OF STATE LAW (PUNITIVE DAMAGES)**

229. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 225, inclusive, with the same force and effect as if set forth at length herein.

230. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Sheehan, Leho, O'Toole, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, committed all of the acts or omissions described above with either a malicious intent to injure Plaintiff or with a "reckless or callous indifference" to Plaintiff's federally protected rights.

231. Under Smith v. Wade, 461 U.S. 30 (1983), punitive damages may be awarded against a state or local official sued under 42 U.S.C. § 1983 in his personal capacity if the state or local official commits wrongful acts with an "actual malicious intent" or with a "reckless or callous indifference" to a plaintiff's federally protected rights.

232. As a direct and proximate result of the wrongful acts or omissions of Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Sheehan, Leho, O'Toole, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, made with "actual malicious intent" or with a "reckless or callous indifference" to Plaintiff's federally protected rights, Mr. Newton was falsely arrested, falsely imprisoned, maliciously prosecuted, forced to

endure an unfair trial and wrongful conviction and then wrongfully imprisoned for over two decades.

233. Thus, pursuant to 42 U.S.C. § 1983, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Sheehan, Leho, O'Toole, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does for punitive damages totaling Fifty Million Dollars ($50,000,000.00), and any other and further relief this Court deems just and proper.

## STATE LAW CAUSES OF ACTION

### ELEVENTH CAUSE OF ACTION
### AGAINST THE DEFENDANTS
### FOR FALSE ARREST/ FALSE IMPRISONMENT

234. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 230, inclusive, with the same force and effect as if set forth at length herein.

235. Defendants Newbert, Galligan, Hartfield, Ryan, Leho, O'Toole and various NYPD John/Jane Does, arrested and confined Alan Newton, intentionally and without the right to do so.

236. Defendants Newbert, Galligan, Hartfield, Ryan, Leho, O'Toole and various NYPD John/Jane Does, did not have probable cause for believing that a crime had been committed and/or that Alan Newton had committed it.

237. Defendants Newbert, Galligan, Hartfield, Ryan, Leho, O'Toole and various NYPD John/Jane Does, did not act as reasonably prudent persons in effecting the arrest and confinement of Alan Newton.

238. Following the wrongful arrest and wrongful initial confinement of Alan Newton, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, continued the unlawful detention and confinement of Plaintiff Alan Newton without probable cause by intentionally secreting, recklessly misplacing, and/or negligently losing exculpatory material.

239. Plaintiff Alan Newton did not consent to the arrest and confinement by the aforementioned Defendants.

240. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

241. Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

242. As a direct and proximate result of the false arrest and false imprisonment by one or more of the aforementioned Defendants, Mr. Newton was forced to endure a wrongful arrest, an unfair trial, a wrongful conviction and a wrongful imprisonment for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

243. Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Sheehan, Leho, O'Toole, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, various ADA John/Jane Does, and The City, for compensatory

damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

## TWELFTH CAUSE OF ACTION
## AGAINST THE DEFENDANTS FOR MALICIOUS PROSECUTION

244. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 240, inclusive, with the same force and effect as if set forth at length herein.

245. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, various NYPD John/Jane Does, DA Merola, ADA Freund, and various ADA John/Jane Does, initiated judicial proceedings against Plaintiff Alan Newton intentionally and without the right to do so.

246. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, various NYPD John/Jane Does, DA Merola, ADA Freund, and various ADA John/Jane Does, did not have probable cause for believing that a crime had been committed and/or that Alan Newton had committed it.

247. Defendants Newbert, Galligan, Hartfield, Ryan, Leho, O'Toole Sheehan, various NYPD John/Jane Does, DA Merola, ADA Freund, and various ADA John/Jane Does did not act as reasonably prudent persons in initiating criminal proceedings against Alan Newton.

248. Following the initiation of judicial proceedings against Plaintiff Alan Newton, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, maliciously continued to use judicial proceedings to detain and confine Mr. Newton, without probable cause, by

intentionally secreting, recklessly misplacing, and/or negligently losing exculpatory material.

249. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

250. Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

251. As a direct and proximate result of the malicious prosecution by one or more of the aforementioned Defendants, Mr. Newton was forced to endure a wrongful arrest, an unfair trial, a wrongful conviction and a wrongful imprisonment for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

252. Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, various ADA John/Jane Does, and The City, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**AGAINST THE DEFENDANTS FOR ABUSE OF PROCESS**

253. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 249, inclusive, with the same force and effect as if set forth at length herein.

254. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, various NYPD John/Jane Does, DA Merola, ADA Freund, and various ADA John/Jane Does, improperly initiated criminal proceedings against Plaintiff Alan Newton.

255. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, various NYPD John/Jane Does, DA Merola, ADA Freund, and various ADA John/Jane Does, used the criminal proceedings for a purpose other than that which the criminal proceedings were designed, *i.e.*, the conviction of an individual who had actually committed a crime.

256. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, various NYPD John/Jane Does, DA Merola, ADA Freund, and various ADA John/Jane Does, did not have probable cause for believing that a crime had been committed and/or that Alan Newton had committed it.

257. Defendants Newbert, Galligan, Hartfield, Ryan, Leho, O'Toole, Sheehan, various NYPD John/Jane Does DA Merola, ADA Freund, and various ADA John/Jane Does, initiated criminal proceedings against Alan Newton either out of personal animosity towards Mr. Newton, or to advance their respective careers, or for some other improper purpose.

258. Following the initiation of judicial proceedings against Plaintiff Alan Newton, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Sheehan, Leho, O'Toole, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, maliciously continued to use criminal proceedings to detain and confine Mr. Newton, without probable cause, by

intentionally secreting or recklessly misplacing, or negligently losing exculpatory evidence.

259. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

260. Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

261. As a direct and proximate result of the abuse of process by one or more of the aforementioned Defendants, Mr. Newton was forced to endure a wrongful arrest, an unfair trial, a wrongful conviction and a wrongful imprisonment for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

262. Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, various ADA John/Jane Does and The City, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**FOURTEENTH CAUSE OF ACTION
AGAINST THE DEFENDANTS
FOR THE NEGLIGENT LOSS OF EVIDENCE**

263. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 259, inclusive, with the same force and effect as if set forth at length herein.

264. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, negligently failed to register, store, preserve, maintain and control critical evidence relating to the crimes of which Alan Newton was charged.

265. While Alan Newton was incarcerated (and/or while any conviction against him remained on file), all of the Defendants had a duty and obligation, as officers and agents of the The City and/or State of New York, to register, store, preserve, maintain, control and produce material and critical evidence relating to the crimes of which Alan Newton was charged and convicted. See, e.g., De Shaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989) ("when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being").

266. In fact, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, took an extraordinarily cavalier attitude with respect to their duty and obligation to preserve material and critical evidence relating to their investigation and prosecution of Plaintiff Alan Newton.

267. In breaching the aforementioned duty and obligation, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund,

and various ADA John/Jane Does, lost and/or misplaced and/or secreted the following material and critical evidence relating to Alan Newton's rape conviction in May, 1985:

a. A rape kit containing, among other things, semen taken from the body of VJ after her rape (this kit was first discovered "lost" by the NYPD Property Division in 1994 and was not produced to Mr. Newton until 2005);

b. Mr. Newton's sneakers, taken from him in June of 1984 by NYPD investigators, were "lost" and never returned to him despite repeated requests;

c. The notes taken by Defendants Newbert, Galligan, *et al.*, relating to their interview of a third-party witness, Deborah Chamberlin, that a "local" man named "Willie" could be linked to the crime scene and a blue and white Pontiac Grand Prix automobile;

d. The "criminal background" information on Deborah Chamberlin that allegedly allowed Defendants Newbert, Galligan, *et al.*, to claim that Ms. Chamberlin was an "unreliable" witness;

e. The notes compiled by Defendants Newbert, Galligan, *et al.*, regarding their search of the Department of Motor Vehicles database for information about "blue and white Pontiac Grand Prix" vehicles in New York State.

268. If the aforementioned evidence had been properly registered, stored, preserved, maintained and controlled by Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD

John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, and had it been produced to Mr. Newton and his attorneys in a timely manner, Mr. Newton would not have been convicted of the crime described above, or his incarceration would have been terminated more than a decade ago.

269. As a direct and proximate result of the negligence of the Defendants in registering, storing, preserving, maintaining, controlling and producing material and critical evidence relating to the aforementioned crime, Mr. Newton endured a wrongful arrest and an unfair trial; he was maliciously prosecuted; he was forced to endure a wrongful conviction, and then wrongfully imprisoned for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

270. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

271. Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

272. Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, various ADA John/Jane Does, and The City, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**FIFTEENTH CAUSE OF ACTION**
**AGAINST DEFENDANTS SHEEHAN, TRABITZ,**
**DA MEROLA & DA JOHNSON  FOR NEGLIGENT SUPERVISION**

273.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 269, inclusive, with the same force and effect as if set forth at length herein.

274.    Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does, knew or should have known of the need for additional screening, training, supervising and disciplining NYPD personnel and Bronx District Attorney's Office personnel to: (a) refrain from ignoring evidence of a criminal defendant's innocence; (b) refrain from misrepresenting withholding or falsifying evidence, (c) exercise care and thoroughness in the investigation and prosecution of a case of a crime involving no other evidence but identifications; (d) accurately identify and handle exculpatory material; (e) refrain from obtaining indictments in bad faith and without probable cause; and (f) record, inventory, protect, and preserve all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant.

275.    Through intentional and deliberate indifference and/or a reckless disregard of basic civil rights, Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does, failed to adequately provide for screening, training, supervising, and disciplining of their personnel with respect to (a) misrepresenting, withholding and falsifying evidence, (b) conducting a proper investigation, (c) obtaining indictments in bad faith without probable cause, (d) identifying and handling exculpatory material in a proper manner, and (e) protecting,

preserving and producing all criminal evidence entrusted to their care and custody that might lead to the exoneration of a criminal defendant. This reckless disregard of basic constitutional rights is evidenced by decisions of the courts of the State of New York reporting that the NYPD and Bronx District Attorney's Office engaged in various acts of misconduct and constitutional violations including: withholding exculpatory evidence from accused individuals, acting in a manner to obtain conviction at all costs rather than seeking truth and justice and, generally, in failing to act in a constitutional capacity.

276. Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does, personally and/or through their authorized delegates, at all relevant times, had final, discretionary authority to promulgate and implement policies and procedures, including policies and procedures as to personnel training and supervision, with respect to the performance of duties by their personnel.

277. Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does breached their duty to supervise their personnel to prevent an abuse of authority.

278. Upon information and belief, personnel employed by the Bronx District Attorney's Office and NYPD have not been disciplined for their misconduct, despite repeated judicial findings of misconduct.

279. Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does, knew or should have known that the need for adequate screening, training, supervising, and disciplining of Assistant District Attorneys and NYPD personnel was and is compelling because of the overriding credo of these

individuals to obtain and sustain convictions at all costs, with a deliberate and total disregard for the truth and the constitutional rights of the accused.

280.     Specifically, with respect to the NYPD and ADA Defendants named in this action, Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does, knew or should have known of the inherent risks of permitting the individual Defendants named herein to handle the Newton criminal case and the resulting evidence.

281.     Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does, knew or should have known that Bronx Sex Crimes Unit of the NYPD, the NYPD Property Clerk's Department and the Bronx District Attorney's Office would do all in their power to obtain and sustain a rape, robbery and assault conviction.  This circumstance required an even more heightened and controlled level of supervision which should have been exercised or, alternatively, all conceivable steps should have been taken to ensure that the Bronx Sex Crimes Unit, the NYPD's Property Clerk's Division and Bronx District Attorney's Office would act ethically and, specifically in accordance with their duties as officers of the peace and quasi-judicial officers.

282.     However, rather than providing more scrutiny and supervision to avoid such concerns, Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does, actually fostered and instigated the wrongful conduct of their personnel.  Supervisory personnel and others were apparently directly involved and became aware of, but ignored, the evidence and strong indications that

Plaintiff Alan Newton was innocent and that evidence was being withheld from him and his attorneys.

283. In addition, during all Mr. Newton's post-conviction proceedings and hearings, the NYPD and the Bronx District Attorney's Office used every tool to prevent the disclosure of exculpatory evidence and hide the improper behavior of its employees. Upon information and belief, they did no investigation into the circumstances surrounding this improper behavior but sought only to protect the "integrity" of their respective offices.

284. But for the deliberate indifference of Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does, in failing to provide adequate screening, training, supervision, and discipline of their personnel, the innocent Plaintiff would not have been prosecuted nor convicted of the crime nor would he have continued to suffer through the failure of his post-conviction motions.

285. The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment. Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

286.    The foregoing violations of Plaintiff's constitutional rights, his conviction, his sentence, his incarceration, and his resulting and continuing injuries were directly and proximately caused by the negligent supervision, training and retention of incompetent personnel by Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does within the Bronx District Attorney's Office.

287.    Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, and various John/Jane Does within the Bronx District Attorney's Office, are responsible personally and in their official capacities in this instance for the wrongs perpetrated against Mr. Newton and the damages he sustained.

288.    Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

289.    Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Sheehan, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, various John/Jane Does within the Bronx District Attorney's Office, and The City, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**SIXTEENTH CAUSE OF ACTION
AGAINST THE DEFENDANTS
FOR INFLICTION OF EMOTIONAL DISTRESS**

290.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 286, inclusive, with the same force and effect as if set forth at length herein.

291.    Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, owed a duty of care to act ethically and within the rules of law, as police officers or quasi-judicial officers, to ensure a fair investigation, a fair trial and proper post-conviction proceedings free from misrepresentation.

292.    Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, failed to conduct themselves in that manner by knowingly, recklessly or negligently withholding and ignoring exculpatory evidence when they had an absolute duty to produce it and bring it promptly to the attention of the court and defense counsel.

293.    Various personnel within the Bronx County District Attorney's Office and the NYPD improperly argued against vacating Alan Newton's conviction in the face of mounting evidence of his innocence by, among other things, concealing evidence of his innocence.  By doing so, they placed their credibility and status as District Attorneys, Assistant District Attorneys and NYPD police officers before the court in a single-minded attempt to uphold a conviction at all cost, without regard to the truth.

294.    Through its personnel, the District Attorney's Office, Bronx County, and the NYPD, failed to investigate further and properly when confronted with clear-cut evidence pointing toward the innocence of Alan Newton and they thereafter intentionally, recklessly or negligently lost, secreted or misplaced exculpatory evidence.

295. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, themselves, and through their personnel, did these outrageous, unethical and improper acts in a case fraught with ambiguity and, at a minimum, substantial doubt about the guilt of Alan Newton, thereby subjecting an innocent person to decades of imprisonment without any regard as to his innocence and the suffering that a conviction would create; these Defendants continued to fight to uphold Mr. Newton's conviction despite evidence in their possession - withheld from the defense - which clearly indicated Plaintiff's innocence.

296. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

297. Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

298. As a direct and proximate result of the above-described outrageous conduct by one or more of the aforementioned Defendants, Mr. Newton was forced to endure a wrongful arrest, an unfair trial, a wrongful conviction and a wrongful imprisonment for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

299. Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, various ADA John/Jane Does, and The City, for compensatory

damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**SEVENTEENTH CAUSE OF ACTION**
**AGAINST THE CITY FOR MUNICIPAL LIABILITY**
**ARISING OUT OF THE BREACH OF A "SPECIAL RELATIONSHIP"**

300. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 296, inclusive, with the same force and effect as if set forth at length herein.

301. While Alan Newton was incarcerated (and/or while any conviction against him remained on file), servants, agents and/or representatives of Defendant The City had an obligation to register, store, preserve, maintain, control and produce material and critical evidence relating to the crimes of which Alan Newton was charged and convicted.

302. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, and various John/Jane Does, were the servants, agents and/or representatives of Defendant The City who were charged with the responsibility of registering, storing, preserving, maintaining, controlling and/or producing the material and critical evidence surrounding the charges brought against Plaintiff Alan Newton.

303. As a result of the duty and obligation to preserve Mr. Newton's evidence, a "special relationship" was formed between Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does and Plaintiff Alan Newton.

304. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, and various NYPD John/Jane Does,

however, failed to register, store, preserve, maintain, control and produce material and critical evidence relating to the crimes of which Plaintiff Alan Newton was charged.

305. In fact, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, and various NYPD John/Jane Does, breached their obligation to preserve and produce the material and critical evidence surrounding their investigation and prosecution of Alan Newton.

306. As a direct and proximate result of the deliberate (or reckless) failure of servants, agents and/or representatives of Defendant The City to register, store, preserve, maintain, control and produce the material and critical evidence relating to the crimes of which Alan Newton was charged and convicted, Mr. Newton endured a wrongful arrest, an unfair trial, a wrongful conviction and a wrongful imprisonment for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

307. Accordingly, Plaintiff Alan Newton now demands judgment against The City for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**EIGHTEENTH CAUSE OF ACTION**
**AGAINST THE CITY FOR MUNICIPAL LIABILITY**
**UNDER THE CONSTITUTION OF THE STATE OF NEW YORK**

308. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 304, inclusive, with the same force and effect as if set forth at length herein.

309. Municipalities and their subdivisions may be held liable to an individual if they enforce a policy, decision, practice or custom that causes the deprivation of the individual's rights under the Constitution of the State of New York.

310. Municipal liability may be based upon:

    a.    a formally promulgated policy;

    b.    a well settled custom or practice;

    c.    a final decision by a municipal policymaker; or

    d.    deliberately indifferent training or supervision.

311. Defendant The City, by and through its final policymakers, maintained the following customs, decisions, policies, and/or indifferent employee training or supervision practices, that allowed for the violations of Article 1, §§ 6 and 11 of the New York State Constitution:

    a.    NYPD personnel systematically conducted unduly suggestive identification procedures intended to and/or highly likely to cause misidentification of suspects;

    b.    NYPD personnel systematically failed to disclose to prosecutors material information that was favorable to criminal defendants;

    c.    NYPD personnel systematically fabricated falsely inculpatory evidence and/or committed perjury against suspects in order to secure arrests and close cases;

    d.    NYPD personnel systematically abused process by presenting false evidence to courts reviewing investigations, arrests and detention of suspects;

e. NYPD personnel systematically destroyed, lost or secreted evidence, or recklessly disregarded the rights of the accused in timely producing evidence, to further their personal goals of obtaining and sustaining convictions; and

f. NYPD personnel acted with impunity in destroying criminal evidence, or by reporting it "lost," claiming that they had no duty to preserve and produce evidence once a conviction had been obtained and the criminal defendant's appeals had been "exhausted" (but while the criminal defendant was still incarcerated).

312. The City's unconstitutional customs, decisions, policies and/or indifferent employee training or supervision practices were: (a) deliberately or recklessly indifferent to the obvious risks of inducing eyewitnesses to crimes to misidentify suspects, (b) deliberately or recklessly indifferent to the repeated destruction and/or loss of material criminal evidence, (c) deliberately or recklessly indifferent to a criminal defendant's constitutional rights, and (d) deliberately or recklessly indifferent to the issue of whether innocent people were being convicted of crimes.

313. The City's municipal liability here is premised upon, among other things, their failure to adopt proper and reasonable policies and practices in the face of an obvious need to do so.

314. The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established rights under Article 1, §§ 6 and 11 of the Constitution of the State of New York, including Plaintiff's right not to be significantly detained pretrial

except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment. Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

315. As a direct and proximate result of The City's unconstitutional customs, decisions, policies and/or indifferent employee training or supervision practices, Mr. Newton was falsely arrested, falsely imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction and then wrongfully imprisoned for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

316. Accordingly, Plaintiff Alan Newton now demands judgment against Defendant The City for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**NINETEENTH CAUSE OF ACTION
AGAINST THE INDIVIDUAL DEFENDANTS FOR
THEIR WRONGFUL VIOLATION OF PLAINTIFF'S
CIVIL RIGHTS UNDER THE NEW YORK STATE CONSTITUTION**

317. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 313, inclusive, with the same force and effect as if set forth at length herein.

318. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various

ADA John/Jane Does, acting within the scope of their employment and under color of state law, wrongfully arrested and/or detained Mr. Newton pursuant to legal process knowing: (a) that the only evidence linking Mr. Newton to the crimes alleged -- two eyewitness identifications -- were highly suspect; (b) that they had collected physical evidence that they failed or refused to test, and then "lost" the evidence so no one else could test it; (c) that VJ had originally identified another man named "Willie" as her assailant; (d) that a man named "Willie" might be linked to the crime scene and the type of automobile used by the assailant; (e) that Mr. Newton had an apparent alibi, and (f) that there was an absolute absence of any physical evidence linking Mr. Newton to the victim or the crime scene. In short, the aforementioned Defendants knew or should have known that they did not have probable cause for an arrest, detention and prosecution of Plaintiff Alan Newton.

319. First, neither eyewitness provided anything close to a satisfactory identification as seen above. VJ was intoxicated, medicated and, by her own admission, did not obtain a good and clear look at her assailant. The only other witness, Ms. Gonzalez, saw VJ's assailant for less than a minute or so at the front counter of her store.

320. Second, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, and various NYPD John/Jane Does, collected physical evidence from two crime scenes, but failed to perform or ensure follow up testing to confirm Mr. Newton's guilt or innocence. In particular, these Defendants collected blood, semen and hairs from the victim, and sneakers from Mr. Newton, but failed to perform testing on these items to determine whether any links existed between the victim, Mr. Newton or some third person. These same Defendants, along with ADA Freund and various ADA John/Jane

Does, then proceeded to hide, secrete or lose this physical evidence in reckless disregard of Mr. Newton's constitutional rights.

321. Third, Defendants Newbert, Galligan, Hartfield, Ryan, O'Toole, various NYPD John/Jane Does, met with and interviewed a witness (Ms. Deborah Chamberlin) who offered information about a man named "Willie" who may have been VJ's true assailant. These Defendants, however, wrongfully and with reckless disregard for Mr. Newton's constitutional rights, dismissed the information offered by Ms. Chamberlin as "unreliable" and failed to reveal the true identity of this witness and her potentially exculpatory information from Mr. Newton and his attorneys. In fact, these Defendants, individually or collectively, purposely lost, destroyed or secreted notes made by NYPD investigators during their interview of Ms. Chamberlin.

322. Fourth, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, various NYPD John/Jane Does, ADA Freund, and various ADA John/Jane Does, never gave Mr. Newton's alibi any weight whatsoever. They never even bothered to interview the people Mr. Newton was with at the times of the alleged crimes.

323. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, various NYPD John/Jane Does, DA Merola, ADA Freund, and various ADA John/Jane Does, maliciously and/or without probable cause initiated the prosecution against Mr. Newton by wrongfully pressuring eyewitnesses into falsely identifying him as the rapist, by submitting deliberate fabrications about the results of tests performed (or not) on physical evidence and the credibility of third-party witnesses, by ignoring exculpatory alibi information and omitting (and thereafter destroying) other exculpatory information.

324. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, various NYPD John/Jane Does, ADA Freund, and various ADA John/Jane Does, misled the District Attorney's Office for Bronx County which authorized the arrest of Mr. Newton by presenting deliberate fabrications and making material omissions of exculpatory evidence.

325. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, various NYPD John/Jane Does, ADA Freund, and various ADA John/Jane Does, maliciously continued the prosecution by improperly and wrongfully pressuring the eyewitnesses into falsely identifying Mr. Newton as the rapist, by deliberately (or with reckless disregard) failing to investigate any of the information that led away from Mr. Newton, as well as by hiding their misconduct and destroying evidence.

326. The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under Article I, §§ 6 and 11, of the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment. Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

327. As a direct and proximate result of the wrongful conduct of Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole various NYPD John/Jane Does, DA Merola, ADA Freund, and various ADA John/Jane Does, Mr. Newton was

falsely arrested, falsely imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction and then wrongfully imprisoned for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

328. In addition, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, acting within the scope of their employment and under color of state law, deliberately failed to register, store, preserve, maintain and control material and critical evidence relating to the crimes of which Alan Newton was charged (*i.e.*, they acted with reckless disregard of Plaintiff's constitutional rights).

329. While Plaintiff Alan Newton was incarcerated (and/or while any conviction against him remained on file), all of the Defendants had a constitutional obligation, as officers and agents of The City and/or State of New York, to register, store, preserve, maintain and control material and critical evidence relating to the crimes of which Alan Newton was charged and convicted. See, e.g., De Shaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989) ("when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being").

330. In fact, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, acting within

the scope of their employment and under color of state law, took an extraordinarily cavalier attitude with respect to their constitutional obligation to preserve material and critical evidence relating to their investigation and prosecution of Alan Newton.

331. With reckless disregard for Alan Newton's constitutional rights, Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, lost and/or misplaced and/or secreted the following material and critical evidence relating to Alan Newton's conviction under Bronx County Indictment No. 2441/84:

a.    A rape kit containing, among other things, semen taken from the body of VJ after her rape (this kit was first discovered "lost" by the NYPD Property Division in August 1994 and was not produced to Mr. Newton until November 2005);

b.    Mr. Newton's sneakers, taken from him in June of 1984 by NYPD investigators, were "lost" and never returned to him despite repeated requests;

c.    The notes taken by Defendants Newbert, Galligan, *et al.*, relating to their interview of a third-party witness, Deborah Chamberlin, that a "local" man named "Willie" could be linked to the crime scene and a blue and white Pontiac Grand Prix automobile;

d.    The "criminal background" information on Deborah Chamberlin that allegedly allowed Defendants Newbert, Galligan, *et al.*, to claim that Ms. Chamberlin was an "unreliable" witness; and

e.    The notes compiled by Defendants Newbert, Galligan, *et al.*, regarding their search of the Department of Motor Vehicles database for information about "blue and white Pontiac Grand Prix" vehicles in New York State.

332.    If the aforementioned evidence had been properly registered, stored, preserved, maintained and controlled by Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, and had it been produced to Mr. Newton and his attorneys in a timely manner, Mr. Newton would not have been convicted of the crimes described above, or his incarceration would have been terminated more than a decade ago.

333.    The aforesaid conduct operated, *inter alia*, to deprive Mr. Newton of important and well established rights under Article I, §§ 6 and 11, of the Constitution of the State of New York, including Plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his incarceration for over twenty-two years.

334.    As a direct result of the deliberate (or reckless) failure to register, store, preserve, maintain and control material and critical evidence relating to the crimes of which Alan Newton was charged and convicted, Defendants Newbert, Galligan,

Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, Mr. Newton endured a wrongful arrest and an unfair trial in violation of his clearly established constitutional rights; he was maliciously prosecuted; he was forced to endure a wrongful conviction, and then wrongfully imprisoned for over two decades. During all of these events, Mr. Newton endured substantial physical, emotional and pecuniary injuries detailed above.

335. The intentional conduct and/or reckless disregard of Mr. Newton's constitutional rights by Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, makes these Defendants liable to Mr. Newton for violating the New York State Constitution under Brown v. New York, 89 N.Y.2d 172 (1996).

336. Each of the aforementioned Defendants is liable personally and in their official capacity for these acts which damaged Plaintiff.

337. Thus, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Leho, O'Toole, Sheehan, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, for compensatory damages totaling One Hundred Million Dollars ($100,000,000.00), plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**TWENTIETH CAUSE OF ACTION
AGAINST THE INDIVIDUAL
<u>DEFENDANTS FOR PUNITIVE DAMAGES</u>**

338. Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 334, inclusive, with the same force and effect as if set forth at length herein.

339. Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Sheehan, Leho, O'Toole, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, acted wantonly, recklessly and maliciously with respect to Plaintiff Alan Newton, his safety, his rights and his quest to prove his innocence.

340. All of the acts and omissions described on the part of Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Sheehan, Leho, O'Toole, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, show that these Defendants acted with a conscious indifference and utter disregard for the safety and rights of Plaintiff Alan Newton.

341. As a direct and proximate result of above-described wanton, reckless and malicious acts and/or omissions of Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Sheehan, Leho, O'Toole, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, Plaintiff Alan Newton was falsely arrested, maliciously prosecuted, and falsely imprisoned; he was forced to endure an unfair trial and wrongful conviction and then wrongfully imprisoned for over two decades.

342.    Accordingly, Plaintiff Alan Newton now demands judgment against Defendants Newbert, Galligan, Hartfield, Ryan, Harris, Sheehan, Leho, O'Toole, McGuire, Haskins, Kiely, Trabitz, various NYPD John/Jane Does, DA Merola, DA Johnson, ADA Freund, and various ADA John/Jane Does, for punitive damages totaling Fifty Million Dollars ($50,000,000.00), and any other and further relief this Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
### AGAINST THE CITY & DA JOHNSON
### - FOR INJUNCTIVE RELIEF -
### FOR AN ORDER REQUIRING THE PRESERVATION OF EVIDENCE

343.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 339, inclusive, with the same force and effect as if set forth at length herein.

344.    Defendants The City and the Bronx County District Attorney's Office have, at various times, been entrusted with evidence vital to the criminal charges brought against Alan Newton under Bronx County Indictment No. 2441/84.

345.    Defendants The City and the Bronx County District Attorney's Office (DA Johnson) (through their agents, servants and representatives) have, nevertheless, shown a callous disregard for the protection and retention of files and evidence relating to the criminal charges brought against Alan Newton under Bronx County Indictment No. 2441/84.

346.    As detailed above, Defendants The City and the Bronx County District Attorney's Office (DA Johnson) (through their agents, servants and representatives) have, among other things, lost and/or misplaced and/or secreted the following material and critical evidence relating to Alan Newton's rape conviction in May, 1985:

a.  A rape kit containing, among other things, semen taken from the body of VJ after her rape (this kit was first discovered "lost" by the NYPD Property Division in 1994 and was not produced to Mr. Newton until 2005);

b.  Mr. Newton's sneakers, taken from him in June of 1984 by NYPD investigators, were "lost" and never returned to him despite repeated requests;

c.  The notes taken by Defendants Newbert, Galligan, *et al.*, relating to their interview of a third-party witness, Deborah Chamberlin, that a "local" man named "Willie" could be linked to the crime scene and a blue and white Pontiac Grand Prix automobile;

d.  The "criminal background" information on Deborah Chamberlin that allegedly allowed Defendants Newbert, Galligan, *et al.*, to claim that Ms. Chamberlin was an "unreliable" witness; and

f.  The notes compiled by Defendants Newbert, Galligan, *et al.*, regarding their search of the Department of Motor Vehicles database for information about "blue and white Pontiac Grand Prix" vehicles in New York State.

347.  Plaintiff Alan Newton has recently learned that DA Johnson and the Bronx District Attorney's Office has lost or misplaced his/its file relating to the charges brought against Mr. Newton under Bronx County Indictment No. 2441/84.

348.  Finally, Plaintiff Alan Newton also has recently learned that the Clerk of the Criminal Part of the Bronx Supreme Court has lost or misplaced the court file relating

to the criminal charges brought against Alan Newton under Bronx County Indictment No. 2441/84.

349. In short, more evidence has been lost/destroyed than preserved relating to the criminal charges brought against Alan Newton under Bronx County Indictment No. 2441/84. Some step must be taken on an emergency basis to require Defendants The City and the Bronx County District Attorney's Office (DA Johnson) to preserve all remaining evidence relating to Alan Newton and Bronx County Indictment No. 2441/84.

350. The need for a court order requiring the preservation of this vital evidence is also buttressed by the fact that there is no existing New York State or New York City law requiring the preservation of criminal evidence in a case such as this. For example, after a criminal defendant is convicted and his/her direct appeal from that conviction has been "exhausted," Defendants The City and the Bronx County District Attorney's Office (DA Johnson) claim that no express City or State law requires them to preserve evidence relating to that conviction. This "gap" in the law has caused the loss of evidence in numerous "old" criminal cases; the convictions in these cases might have been otherwise been challenged by the testing of DNA evidence if the latter evidence had not been lost or destroyed.

351. The loss of criminal evidence by Defendants The City (NYPD) and the Bronx County District Attorney's Office (DA Johnson) has been so commonplace and so threatening to the integrity of the criminal justice system in New York State, that some New York legislators have proposed unprecedented legislation that would increase the standards for evidence preservation. One of the proposed bills, entitled "Evidence Preservation" (A8046), would allow New York State to tap the potential of preserved

evidence by empowering the New York State Forensic Science Commission to create rules regarding the proper retention, storage and organization of biological evidence. Twenty-one states have laws requiring the preservation of evidence; New York does not. For more on laws regulating evidence preservation and storage, go to: http://www.innocenceproject.org/fix/Evidence-Handling.php.

352. Until the aforementioned legislation is passed, there is a strong likelihood that evidence relating to the criminal charges brought against Alan Newton under Bronx County Indictment No. 2441/84 will be lost or destroyed by Defendants The City and the Bronx County District Attorney's Office (DA Johnson) with impunity.

353. A declaration is needed from this Court to ensure that Plaintiff Alan Newton's rights are not violated and irreparably damaged by the callous and wrongful destruction of evidence relating to Bronx County Indictment No. 2441/84 while this action is pending.

354. Plaintiff Alan Newton's claims herein have a reasonable likelihood of success on the merits. Alternatively, sufficiently serious and substantial questions exist in this action to make the claims fair grounds for litigation; and, when the hardships are weighed in connection with the granting of the relief requested, the balance tips decidedly in Plaintiff's favor.

355. Wherefore, Plaintiff Alan Newton requests that this Court award the following relief:

> A. Declare that the destruction of any evidence relating to Plaintiff Alan Newton and Bronx County Indictment No. 2441/84 would be wrongful and a violation of Mr. Newton's constitutional rights;

B.    Enter a permanent injunction prohibiting Defendants The City and the Bronx County District Attorney's Office (DA Johnson), and their agents, servants and representatives, from destroying any evidence relating to Plaintiff Alan Newton and Bronx County Indictment No. 2441/84; and

C.    Award such other and further injunctive relief as the Court deems appropriate and just.

## JURY DEMAND

Plaintiff Alan Newton hereby demands a trial by jury on all issues.

WHEREFORE, Plaintiff demands JUDGMENT against Defendants as follows:

I.     For compensatory damages in the amount of One Hundred Million ($100,000,000.00);

II.    For punitive damages in the amount of Fifty Million Dollars ($50,000,000.00);

III.   For reasonable attorneys' fees, together with costs and disbursements of this action pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court;

IV.    For pre-judgment interest, as allowed by law;

V.     For injunctive relief to prevent the destruction of evidence relating to Plaintiff Alan Newton and/or Bronx County Indictment No. 2441/84; and

VI.    For such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       July 2, 2007

                              Respectfully submitted,
                              Law Office of John F. Schutty, P.C.



                              By:____/s_____
                                   John F. Schutty
                                   (JS 2173)
                              445 Park Avenue, 9th Floor
                              New York, NY 10022
                              (212) 836-4796

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x

ALAN NEWTON,

                             Plaintiff,

                -against-

THE CITY OF NEW YORK, DISTRICT ATTORNEYS
MARIO MEROLA AND ROBERT T. JOHNSON,
INDIVIDUALLY AND IN THEIR OFFICIAL
CAPACITY, ANDREA FREUND AND VARIOUS
JOHN/JANE DOES, INDIVIDUALLY AND IN THEIR
OFFICIAL CAPACITIES AS EMPLOYEES OF THE
CITY OF NEW YORK WHO ARE/WERE ASSISTANT
DISTRICT ATTORNEYS WITHIN THE OFFICE OF
THE DISTRICT ATTORNEY, COUNTY OF BRONX;
DETECTIVE JOANNE NEWBERT, DETECTIVE
PHILIP GALLIGAN, DETECTIVE [JOHN DOE]
HARTFIELD, DETECTIVE [JOHN DOE] RYAN,
DETECTIVE [JOHN DOE] HARRIS, POLICE OFFICER
DOUGLAS LEHO, POLICE OFFICER WILLIAM SEAN
O'TOOLE, LIEUTENANT MICHAEL SHEEHAN,
SERGEANT PATRICK J. McGUIRE, POLICE OFFICER
[JOHN DOE] HASKINS, POLICE OFFICER [JANE
DOE] KIELY, INSPECTOR JACK TRABITZ AND
VARIOUS JOHN/JANE DOES, INDIVIDUALLY AND
IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES
OF THE CITY OF NEW YORK WHO ARE/WERE
MEMBERS OF THE POLICE DEPARTMENT OF THE
CITY OF NEW YORK,

                            Defendants.

---------------------------------------------------------------------- x

**ANSWER OF DEFENDANTS
CITY OF NEW YORK,
JOHNSON, FREUND,
NEWBERT, RYAN, HARRIS,
LEHO, O'TOOLE,
SHEEHAN, MCGUIRE,
KIELY AND TRABITZ**

07-CV-6211 (SAS) (HBP)

**JURY TRIAL DEMANDED**

        Defendants City of New York, Robert T. Johnson, Andrea Freund, Joanne

Newbert, Bernard Ryan (sued herein as "Detective John Doe Ryan"), Roland Harris (sued herein

as "Detective John Doe Harris"), Douglas Leho, William Sean O'Toole, Michael Sheehan,

Patrick McGuire, Catherine Kiely (sued herein as "Police Officer Jane Doe Kiely"), and Jack Trabitz,[1] by their attorney Michael A. Cardozo, Corporation Counsel of the City of New York, as and for their answer to the complaint, respectfully allege, upon information and belief, as follows:

1. Deny the allegations set forth in paragraph "1" of the complaint, except admit that plaintiff purports to bring this action as stated therein.

2. Deny the allegations set forth in paragraph "2" of the complaint, except admit that plaintiff purports to invoke this Court's jurisdiction as stated therein.

3. Deny the allegations set forth in paragraph "3" of the complaint, except admit that plaintiff purports to invoke this Court's jurisdiction as stated therein.

4. Deny the allegations set forth in paragraph "4" of the complaint, except admit that plaintiff purports to lay venue in this district.

5. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "5" of the complaint.

6. Deny the allegations set forth in paragraph "6" of the complaint, except admit that the City of New York (the "City") is a municipal corporation organized under the laws of the State of New York.

7. Deny the allegations set forth in paragraph "7" of the complaint, except admit that the City maintains a police department.

8. Deny the allegations set forth in paragraph "8" of the complaint, except admit that Mario Merola was formerly the District Attorney of Bronx County, that Robert

---

[1] Upon information and belief, defendants Haskins, Merola, Hartfield and Galligan are deceased.

Johnson currently is the District Attorney of Bronx County, and that Andrea Freund, John F.
Carroll, Robert Moore and Rafael Curbello were employed by the Bronx County District
Attorney's Office.

9. The allegations of paragraph "9" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

10. The allegations of paragraph "10" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

11. Deny the allegations set forth in paragraph "11" of the complaint, except admit that the City maintains a police department.

12. The allegations of paragraph "12" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

13. Deny the allegations set forth in paragraph "13" of the complaint, and respectfully refer the Court to the Charter and Administrative Code of the City of New York, Article 18 of the County Law of the State of New York and all other applicable law for a full and complete statement of the powers and duties of the District Attorney.

14. Deny the allegations set forth in paragraph "14" of the complaint, except admit that JoAnn Newbert was formerly employed by the NYPD.

15. Deny the allegations set forth in paragraph "15" of the complaint, except admit that Philip Galligan was formerly employed by the NYPD.

16.     Deny the allegations set forth in paragraph "16" of the complaint, except admit that Richard Hartfield (sued herein as "John Doe Hartfield") was formerly employed by the NYPD.

17.     Deny the allegations set forth in paragraph "17" of the complaint, except admit that Bernard Ryan (sued herein as "John Doe Ryan") was formerly employed by the NYPD.

18.     Deny the allegations set forth in paragraph "18" of the complaint, except admit that Roland Harris (sued herein as "John Doe Harris") is employed by the NYPD.

19.     Deny the allegations set forth in paragraph "19" of the complaint, except admit that Douglas Leho was formerly employed by the NYPD.

20.     Deny the allegations set forth in paragraph "20" of the complaint, except admit that William Sean O'Toole is employed by the NYPD.

21.     Deny the allegations set forth in paragraph "21" of the complaint, except admit that Michael Sheehan was formerly employed by the NYPD.

22.     Deny the allegations set forth in paragraph "22" of the complaint, except admit that Patrick McGuire was formerly employed by the NYPD.

23.     Deny the allegations set forth in paragraph "23" of the complaint, except admit that John Haskins (sued herein as "John Doe Haskins") was formerly employed by the NYPD.

24.     Deny the allegations set forth in paragraph "24" of the complaint, except admit that Catherine Kiely is employed by the NYPD.

25.     Deny the allegations set forth in paragraph "25" of the complaint, except admit that Inspector Jack Trabitz is employed by the NYPD.

26.     Deny the allegation that any City employee was "involved in . . . omissions" relating to Alan Newton, deny knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations set forth therein, and refer the Court to any existing documents and evidence relating to the circumstances surrounding the rape and assault of V.J. and the related proceedings conducted under Indictment # 2441/84, including the trial held in May, 1985, and the proceedings related to plaintiff's requests for post-conviction DNA testing (the "relevant documents, evidence and proceedings").

27.     The allegations of paragraph "27" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

28.     The allegations of paragraph "28" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

29.     The allegations of paragraph "29" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations, and respectfully refer the Court to the Charter and Administrative Code of the City of New York for a full and complete statement of the duties and responsibilities of the NYPD.

30.     Deny the allegations set forth in paragraph "30" of the complaint.

31.     Deny the allegations set forth in paragraph "31" of the complaint, except admit that plaintiff appeared for a hearing pursuant to Section 50-h of the General Municipal Law on or about December 19, 2006.

32.     The allegations of paragraph "32" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

33.     Deny the allegations set forth in paragraph "33" of the complaint, except admit that plaintiff was released from prison in or about July, 2006.

34.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "34" of the complaint.

35.     Deny the allegations set forth in paragraph "35" of the complaint, except admit that plaintiff was released from prison in or about July, 2006.

36.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "36" of the complaint.

37.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "37" of the complaint, except admit that V.J. was raped on or about June 23, 1984,  and refer the Court to the relevant evidence, documents and proceedings.

38.     Deny the allegations set forth in paragraph "38" of the complaint, except admit that Alan Newton was indicted under Indictment # 2441/84, and refer the Court to the relevant documents, evidence and proceedings.

39.     Deny the allegations set forth in paragraph "39" of the complaint.

40.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "40" of the complaint, except admit that DNA testing was reportedly conducted, and refer the Court to the relevant documents, evidence and proceedings.

41.  Deny the allegations set forth in paragraph "41" of the complaint, except admit that plaintiff's conviction was set aside in or about July, 2006.

42.  Deny the allegations set forth in paragraph "42" of the complaint.

43.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "43" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

44.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "44" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

45.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "45" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

46.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "46" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

47.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "47" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

48.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "48" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

49. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "49" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

50. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "50" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

51. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "51" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

52. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "52" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

53. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "53" of the complaint, except admit that V.J. was transported to Jacobi Hospital, and refer the Court to the relevant documents, evidence and proceedings.

54. Deny the allegations set forth in paragraph "54" of the complaint, except admit that a rape kit was collected.

55. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "55" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

56.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "56" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

57.     Deny the allegations set forth in paragraph "57" of the complaint.

58.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "58" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

59.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "59" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

60.     Deny the allegations set forth in paragraph "60" of the complaint.

61.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "61" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

62.     Deny the allegations set forth in paragraph "62" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

63.     Deny the allegations set forth in paragraph "63" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

64.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "64" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

65.     Deny the allegations set forth in paragraph "65" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

66. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "66" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

67. Deny the allegations set forth in paragraph "67" of the complaint.

68. Deny the allegations set forth in paragraph "68" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

69. Deny the allegations set forth in paragraph "69" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

70. Deny the allegations set forth in paragraph "70" of the complaint.

71. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "71" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

72. Deny the allegations set forth in paragraph "72" of the complaint.

73. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "73" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

74. Deny the allegations set forth in paragraph "74" of the complaint.

75. Deny the allegations set forth in paragraph "75" of the complaint.

76. Deny the allegations set forth in paragraph "76" of the complaint.

77. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "77" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

78. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "78" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

79. Deny the allegations set forth in paragraph "79" of the complaint.

80. Deny the allegations set forth in paragraph "80" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

81. Deny the allegations set forth in paragraph "81" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

82. Deny the allegations set forth in paragraph "82" of the complaint.

83. Deny the allegations set forth in paragraph "83" of the complaint.

84. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "84" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

85. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "85" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

86. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "86" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

87. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "87" of the complaint.

88. Deny the allegations set forth in paragraph "88" of the complaint.

89. Deny the allegations set forth in paragraph "89" of the complaint.

90. Deny the allegations set forth in paragraph "90" of the complaint.

91. Deny the allegations set forth in paragraph "91" of the complaint.

92. Deny the allegations set forth in paragraph "92" of the complaint.

93. Deny the allegations set forth in paragraph "93" of the complaint.

94. Deny the allegations set forth in paragraph "94" of the complaint.

95. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "95" of the complaint, except admit that a verdict was reached on or about May 21, 1985, and refer the Court to the relevant documents, evidence and proceedings.

96. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "96" of the complaint, except admit that Newton was convicted of First Degree Rape and other crimes, and refer the Court to the relevant documents, evidence and proceedings.

97. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "97" of the complaint, except admit that Newton was sentenced.

98. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "98" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

99. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "99" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

100. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "100" of the complaint, except admit that a rape kit was vouchered, and refer the Court to the relevant documents, evidence and proceedings.

101. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "101" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

102. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "102" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

103. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "103" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

104. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "104" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

105. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "105" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

106. Deny the allegations set forth in paragraph "106" of the complaint.

107. Deny the allegations set forth in paragraph "107" of the complaint.

108. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "108" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

109. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "109" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

110. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "110" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

111. Deny the allegations set forth in paragraph "111" of the complaint.

112. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "112" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

113. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "113" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

114. Deny the allegations set forth in paragraph "114" of the complaint.

115. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "115" of the complaint.

116. Deny the allegations set forth in paragraph "116" of the complaint.

117. Deny the allegations set forth in paragraph "117" of the complaint.

118. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "118" of the complaint, and refer the Court to the relevant documents, evidence and proceedings.

119. Deny the allegations set forth in paragraph "119" of the complaint.

120. Deny the allegations set forth in paragraph "120" of the complaint.

121.    Deny the allegations set forth in paragraph "121" of the complaint.

122.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "122" of the complaint, except admit that DNA testing reportedly was conducted, and refer the Court to the relevant documents, evidence and proceedings.

123.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "123" of the complaint, except admit that Newton's conviction was vacated in or about July, 2006, and refer the Court to the relevant documents, evidence and proceedings.

124.    Deny the allegations set forth in paragraph "124" of the complaint.

**ANSWERING THE FIRST CAUSE OF ACTION**

125.    Repeat and reallege each and every response to paragraphs "1" through "124" of the complaint, as though fully set forth herein.

126.    Deny the allegations set forth in paragraph "126" of the complaint

127.    Deny the allegations set forth in paragraph "127" of the complaint.

128.    Deny the allegations set forth in paragraph "128" of the complaint.

129.    Deny the allegations set forth in paragraph "129" of the complaint.

130.    Deny the allegations set forth in paragraph "130" of the complaint.

131.    Deny the allegations set forth in paragraph "131" of the complaint.

132.    Deny the allegations set forth in paragraph "132" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

**ANSWERING THE SECOND CAUSE OF ACTION**

133. Repeat and reallege each and every response to paragraphs "1" through "132" of the complaint, as though fully set forth herein.

134. Deny the allegations set forth in paragraph "134" of the complaint.

135. Deny the allegations set forth in paragraph "135" of the complaint.

136. Deny the allegations set forth in paragraph "136" of the complaint.

137. Deny the allegations set forth in paragraph "137" of the complaint.

138. Deny the allegations set forth in paragraph "138" of the complaint.

139. Deny the allegations set forth in paragraph "139" of the complaint.

140. Deny the allegations set forth in paragraph "140" of the complaint.

141. Deny the allegations set forth in paragraph "141" of the complaint.

142. Deny the allegations set forth in paragraph "142" of the complaint.

143. Deny the allegations set forth in paragraph "143" of the complaint.

144. Deny the allegations set forth in paragraph "144" of the complaint.

145. Deny the allegations set forth in paragraph "145" of the complaint.

146. Deny the allegations set forth in paragraph "146" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

**ANSWERING THE THIRD CAUSE OF ACTION**

147. Repeat and reallege each and every response to paragraphs "1" through "146" of the complaint, as though fully set forth herein.

148. Deny the allegations set forth in paragraph "148" of the complaint.

149. Deny the allegations set forth in paragraph "149" of the complaint.

150. Deny the allegations set forth in paragraph "150" of the complaint.

151. Deny the allegations set forth in paragraph "151" of the complaint.

152. Deny the allegations set forth in paragraph "152" of the complaint.

153. Deny the allegations set forth in paragraph "153" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

## ANSWERING THE FOURTH CAUSE OF ACTION

154. Repeat and reallege each and every response to paragraphs "1" through "153" of the complaint, as though fully set forth herein.

155. Deny the allegations set forth in paragraph "155" of the complaint.

156. The allegations of paragraph "156" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

157. Deny the allegations set forth in paragraph "157" of the complaint.

158. Deny the allegations set forth in paragraph "158" of the complaint.

159. Deny the allegations set forth in paragraph "159" of the complaint.

160. Deny the allegations set forth in paragraph "160" of the complaint.

161. Deny the allegations set forth in paragraph "161" of the complaint.

162. Deny the allegations set forth in paragraph "162" of the complaint.

163. Deny the allegations set forth in paragraph "163" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

## ANSWERING THE FIFTH CAUSE OF ACTION

164. Repeat and reallege each and every response to paragraphs "1" through "163" of the complaint, as though fully set forth herein.

165. Deny the allegations set forth in paragraph "165" of the complaint.

166. Deny the allegations set forth in paragraph "166" of the complaint.

167. Deny the allegations set forth in paragraph "167" of the complaint.

168. Deny the allegations set forth in paragraph "168" of the complaint.

169. Deny the allegations set forth in paragraph "169" of the complaint.

170. Deny the allegations set forth in paragraph "170" of the complaint.

171. Deny the allegations set forth in paragraph "171" of the complaint.

172. Deny the allegations set forth in paragraph "172" of the complaint.

173. Deny the allegations set forth in paragraph "173" of the complaint.

174. Deny the allegations set forth in paragraph "174" of the complaint.

175. Deny the allegations set forth in paragraph "175" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

## ANSWERING THE SIXTH CAUSE OF ACTION

176. Repeat and reallege each and every response to paragraphs "1" through "172" of the complaint, as though fully set forth herein.

177. The allegations of paragraph "177" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

178. Deny the allegations set forth in paragraph "178" of the complaint.

179. Deny the allegations set forth in paragraph "179" of the complaint.

180. Deny the allegations set forth in paragraph "180" of the complaint.

181. Deny the allegations set forth in paragraph "181" of the complaint.

182. Deny the allegations set forth in paragraph "182" of the complaint.

183. Deny the allegations set forth in paragraph "183" of the complaint.

184.    Deny the allegations set forth in paragraph "184" of the complaint.

185.    Deny the allegations set forth in paragraph "185" of the complaint.

186.    Deny the allegations set forth in paragraph "186" of the complaint.

187.    Deny the allegations set forth in paragraph "187" of the complaint.

188.    Deny the allegations set forth in paragraph "188" of the complaint.

189.    Deny the allegations set forth in paragraph "189" of the complaint.

190.    Deny the allegations set forth in paragraph "190" of the complaint.

191.    Deny the allegations set forth in paragraph "191" of the complaint.

192.    Deny the allegations set forth in paragraph "192" of the complaint.

193.    Deny the allegations set forth in paragraph "193" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

### ANSWERING THE SEVENTH CAUSE OF ACTION

194.    Repeat and reallege each and every response to paragraphs "1" through "190" of the complaint, as though fully set forth herein.

195.    The allegations of paragraph "195" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

196.    Deny the allegations set forth in paragraph "196" of the complaint.

197.    Deny the allegations set forth in paragraph "197" of the complaint.

198.    Deny the allegations set forth in paragraph "198" of the complaint.

199.    Deny the allegations set forth in paragraph "199" of the complaint.

200.    Deny the allegations set forth in paragraph "200" of the complaint.

201.    Deny the allegations set forth in paragraph "201" of the complaint.

202.    Deny the allegations set forth in paragraph "202" of the complaint.

203.    Deny the allegations set forth in paragraph "203" of the complaint

204.    Deny the allegations set forth in paragraph "204" of the complaint.

205.    Deny the allegations set forth in paragraph "205" of the complaint.

206.    Deny the allegations set forth in paragraph "206" of the complaint.

207.    Deny the allegations set forth in paragraph "207" of the complaint.

208.    Deny the allegations set forth in paragraph "208" of the complaint.

209.    Deny the allegations set forth in paragraph "209" of the complaint.

210.    Deny the allegations set forth in paragraph "210" of the complaint.

211.    Deny the allegations set forth in paragraph "211" of the complaint.

212.    Deny the allegations set forth in paragraph "212" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

## ANSWERING THE EIGHTH CAUSE OF ACTION

213.    Repeat and reallege each and every response to paragraphs "1" through "209" of the complaint, as though fully set forth herein.

214.    Deny the allegations set forth in paragraph "214" of the complaint.

215.    Deny the allegations set forth in paragraph "215" of the complaint.

216.    Deny the allegations set forth in paragraph "216" of the complaint.

217.    Deny the allegations set forth in paragraph "217" of the complaint.

218.    Deny the allegations set forth in paragraph "218" of the complaint.

219.    Deny the allegations set forth in paragraph "219" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

### ANSWERING THE NINTH CAUSE OF ACTION

220. Repeat and reallege each and every response to paragraphs "1" through "216" of the complaint, as though fully set forth herein.

221. The allegations of paragraph "221" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

222. The allegations of paragraph "222" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

223. Deny the allegations set forth in paragraph "223" of the complaint.

224. Deny the allegations set forth in paragraph "224" of the complaint.

225. Deny the allegations set forth in paragraph "225" of the complaint.

226. Deny the allegations set forth in paragraph "226" of the complaint.

227. Deny the allegations set forth in paragraph "227" of the complaint.

228. Deny the allegations set forth in paragraph "228" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

### ANSWERING THE TENTH CAUSE OF ACTION

229. Repeat and reallege each and every response to paragraphs "1" through "225" of the complaint, as though fully set forth herein.

230. Deny the allegations set forth in paragraph "230" of the complaint.

231. The allegations of paragraph "231" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

232.     Deny the allegations set forth in paragraph "232" of the complaint.

233.     Deny the allegations set forth in paragraph "233" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

**ANSWERING THE ELEVENTH CAUSE OF ACTION**

234.     Repeat and reallege each and every response to paragraphs "1" through "230" of the complaint, as though fully set forth herein.

235.     Deny the allegations set forth in paragraph "235" of the complaint.

236.     Deny the allegations set forth in paragraph "236" of the complaint.

237.     Deny the allegations set forth in paragraph "237" of the complaint.

238.     Deny the allegations set forth in paragraph "238" of the complaint.

239.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "239" of the complaint.

240.     Deny the allegations set forth in paragraph "240" of the complaint.

241.     Deny the allegations set forth in paragraph "241" of the complaint.

242.     Deny the allegations set forth in paragraph "242" of the complaint.

243.     Deny the allegations set forth in paragraph "243" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

**ANSWERING THE TWELFTH CAUSE OF ACTION**

244.     Repeat and reallege each and every response to paragraphs "1" through "240" of the complaint, as though fully set forth herein.

245.     Deny the allegations set forth in paragraph "245" of the complaint.

246.     Deny the allegations set forth in paragraph "246" of the complaint.

247.     Deny the allegations set forth in paragraph "247" of the complaint.

# A-174

248. Deny the allegations set forth in paragraph "248" of the complaint.

249. Deny the allegations set forth in paragraph "249" of the complaint.

250. Deny the allegations set forth in paragraph "250" of the complaint.

251. Deny the allegations set forth in paragraph "251" of the complaint.

252. Deny the allegations set forth in paragraph "252" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

### ANSWERING THE THIRTEENTH CAUSE OF ACTION

253. Repeat and reallege each and every response to paragraphs "1" through "249" of the complaint, as though fully set forth herein.

254. Deny the allegations set forth in paragraph "254" of the complaint

255. Deny the allegations set forth in paragraph "255" of the complaint.

256. Deny the allegations set forth in paragraph "256" of the complaint.

257. Deny the allegations set forth in paragraph "257" of the complaint.

258. Deny the allegations set forth in paragraph "258" of the complaint.

259. Deny the allegations set forth in paragraph "259" of the complaint.

260. Deny the allegations set forth in paragraph "260" of the complaint.

261. Deny the allegations set forth in paragraph "261" of the complaint

262. Deny the allegations set forth in paragraph "262" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

### ANSWERING THE FOURTEENTH CAUSE OF ACTION

263. Repeat and reallege each and every response to paragraphs "1" through "259" of the complaint, as though fully set forth herein.

264. Deny the allegations set forth in paragraph "264" of the complaint.

265. Deny the allegations set forth in paragraph "265" of the complaint.

266. Deny the allegations set forth in paragraph "266" of the complaint.

267. Deny the allegations set forth in paragraph "267" of the complaint.

268. Deny the allegations set forth in paragraph "268" of the complaint.

269. Deny the allegations set forth in paragraph "269" of the complaint.

270. Deny the allegations set forth in paragraph "270" of the complaint.

271. Deny the allegations set forth in paragraph "271" of the complaint.

272. Deny the allegations set forth in paragraph "272" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

## ANSWERING THE FIFTEENTH CAUSE OF ACTION

273. Repeat and reallege each and every response to paragraphs "1" through "269" of the complaint, as though fully set forth herein.

274. Deny the allegations set forth in paragraph "274" of the complaint.

275. Deny the allegations set forth in paragraph "275" of the complaint.

276. Deny the allegations set forth in paragraph "276" of the complaint.

277. Deny the allegations set forth in paragraph "277" of the complaint.

278. Deny the allegations set forth in paragraph "278" of the complaint.

279. Deny the allegations set forth in paragraph "279" of the complaint.

280. Deny the allegations set forth in paragraph "280" of the complaint.

281. Deny the allegations set forth in paragraph "281" of the complaint.

282. Deny the allegations set forth in paragraph "282" of the complaint.

283. Deny the allegations set forth in paragraph "283" of the complaint.

284. Deny the allegations set forth in paragraph "284" of the complaint.

285.     Deny the allegations set forth in paragraph "285" of the complaint.

286.     Deny the allegations set forth in paragraph "286" of the complaint.

287.     Deny the allegations set forth in paragraph "287" of the complaint.

288.     Deny the allegations set forth in paragraph "288" of the complaint.

289.     Deny the allegations set forth in paragraph "289" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

## ANSWERING THE SIXTEENTH CAUSE OF ACTION

290.     Repeat and reallege each and every response to paragraphs "1" through "286" of the complaint, as though fully set forth herein.

291.     The allegations of paragraph "291" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

292.     Deny the allegations set forth in paragraph "292" of the complaint.

293.     Deny the allegations set forth in paragraph "293" of the complaint.

294.     Deny the allegations set forth in paragraph "294" of the complaint.

295.     Deny the allegations set forth in paragraph "295" of the complaint.

296.     Deny the allegations set forth in paragraph "296" of the complaint.

297.     Deny the allegations set forth in paragraph "297" of the complaint.

298.     Deny the allegations set forth in paragraph "298" of the complaint.

299.     Deny the allegations set forth in paragraph "299" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

## ANSWERING THE SEVENTEENTH CAUSE OF ACTION

300. Repeat and reallege each and every response to paragraphs "1" through "296" of the complaint, as though fully set forth herein.

301. Deny the allegations set forth in paragraph "301" of the complaint.

302. Deny the allegations set forth in paragraph "302" of the complaint.

303. Deny the allegations set forth in paragraph "303" of the complaint.

304. Deny the allegations set forth in paragraph "304" of the complaint.

305. Deny the allegations set forth in paragraph "305" of the complaint.

306. Deny the allegations set forth in paragraph "306" of the complaint.

307. Deny the allegations set forth in paragraph "307" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

## ANSWERING THE EIGHTEENTH CAUSE OF ACTION

308. Repeat and reallege each and every response to paragraphs "1" through "304" of the complaint, as though fully set forth herein.

309. The allegations of paragraph "309" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

310. The allegations of paragraph "310" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

311. Deny the allegations set forth in paragraph "311" of the complaint.

312. Deny the allegations set forth in paragraph "312" of the complaint.

313. Deny the allegations set forth in paragraph "313" of the complaint.

314. Deny the allegations set forth in paragraph "314" of the complaint.

315. Deny the allegations set forth in paragraph "315" of the complaint.

316. Deny the allegations set forth in paragraph "316" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

### ANSWERING THE NINTEENTH CAUSE OF ACTION

317. Repeat and reallege each and every response to paragraphs "1" through "313" of the complaint, as though fully set forth herein.

318. The allegations of paragraph "318" of the complaint set forth conclusions of law to which no response is required; to the extent a response is required, deny all such allegations.

319. Deny the allegations set forth in paragraph "319" of the complaint.

320. Deny the allegations set forth in paragraph "320" of the complaint.

321. Deny the allegations set forth in paragraph "321" of the complaint.

322. Deny the allegations set forth in paragraph "322" of the complaint.

323. Deny the allegations set forth in paragraph "323" of the complaint.

324. Deny the allegations set forth in paragraph "324" of the complaint.

325. Deny the allegations set forth in paragraph "325" of the complaint.

326. Deny the allegations set forth in paragraph "326" of the complaint.

327. Deny the allegations set forth in paragraph "327" of the complaint.

328. Deny the allegations set forth in paragraph "328" of the complaint.

329. Deny the allegations set forth in paragraph "329" of the complaint.

330. Deny the allegations set forth in paragraph "330" of the complaint.

331. Deny the allegations set forth in paragraph "331" of the complaint.

332.    Deny the allegations set forth in paragraph "332" of the complaint.

333.    Deny the allegations set forth in paragraph "333" of the complaint.

334.    Deny the allegations set forth in paragraph "334" of the complaint.

335.    Deny the allegations set forth in paragraph "335" of the complaint.

336.    Deny the allegations set forth in paragraph "336" of the complaint.

337.    Deny the allegations set forth in paragraph "337" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

## ANSWERING THE TWENTIETH CAUSE OF ACTION

338.    Repeat and reallege each and every response to paragraphs "1" through "334" of the complaint, as though fully set forth herein.

339.    Deny the allegations set forth in paragraph "339" of the complaint.

340.    Deny the allegations set forth in paragraph "340" of the complaint.

341.    Deny the allegations set forth in paragraph "341" of the complaint.

342.    Deny the allegations set forth in paragraph "342" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

## ANSWERING THE TWENTY-FIRST CAUSE OF ACTION

343.    Repeat and reallege each and every response to paragraphs "1" through "339" of the complaint, as though fully set forth herein.

344.    Deny the allegations set forth in paragraph "344" of the complaint.

345.    Deny the allegations set forth in paragraph "345" of the complaint.

346.    Deny the allegations set forth in paragraph "346" of the complaint.

347.    Deny the allegations set forth in paragraph "347" of the complaint.

348. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "348" of the complaint.

349. Deny the allegations set forth in paragraph "349" of the complaint, except admit that plaintiff purports to demand judgment as stated therein.

350. Deny the allegations set forth in paragraph "350" of the complaint.

351. Deny the allegations set forth in paragraph "351" of the complaint.

352. Deny the allegations set forth in paragraph "352" of the complaint.

353. Deny the allegations set forth in paragraph "353" of the complaint.

354. Deny the allegations set forth in paragraph "354" of the complaint.

355. Deny the allegations set forth in paragraph "355" of the complaint, except admit that plaintiff purports to demand judgment as stated therein; and admit that plaintiff demands trial by jury.

## FIRST AFFIRMATIVE DEFENSE

356. The complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

357. Defendants have not violated any rights, privileges or immunities under the Constitution or laws of the United States or the State of New York or any political subdivision thereof, nor has defendant violated any act of Congress providing for the protection of civil rights.

## THIRD AFFIRMATIVE DEFENSE

358. At all times relevant to the acts alleged in the complaint, the duties and functions of the municipal defendants' officials entailed the reasonable exercise of proper and lawful discretion. Therefore, defendant City of New York has governmental immunity from liability.

### FOURTH AFFIRMATIVE DEFENSE

359.    Any injury alleged to have been sustained resulted from plaintiffs' own culpable or negligent conduct and was not the proximate result of any act of the defendant.

### FIFTH AFFIRMATIVE DEFENSE

360.    Defendants had probable cause and/or reasonable suspicion for the conduct in question.

### SIXTH AFFIRMATIVE DEFENSE

361.    None of the defendants violated any clearly established constitutional right of which a reasonable person would have known, and therefore, said defendants are protected from liability by qualified immunity.

### SEVENTH AFFIRMATIVE DEFENSE

362.    Punitive damages may not be recovered against the City of New York.

### EIGHTH AFFIRMATIVE DEFENSE

363.    Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation.

### NINTH AFFIRMATIVE DEFENSE

364.    Plaintiff has failed to comply with the conditions precedent to this lawsuit, including those mandated by Section 50-e of the General Municipal Law.

# A-182

WHEREFORE, defendants request judgment dismissing the complaint in its entirety, together with the costs and disbursements of this action, and such other and further relief as the Court may deem just and proper.

Dated:      New York, New York
              September 28, 2007

                       MICHAEL A. CARDOZO
                       Corporation Counsel of the
                         City of New York
                       Attorney for Defendant
                       100 Church Street
                       New York, New York 10007
                       (212) 788-1599

                       By:               /s/
                                 Arthur G. Larkin (AL 9059)
                                 Assistant Corporation Counsel

TO:    THE LAW FIRM OF JOHN F. SCUTTY, P.C.
       *Attorneys for Plaintiff*
       445 Park Avenue, 9th Floor
       New York, New York 10022
       (212) 836-4796
       (By ECF)

31

07-CV-6211 (SAS) (HBP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALAN NEWTON,

Plaintiff,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

**ANSWER OF DEFENDANTS CITY OF NEW YORK,
JOHNSON, FREUND, NEWBERT, RYAN, HARRIS,
LEHO, O'TOOLE, SHEEHAN, MCGUIRE, KIELY AND
TRABITZ**

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, Room 3-193*
*New York, N.Y.  10007*

*Of Counsel:  Arthur G. Larkin*

*NYCLIS No. 2007-021009*

*Due and timely service is hereby admitted.*

*New York, N.Y.  ......................................................., 200......*

*............................................................................... Esq.*

*Attorney for...............................................................................*

82QVNEWC                    Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ALAN NEWTON,

                Plaintiff,

        v.                          07 CV 06211 (SAS)

THE CITY OF NEW YORK, ET AL,

                Defendants.

------------------------------x

                                    New York, N.Y.
                                    February 26, 2008
                                    4:25 p.m.

Before:

                HON. SHIRA A. SCHEINDLIN,

                                    District Judge

                            APPEARANCES

LAW OFFICES OF JOHN F. SCHUTTY
    Attorneys for Plaintiff
BY:  JOHN F. SCHUTTY

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
    Attorneys for Defendants
BY:  ARTHUR G. LARKIN

                    SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

        (In open court)
        THE COURT:  Mr. Schutty?
        MR. SCHUTTY:  Schutty.  Yes, your Honor.
        THE COURT:  Mr. Larkin?
        MR. LARKIN:  Yes, your Honor.  Good afternoon.
        THE COURT:  All right.  So I have letters from
Mr. Schutty and from the law department.  The first letter is
from the law department dated February 15th, and then from
Mr. Schutty dated February 20th, fighting about the terms of a
protective order and asking for a court conference to try to
resolve the dispute.
        Well, one way around the problem is it won't be a
stipulation.  If you can't agree, we won't have a stipulation

Page 1

Transcript - 2- 26-08 PTC w Scheindlin

and protective order, we'll just have a protective order.

And it seems that the plaintiff's counsel had the better of this. And the party inserting their document as confidential has the burden to show that it is. So you can mark things confidential, but if he challenges it, clearly it's your burden, Mr. Larkin, right?

MR. LARKIN: Yes. Absolutely.

THE COURT: So what's the problem?

MR. LARKIN: The objective or at least one of the objectives in bringing the issue to the Court is to try to have some understanding as to what general categories of documents would be confidential in advance of production so that we don't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

have to come back --

THE COURT: He doesn't have to agree -- he can't agree in advance. You can mark anything you want confidential, he can view it, and then if he says, Well, I just don't agree with that, I don't see why that's confidential at all, you have the burden to convince a court that it should be maintained as confidential.

MR. LARKIN: That's fair, your Honor. But I think that there are some general categories of documents that courts typically recognize as confidential.

THE COURT: Right.

MR. LARKIN: Such as police officer personnel files.

THE COURT: Right. And he talked about that.

MR. LARKIN: I think that based on discussions or on an email exchange with plaintiff's counsel the week before last, my understanding is that counsel would not agree that police officer personnel files should be confidential.

THE COURT: Well, he does and he doesn't. He says portions certainly contain confidential information; but he says the entire file should not be deemed presumptively confidential. And this does seem to be an awful lot of work to go through every single personnel file and distinguish the presumptively confidential nature, that is, the officer's home address and Social Security number and pay records and whatever. And these are police officers; obviously that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

information is not going to be on the street.

So what portions are you worrying about, Mr. Schutty, that you don't think are confidential?

MR. SCHUTTY: Well, your Honor, just as you've just said, I'm not familiar with how the police department maintains their personnel files.

THE COURT: You've never seen one?

MR. SCHUTTY: No, I have not.

THE COURT: Oh.

MR. SCHUTTY: And, your Honor, I'll be the first to say that an officer's home address can be redacted; I'll stipulate to that.

THE COURT: You want to go through one personnel file and take a look at one?

MR. SCHUTTY: Well, my idea was if --

THE COURT: If you've never seen one, maybe you'd

Page 2

Transcript - 2- 26-08 PTC w Scheindlin

better look at one.  Because I can't imagine -- we're kind of wasting time here.  What are you going to do with the, quote, nonconfidential portion?  What do you think you're going to do with it?  I have to say, most attorneys probably stipulate to the confidentiality of the officer's personnel file unless and until they need to use it in a brief or something that it's going to be publicly filed; and then they say I need to use these portions as an exhibit in my brief, is there any problem in using it?  Otherwise, what do you want to do with it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

MR. SCHUTTY:  Your Honor, I tend to agree with you.  Of all the categories, that's the one category we can probably reach some agreement on.
THE COURT:  Well, let's probably do it now.
MR. SCHUTTY:  I don't know what's in the personnel file.  If he'll provide one so I know.
THE COURT:  Under confidentiality.
MR. SCHUTTY:  Correct.  To me, attorneys' eyes only.
THE COURT:  All right.  Give him one personnel file that you've looked through, Mr. Larkin.  Redact what you want to redact, and give him the rest so he knows what a personnel file looks like, and maybe we can get on with this.  Seems like this is going to cause a big delay.
All right.  The next category in the plaintiff's letter says records of criminal investigations, including any records reflecting tests performed by the NYPD crime lab.
What records of criminal investigations are we talking about here, Mr. Schutty, do you know?
MR. SCHUTTY:  No, your Honor, I don't know.
THE COURT:  What have you asked for?
MR. SCHUTTY:  I've asked for records relating to, for example, my clients, evidence taken from my client that were tested by the NYPD crime lab.
THE COURT:  That's all, just your own clients?
MR. SCHUTTY:  And other instances of lost evidence by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

the NYPD.
THE COURT:  That could be millions over 100 years.  I mean what's the limitation on this request?
MR. SCHUTTY:  I think I asked for a specific time year period, your Honor.
THE COURT:  What years did you ask for?
MR. SCHUTTY:  I think I asked for a ten-year period.
THE COURT:  For every record lost by the NYPD for ten years?
MR. SCHUTTY:  If there are thousands, then they can tell me there are thousands and they won't produce them; but maybe there are not thousands, maybe there are 25.
THE COURT:  No, there are not 25.  I'm always hearing about lost evidence.  If you're going back ten years, I don't even know what the word "lost" means.  Does it mean not available today?  In other words, if there was a record of a test done on evidence in 1998, and it's not available today, is that your definition of lost?
MR. SCHUTTY:  Your Honor, I can't argue the relevance

Page 3

Transcript - 2- 26-08 PTC w Scheindlin

of going out that far.

THE COURT: So I need to understand what you really need. The point is they no longer have maintained the evidence in your case, is that the problem?

MR. SCHUTTY: No, the argument is that they want to make it confidential.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

THE COURT: No, no, no, no. Let's start from the beginning. In your case, are the test results available?

MR. SCHUTTY: I don't know. I have not received any documents.

THE COURT: Do you know whether there are any tests?

MR. SCHUTTY: Yes, your Honor.

THE COURT: What tests were there?

MR. SCHUTTY: There were tests performed on the rape kit, for example, that was ultimately found. There were early tests performed on it, and they were inconclusive.

THE COURT: Okay.

MR. SCHUTTY: And I happen to have a few of those that I've discovered on my own, but I haven't had them produced by the city. Why are those confidential?

THE COURT: They are not.

MR. SCHUTTY: That was my objection.

THE COURT: They are your case. Of course, the victim's identity, was that known or unknown at this point? Everybody knows who it is or doesn't know?

MR. LARKIN: I can perhaps speak to that, your Honor. The name of the victim can't be disclosed under the civil rights law.

THE COURT: Okay, and hasn't been.

MR. LARKIN: And has not been.

THE COURT: Oh, okay.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

MR. LARKIN: As of today. Not in the complaint and not in any of the documents filed in this case.

THE COURT: All these years. Okay.

MR. LARKIN: I have the OCNE records that counsel is referring to regarding tests that were done on the physical evidence that was collected in this case.

THE COURT: Okay.

MR. LARKIN: Some of those records do refer to the victim by her name.

THE COURT: Well, then redact it. Redact the victim's name. We have probably a rape shield law or whatever it's called.

MR. LARKIN: The rape shield law would cover it.

THE COURT: Well, then redact it. I don't think the conferences between the two of you have gone too well. Some of these are so obvious. Redact the portion that the law permits you to redact, and turn over the test results.

MR. LARKIN: We can turn the test results over even unredacted --

THE COURT: No, no, do it redacted, and that's the end of it. Then you don't have to worry about confidentiality. What's next? According to his letter, the third

Page 4

Transcript - 2- 26-08 PTC w Scheindlin
category is documents or other materials that reflect police
department guidelines, training practices, customs or
procedures.  And he's right, a lot of that might be publicly
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

available on the web site, for all I know.  That's a category
where you need to make a specific designation of material that
is confidential and not do it as a category, because I'm sure a
lot of that stuff is old and known.  And the patrol guide or
whatever is out there.  Everybody can get that.
MR. LARKIN:  Some of it may be detectives guide
provisions, your Honor, from the '80s.
THE COURT:  Exactly.  Which is not -- no need to be
confidential, right?
MR. LARKIN:  Well, I don't know.
THE COURT:  Oh.
MR. LARKIN:  I can't represent that everything that
was done in 1981 or '85 is exactly the same as the way things
are done today.
THE COURT:  I'm not worried about that, but is there
any reason to maintain that 20-year-old record, 23-year-old
record, as confidential any longer?  I doubt it.  A 23-year-old
patrol guide, you made a specific argument the need to keep it
confidential, I'd probably say you must be kidding.
MR. LARKIN:  I see.  If the provisions are similar,
the only concern I would have is that if the provisions in the
detectives guide that reveal investigative techniques --
THE COURT:  I don't know that those are confidential
now; they've been revealed in so many litigations, you'd better
check into whether they've been held confidential or they have
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

already been publicly filed in, I don't know, maybe one
gazillion, spelled g-a-z-i-l-l-i-o-n, lawsuits.  I just don't
know.
MR. LARKIN:  Typically, your Honor, we always insist
on confidentiality for those documents.
THE COURT:  I don't think so.
MR. LARKIN:  Not all of the patrol guide stuff, but
the detectives guide.
THE COURT:  Well, maybe you have to look into it and
you have to do it obviously in accordance with your Officer of
the Court status.  If you learn that they are routinely
produced without a confidentiality order, which is my
suspicion, then that's it.
MR. LARKIN:  Then I couldn't make that argument --
THE COURT:  No, you couldn't.  Not in good faith.
MR. LARKIN:  -- in good faith.  But my understanding,
based on my discussion with others, including my supervisors,
is that we -- particularly with regards to the detectives
guide --
THE COURT:  You may be right.  But I know I have a lot
of cases with patrol guides --
MR. LARKIN:  Patrol guide is a different story.  The
detectives guide involves more detail as to investigative
techniques.
THE COURT:  Right.  Gotcha.  Look into it.  But to say

Transcript - 2- 26-08 PTC w Scheindlin
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

that it's a category that he has to agree to before you make the discovery in this case is just wrong.

And then the next one says, documents concerning post-conviction requests for physical or other evidence made by any person. Now, that's the one that bothers me, Mr. Schutty, I mean that's just overbroad anyway.

MR. SCHUTTY: Well, your Honor, that isn't a document request that we have made; that's the category that they've developed.

THE COURT: What do you actually want?

MR. SCHUTTY: We've asked for a number of documents relating to how evidence, post conviction, was requested by incarcerated individuals, and whether --

THE COURT: What does that mean how it was requested? How about a lawsuit with a document request. I don't know what you mean, how it was requested.

MR. SCHUTTY: Your Honor, I have a number of document requests that would fit within this category described by the city. But what they want to do is say that all these documents are confidential.

THE COURT: I understand. But I'm going a little bit beyond that, trying to figure out what you really want. Post-conviction requests for physical or other evidence are made all the time. What is it you want?

MR. SCHUTTY: I want the ones that the city has not
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

been able to answer because they can't locate the evidence.

THE COURT: That's what we were talking about earlier. All of the times that they have to admit that something was lost or they weren't able to provide the person with the request for evidence that they requested?

MR. SCHUTTY: Well, specifically The Innocence Project, who was involved in Mr. Newton's case, is reported on their web site, their public web site, at least 20 other cases of individuals just like Mr. Newton who specifically requested rape kits that could no longer be located.

THE COURT: But I thought in your case actually it can be located.

MR. SCHUTTY: It can be. But on how many other occasions has the city lost the evidence that's relevant.

THE COURT: What's that got to do with you? It's not your case.

MR. SCHUTTY: Well, if it's a practice of the city to lose these rape kits --

THE COURT: It may well be, but it's not your case. It's available in your case.

MR. SCHUTTY: Your Honor, I believe that it is relevant.

THE COURT: Mr. Schutty, guess what? You're going to live with my ruling. It's not relevant in your case because miraculously it's not missing here. So that's somebody else's
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Transcript - 2- 26-08 PTC w Scheindlin

case someday.  The next lawyer can walk in, ask for the post-conviction evidence in a rape case; it's missing.  He can say, Ah, pattern and practice, I want every case where the rape kit is missing.  But that's not your case.

MR. SCHUTTY:  It was my case for 12 years though, your Honor.

THE COURT:  I see.

MR. SCHUTTY:  For 12 years my client requested a rape kit and was told, and was told, the records have been destroyed in a fire; or we've looked and we couldn't find it.  What about all these other cases with similar excuses?

THE COURT:  Wait, wait, wait.  That's different.  So that's what he was told for 12 years.

MR. SCHUTTY:  Yes, your Honor.

THE COURT:  But, in fact, it turns out it's there.

MR. SCHUTTY:  It was there the whole time.

THE COURT:  I see.  So you really want to know if there's a pattern and practice of giving a false response.

MR. SCHUTTY:  That's correct, your Honor.

THE COURT:  A false response.

MR. SCHUTTY:  And why would those documents be confidential?

THE COURT:  I don't know.  But the first step is to find out how in the world they would get at false response cases.  It's a different category than what you first said.  I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

thought you wanted missing evidence cases.  There may be so many cases where the evidence truly is gone, truly is gone, that's what The Innocence Project may indeed have on its web site, at least 20 cases where the evidence is gone.

Your case is different.  This is where the person is told it's gone and, in fact, it isn't.

MR. SCHUTTY:  Correct.

THE COURT:  How do you get at false answer cases in terms of pattern and practice?

MR. SCHUTTY:  There was a pattern and practice of a specific response from the Pearson Place Warehouse as to what may have happened to the evidence.  These assumptions were put in letters to these incarcerated individuals saying there was a fire; records were destroyed.

THE COURT:  I see.

MR. SCHUTTY:  Or we destroyed the evidence, along with other cartons or bins.

THE COURT:  From this one warehouse you mean?

MR. SCHUTTY:  Yes, your Honor.

THE COURT:  Is that the warehouse where all records of all cases in New York are stored?

MR. SCHUTTY:  Pretty much everything from the Bronx, once it leaves the property clerk's office in the Bronx, goes out to Queens.

THE COURT:  Goes out to Queens for storage.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR. SCHUTTY:  Correct, your Honor.

Transcript - 2- 26-08 PTC w Scheindlin

THE COURT: But in Bronx cases, you're saying. So anybody who would have made a request in Bronx cases would have gotten a pretty standard response saying, Oh, evidence is gone; it was in a fire.

MR. SCHUTTY: Correct, your Honor.

THE COURT: Oh.

MR. LARKIN: That's -- well, I mean that's not really accurate. The fact is that the records were destroyed in a fire. There's documentation that the fire occurred at -- I think it was located on Meeker Avenue was the facility where the vouchers were kept. I'm not going to go into all -- I don't know if it's worth it to go into all of the details about what our own investigation has revealed.

THE COURT: Well, I'm just thinking down the road, he's going to have a burden to made a Monell claim of pattern and practice. And if he has a burden to make a Monell claim, one of the things he would show is the pattern and practice of false responses.

If you, quote, block that discovery, then I can't grant your motion to dismiss the Monell claim. You can't have it both ways. So either you have to go through the tortuous work of finding every request for a Bronx conviction post-relief where somebody asked for evidence and the city said it's gone, but it turned out it wasn't gone or something like

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

that, so that you can try to isolate the proof of a pattern, or you're going to have to concede without going through the work of finding it, many people were told that it was gone, when, in fact, it was found later. You can't have it both ways. He has to prove a Monell claim.

MR. LARKIN: There may be a way to cut through it, your Honor. And it's a separate subject, I did want to raise it today. That is, that we are going to be filing a 12(c) motion to dismiss the complaint in its entirety.

THE COURT: How are you going to do that?

MR. LARKIN: Because there are two sets of claims here. There's one claim based on the criminal investigation of the case involving Mr. Newton in 1984-85; and there is also a claim concerning, as counsel just stated, the inability to find the evidence -- an evidence retention claim, I'll call it.

Under state law, there is no duty to preserve evidence after direct appeals are exhausted. So, in our view, there is no state law negligence claim here.

THE COURT: Got to be wrong, Mr. Larkin, and I'll tell you why. You had no duty to preserve, but you had a duty to answer truthfully. And if he asked for the evidence and you falsely answered, We don't have it, but you did, it's not a duty-to-preserve case.

So while you're right that there may be no duty to preserve evidence, there is a duty to respond truthfully. So

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

if you did preserve the evidence, that's your problem. Do you see what I'm saying? There's no point in making a motion telling me there's no duty to preserve. In fact, you preserved. So when he asked for it, your response was to find

Page 8

Transcript - 2- 26-08 PTC w Scheindlin

it and produce it.  That doesn't go to the duty to preserve.  You preserved it all by yourself.

MR. LARKIN:  If there's no duty to preserve --

THE COURT:  Doesn't matter.  You did.

MR. LARKIN:  It seems that there can't be a legal obligation to produce that --

THE COURT:  Wrong.  Wrong.  That which you have you must -- wrong.  I'm fully aware of the law on duty to preserve.  If you go ahead and preserve it, whether you should have or not, you have to produce it.  Right?

I mean if somebody requested a document today and you said, I don't know, I never had any duty to preserve it, so I'm not giving it to you, what would the Court say?  Do you have it, Mr. Larkin?  You would say yes.  The Court would say if it's relevant, produce it.  It doesn't matter whether you had a duty; you have it.  And the Court would always rule if it's relevant, produce it.

So I'm saying it doesn't do you any good in this particular case.  Again, you're doing what Mr. Schutty did.  In a case where the evidence is truly gone, you might have a good argument:  We never had a duty to produce it; we're so sorry

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

it's gone, but we have to win because we never had a duty to preserve it.  But the law is the opposite here.  If you happen to have it, you have a duty to produce it, if relevant.

MR. LARKIN:  I see the argument.

THE COURT:  Good.  This is an accomplishment.

MR. LARKIN:  Your Honor, I understand.  But I do believe that we -- under the circumstances, this case -- these cases involving DNA test results are new to our office.  And it's an important issue for us, for the city.

THE COURT:  Right.

MR. LARKIN:  And it is an argument that we would like to present to the Court.

THE COURT:  You needn't do it in writing, because I'm going to deny it on this oral record.  If you have the evidence and somebody asks for it, you can't lie.  You have a duty to produce it.

Now, if you negligently -- if you acted negligently, so there's wilfulness, you didn't lie because you didn't realize you had it, we got a negligence issue.  But the negligence is not failure to preserve, the negligence was failure to discover that, in fact, you had it.  That's a different issue than failure to preserve.  The accident here is that you did preserve.  So it's the wrong case for a test case.

You've got a good test case in some other case where indeed it's gone, very sadly for the guy who might have been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

wrongfully convicted.  By the way, did this all end up with a wrongful conviction?  Is that the proof in the end?

MR. SCHUTTY:  Yes, your Honor.

THE COURT:  He didn't do it.  Okay.  So that's not the ground that's going to win this case.

What's the other argument for a 12(c) motion?

MR. LARKIN:  The argument as to the investigation

Page 9

Transcript - 2- 26-08 PTC w Scheindlin

itself would be pretty straightforward. All of the facts that are alleged in the complaint were known at the time of Mr. Newton's criminal trial.

There is alleged wrongdoing on the part of police officers, for example, by conducting a suggestive identification procedure by failing to investigate an alibi and by failing to pursue another lead that they received from another witness. All those facts were known at the time.

All the facts that are alleged in the complaint that constitute the Fourth Amendment cause of action were known at the time. They were fully disclosed.

The prosecutor, nevertheless, made a decision to go forward with the case for which the prosecutor is immune under Imbler v. Pachtman. And the police officers are likewise immune or, rather, the claims against the police officers should be dismissed under the authority of Wray v. The City of New York and Townes v. The City of New York, which hold that intervening decisions by a prosecutor or by a judge are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

supervening, superseding causes that mitigate or that eliminate any liability on the part of the investigating police officers. So we think we have a very good motion on that basis, as well.

There was a federal constitutional claim under Arizona v. Youngblood for bad-faith destruction of evidence.

THE COURT: But that's not our case either, because you're saying the evidence was not destroyed.

MR. LARKIN: That's not our case either.

THE COURT: Right.

MR. LARKIN: That's not our case either. So I believe those claims would be subject to dismissal.

THE COURT: Right. The evidence was not destroyed.

MR. LARKIN: Perhaps leaving only a state law negligence claim, depending on how that issue were to be resolved. And I understand that your Honor has a strong view about that.

THE COURT: Right. The evidence was there all along; he asked for it. Had it been turned over, he might have gotten out years ago. So there's certainly a negligence claim.

Is that what proved him innocent in the end, the getting the evidence?

MR. SCHUTTY: Yes, your Honor.

THE COURT: Yeah. He finally got it. I mean that's the claim, isn't that what happened, no?

MR. LARKIN: Well, that's the plaintiff's position.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

THE COURT: What do you mean position? How do you get out?

MR. LARKIN: The DA consented to vacate the conviction.

THE COURT: Based on the evidence, right?

MR. LARKIN: Based on the results of the DNA test, that's correct.

THE COURT: That's what I'm trying to tell you, Mr. Larkin. So if the evidence had been found years earlier and what it eventually revealed, he spent a lot of extra years

Page 10

Transcript - 2- 26-08 PTC w Scheindlin

in the custody of this state, which most people don't want to be a guest of the state in the conditions in which he was a guest.

MR. LARKIN:  I understand.  I understand obviously.

THE COURT:  So I think this case cannot be dismissed totally.  The other stuff is interesting, but totally, no. It's still going to be about negligence.

MR. LARKIN:  If there's only a state law negligence claim, I'm not sure that the case belongs in this federal court.  Maybe that's an issue that we would have to --

THE COURT:  But that's my whole point about Monell.

MR. LARKIN:  -- visit at the appropriate time.

THE COURT:  Yeah, but that's my whole point about Monell.  He says there's a pattern of practice of denying people their constitutional right to not be unlawfully deprived

of their liberty.  There's your constitutional claim.  As the stuff turned over, as I said, he wouldn't have been deprived of his liberty wrongfully.  That's a constitutional claim.

MR. LARKIN:  Yes.

THE COURT:  It remains here.

MR. LARKIN:  There's an additional issue concerning a time bar, your Honor --

THE COURT:  Yes.

MR. LARKIN:  -- that we believe is significant, as well.

THE COURT:  when did he finally get the evidence?

MR. LARKIN:  He got the evidence in 2005 or 2006.

THE COURT:  Well, then he isn't time-barred.  When did he sue?

MR. LARKIN:  He sued in 2007.

THE COURT:  Yeah, he's not time-barred.

MR. LARKIN:  The damage is not in getting the evidence; is the damage is not getting the evidence.

THE COURT:  Yeah, right.  The damage was in being a guest of the state against his will.  And that didn't end until 2007.

MR. LARKIN:  True.  But the knowledge -- but Heck v. Humphrey would not bar -- in our view, would not bar a claim for either wrongful destruction of evidence or --

THE COURT:  You just said it would; you just said you

had no duty to preserve it.  Up till then he thought it was gone.  And you told him it was gone, and you had no duty to preserve it.  You would have won that one.  Come on, Mr. Larkin, you're dancing on the head of a pin.

The simple constitutional claim is that he was in custody a whole lot of extra years, which is the deprivation of a constitutional right to liberty, allegedly, for because the city didn't produce the evidence it had.  When it finally found it, the city immediately said, Wrongful conviction, so sorry, you're out.  That could have happened years earlier allegedly.

MR. LARKIN:  That's exactly the point.

THE COURT:  But the city didn't let it happen because the city didn't produce the evidence.

# A-195

MR. LARKIN:  But the right, the right that was abridged was the right to have the evidence tested.  That's the constitutional --

THE COURT:  Incorrect.  The right that was abridged was the right to liberty.

MR. LARKIN:  The law, I think, is to the contrary.  And I would like the opportunity --

THE COURT:  What such law is that?  You can be wrongfully deprived of your liberty?

MR. LARKIN:  No.

THE COURT:  No.

MR. LARKIN:  There is a 1983 cause of action.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

THE COURT:  Right.

MR. LARKIN:  A 1983 cause of action exists for -- to vindicate the right to have DNA testing done independent of Heck v. Humphrey.

THE COURT:  It's great, but you told him there was nothing to test.  You, the city, said, We're sorry, but the stuff is gone; it can't be tested.  That's not the plaintiff's fault.

MR. LARKIN:  To the extent that he had a constitutional claim, he could have brought the claim when he was informed of that fact.

THE COURT:  And then you would have said, There's no duty to preserve evidence, so sorry, you lose.  I'm sorry, but we can't close the door.

MR. LARKIN:  That's state law.

THE COURT:  Mr. Larkin, we can't close the door in each direction; it's not going to work out that way.

So let me get back to the discovery dispute we came here to do.  If you think I would stay discovery for 30 seconds, much less 30 days or 30 months, based on these somewhat off-the-wall theories, you're wrong.

Discovery will proceed apace while you make motions that you can make pursuant to Rule 11, which you'd better carefully consider after this transcript, which I ask that you review with a supervisor before you waste my time.  There may

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

be some parts of this motion you can make, and some parts that you can't.  I wouldn't dream of staying discovery while you figured that out.

So let's get back to discovery.  It's not going to help us cut through this.  So we were up to documents concerning post-conviction request for physical or other evidence made by any person.  And you said you wanted that to show a pattern or practice of saying it's gone when it's not, is that what you're hoping to --

MR. SCHUTTY:  Yes, your Honor.

THE COURT:  Well, I don't know how you get at that, Mr. Larkin.  But you either have to do the work or stipulate that, unfortunately, there were a number of times where people were told that the evidence was missing due to this fire and destruction; but, in fact, it turned up elsewhere.

So either you have to really find those instances or

Page 12

Transcript - 2- 26-08 PTC w Scheindlin

agree to it; in other words, admit the fact.  He can't be the only one, I don't know, because there really was a fire.  But I guess some people's evidence was moot so...

MR. LARKIN:  I mean we're not aware of any other case where --

THE COURT:  It doesn't have to be a case; just an instance.

MR. LARKIN:  Well, that's what I mean, any other case, any other instance where a person requested evidence and was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

informed that the evidence did not exist, and that the evidence subsequently turned up.

THE COURT:  Really.  You've already investigated that?

MR. LARKIN:  We're not aware -- I've discussed the issue with the commanding officer of the property clerk division, and I mean this case is one example, is one, the one that we're aware of.

THE COURT:  Right.

MR. LARKIN:  I mean if -- I suppose it's -- maybe it's somewhat of a catch-22, because if the request is made for evidence and a report comes back that the evidence can't be found, the evidence can't be found.

THE COURT:  Right.  Unless it so happens, as happened here, that it subsequently was found, and you know of no other case.  How would you get it finding out if there is any such other instance?

MR. LARKIN:  I would start by going case-by-case through the instances on The Innocence Project web site to figure out whether any of that evidence was ever located in any of those cases.

THE COURT:  Right.

MR. LARKIN:  I've got to believe that if The Innocence Project reports that requests were made for evidence, and that evidence was not turned over, that the evidence just couldn't be located.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

THE COURT:  Not in those group of cases they took. They must get hundreds of requests and don't take the case, so I don't know.  I don't know how you research this.  But try. That's all I can say.  I mean we're not really talking about the confidentiality part.  Assuming you find any, that's what it comes down to, assuming you find any, and again, you can redact identifying information, such as the name of a victim. I mean we need to get to the heart of the discovery problem, and it's not easy, because I don't know if this is the one oddball case where, after being told there was none, it turns up, or whether there's many like it.  I have no idea.

And the last category in this, in Mr. Schutty's letter, anyway, says the documents that identify the victim of any sex offense.  Yeah, well, there is this protection, so the city is right, they have to redact the identifying information. And I think that may be true even if the person is deceased. Is that the law, Mr. Larkin, that even if the victim is now deceased, this rape shield law continues to protect?  I don't know the law.

Page 13

Transcript - 2- 26-08 PTC w Scheindlin

MR. LARKIN: I believe it does. There are exceptions in the rape shield law.

THE COURT: Well, check it out.

MR. LARKIN: There's a statute. And none of them involve death of the victim.

THE COURT: Oh, really? Oh, okay.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

MR. LARKIN: So I believe that the law --

THE COURT: Well, he could read that law as carefully as you can. Do you know the citation to that law or not as you stand here?

MR. LARKIN: I've got it right here. It's Section 50-b of the civil rights -- the New York State Civil Rights Law.

THE COURT: Well, check it out for yourself, Mr. Schutty. If it guarantees confidentiality to the victim and there's no exception for death, then he's right, he can't give you that identifying information.

MR. SCHUTTY: May I just add one point?

THE COURT: Yes.

MR. SCHUTTY: I'm not opposed to the redaction of names and addresses. I'm opposed to the whole document being deemed confidential.

THE COURT: I know.

MR. SCHUTTY: And further, in the stipulation that I was provided, any mention of that document in a deposition or a trial requires the courtroom to be cleared or the deposition transcript to be sealed.

THE COURT: Well, the answer is only if it would violate the rape shield law.

MR. SCHUTTY: Correct, your Honor.

THE COURT: Right. So that's the answer. Is there

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

anything more to these two letters that I have to do? Because you can now draft an order, forget about a stipulation, that comports with what I've said here. And I'll sign it.

MR. LARKIN: There's only one or two more issues, your Honor --

THE COURT: Okay.

MR. LARKIN: -- in our letter.

THE COURT: Okay.

MR. LARKIN: We ask that if any documents that are confidential are shown to an expert, that the expert sign off on an affidavit.

THE COURT: That is typically done. In other words, if they see an unredacted version that really has the confidential information, they usually have to sign --

MR. LARKIN: Or if --

THE COURT: -- that they have seen it.

MR. LARKIN: Or if they review personnel files or other documents.

THE COURT: That's right. Anything that ultimately is deemed confidential, the expert has to agree to keep confidential. That's standard.

MR. LARKIN: Right. I don't think there's any

Page 14

Transcript - 2- 26-08 PTC w Scheindlin

objection to that provision.

THE COURT: Right.

MR. LARKIN: But our concern is we wanted to at least

30

be able to know the names of anybody to whom confidential information --

THE COURT: He says you shouldn't know about non-testifying experts and run around the consulting expert provision.

All right. So he can submit it in camera and I'll seal it. But he has to put that name somewhere; he doesn't have to let me know. So if the person is a consulting expert, non-testifying expert, you are not entitled to their identity; but he must get the required affidavit from the person, file it with the Court under seal, we'll put it in a sealed envelope, and it will be there for the record.

MR. LARKIN: Okay. And the last -- thank you, your Honor. And the last issue is just if we disclose the names of witnesses, nonparty witnesses who are not represented by our office and were not city employees, but whose names may have been uncovered in a police investigation, we would want the address and phone number of those individuals kept for attorneys' eyes only.

THE COURT: Attorneys' eyes only.

MR. LARKIN: Right.

THE COURT: Yeah. Because he may need to follow up an investigation, I don't know.

MR. LARKIN: Counsel may want to subpoena those witnesses.

31

THE COURT: That's right.

MR. LARKIN: And we obviously understand that. And there's a provision in our draft order that would permit counsel to use the information for that purpose.

THE COURT: Okay. I just think based on this conference you should be able now to construct an order that I can sign.

Now, as far as your contemplated motion or motions, I'm not entirely sure, did you have a proposed schedule in mind? Because we really haven't had a proper premotion conference, but we sort of did.

MR. LARKIN: Well, I have not yet written to counsel in accordance with your Honor's rules, and I had anticipated doing that.

THE COURT: Right.

MR. LARKIN: I was just going to say, it may be worth it to set it out on paper and then appear before the Court.

THE COURT: Well, he may agree to some of it. Has he sued, for example, the ADAs --

MR. LARKIN: Yes, he has.

THE COURT: -- who have full immunity? They may have -- prosecutorial immunity I think is absolute, not qualified. The officers may have qualified immunity, but I believe that the immunity for prosecutors and judges and such is absolute.

Transcript - 2- 26-08 PTC w Scheindlin
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

MR. SCHUTTY:  In the courtroom it's absolute immunity. In fact, the assistant district attorney in this case was involved in the factual investigation.  She was involved within two weeks of Mr. Newton being arrested, and personally interviewed the two eyewitnesses that testified at the trial.

THE COURT:  That's what ADAs do.

MR. SCHUTTY:  It's qualified immunity if they are involved in the factual investigation, not absolute.  And to this day, in a criminal investigation, you are never permitted to depose or take testimony from the ADA as to what she did or did not do and what role she played.

THE COURT:  You are or not you say?

MR. SCHUTTY:  You are not permitted in the criminal investigation -- in the criminal trial.  There's no discovery of the assistant district attorney.

THE COURT:  No, no.  Right, right, right.

MR. SCHUTTY:  And here we had a very aggressive assistant district attorney who met with witnesses, apparently met frequently with the police officers, and may have directed the whole prosecution of Mr. Newton, despite evidence that indicated he wasn't the perpetrator.  In fact, the victim in this case, the Friday before this trial was to begin, recanted to the assistant district attorney, and yet the assistant district attorney somehow convinced this witness to take the stand and point Mr. Newton out.  I think we're entitled to at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

least a deposition of the assistant district attorney.

THE COURT:  I don't know.  I don't want to rule on that without knowing the law, because first I thought there was absolute immunity, but then I remembered years ago reading some case about an ADA, and it did depend maybe on the function that the ADA was handling at the moment.

MR. SCHUTTY:  That's correct, your Honor.

THE COURT:  So maybe.  But you two can find these cases and get together, make some kind of a stipulation as to whether it's qualified or absolute, depending on the activity. And you know what activity he's alleging, because qualified doesn't mean it's over either; it just means that it has to be put to the Court in a motion.

But, anyway, if there is anything you can dismiss based on his letter, you'll do it; if there is anything you can't, you won't.  And you get to write a letter back convincing him not to make the motion in certain ways.  And I'd give him some aid and assistance on that by giving him preliminary views.

All right.  So I shouldn't set a schedule yet; you are not quite ready.

MR. LARKIN:  I think it might pay for us to spell out our viewpoints, and then write another letter to the Court explaining the basis for the motion.  And then your Honor will give us perhaps some additional guidance as to what the Court's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# A-200

views are, and we can set a schedule at that time.

THE COURT: Right. Okay. All right. But discovery proceeds.

MR. SCHUTTY: And, your Honor, we have one item of discovery we'd like to address before you close.

In the last paragraph of my letter I advised the Court that we have received no documents from the defendants, none from any of the defendants. And they were due back on January 31.

THE COURT: Right. And that's because he's carrying on about the protective order, which we are about to try to get in place. As soon as that's in place, you're prepared to produce, right, Mr. Larkin?

MR. LARKIN: Yes, your Honor.

THE COURT: All right. Okay. So let's get an order. How about if I set a deadline for that? Something has to be submitted to the Court by a week from Friday.

MR. LARKIN: Oh, sure, sure.

THE COURT: Friday is the 29th, so that would be March 7. No later than -- do I have the right week? Yeah, no later than March 7th.

MR. LARKIN: March 7th, yes.

THE COURT: No later. If you can get it in early, better yet.

MR. LARKIN: We'll try to do that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT: All right. Thank you.

MR. LARKIN: Thank you very much, your Honor.

*   *   *

# A-201

93brnewm

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ALAN NEWTON,

            Plaintiff,

       v.                 07 Civ. 6211 (SAS)

CITY OF NEW YORK, et al.,

                     Conference

            Defendants.

------------------------------x

                       New York, N.Y.
                       March 11, 2009
                       5:10 p.m.

Before:

      HON. SHIRA A. SCHEINDLIN

                       District Judge

      APPEARANCES

JOHN F. SCHUTTY
    Attorney for Plaintiff

MICHAEL A. CARDOZO
    Corporation Counsel for the City of New York
    Attorney for Defendants
ARTHUR LARKIN
FRED WEILER
    Assistant Corporation Counsel

              SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

93brnewm

    (Case called)

    THE COURT: I have four submissions from you folks. I have a letter from the city dated March 4, 2009, requesting leave to move for partial summary judgment. I have a letter in response dated March 10th from Mr. Newton's counsel. I also have a letter dated March 9th from Mr. Newton's counsel requesting leave to move to amend the complaint. Then I have a letter dated March 10th from the city in opposition to Mr. Newton's request for leave to amend. Those are the four submissions I have.

# A-202

Transcript - 3-11-09 Conference w Scheindlin

We have a lot to discuss. Let's see if I can help by telling you my initial reactions to the letters. The claims against Ms. Freund, the ADA who prosecuted the case, should be dismissed. She didn't take any additional steps. She is entitled to absolute immunity. If she is, then so are her supervisors pursuant to the Supreme Court's case of this year, Van de Camp v. Goldstein. I think you would probably agree, Mr. Schutty, that Ms. Freund and her supervisors should go. That's one reaction.

We need to discuss -- I'm not going to give you a reaction -- the probable cause for the arrest argument. I will say, Mr. Schutty, I see the burden on you to tell me what evidence you have of bad faith. If you don't have evidence of bad faith, we have a problem. Absent that, one would think that a police officer, a reasonable police officer, would have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

93brnewm

thought there was probable cause for this arrest. There was a lot of evidence. You would have to show why no reasonable officer would have thought that.

With respect to leave to amend, again I think you have an uphill battle, Mr. Schutty, mostly on the grounds of the delay in having done it. I don't think you're out on statute of limitations grounds on the actions against the defendants individually under 1938. You are out of time with respect to any actions against the municipality or the employees acting in their official capacity, because then you have the 90-day problem, unless you have relation back. But even if you have relation back, you would have notice of claim problems. So I think you have a problem on everything but the 1983 action against the individuals in their individual capacity.

You may be able to survive under the Youngblood test. I think the city probably misstated it somewhat in their letter, made it stronger than it is. I looked very carefully at Youngblood. It does not say what the city says. The city says that unless the plaintiff can show that the officer knew that the evidence that was not produced was exculpatory, there no violation. I think that's a misreading of the case.

All the cases that have followed Youngblood since then, all they really say is bad faith. That language of knew, K-N-E-W, came out of a single footnote. That really isn't part of the holding. If you read the case itself, it's really about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

93brnewm

good faith, and all the cases thereafter are about bad faith. They don't have to know that this evidence would have exonerated Mr. Newton. That's an overstatement.

But I think the city is right that there would have to be proof of bad faith. Maybe you have that, and maybe there is a disputed issue of fact about bad faith. So I wouldn't oppose the amendment on the utility ground of Youngblood, but I do have a problem with the delay in doing it and with the statute of limitations to some extent.

I think that summarizes my initial reactions.

I would also say on the settlement point I'm a little confused. I agree with you, Mr. Schutty, that Magistrate Judge Freeman has offered to have a settlement conference and the

Page 2

Transcript - 3-11-09 Conference w Scheindlin

city keeps declining to do so.  But now they write a letter to me saying, you do it, please do it.  Why I'm more attractive than the settlement judge, I don't know.  I'm pretty good at it, but she's probably better.  There are two good choices.

Why me, Mr. Larkin?  You seem to say yes, we're ready for a settlement conference, but we prefer to do here than there.  Why?

MR. LARKIN:  Your Honor, since the Court is the trial judge and is going to be deciding evidentiary issues as well as the expected motions that may ensue after today's conference, my view is the Court is in a better position.

THE COURT:  That argument would be true in every

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

93brnewm

single case, and I just don't have the time.  We, the Court, routinely use magistrate judges to help us by doing the settlement work.  That's the best work we can assign them.  Some judges, I think wrongfully, ask them to do dispositive motions.  That's really very bad for the litigants, because if they don't like the ruling, they have to get into de novo review, they have to do it twice, and it's very expensive.

I think the better judges try to say settlement work is what they are really best at and have the time to do.  We're often stuck on a long trial, we're deciding any motions that come our way.  It's time-intensive to do a good job on a settlement conference.  While every once in a while I do them, I don't do them very often.  I really don't.  I keep it to a bare minimum.  To do it right, you should pour your time into it.  To do it right, you might want to spend six hours, really, a day sitting down and listening to people and taking them very seriously and going back and forth and this and that.

So I'm reluctant to say yes when I know Judge Freeman is very good at settlement work, very patient, takes that aspect of her job very seriously.  Why not do it there first?  Then, if you get close at all, maybe you do need my assistance to close the gap.  But just to get started on the process, why not do it there?  And she knows this area of law as well as I do.

She can't know exactly how I'm going to decide, but

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

93brnewm

neither do I before the briefings.  I may have a sense of it, which I have just shared with you, for example, but that's subject to briefing, subject to argument, subject to more reading and thinking.

I've shared my initial views.  I hope that's helpful to you as you go through the pre-motion conference today.  But she's got the transcript of today anyway, so she's just as advanced as I am.

MR. LARKIN:  That is certainly very fair, your Honor.  I know that our office has had positive experiences with you on settlement.  This case is somewhat unusual.

THE COURT:  It is?

MR. LARKIN:  It's certainly not the kind of case that comes across my desk every day.

THE COURT:  That's true.

MR. LARKIN:  I realize that a district judge's time is

Page 3

Transcript - 3-11-09 Conference w Scheindlin

extremely valuable. I wanted to put the suggestion out there that if the Court were interested in having a settlement conference, we would be more than willing to participate. And if the Court even has any time after today's conference, if the Court has a few moments, I could share with your Honor in private, if the Court would agree to that, some of our thinking as to how and why a conference with the Court might be successful.

Those are our thoughts on it.

7

93brnewm

THE COURT: Mr. Schutty, would you actively oppose my being involved in settlement?

MR. SCHUTTY: No, your Honor.

THE COURT: You're just pointing out that they didn't bother to take up --

MR. SCHUTTY: This is a surprise to me, your Honor. I did give them a demand more than a year ago. A year has elapsed. I have received no offer.

THE COURT: I understand that.

MR. SCHUTTY: Their suggestion they are going to talk to you today before even conveying an offer to me, how serious can they be? I question that.

THE COURT: I don't agree with that.

MR. SCHUTTY: In order for us to sit down, I have to have an opportunity to talk to my client about what their preliminary offer is and an interchange.

THE COURT: Of course.

MR. SCHUTTY: I agree with your Honor, it would take a good day, because of the complexity of this case, to talk about it and work it out if we are going to do that. I'm happy to sit with your Honor or Magistrate Freeman. I don't really have a problem.

THE COURT: Of course, you realize that to do it right the judge has to meet separately with each side. Do you have a problem with that?

8

93brnewm

MR. SCHUTTY: I don't have a problem with that. I do have a problem if defendants are attempting to gain leverage at trial by involving you in the settlement negotiations, which is a common practice. It happens. But I have no problem, your Honor. I would waive any objection to settlement discussions with you.

THE COURT: All right.

MR. SCHUTTY: Can I begin by addressing some of what you raised? You seem to be taking a contrary position to many of my positions.

THE COURT: One other question. One of the arguments the city has made many times and I remain interested in it is the other conviction. I've always been interested in the other conviction. While he ends up exonerated on this one, he remains convicted on the other, for which he received 3 1/3 to 10 years, right?

MR. SCHUTTY: Your Honor, it is a fascinating case. Let me tell you what we have just discovered. The arresting detective has been deposed in this case as of two and a half

Transcript - 3-11-09 Conference w Scheindlin

weeks ago.  I am yet to get her deposition transcript.

THE COURT:  You were there.  You know what she said.

MR. SCHUTTY:  I was there.  It was a fascinating deposition.  What I learned in that deposition is the arresting detective in this case, and this was a secret to me until her deposition, was the member of the sex crimes unit assigned to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

93brnewm

that case.  She received notice, the complaint report filed by the NYPD and a report from the arresting detective in that case, either a couple of days before Mr. Newton's photograph was shown to the rape victim in this case or a week or two before.  She was familiar with Mr. Newton.  That explains to a great extent why she had this conviction that Alan Newton was involved in this rape case.

THE COURT:  That's fine for this case.  It doesn't answer anything I asked you about the other case.

MR. SCHUTTY:  The same ADA is involved, the same arresting detectives, same defense counsel.  These two cases begin to snowball and they begin to feed off each other.  Mr. Newton is believed to be a serial rapist.  On the first case it's pedophile, and in the second case it's a mature woman who apparently was a prostitute, which we discovered, too.  The cases don't fit, but they have become convinced that they are related.

When you look at the first case, how weak it was, it probably would never have gone to trial but for this rape charge.  It was a 9-year-old girl who gave a very different description of her assailant until she was shown a photograph of Mr. Newton.  Her family convinced her while she was sitting examining the photographs that it must be him because he lived upstairs.  That was the only evidence against him.

I filed a motion to vacate that conviction.  It's on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

93brnewm

appeal in the Appellate Division.  I don't know what's going to happen.

THE COURT:  In other words, you lost at the trial court?

MR. SCHUTTY:  I lost in the trial court.  A motion for leave to appeal has been filed with the Appellate Division.

THE COURT:  If that's denied?

MR. SCHUTTY:  I will exhaust every appeal I can in that case.

MR. LARKIN:  Your Honor, we understand that that motion has been denied by the First Department.  The district attorney has advised us of that earlier this week.

MR. SCHUTTY:  I have received no paperwork yet.  If that's the case, I will have to pursue whatever remedy I have available to me.

THE COURT:  He said earlier this week, so it is very current.  Today is only Wednesday.  Earlier this week only leaves Monday or Tuesday.

MR. SCHUTTY:  I say with conviction, having examined the transcript, it was the weakest of cases against Mr. Newton.  His attorney didn't put on any evidence, didn't handle the suppression hearing well.  It was tainted suggestion

# A-206

Transcript - 3-11-09 Conference w Scheindlin

procedures. I've hired an expert who has looked at it who said it was awful what happened to him on that case. But I may not get it overturned.

11

93brnewm

THE COURT: Because leave to appeal has been denied.

MR. SCHUTTY: If I can't get that conviction over-turned, he would have served a minimum, and probably only the minimum, of 3 1/3 in that case.

THE COURT: Why do you say that?

MR. SCHUTTY: Based on his record in jail, based on the sentence, he would have done 3 1/3.

THE COURT: Why?

MR. SCHUTTY: Because those were the parole guidelines at that time. If you had no major violation when you were incarcerated, you served the minimum.

THE COURT: How about prior record?

MR. SCHUTTY: He had an arrest which there was an ACD for, so he didn't have a prior. He would have done 3 1/3, according to the people I inquired of, criminal defense attorneys. I may have to employee an expert at trial if that's the case, or at least in a hearing, to establish to your Honor what deduction should be made on damages. I have been told it's 3 1/3 year. So we're still talking 18 and change.

THE COURT: What about the argument they always make about how, if you were not here, you still have compensation in the state court under this whatever? I forgot the name of the statute?

MR. SCHUTTY: Your Honor, that's irrelevant to liability, and they keep bringing that case up. I have a civil

12

93brnewm

rights case here. I have a claim under statute in the court of claims.

THE COURT: That's the one I'm referring to.

MR. SCHUTTY: Statutory liability. I have no jurisdiction over the state in this court, so I can't bring all the parties in.

THE COURT: How much are you likely to recover in the statutory case?

MR. SCHUTTY: It's unlimited damages. There is no limit as to what you can recover. It's compensation.

THE COURT: By the state?

MR. SCHUTTY: By the state.

THE COURT: Why does the state compensate?

MR. SCHUTTY: By statute they have decided if a criminal defendant can prove that they are unjustly convicted by clear and convincing evidence, that they were innocent, then they recover damages. It's a statutory liability.

THE COURT: Who decides the amount of the damages?

MR. SCHUTTY: The court of claims judge.

THE COURT: Just the judge?

MR. SCHUTTY: Just the judge. It's nonjury.

THE COURT: Have you gotten as far as proving actual innocence, or that would have to be at trial?

MR. SCHUTTY: No. In fact, Mr. Newton is likely to move for partial summary judgment. There is a recent case in

Page 6

# A-207

13

93brnewm

the court of claims that says when there is a DNA exoneration and you can show by clear and convincing evidence, he can do it on the paperwork. We will be shortly filing a motion for partial summary judgment in the court of claims.

THE COURT: I thought you said Mr. Larkin is going to move that.

MR. SCHUTTY: No, I'm sorry. If I said that, I misstated. My client. I will move in the court of claims shortly for partial summary judgment.

THE COURT: Because the exoneration based on DNA is sufficient for clear and convincing evidence?

MR. SCHUTTY: Yes, your Honor.

THE COURT: Do you agree with that, Mr. Larkin?

MR. LARKIN: The court of claims standard is clear and convincing evidence.

THE COURT: I know that. Do you agree that DNA exoneration is clear and convincing evidence of innocence?

MR. LARKIN: It depends on the facts of the case.

THE COURT: Mr. Schutty just told me that it doesn't matter, if you have DNA evidence, then that's clear and convincing evidence that you didn't do it.

MR. SCHUTTY: On facts like we have here.

THE COURT: I'm saying where the DNA is not the defendant's.

MR. SCHUTTY: Yes.

14

93brnewm

THE COURT: The DNA collected from the victim does not belong to the defendant.

MR. SCHUTTY: And the victim stated that there was one assailant, that there was semen coming down her leg. I can link it up and prove clear and convincing on the papers. The judge in the court of claims has already inquired, has requested a survey on the law of what damages he may award. I have provided a letter on that. He is very curious because he also has another case also being handled by Mr. Larkin.

THE COURT: So Mr. Larkin handles that case --

MR. SCHUTTY: No, no. Mr. Larkin has a case known as Fappiano.

THE COURT: He doesn't handle that case in the state?

MR. LARKIN: No. The state Attorney General's office handles it. But there are separate liability issues in each case.

THE COURT: I realize that.

MR. SCHUTTY: The issue is, I think I told your Honor in prior conferences, a deduction made based on the award there or is a deduction -- how is that worked out? It's really not clear under the law.

MR. LARKIN: I think the law is clear that there is an offset. In other words, you can't have a double recovery for the same period of incarceration. If damages are sought for lost wages, for instance, if they are recovered in one case,

Transcript - 3-11-09 Conference w Scheindlin

15

93brnewm

you can't recover the same damages in the other case.

THE COURT:  When do we think this judge might get to this?

MR. SCHUTTY:  The state has demanded a deposition of the office of the chief medical examiner, who conducted the DNA testing, before I can move for a partial judgment.  That deposition is scheduled next week.  We have our next conference in the court of claims on May 19th.  I probably will move for partial summary judgment shortly thereafter.

THE COURT:  Interesting.  All right.  I guess I've covered all the ancillary matters.  I'd like you to go ahead and address the probable cause for the arrest.

MR. SCHUTTY:  Probable cause for the arrest.  I started to tell you about the arresting detective.  She was admittedly a very inexperienced investigator in the sex crimes unit.  I think this was her fifth arrest.  She had only held five prior lineups.  She adhered to a view during the deposition that your Honor would find remarkable.  She still believes Mr. Newton is guilty because of the prior arrest.

THE COURT:  Mr. Larkin expressed that view more than once here, too, I thought.

MR. SCHUTTY:  She was adamant.  I wish I had videotaped the deposition and either you or the jury could see how tightly wound she was about this.  I think she displayed a determination to get an arrest, an indictment, and a conviction

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

93brnewm

at all costs.  There were multiple things that she was exposed to that indicated that this complaining witness was not credible, and she turned her back on all of them, admittedly.  She confessed that she knew this woman, she has handwritten notes, was drinking heavily.

THE COURT:  Many victims drink.  The bottom line is there is a lineup, there is a voice ID, the victim is positive, she says this is definitely the person.  And then even behind closed doors, when she can't say whether it's the same one she picked out of the lineup, she said, that's the voice, that's the one who said the words to me.  So she's sure.  What is the policeman supposed to do?

MR. SCHUTTY:  The lineup was a mess that she picked Mr. Newton out of.  The lineup was three different voice attempts because she wasn't sure when she examined him.  She was convinced at trial to say, yeah, I picked him out, but they had three attempts to do a voice identification.

At one point they had each of the individuals in the lineup go over to a door, crack the door open, and they are now talking through the door to the victim.  One of the detectives who was involved in the lineup procedure said he had conducted over 100 lineups previously and this was the first one where such a procedure had been used like this.

THE COURT:  But that's the voice ID part.  If you're behind the door, the victim can't see the person, so she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

93brnewm

doesn't know that it's the same person she picked from the

Page 8

Transcript - 3-11-09 Conference w Scheindlin

lineup. She listened to the voice behind a door and says that's the guy. I'm not saying she was right, but why shouldn't a reasonable officer have believed it?

MR. SCHUTTY: It was the way the lineup procedure was conducted. Let me tell you what else they did. Before they started repeating phrases in front of the victim, they didn't drop the shade. Apparently they left the shade up. The five fillers who were in the lineup with Mr. Newton apparently were very familiar with the detectives in the lineup room. They were commonly called as fillers.

When the principal detective in the lineup room conveyed to them what he were supposed to say, with the shade up, they all started giggling except Mr. Newton. Of course he's not going to giggle. He knows the seriousness of the situation. But they left the shade up. They let her watch the instructions that were given to the fillers. Did they confess this at the trial? No. They hid and secreted what happened at that lineup procedure.

THE COURT: When she identifies the voice, it's behind a closed door, she can't see whether it's the filler or Mr. Newton, she doesn't know, but she says that's the voice.

MR. SCHUTTY: There is some confusion about that as well. When Mr. Newton is told that he has been selected, he begins to raise his voice and scream, and that's when the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

93brnewm

victim says, I recognize that voice, the anger he's expressing indicates to me that's the guy.

THE COURT: Even if that version is right, he doesn't express that anger until he is told that she just identified him.

MR. SCHUTTY: Correct. And she is in a separate room. But that's when she becomes convinced that Mr. Newton is the man.

THE COURT: I thought she already said that's the voice and he is told that and that's why he raises his voice. You just said that.

MR. SCHUTTY: Detective Newbert is the only person to offer testimony who was present. The other officer who was present is deceased, a detective Hartfield who was in the viewing room with her. But another detective in the lineup room testified at the criminal trial, unfortunately he is deceased, testified that he wasn't aware that a decision had been made until all the voice identifications were completed.

Let me get back to the facts that were not disclosed. Within a day or two of the rape, Detective Newbert and Detective Gallagher went out and met a witness on the street. The victim originally told Detective Newbert that her rapist might have been as short as 5-foot-4 and heavy as 180 pounds, and her handwritten notes confirm that. The next day, when she shows photographs and the victim finally picks Mr. Newton in a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

93brnewm

photograph, all of a sudden it's confidently 5-foot-7 to 5-foot-8 and 150 pounds. No translation of the written notes into her formal NYPD report.

Moreover, when they go out and interview someone on

Page 9

Transcript - 3-11-09 Conference w Scheindlin

the street, the rape victim originally said it was a guy named Willy, he told me his name was Willy, he drove a blue and white car, and he took me to this abandoned building. They interview someone on the street who says, I know a guy named Willy who fits that description and he drives a blue and white car. Those handwritten notes are destroyed. The interview with that woman is never placed in an official NYPD report.

Now, you had a man, now that we know Mr. Newton is exonerated, a man fitting the description who apparently used to live in the building where the rape occurred driving a similar car, and the notes are destroyed.

We have a pair of sneakers --

THE COURT: I know they were never tested. But you know there is no obligation to test. When you evaluate probable cause, it's not what you didn't do, it's what you knew is sufficient for you to make that arrest. That's clear law. You don't have to test evidence that's available to be tested. That's certainly not the probable cause thing. One would think you might get it done by trial.

MR. SCHUTTY: But they are now produced. The original vouchers were found, produced to me, on February 4th, just over

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

93brnewm

a month ago. The original vouchers which had been lost for years suddenly appeared, produced to me in the middle of a deposition only because I demanded the originals, I wanted to take a look at them. They show on the voucher for the sneakers that testing was requested.

THE COURT: When was testing requested?

MR. SCHUTTY: On the original voucher for the sneakers, the police officer, Detective Newbert, states property listed above was removed from defendant to have soles analyzed and processed to determine traces of blood. It clearly shows her intent to do it, and she can't explain why they weren't tested. Today the NYPD can't find these sneakers, can't find the evidence. They found the voucher finally, but they can't find the evidence, and they can't explain why it wasn't tested.

THE COURT: What does that show about the defendant on a probable cause analysis? In fact, it cuts the wrong way. She asks for testing. How does that demonstrate her bad faith?

MR. SCHUTTY: But it wasn't followed up and it wasn't performed. They closed this case the day Mr. Newton was arrested and turned it back --

THE COURT: You say used the word "they." That's a little loose.

MR. SCHUTTY: Detective Newbert and ADA Freund failed to follow up. She interviewed this witness, was aware the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

93brnewm

witness was an alcoholic, knew she was a street person, and said that's all I needed despite all this other circumstantial evidence.

THE COURT: Her interviewing a trial witness is trial preparation, it's not investigation. I'm telling you, she has absolute immunity. You need to move past her. I really don't want to waste time on a portion of this. It's bad enough there

Page 10

Transcript - 3-11-09 Conference w Scheindlin

are three or four that are closer calls. But I don't think you can possibly, possibly prevail against her.

MR. SCHUTTY: I have just received her deposition transcript. I haven't had a chance to review it. Your Honor, I understand the case against ADA Freund is a difficult one, I do. In my complaint that's why I framed it only in the sense that she performed an investigation. I'll take a look at the deposition transcript and be very candid with you.

THE COURT: Interviewing a witness for trial is not investigation. Somebody hands you the witnesses. You have to interview them to put them on the stand.

MR. SCHUTTY: But this interview occurred within a week of the arrest, within a week of the assault. It was not the day before trial, the week before trial.

THE COURT: But she has to put the case in the grand jury, too. Did she have an indictment already? That's all part of the prosecutorial function.

MR. SCHUTTY: I have to go back and look.

22

93brnewm

MR. LARKIN: Your Honor, what happened is -- I didn't mean to interrupt. I do apologize.

THE COURT: That's all right.

MR. LARKIN: Mr. Newton was arrested. He was picked out of the lineup on the 28th of June. On the 29th the case was put to the grand jury. ADA Freund interviewed the eyewitnesses that day, the 29th, before she put the case to the grand jury. I think the law is clear that putting the case into grand jury --

THE COURT: Is part of the prosecutorial function.

MR. LARKIN: She gets immunity for that.

THE COURT: I believe so. Anyway, let's go back to the probable cause on the arrest. Are you done with that, Mr. Schutty?

MR. SCHUTTY: There were multiple things that weren't done and disclosed to Mr. Newton and/or his attorneys.

THE COURT: The law is very cautious on that. It's not going to set a standard that there is no probable cause unless you do A, B, C, D, and E. The law is that a reasonable officer had enough to make the arrest.

MR. SCHUTTY: We just took the testimony a week or so ago from a member of the DA's office, and we have taken testimony from the New York City Police Department about probable cause, what constitutes probable cause. A major factor in probable cause is the veracity of the complaining

23

93brnewm

witness.

THE COURT: Yes, that is true.

MR. SCHUTTY: There were several blatant themes here that indicated that this complaining witness lacked credibility. For example, what's come out in the depositions is the first uniformed officer on the scene was told by the complaining witness that she was picked up in a car at 158th Street and Park Avenue. She then begins to tell people that she only met this guy in the bodega, and that was her trial testimony. She gave very inconsistent accounts as to where she

Transcript - 3-11-09 Conference w Scheindlin
met him, how well she knew him.

The second eyewitness admits that she saw this woman arguing with the guy in the bodega that night.  But the complaining witness claims that she met him for the first time out on the street when he put a blade to her neck, that she never talked to him.

There were such inconsistencies that should have been followed up on that probable cause, there is a difference of opinion here, it's an issue of fact for a jury to determine. Weighing everything that the NYPD had at its disposal, should they have merely said, oh, we're going to believe her and not look over here?  We had a man who was with his girlfriend and her extended family that entire weekend.  There were facts that should have put them on notice, hey, maybe we should look beyond this.

24

93brnewm

I've noticed the deposition of the second eyewitness. I've met with her personally.  I know what she is going to say.

THE COURT:  Second eyewitness to what?

MR. SCHUTTY:  The store clerk in the bodega who apparently supported the identification.

THE COURT:  Supported the identification of Mr. Newton?

MR. SCHUTTY:  Yes, who also picked Mr. Newton as the man she believed was in the store that night.  In fact, the police employed suggestive identification procedures.  I'm scheduled to depose her next week, March 19th, along with her husband at her home.

THE COURT:  They are going to say --

MR. SCHUTTY:  That there were suggestive procedures employed.  There were a series of things that were not disclosed that if they had been disclosed, Mr. Newton might not have been convicted.  On probable cause, if you challenge the veracity of the rape victim, and you can because you have the evidence to do it, it weakens probable cause, this case should go to the jury.

THE COURT:  Now, Mr. Larkin, on the other hand, I think that this business about failing to produce the rape I've always felt cannot be disposed of on summary judgment.  I don't know how you can make that one in good faith.  I've told you that and told you that.  There is a real issue there about bad

25

93brnewm
faith.

Once the Innocence Project gets involved, suddenly people snap to it and produce a rape kit, but that's a gazillion years later, with the man in jail for a long, long, long time.  I know you have made your point about the other conviction.  Whether it's 3 1/3 years or even 10, it's not 22. He has been asking and asking and asking.  You either have gross negligence, recklessness, bad faith, but you have something beyond mere negligence.  Plus, Mr. Schutty says, I'm going to show a pattern and practice in this.

MR. LARKIN:  With regards the state law claims, we would concede that a summary judgment motion at this point would not be appropriate.  With regards, though, to the

Transcript - 3-11-09 Conference w Scheindlin

constitutional claims, the issue under the due process clause is access to evidence. It's a Fifth Amendment due process type case. The question is in a case where you have biological evidence that might be subjected to tests, that might be exculpatory or it might be inculpatory, as the Court said, you have to show bad faith.

THE COURT: Right.

MR. LARKIN: Youngblood, I believe, said that you look at the conduct of the officers when the evidence is sought to be produced in order to determine whether there is bad faith. If the conduct of the officers suggests that the officers believed that the evidence would exculpate --

26

93brnewm

THE COURT: I don't think Youngblood goes that far. They have to know that it could exculpate. Obviously, scientific evidence could exculpate. When you test it, you don't know whether it's going to be the defendant's DNA or not the defendant's DNA. You don't have to know it's going to exculpate him.

MR. LARKIN: Right. But to get to bad faith it has to be more than, gee, should we look for that, maybe we won't look for that, should we bother to look for that? It has to be more than that. It has to be an officer saying to himself, you know, that piece of evidence might exonerate that defendant.

THE COURT: That's right.

MR. LARKIN: Let's ditch it, let's dust it.

THE COURT: That may be what the jury will finally conclude here. New York keeps rape kits. It doesn't keep all kinds of evidence. It keeps that because it must recognize that it has an incredibly strong value to prove or disprove the crime. He had asked and asked and asked and was told can't be found, can't be found, until the Innocence Project asked, and then suddenly it can be found, and he's innocent.

MR. LARKIN: Actually, can I say something about a about that, your Honor?

THE COURT: Sure.

MR. LARKIN: What the evidence is going to show is that when Chief Trabitz, who was the commanding officer of the

27

93brnewm

unit and who was the commanding officer of the unit in 2004, when the rape kit was located, literally was on the telephone with Alissa Kenderman, who is the head of the Bronx sex crimes unit. He was wracking his brain trying to figure outlet how am I going to find this piece of evidence. He said to her, if I only had a copy of the voucher, I could find it.

THE COURT: Right.

MR. LARKIN: She had a copy of the voucher. She sent him a copy of the voucher, and the evidence was located.

THE COURT: Right, which just shows how easy it would have been to do. Why wasn't it done all these years that he was asking?

MR. LARKIN: That, your Honor, might be a negligence claim. It's not --

THE COURT: Only if the jury sees it your way. There may be proof, and I think Mr. Schutty has to supply that proof

Page 13

# A-214

Transcript - 3-11-09 Conference w Scheindlin

now to defeat summary judgment.

What's the proof that it wasn't mere negligence? What's the proof, Mr. Schutty, that would let a jury conclude that it was bad faith? Bad faith is the test.

MR. SCHUTTY: Your Honor, we have only developed this in the last month.

THE COURT: Just tell me what it is. Whether it's the last month or last six years, what have you developed?

MR. SCHUTTY: They had this document. This document

93brnewm

is a color copy of the original voucher in the Bronx property clerk's office, in a file. It's been sitting there since at least 1988, when this evidence went out to the OCME. They failed to find it. Why? No one asked for it properly. There were procedures as to how this document was to travel.

THE COURT: But he's saying show me the evidence that you're going to tell the takes this out of the negligence box and puts it into the bad faith box.

MR. SCHUTTY: That's a question of degree for the jury.

THE COURT: No. You have to have evidence. How you defeat summary judgment is with evidence. What's the evidence -- we can consider circumstantial evidence, but it has to be direct or circumstantial -- that this is not a negligence case but a bad faith case? If you have no evidence, either direct or circumstantial, of bad faith, then I'd have to grant summary judgment.

MR. SCHUTTY: Let's go through that. Everyone involved is pointing the finger at everybody else. The New York City Police Department's property clerk division is saying the district attorney's office didn't give me the correct information, they didn't tell us we were looking for a rape kit and they didn't tell us that it went to the OCME in 1988.

The district attorney's office is saying, we asked for it, but they had a copy of this document, a photocopy in their

93brnewm

file, which when it was originally produced to me I couldn't understand the significance. There is handwriting right here that's barely legible that indicates where the rape kit was located. They had this document in their file. They could have simply sent it to the property clerk's office.

The office of the chief medical examiner, I've recently received a logbook from them. They knew that they sent it back to the police department in 1989. No one put their heads together. Everyone just didn't care. This was a convicted criminal defendant who was sitting in jail convicted of rape. No one put together the effort to inquire properly how to find the rape kit.

That smacks of bad faith. Everyone's pointing the finger at everybody else. The police department says it was the district attorneys office. I'm sure the district attorney's office is going to say it's the office of the chief medical examiner.

Your Honor's question is why I moved to amend the complaint. Because there is finger pointing going on now. I

Page 14

# A-215

know when I present this case to the jury I don't want there to be empty chairs. I don't want the police department to be saying those assistant attorneys, they should have given us the information, and that provides the jury with the out.

This document was provided to me February 4th. I have not delayed amending the complaint. This document and what is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

93brnewm

attached is a complete tracking history for what happened to that rape kit. The rape kit was not properly signed back into the New York City Police Department property clerk's division in 1988 or 1989. The back shows that.

I never had a copy of this before. I didn't have the testimony of Sergeant McGuire, who wrote that crazy letter to Mr. Newton's attorneys or to the district attorney's office saying, we think the rape kit is destroyed. He said that if he had had a copy of this, he could have found it in five minutes. I just got the transcript a week or two ago. I have moved to amend the complaint.

Under the doctrine of relation back, I should be able to bring these people in. I knew they were somehow involved, but I didn't have all the facts. I didn't have this document. I didn't have the evidence and have the deposition testimony. I don't think it would be appropriate to preclude me from bringing them in at this point. Based on the record, I've only discovered this in the last month. I timely moved when I found out how involved the district attorney's office was.

THE COURT: What about the notice of claim?

MR. SCHUTTY: That's with respect to state law claims. But certainly on the civil rights claims, I should be entitled to bring them in.

THE COURT: Under the doctrine of relation back?

MR. SCHUTTY: Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

93brnewm

Getting back to bad faith, though, I have everyone in the room pointing at the other person saying they are responsible, but no one took responsibility. The people at Pearson Place are blaming the DA's office. The DA's office, when I take their testimony on this, is going to blame the police department and the OCME. And the OCME, they are all employed by the city.

THE COURT: Three of the ADA's you want to bring in now were identified in the complaint all along but not named as defendants.

MR. SCHUTTY: I didn't know what specific role they played. And Sergeant McGuire has made clear, at least with the assistant district attorney he dealt with, I wasn't given the information that I needed. The additional discovery required is minimal. I will take their testimony, their deposition, and say, what did you convey to the New York City Police Department? Then I will let the cards fall where they may at trial. Was it the DA's office fault? Was it the property clerk's office fault? Was it the OCME's fault?

THE COURT: Basically, you would want to sue the ADAs in their official capacity?

MR. SCHUTTY: In their individual and official

Page 15

Transcript - 3-11-09 Conference w Scheindlin
capacity. I have the district attorney's office named individually. Robert Johnson, who I believe, because he has been a district attorney for so many years, would have been the

32

93brnewm

district attorney I believe going back as far as 1990. He has been sitting quite a bit. I haven't thought that through, your Honor.

THE COURT: Right.

MR. LARKIN: May I address some of the points, your Honor, briefly?

THE COURT: You only want to add these people on the failure to produce the rape kit?

MR. SCHUTTY: That's correct, your Honor, only on their administrative role in the request made by the Court to get the rape kit, administrative, ministerial, and their failure to convey proper information to get it.

MR. LARKIN: Your Honor, I think in order to state a claim under 1983 along the lines of the proposed amendment, you would have to show personal involvement and you would have to show bad faith, those two things. In addition, we have the problem of delay. Fact discovery is closed and the case is on for trial.

THE COURT: But now he says with respect to delay that he just got a copy of this original voucher a month ago, which put the pieces of the puzzle together.

MR. LARKIN: The front and back, counsel has had the front and back since the outset of the case.

THE COURT: I thought Mr. Schutty just said the opposite.

33

93brnewm

MR. LARKIN: He produced a copy of the front and a copy of the back in his own initial disclosures, your Honor.

THE COURT: Could you explain, Mr. Schutty, what Mr. Larkin is telling me?

MR. SCHUTTY: I absolutely can, your Honor. Mr. Larkin doesn't see the difference between what I had and what was provided to me in the deposition.

THE COURT: What is the difference?

MR. SCHUTTY: Your Honor, you can see from this document, especially because it's colored, that it is yellow.

THE COURT: Yes.

MR. SCHUTTY: You can also see at the bottom that this says "property clerk work copy." This document starts out as a six-copy document with carbons. In order to determine the significance of this document, I need a complete copy. That means at least 100 percent so I can see this red line at the bottom "work copy."

I also, based on my not being familiar with these documents, didn't know what was on the back. It wasn't clear to me. I never had a complete copy of the voucher before. I didn't understand that this was one page and that on the back was the history of how the evidence traveled.

THE COURT: But you had the back.

MR. SCHUTTY: I had it, but until I had a deposition of Deputy Chief Trabitz on February 4th, I didn't understand

Page 16

# A-217

34

93brnewm

the significance.  And I didn't have a complete copy.  Once he produced the complete copy and explained to me how it worked, everything started to fall together.  Once he showed me that they were able to find the evidence -- I never knew where it was found until his deposition.  This evidence was found in OA barrel number 22.

THE COURT:  But you had that piece of paper you're pointing to.

MR. SCHUTTY:  Well, I had it without the key to disclosing what it meant.

THE COURT:  The key being?

MR. SCHUTTY:  The document and the testimony.

THE COURT:  The testimony is a matter of when you held the deposition.

MR. SCHUTTY:  But that deposition was requested in September, in October, and they chose to produce these witnesses to me in the last month of your Honor's discovery cutoff.

THE COURT:  Right.

MR. SCHUTTY:  I've been pushing for these depositions before Magistrate Judge Freeman for months, as your Honor is probably aware.

THE COURT:  Mr. Larkin, if the relation back doctrine applies, is he timely?

MR. LARKIN:  I would have to look at it.  I'm not a

35

93brnewm

hundred percent sure.  I think that the plaintiff has known since the beginning of the case that the rape kit in or about 1988 went to the medical examiner, that it was tested by the medical examiner in 1988, that it subsequently found its way back to Pearson Place and was found in DOA barrel number 22 of 1989.

Furthermore, counsel has had the documents that reflect the involvement of the ADAs in trying to locate the rape kit.  For example, there is an entry in the medical examiner file from 1988 which we produced in March of 2008, about a year ago, indicating that ADA Carroll in 1994 made a phonecall over there to inquire where the rape kit was.

The facts on which this new amendment is predicated have been out there and well known since the beginning, it seems to me.  Very clear.

MR. SCHUTTY:  That's simply not the case, your Honor.  In my complaint, one of the things I need to correct, and your Honor may recall this, even from her opinion previously written in this case -- I have been under the assumption all along the rape kit was found in its original storage location.

THE COURT:  Right.

MR. SCHUTTY:  It was not in its original storage location in the Bronx.  My complaint says that that's where it was found.  One of the things I need to correct is that the rape kit, which I discovered for the first time during Deputy

Transcript - 3-11-09 Conference w Scheindlin

93brnewm

Chief Trabitz's disposition, was found in a DOA barrel.

THE COURT: What does DOA mean?

MR. SCHUTTY: I have had one witness said it meant dead on arrival --

MR. LARKIN: None of the witnesses said that. It's a barrel for biological evidence, your Honor.

THE COURT: Where is it?

MR. LARKIN: It came from the medical examiner to Pearson Place. The complaint in this case alleged specifically that the rape kit was found at Pearson Place. Counsel has known that.

THE COURT: And it was.

MR. LARKIN: Right.

THE COURT: What do you have to correct? Mr. Schutty, I'm getting lost. Was it not found where you said it was found in the original complaint?

MR. SCHUTTY: In the original complaint I said it was found at Pearson Place in its original storage location, which I named. I called it I believe 84B19041. In my ignorance, 84B19041 is a storage location in the Bronx supreme courthouse. I believed that the barrel was found at Pearson Place.

THE COURT: But that turned out to be true.

MR. SCHUTTY: No, it's not.

THE COURT: I thought you just said the barrel --

MR. SCHUTTY: Deputy Chief Trabitz said he believes it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

93brnewm

was found in a different storage location.

MR. LARKIN: No.

THE COURT: Hold on. I thought Mr. Larkin said it was it was found at Pearson Place.

MR. LARKIN: Either there or in the annex, two buildings that are adjacent to one another.

THE COURT: That means they are both on Pearson Place.

MR. LARKIN: Right. One of two addresses on Pearson Place, your Honor.

THE COURT: Pearson Place.

MR. SCHUTTY: Just so you are aware, Magistrate Judge Freeman has ordered the defendants, and I haven't received it yet, to state exactly where the rape kit was found.

THE COURT: I understand. But it's going to be Pearson Place.

MR. SCHUTTY: If it is, OK, but not in the storage where I believed.

THE COURT: I got you.

MR. SCHUTTY: If I looked at a photocopy of this -- there is a host of handwriting on here -- as a layperson I could never decipher what DOA barrel number 22 1989 meant. It was one of my first questions for the witness when I had a photocopy, but it all came together in a deposition.

THE COURT: What does it prove that you now know that it was found in this barrel? What does that prove?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

93brnewm

MR. SCHUTTY: The original voucher was available in

Page 18

Transcript - 3-11-09 Conference w Scheindlin
the Bronx property clerk's office and a copy was in the district attorney's office file.  This was produced to me from the district attorney's office.  Now that you see this copy, you can see DOA barrel 22 1989.

There were so many versions of this invoice floating around simply because the original was six copies that gets dispersed.  For me as a layperson to track what's the significance of this photocopy and what is the difference in this handwriting -- it all came into focus last month, your Honor, when I deposed Sergeant McGuire and Deputy Chief Trabitz.

Now I have a good handle, as does Mr. Larkin, who was producing documents to me the day before these depositions and in these depositions.  We finally know what happened.  Deputy chief Trabitz testified that he was able to find this voucher because Mr. Larkin produced to him an OCME log.

THE COURT:  Let's go back to the defendant.  If you are allowed to amend and to name these people, where is the bad faith on the part of these defendants, the new defendants that you want to add?  Assuming you didn't delay and assuming you're not time-barred, where is the bad faith?

MR. SCHUTTY:  That they had a copy of this sitting in their file, failed to look through their file, failed to provide it to --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

93brnewm

THE COURT:  That may be negligence.

MR. SCHUTTY:  That may be bad faith.  They were under court order to produce the rape kit and they didn't provide vital information to the city police department?

THE COURT:  I don't know that they were under a court order.

MR. SCHUTTY:  They were under a court order at the time.  In each instance they were asked to serve and find the rape kit.

THE COURT:  These very people?

MR. SCHUTTY:  Yes.  There were motions made by Mr. Newton and his attorney.  There was usually involvement of the court.  There was a habeas corpus petition before Magistrate Judge Grubin at the time, and there were two state productions.

MR. LARKIN:  Your Honor, the defendants on one occasion were ordered to produce the rape kit and did so.  That was in 1988.  With respect to the other applications, the district attorney did not oppose production of the rape kit.  There wasn't any order directing them to produce it as such, because the DA agreed that they should look for it and try to find it, and there were efforts made to look for it and try to find it.

It's not disputed that the efforts in 1994, 1998, and there might have been another one in 2002, I'm not a hundred percent sure, but it's not disputed that those efforts were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

40

93brnewm

unsuccessful.

THE COURT:  That's not the point if it was as easy as finding it in your own file drawer and you didn't.  In other words, these people had it right there and had the voucher

Page 19

# A-220

right there, which would have told everybody the location, and they didn't manage to pull it out of their drawer, so to speak.

MR. LARKIN: Plaintiff produced to us documents in their own disclosures that demonstrated that they were aware of that.

THE COURT: Aware of what? You can't use the word "that."

MR. LARKIN: I'm sorry, your Honor. Aware of the fact that the Bronx district attorney had a copy of the voucher in its files with the storage location and sent it to the property clerk, and upon receiving that voucher the property clerk located the evidence.

There is an email transmission from Elissa Kenderman to Vanessa Potkin, who is Mr. Newton's Innocence Project attorney, specifically saying the copy of the voucher in our file had the location written on it. With that voucher, the property clerk found the evidence, in words or in substance. That's a 2004 email that counsel has had since January of last year, and it was produced to us in the case.

So the facts here about the rape kit, where it went --

THE COURT: I think the better way to go on this is to

41

93brnewm

have the amendment made, have these people deposed very promptly, and then move to dismiss the amended complaint on the same ground, that as a matter of summary judgment they cannot show bad faith. That's what it boils down to.

MR. LARKIN: There are five new individuals, not all of whom stand in the same footing. One is an OCME scientist. I can't understand why that individual is being named as a defendant now.

THE COURT: I don't know either. Why is that individual being named?

MR. SCHUTTY: Your Honor, in 1994 Justice Burton Roberts issued a court order advising the district attorney's office that the rape kit was to be tested under the supervision of Robert Schaller of Life Codes, Inc., an independent testing company. In fact, the rape kit was apparently delivered to the OCME in 1994. When the district attorneys office provided the precise information that it wasn't supposed to be tested by OCME, without Robert Schaller present or not, it subsequently was tested.

The result of the testing that came back was, we didn't find any semen in there. But we know there was semen there subsequently because it exonerated Mr. Newton. Patricia Ryan tested it, apparently without Dr. Schaller, and she was apparently also transferring it back to the property clerk's division of the New York City Police Department. There is some

42

93brnewm

irregularity there because it wasn't processed back by the New York City Police Department properly.

THE COURT: What was her constitutional violation? You want to sue her under 1983 and the --

MR. SCHUTTY: She violated the court order.

THE COURT: I don't know what court order she violated. The one you sent Justice Roberts?

Transcript - 3-11-09 Conference w Scheindlin

MR. SCHUTTY: Yes, Justice Burton Roberts. Perhaps she followed the instruction of the district attorney's office, but I don't know what instruction she was given by the district attorney's office. The OCME received the rape kit.

THE COURT: Anyway, you might have a state law claim against her, that's a fact.

MR. SCHUTTY: I might have a negligence claim against her.

THE COURT: Right.

MR. LARKIN: That might be time-barred, though, because you have the year and 90-day problem.

THE COURT: Not against her in her individual capacity. Under your state law claim? I thought that was a 3-year statute.

MR. LARKIN: If she is a municipal employee, your Honor.

THE COURT: I know. Not acting in her official capacity but her individual capacity. I don't know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43

93brnewm

MR. LARKIN: I haven't looked at it.

THE COURT: I guess it is too late for me to straighten this out, too many people. I'm trying to get it done in the fastest way so we don't delay the end game, so to speak. That's why if they just filed the amendment, got the people deposed, and then you moved to dismiss it for lack of evidence on summary judgment, you may prevail in any of these arguments. To do it up front delays the eventual filing and the eventual discovery and we are going to lose another year, and that's a bad thing.

MR. LARKIN: I think that we could make the motion now.

THE COURT: He's going to say, I need to take their deposition, and I'm going to agree. You might as well just schedule these depositions and get them done and see what these people say. Maybe after he takes them he will realize he doesn't have bad faith proof and he had better move on. But he should take their deposition by the same date that Judge Freeman has set as the cutoff anyway. It might be wisest to let them be deposed.

MR. LARKIN: You have five individuals. One of them used to work for the medical examiner. I don't know where she is now. One of the defendants, ADA Cozello, still works at the district attorney's office. The other three DA defendants no longer work for the DA. I don't know where they are. I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

44

93brnewm

suppose we could make an effort to try and track them down. But by the time that they get served, by the time we are able to locate them, prepare them, produce them, it is going to be several months.

THE COURT: I agree.

MR. LARKIN: And we have a trial date of July 13th.

THE COURT: I agree. Maybe the wisest thing would be to depose them first and hold off not only the filing of the amended complaint but the motion not to permit the filing of the amended complaint. Both should be held off. Just add them

Page 21

Transcript - 3-11-09 Conference w Scheindlin

to your depositions.

MR. SCHUTTY: We have one other issue. Mr. Larkin has told me that the witness that he has been ordered to produced by March 20th will now not be available until April. I have to get expert reports done. I'm just getting transcripts. Mr. Larkin asked me to agree to that, and under most circumstances I would.

THE COURT: Who is that?

MR. LARKIN: A witness from the Bronx DA's office to testify about certain subjects, your Honor. One of the areas would be procedures for investigating a sex crime, which it appears that based on the Court's reaction to the likely motion for summary judgment, maybe we could agree that that topic would not be covered.

there was going to be an issue, it seems to me, as to

45

93brnewm

the Bronx DA's investigatory practices. So I would suggest under Van de Camp you might just not have that topic covered, and then we could cover the other topics, which involve tracking evidence and that sort of thing.

THE COURT: Right. These five people, can't you start scheduling them as fast as you can find them, get them deposed, and then consider whether there is a reason to have to add them as defendants or not? You will have their testimony. You don't really gain anything in adding all these defendants other than what you said, Mr. Schutty, that you don't want finger-pointing at empty chairs. But you don't really gain in recovery. So if you have their testimony under oath, that may do it.

MR. SCHUTTY: It may, your Honor.

THE COURT: It just may be.

MR. SCHUTTY: I'm amenable to taking their depositions.

THE COURT: Then do it.

MR. LARKIN: But, your Honor --

THE COURT: What? That's the best solution. He said he may be amenable not to bringing them in if he has their testimony locked in.

MR. LARKIN: These individuals have been known from the beginning of time.

THE COURT: I can't help that. This is what I'm

46

93brnewm

ruling, Mr. Larkin. Take the depositions. We'll hold off on the amendment. You should be happy. Your clients or future clients may never be sued. That's what you really want. I'm going to allow their testimony to be taken to close the loop. Now you need to help him find these people. One is at the DA's office. Schedule that one immediately. The two former ADAs are attorneys. Attorneys are usually easy to find. Start with the red book or whatever.

MR. LARKIN: There are four ADAs and then the OCME.

THE COURT: The four ADAs should be easiest. Lawyers don't disappear. They may die, but they don't disappear.

MR. LARKIN: It's going to happen to all of us, unfortunately.

Transcript - 3-11-09 Conference w Scheindlin

THE COURT:  That's true.  I don't like to be reminded of that really.

MR. LARKIN:  None of us do.

THE COURT:  Anyway, the OCME guy, I don't know how you find him, I really don't.  But the former employer, you will get the last address or something.

MR. LARKIN:  Why should that individual be deposed now?

THE COURT:  Why not?

MR. LARKIN:  They stand on a different footing.

THE COURT:  I don't want to reargue.  Yes, he or she should be disposed.  She, actually.  You said Patricia Ryan.

47

93brnewm

She could be deposed now for sure.  Maybe after he gets their testimony pinned down he won't need to amend.

Let's turn to the briefing on the remaining motions Mr. Schutty, when can you tell your adversary whether you're willing to dismiss the claim against DA Freund so he doesn't have to move on that one, where I think there is absolute immunity?  You said you want to review the transcript.

MR. SCHUTTY:  I need to review the transcript.

THE COURT:  By when can you tell me?

MR. SCHUTTY:  I need two weeks, because the deposition is this week and next week.

THE COURT:  All right.  Everything else, Mr. Larkin, if you wish to make the motions, make them.  When do you want to do it by?

MR. LARKIN:  Your Honor, should I wait until we finish the next round of depositions before filing any motions or should I file a summary judgment motion on the malicious prosecution claim now?

THE COURT:  You mean basically the false arrest?

MR. LARKIN:  Right.

THE COURT:  It's the same thing.

MR. LARKIN:  Exactly.  Whatever the Court prefers.

THE COURT:  The false arrest is the false arrest.  Nothing is going to change on that, is it, Mr. Schutty, as opposed to the loss of evidence?  What's going to change?

48

93brnewm

MR. SCHUTTY:  We have more depositions coming up.  By my count, we have six more depositions.

THE COURT:  Do they relate to the false arrest?

MR. SCHUTTY:  At least the depositions of Mr. and Mrs. Gonzalez do, and that's March 19th.

THE COURT:  Starting with March 19th, how long do you need, Mr. Larkin, to move to the false arrest?

MR. LARKIN:  I would say three weeks after that would be fine.

THE COURT:  I think you ought to do it.  You need to move something along.  That would be April 9th.  How long do you need to respond, Mr. Schutty?

MR. SCHUTTY:  Two weeks.

THE COURT:  April 23rd.  Mr. Larkin, to reply?

MR. LARKIN:  I guess two weeks also.

THE COURT:  That's May 7th.  That's that.

Transcript - 3-11-09 Conference w Scheindlin
Now, since we're splitting the motions, which was a big mistake from the Court's perspective, I want to make sure you keep the page limits very tight on the false arrest slash malicious prosecution, because it's a completely different issue than the loss of evidence. I think in this case it makes some sense to do it this way. My page limits are usually 25, 25, and 10, but let's cut it back. There is just no point. Let's do 20, 20, and 8, or something reasonable. It's limit it. It is what it is.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

93brnewm

MR. SCHUTTY: One issue on expert witness reports, your Honor.
THE COURT: Yes.
MR. SCHUTTY: I'm not going to have transcript --
THE COURT: I realize that. So you need an extension again?
MR. SCHUTTY: Yes, your Honor.
THE COURT: He does. He has to finish up. When would that be? When is it now, Mr. Schutty?
MR. LARKIN: It's April 15th, your Honor.
THE COURT: What do we have to do? Move it a month?
MR. SCHUTTY: At least a month, because we are taking depositions now until mid April.
THE COURT: OK. May 15th. I have to do it. May 15th. As far as your super firm trial date, I do have to warn you that all judges double- and triple-book trial dates because so many things plead or settle. I can't give you another date out. I have another city case for June 22nd. If that one really goes, which it has never gone -- this is an affirmative case.
MR. LARKIN: We are the plaintiff in that case.
THE COURT: You are. None of these have ever been tried anywhere yet. But if this one finally goes, it will wipe out your trial date anyway because it has priority, it's even older. I don't know that it will go. As I said, every other

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

93brnewm

one has settled. But this could be the exception.
MR. LARKIN: It could be the exception.
THE COURT: Could be. It also could get bumped because on June 1st we start a criminal case that claims it's two months. If that one takes all of June and July, then that's going to be fun. Anyway, the criminal case I thought was two months may be one month, which would put the city case back on for June 27th. If it goes, it goes. If not -- anyway, I'm giving you until May 15th for the expert.
Anything more this afternoon?
MR. SCHUTTY: Expert witness depositions, because that will be pushed back.
THE COURT: Yes, it will. It will be pushed back. The same amount of time post the report. Whatever you have before post the report, just do the math.
MR. LARKIN: Then it would be 5/15 for the reports, June 1 for rebuttal reports, and then if we've got a July 13 trial date I guess we have to finish all the expert depositions by 6/15, and then start exchanging our pretrial order.

Page 24

Transcript - 3-11-09 Conference w Scheindlin

THE COURT: I guess. I'll keep you posted on these other trials. Plus, it's your office, you may hear gossip in the halls. You seem to know all about it as it is.

Anything more we have to talk about? Because it is tiring, 6:15.

MR. SCHUTTY: Do we go back before Magistrate Judge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

51

93brnewm

Freeman for settlement talks?

THE COURT: I have to think about that. I'll give it some thought. The city is willing to talk either before me or her. They have reason to think it makes sense here. They said they wanted to meet with me separately to tell me why I should do it and not Judge Freeman.

MR. LARKIN: If the Court is inclined, I could just spend a few minutes speaking to your Honor.

THE COURT: Yes. Mr. Schutty, do you have any objection to him explaining why it should be here, not there?

MR. SCHUTTY: No, your Honor.

THE COURT: All right. Then you get to leave and he gets to stay.

MR. SCHUTTY: OK, your Honor. Thank you very much for your patience.

THE COURT: You can trust that I have no intention of hearing anything legal from him. He is not going to argue the summary judgment all over again in your absence, I assure you.

MR. LARKIN: I certainly am not.

THE COURT: Have a good evening.

(Adjourned)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

ALAN NEWTON,

                                      Plaintiff,        **NOTICE OF MOTION**

            -against-                    07-CV-6211 (SAS)

THE CITY OF NEW YORK, et al.,

                                    Defendant(s).

------------------------------------------------------------------------ X

        PLEASE TAKE NOTICE, that upon the annexed declaration of Arthur G. Larkin, Esq., dated April 9, 2009, the exhibits thereto, the memorandum of law submitted herewith, defendants' Statement Pursuant to Local Civil Rule 56.1, and upon all prior pleadings and proceedings had herein, defendants will move this Court, Hon. Shira A. Scheindlin, at the Courthouse, 500 Pearl Street, New York, New York, on a date and time to be determined by the Court, for an order pursuant to Rule 56(c) granting partial summary judgment:

      (1)     Dismissing plaintiff's First, Second, Eleventh and Twelfth Causes of Action in their entirety;

      (2)     Dismissing plaintiff's Fourth, Sixth, Eighth, Ninth, Fourteenth and Fifteenth Causes of Action, in part; and

      (3)     For such other and further relief as the Court deems just and proper.

# A-227

PLEASE TAKE FURTHER NOTICE that answering papers are to be served so as to be received no later than April 23, 2009.

Dated:      New York, New York
            April 9, 2009

MICHAEL A. CARDOZO
Corporation Counsel of the
  City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 788-1599


By:       _____/s/_____
          Arthur G. Larkin (AL 9059)
          Assistant Corporation Counsel


TO:    THE LAW FIRM OF JOHN F. SCUTTY, P.C.
       *Attorney for Plaintiff*
       445 Park Avenue, 9th Floor
       New York, New York 10022
       (212) 836-4796
       (By ECF)

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X

ALAN NEWTON,

                           Plaintiff,

              -against-

THE CITY OF NEW YORK, et al.,

                        Defendant(s).

------------------------------------------------------------------------- X

**STATEMENT PURSUANT
TO LOCAL CIVIL RULE 56.1**

07-CV-6211 (SAS)

       Defendants, as and for their Statement Pursuant to Local Civil Rule 56.1, state as follows:

       1.      On June 23, 1984, in the early morning hours, a woman whose initials are "V.J." was raped, robbed and assaulted in Bronx County, New York. (Exhibit A [Grand Jury Minutes], at pp. 1-2, 7-9; Exhibit B [V.J. *Wade* hearing testimony], at 153:10-22; Exhibit C [V.J. trial testimony], at 335-37, 339-40)[1]

       2.      V.J. was raped once in Crotona Park, and then was raped, robbed and assaulted inside an abandoned building located at 861 Crotona Park North. (Exhibit A [Grand Jury Minutes]; Exhibit C, at 335-45)

       3.      V.J. was an epileptic and an alcoholic. (Exhibit B, at 189:5-6; Exhibit C, at 331:18-19)

       4.      During the evening of June 22, 1984, V.J. had been drinking beer with her mother and her mother's boyfriend, and later with a girlfriend. (Exhibit C, at 330:19-331:14)

---

    [1]    All references are to the exhibits attached to the accompanying declaration of Arthur G. Larkin, submitted with this motion.

5.      She started drinking in the early evening, then fell asleep before going to her girlfriend's house.  (Exhibit C, at 396-97)

6.      After leaving her girlfriend's house, at approximately 4:00 a.m. on June 23, 1984, V.J. entered a superette (bodega-type store) located on Third Avenue and 180th Street, to purchase another can of beer.  (Exhibit C, at 328-29, 330-32; Exhibit D [Gonzalez *Wade* hearing testimony], at 270:21-25; Exhibit E [Gonzalez trial testimony], at 494-95)

7.      At approximately the same time V.J. entered the store, or shortly afterward, a black male also entered the store.  (Exhibit C, at 331-32; Exhibit D, at 273:20 ("She had arrived first, the lady"); Exhibit E, at 495:12-17)

8.      The black male asked for a pack of cigarettes, either a pack of Kool or a pack of Newports.  (Exhibit E, at 495:22-25)

9.      He paid for his cigarettes and left the store.  (Exhibit E, at 507:9-15)

10.     After the black male left, V.J. paid for the can of beer and left the store. (Exhibit C, at 331:20-332:17; Exhibit D, at 278:14-17; Exhibit E, at 511:15-19, 513:20-23)

11.     V.J. then got into a car with the same black male who had been inside the store.  (Exhibit B, at 183:20-23; Exhibit C, at 333-34; Exhibit E, at 497:5-13)

12.     The black male took V.J. to Crotona Park where he raped, robbed and assaulted her.  (Exhibit A [Grand Jury Minutes]; Exhibit C, at 335-45)

13.     During the commission of this crime, the assailant stated to her, in words or substance, "Now, bitch, I'm going to fix it so you can't identify me," and cut her face with a razor.  (Exhibit C, at 339:22-340:8)

14.    V.J. reported the crime by calling the police at a call box, sometime between 5:13 a.m., and 5:21 a.m., on June 23, 1984.  (Exhibit C, at 341:4-10, 455-56; Exhibit F [Leho testimony], at 525-26)

15.    After receiving the call, police officers arrived at a call box on 175th Street and Marmian Avenue, in the Bronx, and observed a woman leaning on the call box, bleeding profusely with cuts all over her face.  (Exhibit F, at 526:2-4)

16.    The woman, V.J., was crying and screaming hysterically to "get me out of here."  (Exhibit C, at 341:4-10; Exhibit F, at 526:5-6)

17.    Her clothes were torn and her face was swollen as if beaten up.  (Exhibit F, at 526:4-5)

18.    Officers took her to Jacobi Hospital, where she received treatment for her injuries.  (Exhibit F, at 527-28)

19.    Her injuries included the loss of her left eye, which was cut open, and four broken ribs.  (Exhibit G [Dr. Howard Charles trial testimony], at 726-730)

20.    At approximately 12:30 p.m., on June 23, 1984, Detective JoAnn Newbert interviewed V.J., at Jacobi Hospital, in the foyer of the operating room where V.J. was being taken for emergency surgery.  (Exhibit H [Police Report, Bates 768]; Exhibit I [Newbert *Wade* hearing testimony], at 41:4-8; Exhibit J [Newbert trial testimony], at 539-40)

21.    At that time, V.J. described the perpetrator as, *inter alia*, a male black, approximately five feet, nine inches (5'9") tall, twenty-five (25) to twenty-seven (27) years of age, with a moustache, and a short, neat afro.  (Exhibit H [Bates 768], Exhibit I, at 41-42)

22.    V.J. told Detective Newbert that the perpetrator had forced her into a car outside a Superette located on Third Avenue and 180th Street.  (Exhibit H [Bates 768])

23.    V.J. also reported to Detective Newbert that the black male told her his name was Willie.  (Exhibit H [Bates 768]; Exhibit J, at 579:12-15)

24.    At the time of the interview, V.J. appeared to be in severe pain and was falling in and out of consciousness.  (Exhibit I, at 41:14-18)

25.    Detective Newbert was advised by doctors that V.J. was "in serious condition, likely to die" as a result of her injuries.  (Exhibit K [Newbert deposition excerpt], at 50:20-21)

26.    Later in the day on June 23, 1984, Detective Newbert went to the crime scene, and directed the crime scene unit to collect a Newport cigarette pack with one possible fingerprint on it, and a mirror that was in a pool of blood, both of which were in the landing of stairwell where V.J. was raped and assaulted.  (Exhibit J, at 585:7-19)

27.    Detective Philip Galligan also went to the crime scene on June 23, 1984, and interviewed a black female.  (Exhibit H [Bates 769]; (Exhibit O, at 654:16-21)

28.    Detective Newbert was present when the interview occurred and was also informed by Detective Galligan about the interview.  (Exhibit J, at 613:4-18)

29.    The female gave her name as Deborah Chambrin or Chamberlin.  (Exhibit O, at 665:2-5)

30.    The female claimed to know someone from the neighborhood named "Willie."  (Exhibit O, at 655:17-19)

31.    Detective Galligan observed "track marks" up and down both of the woman's arms, and she was nodding out while talking to him.  (Exhibit O, at 655-56)

32.     Based on his prior experience in a narcotics unit, Detective Galligan believed that the woman was a heroin addict, whose track marks were caused by heroin injection.  (*Id.*)

33.     Detective Galligan also believed that the female was under the influence of drugs while he was talking to her.  (Exhibit O, at 656:5-7)

34.     He also believed that she was simply repeating back to him the information she thought he wanted.  (Exhibit O, at 656:23-24 (witness "was just feeding me information" in response to specific questions), 688:17-19 (witness "was repeating what [Detective Galligan] was saying" to her), 692:16-19 (same))

35.     When Detective Galligan asked for a description of Willie, the female asked what was in it for her, specifically asking, "How much money can I get?"  (Exhibit O, at 657:4-7)

36.     Detective Galligan told the female that if she cooperated and provided truthful information, she could get some money.  (Exhibit O, at 657:7-10)

37.     At that point, the female described Willie as a Hispanic who speaks with a Spanish accent, and who was about thirty (30) years old.  (Exhibit O, at 657:10-14)

38.     Detective Galligan learned that this female had at least five aliases and approximately ten (10) prior arrests.  (Exhibit O, at 657:16-21)

39.     The female stated that she lived at 1783 Marmian Avenue, Apartment 18. (Exhibit H [Bates 769]; Exhibit J, at 612:12-15)

40.     On June 24, 1984, Detective Galligan attempted to locate the female because "she was supposed to come in and look at photographs" but she did not show up. (Exhibit O, at 682:3-14)

41.    In attempting to find the witness, Detective Galligan learned that the address she supplied did not exist.  (Exhibit O, at 658:5-14 (female gave apartment 18 in the building "and the apartments go in alphabet order"), 681:15-20 ("The address was a good address [but] the apartment was no good"), 683:6-12 (there was "no apartment 18" in the building))

42.    Detective Galligan was unable to find the female who claimed that she knew a male Hispanic named "Willie."  (Exhibit O, at 682:13-14)

43.    On June 23, 1984, at approximately 9:10 p.m., Detective Galligan interviewed Ms. Aurea Gonzalez, the clerk at the superette where V.J. and the black man had purchased items before the crime was committed.  (Exhibit H [Bates 770])

44.    Ms. Gonzalez told Detective Galligan, in words or substance, that a female fitting the description of V.J. was inside the store between 4:00 and 5:00 a.m. that day, and that while the female was inside the store, a black male fitting the description provided by V.J. also entered the store.  (Id.)

45.    Ms. Gonzalez told Detective Galligan that the male and female did not appear to know each other and both paid for their own purchases.  (Id.)

46.    On June 24, 1984, at approximately 8:30 p.m., Detectives Newbert and Galligan spoke to V.J. at Jacobi Hospital.  (Exhibit I, at 5:2-6)

47.    At that time, the detectives showed V.J. photographs of male blacks previously arrested in Bronx County.  (Exhibit I, at 5-6)

48.    The photos were selected based on the height and skin color of the perpetrator as described by V.J.  (Exhibit I, at 44-45; Exhibit K, at 96:10-14 (photos were selected from "a drawer that would contain [photos of] 5 foot 9 [inches tall] black males"))

49.    Detective Newbert asked V.J. to look at the photographs, and if she saw the person who had assaulted her the previous Saturday morning (June 23, 1984), she should pull that picture out.  (Exhibit I, at 7:2-19; Exhibit B, at 156:7-10, 201:19-23)

50.    Prior to showing photographs to V.J., detectives did not tell her that the photos depicted people who had committed sex crimes.  (Exhibit B, at 214:9-20)

51.    V.J. picked out photos that depicted persons who had similar hair and skin, but did not pick out a photo of the person who assaulted her.  (Exhibit I, at 7:2-19; Exhibit B, at 156-57)

52.    The next day, June 25, 1984, Detectives Newbert and Galligan returned to Jacobi Hospital and spoke with V.J. again.  (Exhibit I, at 7-8)

53.    The detectives again showed V.J. photographs of male blacks.  (*Id.*)

54.    At that time, V.J. positively identified a photograph of Alan Newton as the man who assaulted her on June 23, 1984.  (Exhibit B, at 157-59, 203-4; Exhibit I, at 8-10)

55.    The photograph V.J. picked out was an arrest photo dated May 30, 1984. (Exhibit H [Bates 773]; Exhibit I, at 27:5-15, 51-54, 119:4-7)

56.    After seeing the date on the arrest photo, Detective Newbert walked over to Detective Galligan, and said in words or substance, "We've got to check this out, he may be incarcerated still."  (Exhibit I, at 55:18-21)

57.    At the time, Detective Newbert believed that Mr. Newton could have been in jail because of the May 30, 1984, arrest.  (Exhibit I, at 55:24-56:4, 119:24-120:10; Exhibit K, at 102:19-23)

58.     After V.J. picked out Mr. Newton's photograph, Detective Newbert asked V.J. if she was sure, and told her she had to be sure "because we don't want to arrest the wrong person." (Exhibit B, at 204:2-6)

59.     V.J. replied that she was sure Mr. Newton was the man who raped and assaulted her on June 23, 1984. (Exhibit B, at 203:20-23; Exhibit I, at 55:22-23)

60.     Detective Newbert subsequently learned that Mr. Newton had been released on bail after he was arrested on May 30, 1984, and was not in jail at the time the crime was committed. (Exhibit H [Bates 773]; Exhibit K, at 103-4)

61.     Also on June 25, 1984, prior to showing photographs to V.J., Detective Newbert had made efforts to locate a person named "Willie," including by contacting the Red Cross to determine if anyone by that name was relocated from the abandoned building where the rape and assault occurred. (Exhibit H [Bates 772]; Exhibit J, at 579-80)

62.     The same date, she also contacted the Bronx Narcotics Squad and asked if the squad had any information on, or had arrested, a person named "Willie" who lived at 861 Crotona Park North. (Exhibit H [Bates 772]; Exhibit K, at 91-92)

63.     Her inquiries met with negative results and no one named "Willie" was ever located. (Exhibit J, at 602-15; Exhibit K, at 91-92)

64.     On June 27, 1984, Detective Newbert and Detective Galligan showed a six-person photo array to Ms. Gonazalez, the superette clerk. (Exhibit D, at 271:15-17; Exhibit I, at 106-8)

65.     The photo array included the arrest photo of Alan Newton that V.J. had picked out on June 25, 1984. (Exhibit I, at 106-7)

# A-236

66.    Prior to viewing the photo array, Ms. Gonzalez gave police officers a description of the man she had seen in her store on June 23, 1984.  (Exhibit L, at 95-96)

67.    In giving the description, Ms. Gonzalez told the officers what she saw. (Exhibit L, at 96:22-25)

68.    When Detective Newbert showed Ms. Gonzalez the photo array, she asked Ms. Gonzalez if she saw in the photo array the person who was inside the store on June 23, 1984. (Exhibit I, at 111:25-112:6; *see also* Exhibit D, at 281:3-9 (officers told Ms. Gonzalez to tell them "if there was someone that looked like the person that was there at that time in the store"))

69.    Prior to showing the photo array to Ms. Gonzalez, detectives did not tell her that a photograph of the person who was in the store was included in the photo array. (Exhibit D, at 279:20-23; Exhibit L, at 77:7-14)

70.    Prior to showing the photo array to Ms. Gonzalez, detectives did not tell her that a suspect's photo was included in the photo array.  (Exhibit D, at 279:24-280:2; Exhibit I, at 111:11-14; Exhibit L, at 94:16-20)

71.    Prior to showing the photo array to Ms. Gonzalez, detectives did not tell her which photograph to pick out.  (Exhibit D, at 280:23-281:2; Exhibit L, at 62:21-23)

72.    Ms. Gonzalez positively identified the photograph of Alan Newton, photo # 2 in the photo array, as that of the man who was in the store in the early morning hours of June 23, 1984.  (Exhibit D, at 281:13-18; Exhibit I, at 23-24, 112:13-14)

73.    At the time Ms. Gonzalez picked out photo # 2, she "was sure that it was the person that went to the store" on June 23, 1984.  (Exhibit D, at 281:15-18)

74.    On June 28, 1984, at approximately 11:00 a.m., Alan Newton was taken into custody to stand in a lineup.  (Exhibit H [Bates 775])

75.    On June 28, 1984, at approximately 1:00 p.m., Ms. Aurea Gonzalez viewed a lineup at the 48th Precinct stationhouse.  (Exhibit D, at 274:7-12; Exhibit I, at 24-25)

76.    Alan Newton was the person in seat number two in that lineup.  (Exhibit I, at 25:7-9)

77.    Prior to the lineup, Detective Newbert told Ms. Gonzalez to look at the lineup and tell her if she saw the man who was in her store on June 23, 1984.  (Exhibit D, at 282:16-21; Exhibit I, at 25:10-18)

78.    Detective Newbert did not tell Ms. Gonzalez that the man whose photograph she previously picked out was in the lineup.  (Exhibit L, at 26:16-22; Exhibit I, at 114:2-18)

79.    No police officer told Ms. Gonzalez that a suspect was in the lineup. (Exhibit L, at 26:23-27:4, 94:21-25)

80.    No police officer told Ms. Gonzalez what number to pick out of the lineup.  (Exhibit L, at 62:17-20, 75:21-23)

81.    Ms. Gonzalez positively identified Alan Newton, seat # 2, at the man who was in the store on the morning of June 23, 1984.  (Exhibit D, at 275:4-9; Exhibit I, at 25:4-22)

82.    Ms. Gonzalez picked out the person in seat # 2, Alan Newton, because she was sure he was the man who was in the store on the morning of June 23, 1984.  (Exhibit D, at 282:24-25 ("I saw the person that . . . had gone to the store"), 283:15-19 (witness picked out number two "because it was the same person that had gone to the store"); Exhibit L, at 75-76)

83.    On June 28, 1984, at approximately 2:00 p.m., V.J. viewed a lineup at the 48th Precinct stationhouse.  (Exhibit B, at 159:13-17)

# A-238

84.    Alan Newton was the person in seat number five in that lineup.  (Exhibit A [Grand Jury Minutes], at 12; Exhibit I, at 16:17-24; Exhibit J, at 561:9-13)

85.    Detective Newbert and another detective took V.J. from Jacobi Hospital to the 48th Precinct to view the lineup.  (Exhibit B, at 159:21-160:4)

86.    Prior to the lineup, Detective Newbert told V.J. that she was going into a room with a one-way mirror and that the persons in the lineup could not see her, that she should not be afraid, and that she should tell her if she recognized the person who assaulted her on June 23, 1984.  (Exhibit B, at 161:11-17; Exhibit I, at 17:3-21)

87.    Prior to the lineup, neither of the detectives who took V.J. to the station house told her that they had arrested the person whose photo she had picked out, and neither detective told her that the person whose photo she had picked out would be one of the persons in the lineup.  (Exhibit B, at 161:3-10)

88.    After looking at the lineup carefully, V.J. identified Alan Newton, in seat # 5, as the man who raped and assaulted her on June 23, 1984.  (Exhibit B, at 162-63, Exhibit I, at 22:2-5)

89.    V.J. then asked Detective Newbert if each person in the lineup could repeat the phrase spoken by the assailant the night of the crime.  (Exhibit B, at 163:10-13; Exhibit I, at 17-18 (complaining witness asked for each person in the lineup to say, "I'll fix you so you don't indentify me, you bitch"))

90.    Each person in the lineup then said the phrase once.  (Exhibit B, at 163-67; Exhibit I, at 17-21)

91.    Mr. Newton, in seat # 5, was asked to say the phrase a second time because he said it too quietly for V.J. to hear him the first time.  (Exhibit B, at 198-99; Exhibit I,

at 18-19, 89-91; Exhibit P, at 247:14-19 (Newton states, "When they told me say it the second time [I was told to] say it louder, more clear"))

92.     All other persons in the lineup (the five fillers) said the phrase loud enough the first time for V.J. to hear them.  (Exhibit B, at 198-99; Exhibit I, at 18-19, 89-91)

93.     At least one other voice identification procedure was conducted, with the suspect (Mr. Newton) and the five fillers each repeating the phrase from behind a closed door in the lineup room, where V.J. could not see them.  (DE 1 [Complaint], ¶¶ 70-72; Exhibit M)

94.     After the voice identification procedure, V.J. positively identified Mr. Newton, seat # 5, as the man who raped and assaulted her on June 23, 1984.  (Exhibit B, at 166:19-167:3; Exhibit I, at 20:5-6)

95.     After the lineup was over, Mr. Newton was placed under arrest, and began to shout and scream loudly enough so that V.J. could hear him even though she could not see him.  (Exhibit B, at 171-72; Exhibit I, at 21:3-25; Exhibit P, at 249:15-17 (Newton states that "nobody asked [him] to yell and scream while [he was] in the cells, . . . [He] did that on [his] own"))

96.     At that time, V.J. again identified the voice as that of the man who raped and assaulted her on June 23, 1984.  (Exhibit B, at 171:22-172:4 (after the lineup, "while sitting in the detective's office, [V.J.] heard that voice [i.e., the voice of the person in seat # 5] again"); Exhibit I, at 21:3-25; Exhibit Q, at 149-150)

97.     Mr. Newton was placed under arrest on June 28, 1984, after the two lineups were conducted.  (Exhibit I, at 99-100)

98.    The same day, a woman who identified herself as Marva Weston, Mr. Newton's girlfriend, was at the station house and told Detective Newbert that she and Mr. Newton were together in Queens at the time the crime occurred.  (Exhibit H [Bates 775])

99.    Detective Newbert recorded Ms. Weston's address and phone number on her written report of that date.  (*Id.*)

100.    Detective Newbert also recorded in her reports the voucher numbers of physical evidence collected in the investigation, and noted that these items were to be sent to the NYPD crime lab for analysis.  (Exhibit H [Bates 767])

101.    Newton was arraigned on June 29, 1984, and his attorney stated on the record that Newton would not testify before the Grand Jury.  (Exhibit U, at p. 2, ll. 15-16)

102.    On motion by the defendant (Mr. Newton), the court, Hon. Jerome Reinstein, held a *Wade* hearing which took place on May 7-9, 1985.  (Exhibits B, D, I, P-S)

103.    After hearing the evidence, Judge Reinstein ruled that the police did not use suggestive identification procedures with V.J. or Mrs. Gonazalez, and that the identifications made by both eyewitnesses at the lineups would be admitted at trial.  (Exhibit M, at 624-29)

104.    On June 29, 1984, ADA Andrea Freund presented the case to the Grand Jury.  (Exhibit A)

105.    Prior to presenting the case, ADA Freund was aware that V.J. was an epileptic and was under the influence of alcohol on the night of the crime.  (Exhibit T, at 100-02)

106.    Subsequently, the Grand Jury indicted Mr. Newton for First Degree Rape (two counts), First Degree Assault and weapons charges.  (Exhibit N)

107.    At the pre-trial *Wade* hearing and at trial, Ms. Gonzalez testified as witness for the People.  (Exhibit D; Exhibit E)

108.    When Ms. Gonzalez testified, she told the truth and described what she saw.  (Exhibit L, at 36-39)

109.    No police officer ever told Ms. Gonzalez what to say when she testified in court.  (Exhibit L, at 62:13-16)

110.    Ms. Gonzalez believes that she has always said the same things with regard to the subject matter of this case, when questioned by police in 1984, when she testified in court in 1985, and when she gave a deposition in this case on March 19, 2009.  (Exhibit L, at 83:11-19)

111.    Prior to the criminal trial, defendants disclosed the criminal background (BCI) check concerning Deborah "Chambrin" or "Chamberlin," and Mr. Newton's defense attorney accepted the BCI check without the witness' name or address which had been redacted. (Exhibit V)

Dated:        New York, New York
              April 9, 2009

                                        MICHAEL A. CARDOZO
                                        Corporation Counsel of the
                                          City of New York
                                        Attorney for Defendant
                                        100 Church Street
                                        New York, New York 10007
                                        (212) 788-1599


                              By:  _____/s/_____
                                        Arthur G. Larkin (AL 9059)
                                        Senior Counsel


TO:    THE LAW FIRM OF JOHN F. SCHUTTY, P.C.
       *Attorneys for Plaintiff*
       445 Park Avenue, 9th Floor
       New York, New York 10022
       (212) 836-4796
       (By ECF)

# A-242

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

ALAN NEWTON,

                                     Plaintiff,       **<u>DECLARATION</u>**

           -against-                      07-CV-6211 (SAS)

THE CITY OF NEW YORK, et al.,

                                   Defendant(s).

------------------------------------------------------------------------ X

        ARTHUR G. LARKIN, for his declaration pursuant to 28 U.S.C. §1746, states:

        1.      I am a Senior Counsel at the New York City Law Department and I am admitted to practice before the bar of this Court.  I am fully familiar with the matters discussed below, and I make this declaration in support of defendants' motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

        2.      The following exhibits are attached to this declaration (all transcripts of testimony are excerpts with the exception of the Grand Jury minutes):

| | |
|---|---|
| <u>Exhibit A</u> | Grand Jury Minutes |
| <u>Exhibit B</u> | V.J. <u>Wade</u> Hearing Testimony |
| <u>Exhibit C</u> | V.J. Trial Testimony |
| <u>Exhibit D</u> | Gonzalez <u>Wade</u> Hearing Testimony |
| <u>Exhibit E</u> | Gonzalez Trial Testimony |
| <u>Exhibit F</u> | P.O. Leho Trial Testimony |
| <u>Exhibit G</u> | Dr. Charles Trial Testimony |
| <u>Exhibit H</u> | Police Reports |

| Exhibit I | Newbert <u>Wade</u> Hearing Testimony |
| Exhibit J | Newbert trial testimony |
| Exhibit K | Newbert deposition excerpts |
| Exhibit L | Gonzalez deposition excerpts |
| Exhibit M | Decision on <u>Wade</u> motion |
| Exhibit N | Indictment |
| Exhibit O | Galligan trial testimony |
| Exhibit P | Newton <u>Wade</u> hearing testimony |
| Exhibit Q | Galligan <u>Wade</u> hearing testimony |
| Exhibit R | O'Toole <u>Wade</u> hearing testimony [*Intentionally omitted*] |
| Exhibit S | Fillers – <u>Wade</u> hearing testimony [*Intentionally omitted*] |
| Exhibit T | ADA Freund deposition excerpt |
| Exhibit U | Minutes of arraignment, 6/29/84 |
| Exhibit V | Trial Transcript, at 619-22 |

3.     Attached to Exhibit A (Grand Jury Minutes) is a certification of authenticity signed by William J. Carroll, Chief of Stenographic Services for the Office of the District Attorney, Bronx County.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York, New York, on April 16, 2009.

_____/s/_____
ARTHUR G. LARKIN (AL 9059)

SUPREME COURT BUREAU                                    1IS

People vs. Alan Newton
Grand Jury #: 43001
June 29, 1984                          "A" Panel
Presented by:        A.D.A. Freund
Reporter:            Irini Stamos

*    *    *    *    *    *    *    *    *    *    *    *

VELISIA ANNETTE JOHNSON, upon being duly sworn, testified as follows:

EXAMINATION BY MS. FREUND:

Q     Good afternoon. Will you please state your name for the ladies and gentlemen of the Grand Jury?

A     Velisia Annette Johnson.

Q     And what county do you live in?

A     Bronx County.

Q     Ms. Johnson, I will ask you to remember back to last Saturday, the 23rd of June, 1984, the early morning hours of that date, and I will ask you to remember back to two locations, Crotona Park and 861 Crotona Park North. Can you please tell the ladies and gentlemen of the Grand Jury if something unusual happened to you at that time?

A     Yes, it did.

Q     Can you please tell us what happened?

A     I was sodomized and robbed.

Q     Now, where were you before you went to Crotona Park?

A     I was on 180th Street and Third Avenue.

Q     And what's on 180th Street and Third Avenue?

2IS

A    Grocery store where I went to buy me a can of beer.

Q    And did there come a time when you went out of that store?

A    Yes, it did.

Q    Please tell us what happened when you went outside of that store?

A    When I came outside of that store I was standing on the corner waiting to cross the street to get a cab to go home when I – when a guy came up behind me and put a razor to my throat and took me across the street and forced me to get into this car with him.

Q    And where did he put you in the car?

A    On the passenger side of the car.

Q    Now, had you ever – was this man a stranger to you?

A    Yes.

Q    Did you see him before you got outside of that store?

A    No, I didn't

Q    Did you ever see him inside that store?

A    Yes, he came in after I did.

Q    And, but you had never seen him before that night?

A    No, I didn't.

Q    Now, after he put you into the passenger seat of that car --- (Withdrawn) Did he say anything to you when he had the razor to your throat and before he put you into the car?

A    No, he just said go across the street and get in this car with me.

3IS

Q     And when you got into that car, did he also get into the car?

A     Yes, after he locked me in on the passenger side of that car.

Q     And did you drive to a location?

A     Yes, he started towards 18 – he went down 180th Street to Southern Boulevard, he made a right ---

Q     Can you just tell us what location you got to?

A     We got to –

Q     Did you get to a park?

A     We got to Crotona Park.

Q     Did he say anything to you while you were in the car with him?

A     He was just saying that he was, he had been following me and that I didn't really know that he was following me.

Q     Did he make other conversation, did he say other things in the car?

A     No, he didn't.

Q     Did he ask you at all why you were on the street or who you were or say anything about you?

A     No, he didn't ask me who I were.  He just said I bet you southern pussy. I told him no I wasn't.

Q     What did he say?

A     He said that's why I beat up my girlfriend because she told me the same thing and she was out there doing the same thing.

Q     Can you please tell us what happened after you got to Crotona Park?

4IS

A     He took, drove up the hill and then he just said the car stalled, and he had got out and came and opened the passenger side and took me into the park.

Q     What happened inside of the park?  What did he do?

A     He made me suck his penis.

Q     Before that happened, did he at all push you or shove you or do anything like that to you?

A     He pushed me down on the ground.

Q     Now, after he pushed you down on the ground did he--what did he do?

A     He just said bitch, you gonna suck my penis.

Q     Did he use those exact words or did he use different words?

A     He used different words.

Q     And did you—at that point was—did he have his clothing off?

A     No, he didn't.

Q     What part of his clothing did he have off?

A     None of them.

Q     Did you see his penis?

A     Yes, I did.

Q     And how were you able to see his penis?

A     Because he had zipped down his pants and took it out.

Q     And now after that happened, can you tell us what happened next?  What did he do?

A     He went into my sweater pocket where I had my money and my cigarettes and

he had took my money and my cigarettes and he began running through the park and I began chasing him with one shoe on and because one shoe had came off and I told him I needed money. I said please don't take my money because I need my money to feed my baby and then he stopped and he turned around and he came back and he gave me the cigarettes and money back.

Q    Let me ask you a question. At the time that he gave – at the time that he, after you sucked his penis or said that in different words, did you do that?

A    Yes I did, because he had a razor in his hand.

Q    Now after he gave you the money back, did he say anything to you?

A    He said, he said let me go see if I could start this damn car again.

Q    Did he ask you anything about you child or children?

A    No, he didn't.

Q    Now after he gave you the money back, where did you go?

A    I went back to put on my other shoe, to find it.

Q    Did there come a time when you started to leave the park?

A    Yes, I did. I had started walking down the steps to go down Southern Boulevard to get a cab to go home.

Q    What happened at that point?

A    He came up behind me again and put a razor to my throat again.

Q    Where, if anyplace, did he take you from those steps?

A    He had took me to an abandoned building.

Q    And where did he take you within that abandoned building?

A    To the third floor of that building.

Q    While he was taking you to this abandoned building, did he have the razor in his hand?

A    Yes, he had it at my throat.

Q    And were you walking to this abandoned building?

A    Yeah, I was thinking maybe if I could tell him that somebody's up there –

Q    Don't tell us – tell us what you said to him, if anything?

A    I said if is somebody up there, he say you know bitch I hate liars.  He said if there ain't anybody out there I will throw you out this window and I told him, no, there's nobody up there.

Q    What did he do there, if anything?

A    He knocked me down.

Q    Did he use his hands, did he use his legs, what did he use?

A    His hands.

Q    Did he slap you, explain to the Grand Jury what he did?

A    He hold me real hard and slapped me where I fell backwards on the floor and hit my head.

Q    What, if anything, did he do after that?

A    And he got on top of me and he was choking me and I was like gasping for breath.

Q    What, if anything, did you do?

A    I grabbed him below his penis to get him so that I could get some air.

Q       And did he get off you?

A       Yes, he jumped up real fast.

Q       What happened at that point?

A       Then he began pulling off my pants and he pull them all the way off

and then he pull out his penis again and he got on me and he had ---

Q       Where did he put his penis?

A       In my vagina again.

Q       Now, you say again, did he do that before?

A       Yes, he did it in the park.

Q       Was that before or after he had taken out his penis and put it in your mouth?

A       After he put it in my mouth, then he put it in my vagina then.

Q       When you were in the park and he put his penis in your vagina, did you know

if he came?

A       He did, yes.

Q       And at that time that you were in the building and he put his penis in your

vagina, do you know at that point if he penetrated you or came?

A       Well, he just came, I guess, I don't remember exactly.

Q       Did he enter you at that time?

A       Yes, he did.

Q       At the time that this first happened in the park, did he have the razor in his

hand?

A       Yes, he did.

8IS

Q    And at the time in the abandoned building when this happened the second
time, did he have that razor?

A    Yes, he did.

Q    Now, after he put his penis in your vagina in the abandoned building, what,
if anything, happened then?  What, if anything, did he do or say?

A    Well, after had that finished he said I'm make a way you can't identify me,
and then he just took the razor and he began cutting me in the face.

Q    And can you tell us what, if any, other force did he use?  Did he hit you at all?
What, if anything, else did he do?

A    He took and he slammed my head against the floor.

Q    Did he use his feet at all or did he just use his hands?

A    He use his feet.  When he stood up, he kicking me in my ribs.

Q    Now, I see you have a bandage over your left eye and a plastic piece of tape.

     MS. FREUND:    Let the record reflect that there are cuts along the nose and
     the forehead with stitch marks.

Q    Do you have any cuts or scratches on your hands?

A    I have a cut here.

     MS. FREUND:    Indicating the right, above the finger on the right hand,
     the top of the hand.

Q    Now, when he took out this razor and he started cutting you across the face, what
did you do?  Did you at all try to protect yourself?

A    Yes.  I threw up my hands where he couldn't, like he was trying to like cut

both my eyes out.

Q   And was one eye cut?

A   Yes, it was.

Q   And was that the left eye, the eye that's bandaged?

A   Yes.

Q   Did he actually cut the eye ball of that eye?

A   Yes.

Q   Now, the clothing that you had on, did he at all damage that clothing?

A   Yes, he did.  The blouse I had on, he just took the razor and he sliced the blouse up.

Q   Was your body cut by the razor at all?

A   No, it wasn't.

Q   Now, at that time --  Withdrawn.  Did there come a time when he left the the third floor of that building?

A   When he thought I was dead.

MS. FREUND:      I will ask the Jury to please ignore anything that that person might have thought.  That's a conclusion on the part of the witness.

Q   Ms. Johnson, did you see him leaving?

A   Yes, I had – my head was turned like this.   It was facing the wall.  Then I did like this. I was still lying on the head.

Q   Tilting the head?

A    I saw him pick my sweater and take the money and cigarettes again and then he ran down the stairs and then I blacked out.

Q    Did there come a time when you regained consciousness or came to?

A    Yes, I did.

Q    What did you do then?

A    I found that my pants was completely off, my shoes, and that my underwear was missing. And I put my pants on and my shoes and I saw that my blouse was cut and I saw that I was bleeding really bad.

Q    What did you do?

A    I made my way down the stairs to try and find a phone box to call the cops.

Q    And did you find a call box eventually?

A    Yes, I did.

Q    Did you call the police?

A    Yes, I did.

Q    Were you able to see at that time?

A    Only out of the right eye.

Q    Now, can you please tell us if there came a time when the police arrived?

A    Yes, it did.

Q    Did they come to that call box?

A    Yes.

Q    Where were you taken?

A    To Jacobi Hospital.

Q    Do you know what injuries you have?

A    They had told me that my eye was cut and that my eyeball was cut and they had to do surgery as soon as possible.

Q    Do you know if anything happened to your head?

A    I had a mild concussion.

Q    Do you know if there is any damage to your torso or your top of your body?

A    Yes, I have five broken ribs.

Q    At this time, do you have eye sight in your left eye?

A    None whatsoever.

Q    Do you know whether or not you will regain eye sight at that eye?

A    They told me maybe in a couple of months.

Q    Now, did there come a time yesterday, June 28, at the 48th Precinct, when you viewed a lineup?

A    Yes, I did.

Q    And did there come a time when you selected a number from that lineup?

A    Yes.

Q    What number did you select?

A    Number five.

MS. FREUND:    I have no further questions.  Are there any questions of the witness at this time?

( WITNESS EXCUSED)

DETECTIVE JOANNE NEWBERT, upon being duly sworn, testified as follows:

EXAMINATION BY MS. FREUND:

Q      Detective, in a loud and clear voice, please state your name and assignment for the ladies and gentlemen of the Grand Jury?

A      My name is Joanne Newbert and I'm a detective, shield number 2604, and I work for Bronx Sex Crimes.

Q      Detective, can you please tell us if you were present yesterday, June 28, 1984, when a lineup was conducted at the 48th Precinct and when a Ms. Velisia Annette Johnson viewed a lineup?

A      Yes, I was.

Q      Can you please tell us, detective, the name of the person in the number five position?

A      Alan Newton

MS. FREUND:      Thank you.  Are there any questions?

(WITNESS EXCUSED)

1CP

Grand Jury #: 43001/84

People vs. Alan Newton

July 2, 1984

Presented by: ADA Freund

Reported by: Cara M. Piliero

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MS. FREUND:        Ladies and gentlemen, if you recall, my name is Andrea Freund. I'm an Assistant District Attorney in the Sex Crimes Unit. I'm here today to take a vote on the case of People vs. Alan New ton.

I'm going to ask you to consider a number of charges. I'm going to ask you first to consider two counts of section 130.35, subdivision 1, rape in the first degree. A male is guilty of rape in the first degree when he engages in sexual intercourse with a female, subsection one, by forcible compulsion. Two counts of that, ladies and gentlemen..

All right, ladies and gentlemen, do you need a definition of forcible compulsion? The ladies and gentlemen of the jury have reflected that they do not.

Also, please consider section 130.50, subdivision one, sodomy in the first degree. A person is guilty of sodomy in the first degree when he engages in deviate sexual intercourse with another person, subdivision one, by forcible compulsion.

I'm going to ask you to consider three counts of assault in the first degree. First count is section 120.10, subdivision one. A person is guilty of assault in the first degree when with intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous

instrument. The second count of assault in the first degree that I am going to ask you to consider is subdivision two, of section 120.10. A person is guilty of assault in the first degree when with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person. I'm going to ask you to consider as to your last count of assault in the first degree when in the course of and in furtherance of the commission of – Withdrawn -- the commission or attempted commission of a felony or of immediate flight there from, he or another participant, if there be any, causes serious physical injury to a person other than one of the participants.

Does anyone need any definitions such as serious physical injury, et cetera? The ladies and gentlemen of the Grand Jury have indicated that they do not.

I'm going to ask you to consider two counts of robbery in the first degree. First count being section 160.15, subdivision one. Robbery – Withdrawn.

A person is guilty of robbery in the first degree when he forcibly steals property and when in the course of the commission of the crime, or of immediate flight there from, he or another participant in the crime, causes serious physical injury to any person who is not a participant in the crime. And the second section that I am going to ask you to consider is subdivision three. A person is guilty of robbery in the first degree when he forcibly steals property and when in the course of the commission of the crime or of immediate flight there from, he or another participant in the crime uses or threatens the immediate use of a dangerous instrument.

The last section, ladies and gentlemen, is 265.01 of the Penal Law, subdivision

3CP

two, criminal possession of a weapon in the 4th degree. A person is guilty of criminal possession of a weapon in the 4th degree when he possesses any dagger, dangerous knife, dirk, razor, stiletto, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another.

Thank you very much for your attention. I'm going to leave you to take your vote.

Bronx District Attorney's Office
198 E. 161 Street
Bronx, New York 10451

April 3, 2009

Re: People vs. Alan Newton
    Grand Jury #: 43001/1984
    Presented 6/29/84, Grand Jury Reporter Irini Stamos
    Presented 7/2/84, Grand Jury Reporter Cara Piliero

To Whom It May Concern,

I, William J. Carroll, Chief of Stenographic Services for the Bronx District Attorney's Office, hereby certify that the foregoing is a true and complete copy of the minutes of Grand Jury Proceeding number 43001/1984; that it is the regular practice of this Office to maintain copies of all minutes of Grand Jury proceedings; that the foregoing copy was maintained in the archives of New York City's Department of Records and Information Services (DORIS) in accordance with this Office's regular practice; that the court reporters whose names appear on the minutes were under a business duty to transcribe all proceedings (including all testimony) accurately to the best of their ability at the time such proceeding took place; and that I retrieved the foregoing copy from DORIS.


William J. Carroll
Chief, Stenographic Services
Bronx District Attorney's Office


SWORN TO: *Olivia Harrison*
April 6, 2009

OLIVIA HARRISON
Notary Public, State of New York
No. 4524773
Qualified in New York County
My Commission Expires

Proceedings                                    152a

MAY 8, 1985

SUPREME COURT OF THE STATE OF NEW YORK

PART 67, COUNTY OF THE BRONX

PEOPLE OF THE STATE OF NEW YORK against ALAN NEWTON,

    Defendant

INDICTMENT NO.:   2441/1984

BEFORE:  HON. JEROME L. REINSTEIN

APPEARANCES:   (Same as previously noted.)

                    —    —    —

            COURT CLERK:   Come to order.   May I proceed,
Your Honor?

            THE COURT:   Yes, you may.

            COURT CLERK:   Continued Wade Hearing.   People
of the State of New York versus Alan Newton.

            Please   note   on   the   record   the   presence   in
the   courtroom   of   counsel   for   the   People,   defense
counsel and the defendant.

            THE COURT:   Call you next witness.

            MS. FREUND:   People call to the stand Velisia
Johnson.

VELISIA   JOHNSON,   called as a witness on behalf
    of the People, being first been duly sworn, testified
    as follows:

            COURT   OFFICER:   Witness   gives   her   name   as

Johnson - People - Direct                    153

Valisia Johnson.  First name V E L I S I A

J O H N S O N, resident of Bronx County.  Please

speak in a loud, clear voice.

THE COURT:  Proceed.

DIRECT EXAMINATION

BY MS. FREUND:

Q     Good morning, Miss Johnson.

A     Good morning.

Q     Miss Johnson, I'm going to direct your attention to the early morning hours of June 23rd, 1984, Saturday morning. Did something happen to you that morning?

A     Yes, it did.

Q     And I will have to ask you to please speak out loud so that everybody is able to hear you and so the reporter can take down what you say?

A     Okay.

THE COURT:  There's no other witness in the courtroom; is there?

MS. FREUND:  No, Your Honor.  There's none.

Q     Miss Johnson, what happened to your that morning?

A     I was raped.

Q     Did there come a time after you were raped when you were taken to the hospital?

A     Yes, it was.

Johnson - People - Direct                          156

THE COURT:    What did she say to you when she handed you the photographs?

THE WITNESS:    She told me she had to look through the photographs and if I see anybody that I recognize to let her know.

THE COURT:    Did she say if you see the person who raped you?

THE WITNESS:    No, she didn't.    If I see -- yes, she did.    Excuse me.

Q    Okay and did you look through photographs?

A    Yes.

Q    Do you know approximately how many photographs you looked through?

A    No I wasn't counting.

THE COURT:    Were there a lot of photographs?

THE WITNESS:    Yes.

THE COURT:    Several hundred?

THE WITNESS:    It was about a hundred fifty to two hundred.

THE COURT:    And you didn't recognize anybody there?

THE WITNESS:    No.

Q    Did you select any photographs or show her any photographs the first time that she showed you photographs

Johnson - People - Direct                    157

of that evening?

    MR. SEGAL:  Objection.

    THE COURT:  Overruled.  I understand the form. Overruled.

Q    Did you show her any photographs that first evening?

A    The first evening, no.

Q    I will direct your attention to the 25th of June, the following evening, approximately 8:30 or 8:45.  Did Detective Newbert return to the hospital?

A    Yes, she did.

Q    When she returned to the hospital did anybody go with her?

A    Excuse me?

Q    When she returned to the hospital was there anyone with her?

A    Yes, the same detective.

Q    The second time that she returned -- withdrawn.

When she returned to the hospital again that evening did she show you photographs?

A    No.  She just handed me the photographs and I went through them.

Q    What if anything did she say before she handed you the photographs?

A    She just told me to be -- to just look through

Johnson - People - Direct                                          158

them. If I see the person to let her know. That is all.

MR. SEGAL: Sorry, Judge, I didn't get that.

THE COURT: Read back the answer.

THE COURT: You went through the photographs and looked at the photographs?

THE WITNESS: Yes.

THE COURT: Did you pick out any pictures?

THE WITNESS: Yes.

THE COURT: How many did you pick out?

THE WITNESS: I don't remember.

THE COURT: How many photographs did youn pick out?

THE WITNESS: I don't remember how many I picked out.

THE COURT: I'm not asking you how many you looked at. You looked at photographs. Did you pick out a particular picture and tell the officer this is the person who raped me?

THE WITNESS: Yes, I did.

Q    It was that one picture that you picked out?

A    Yes.

Q    You don't remember how many you looked at first before you picked out that one?

A    No.

Johnson - People - Direct                                159

Q    Were there many you looked at though?

A    Yes.  She had them in an envelope.

Q    I will show you that which has been previously marked as People's 2.  I'm going to ask you if you know what this is?

A    This is the photograph that I picked out.

THE COURT:  What if anything did Detective Newbert say to you after you showed her that picture?

THE WITNESS:  She asked me was I sure.

THE COURT:  And what did you tell her?

THE WITNESS:  Yes, I was.

Q    Miss Johnson, I'm going to direct your attention to the 28th of June, at approximately two o'clock in the afternoon and asking if at approximately that time you viewed a lineup.?

A    Yes, I did.

Q    Where were you before the time that you viewed the lineup?

A    In the hospital.

Q    And do you remember how you got from the hospital to the lineup?

A    Yes, I do.

Q    Can you please tell us?

A    I got from the hospital to the lineup, the two

Johnson - People - Direct                         160

police officers, Jo Ann and the other guy, the other cop picked me up at the hospital and took me right to the police station.

Q    What, if anything, did Detective Newbert say to you before you looked at the lineup?

THE COURT:  Or the other officer.

THE WITNESS:  Excuse me?

THE COURT:  Or the other officer?  In other words they took you in a police car; right?

THE WITNESS:  It was a detective's car.

THE COURT:  Detective car, you and the two officers?

THE WITNESS:  Yes.

THE COURT:  What if anything did either of the officers say to you in route from the hospital to the precinct?  Did they tell you where you were going?

THE WITNESS:  Yes, they told me that I was going to view a lineup.

THE COURT:  What else did they tell you, if anything?

THE WITNESS:  They didn't say anything else until I got to the --

THE COURT:  Lineup?

Johnson - People - Direct                    161

THE WITNESS:  Yes.

THE COURT:    Did either officer tell you that they had arrested the person whose picture you had picked out?

THE WITNESS:  No.  They didn't.

THE COURT:    Did either officer tell you that the person whose picture you picked out would be one of the persons on the lineup?

THE WITNESS:  No, they didn't.

Q    Did either Detective Newbert or someone else speak to you before you looked at the lineup?

A    Yes.

Q    And what, if anything, did they tell you?

A    She told me not to be afraid and that if I see the person that assaulted me, don't be afraid, to tell them, to let them know.

Q    Did she -- withdrawn.

Do you know who went with you into the viewing room to view the lineup?

A    The two officers that picked me up at the hospital.

Q    And what, if anything, happened when you got into the viewing room?

A    Well, I wasn't able to see the mirror, through the window because I was too short and I was hurting and

Johnson - People - Direct                    162

they had to help me to look up, you know, into the mirror to see.

THE COURT:  Put you on a platform?

THE WITNESS:  Yes.

THE COURT:  All right.  Then the shade went up?

THE WITNESS:  Yes.

THE COURT:  And then what if anything happened after the shade went up?

THE WITNESS:  I just saw the guys sitting there.

Q    Did you select a number out of that lineup?

A    Yes, I did.

Q    And what number did you select?

A    Number five.

Q    Going to show you that which has been marked People's 5 and ask you if you recognize it?

COURT OFFICER:  (Handed to witness.)

A    Yes, I do.

Q    And what do you recognize it to be?

A    The guy that assaulted me.

Q    What is that a picture of?

A    The lineup.

Q    What if anything happened after you picked out

Johnson - People - Direct                    163

number five from the lineup?

THE COURT:   Before you go on to that, when you say you picked out number five, the shade went up. You looked and then did you say something to the police officers?

THE WITNESS:   I just looked.

Q    Did you tell them it is number five?

A    No, not right away.  I looked carefully.

Q    You looked carefully and then what happened?

A    I said it was number five but then I asked the officer to ask them to say out a sentence that the guy said to me.

Q    First you told them it was number five and you wanted them to ask the men to say, repeat a sentence?

A    Yes.

Q    And then what happned after you asked the officer to have the person in the lineup repeat a sentence?

A    Excuse me.  I didn't understand.

Q    You told the officers it is number five but I would like them to repeat a sentence; is that correct?

A    Yes.

Q    And then what happened after that?

A    Then they said the sentence all of them.

Q    Each one said the sentence?

Johnson - People - Direct                    165

A    Yes.

Q    While you were looking at them?

A    Yes.

Q    Were they still seated?

A    No, they came up to the window.

Q    Each one came up to the window eventually?

A    Yes.

Q    And repeated the sentence?

A    Yes.

Q    First number one, then number two, number three, four, five?

A    Yes.

Q    Six?

A    Yes.

Q    And then after each one repeated the sentence that person went back and sat down?

A    Yes.

Q    The next one came up?

A    Yes.

Q    What if anything happened after all six men repeated that sentence, if anything?

A    I couldn't hear the voice of number five clearly and I asked her if he could say it louder so I could hear.

Q    Then what happened after that?

Johnson - People - Direct                166

A    After the last one said it I said, "I'm positive it is him."

Q    All six men repeated the sentence?

A    No not all of them didn't repeat.

Q    All of them initially came up and said the sentence, all six came up?

A    Yes.

Q    Then you told the officer you couldn't hear number five; is that correct?

A    Yes.

Q    And then what happened?  Did number five come up again?

A    No, he just said it louder.

Q    From where he was seated?

A    No at the window.

Q    When number five came up?

A    He seem like he was lowering his voice.

Q    You asked -- he repeated, did he repeat it right away before number six went or after number six went?

A    After number six.

Q    Number five was seated when number six said it and number five came back to the window?

A    He said it again.

Q    What happened after that?

Johnson - People - Direct                    167

A    I told her I said, "I'm positive it is number five."

Q    Miss Johnson, do you see the person that raped you in the courtroom today?

A    Yes, I do.

Q    Can you please indicate that person for the Court?

A    Sitting right there (indicating).

THE COURT:  Indicating the defendant.

Miss Johnson at the time of the lineup did there come a time when you were taken outside of the viewing room and the men came up to the door and repeated that sentence?

THE WITNESS:  No.  I wasn't taken out of the room until after the lineup.

THE COURT:  In other words whatever occurred while you were in the viewing room and the other six men were you in the lineup room?

THE WITNESS:  Yes.

THE COURT:  And there never was a time when you were taken out of the viewing room to stand in a hallway to listen to the six men repeat that sentence through a door?

THE WITNESS:  No.

Johnson - People - Direct                    171

Q    What did you hear?

A    I heard the voice of a man.

Q    And where were you when you heard the voice of the man?

A    I was back in the detective's office.

THE COURT:    Did the detectives say anything to you after you identified number five as the one who assaulted you?

THE WITNESS:    No, they didn't.

THE COURT:    They asked you if you were sure?

THE WITNESS:    They asked me that before I left the room.  They said, "Are you sure."

THE COURT:    Did they ask you that after the voice identification or after the first identification?

THE WITNESS:    After the voice.

THE COURT:    Voice identification?

THE WITNESS:    Yes.

THE COURT:    You told them twice, told them number five but I want to hear him say the same sentence and after you heard the sentence you said, yes, I'm sure it is number five.

THE WITNESS:    Yes.

THE COURT:    And then you heard while you

Johnson - People - Direct                    172

heard while you were sitting in the detective's office you heard tht voice again?

THE WITNESS:  Yes.

THE COURT:  Did you say anything to the officers at that time?

THE WITNESS:  No, I didn't.

Q    Miss Johnson I will ask you to remember back to that Saturday morning, June 23rd, 1984.  When was the first time that you saw the face of the man that raped you?

A    I was in the grocery store.

Q    What were you doing in the grocery store?

A    Me and a lady that runs the grocery store at night we knew each other because I had worked across the street from the grocery store and we knew each other and we were just talking.

THE COURT:  What was her name?

THE WITNESS:    I didn't know her by name, only through each other, by face.

Q    Did you make a purchase in that store?

A    Yes, I did.

Q    What did you purchase?

A    I purchased the can of beer.

Q    And where did you see the face of the man that raped you in that store?

Johnson - People - Direct                    183

THE WITNESS:  A minute, maybe a minute and a half.

THE COURT:  After you were taken out of the car were you ever able to observe his face either in Crotona Park or on the street?

THE WITNESS:  No.

THE COURT:  When you were looking for the cab or while you were in the abandoned building?

THE WITNESS:  No.

THE COURT:  You didn't see his face at all?

THE WITNESS:  No because it is poor lighting.

THE COURT:  Did you know it was the same person or could it have been another person?

THE WITNESS:  It could have been, you know, but after I saw him in the light I recognized him.

CONTINUED DIRECT EXAMINATION

BY MS. FREUND:

Q    Let me ask you this, Miss Johnson, the person that you saw in the store was that the same person that took you to his car?

A    Yes, it was.

Q    And the person's face that you saw in the car was that the same face that you had seen inside that store?

Johnson - People - Direct                                189
Johnson - People - Cross
MS. FREUND:   Nothing further.

CROSS EXAMINATION

BY MR. SEGAL:

Q     Miss Johnson, you're an epileptic?

A     Yes.

Q     Do you take medication for it?

A     Once a day, Phenobarbital and Dilantin.

Q     How much a day Phenobarbital and Dilantin?

A     I take Phenobarbital twice a day and Dilantin once three times a day.

Q     And you take them in the morning, the evening and at night; is that correct?

A     Yes.

Q     Are you told when you take that medication not to have any liquor with it?

A     Yes.

Q     Because the liquor can effect the medication; am I right?

A     Yes.

Q     On the day this happened, June 23rd, 1984, -- let me ask you this, you have been taking that medication for how long?

A     About five years.

Q     You take it regularly; am I right?

Johnson - People - Cross                    198

the window?

THE WITNESS:  Yes.

Q    Didn't you say earlier when the Judge asked you those questions all six came up to the window?

A    Yes.

Q    And you said you couldn't hear number five?

A    Uh-huh.

Q    Then the police told number five --

A    Speak a little louder.

Q    To speak louder?

A    Yes.

Q    So number five came back up to the window?

A    He didn't come back up to the window.

THE COURT:  He said it twice while he was at the window?

THE WITNESS:  Yes.  He didn't come back to the window.

Q    So number five at the window said it twice?

A    Yes.

Q    In other words, number one said it once?

A    Everyone said it once.

Q    Wait a minute.  Number one came up to the window and he only said it once; is that correct?

A    Only once.

Johnson - People - Cross                    199

Q    Number two said it how many times?

A    Once.

Q    Number three?

A    Like I'm saying everybody said it. Where I couldn't hear them when he got to the window seemed like he lowered his voice that he didn't want me to hear it.

THE COURT:  So you told the officer you couldn't hear number five?

THE WITNESS:  Yes.

THE COURT:  And number five repeated it?

THE WITNESS:  Yes.

THE COURT:  And then he went back sat down?

THE WITNESS:  Yes.

THE COURT:  Then number six came up?

THE WITNESS:  Yes.

THE COURT:  And number six sat down?

THE WITNESS:  Yes.

THE COURT:  Everybody said it once except number five who said it twice?

THE WITNESS:  Yes.

Q    That was it after that?

A    That was it.  I went, left the room.

Q    You went out of the room at that time?

A    Yes.

Johnson - People - Cross                    201

us, don't be afraid, they can't see you, just --

THE WITNESS:  No, they didn't say anything else.

Q    Nothing else?

A    No.

Q    Okay.  Going back to the photo that they brought to the hospital the first night you were unable to pick outr anybody; is that right?

A    Yes.

THE COURT:  Just so you understand the first night she couldn't look at anybody.

Q    You couldn't look at anybody the first night?

A    No I couldn't.

Q    The second time that the police came back to your room, the ward where you were staying they had, you said, about one hundred some odd pictures?

A    Yes, they did.

Q    Did the police say anything to you when they gave you the pictures?

A    No, they just said, we want you to look through photos see if you could find the person that assaulted you. That was it.

Q    Did they help you in any way to look at the pictures?

A    No.

Johnson - People - Cross                                    202

Q    At the time that they brought the pictures to you and this is the first night they brought the pictures to you were you on any kind of medication?

A    No, I wasn't.

Q    Any intravenous, anything like that?

A    No.

Q    You were just laying in the hospital bed?

A    Yes.

Q    Had you undergone an operation earlier?

A    Yes, I did.

Q    And that was an operation for what?

A    Internal bleeding.

Q    And that was all?

A    That was it and they had to sew my eye.

Q    The next day at about -- next night the police come back; right?

A    Yes.

Q    And they come back you said with another group of photographs; is that right?

A    Yes, they did.

Q    Did they say anything to you about those photographs?

A    No.

Q    Do you remember if the photographs were black and white or color?

Johnson – People – Cross                                      203

A    I don't remember.

Q    How many photographs did they show you before you were able to pick somebody out?

A    They showed me many photographs like I say.

Q    Do you remember how many it took, assuming --

Do you remember how long it took before you picked somebody, five minutes, ten minutes?

MS. FREUND:  Objection.

THE COURT:  Overruled.

A    It was more that, I looked at many pictures before I picked the guy out.

Q    Did you say anything to the police when you picked out the photo?

A    Yes, I did.  I told them.

Q    What did you say to them?

A    I don't remember exactly what I said.

Q    Just tell us what you remember?

A    I told her, I said, "This is the guy."

Q    What did the police say to you at that time?

A    They asked me was I sure.

Q    What did you say ?

A    I looked at the photo again then I said, "I'm sure."

Q    Did they say anything after that?

A    No, they didn't.

A-282

Johnson - People - Cross                                          204

Q   Did the police then leave?

A   No, they didn't leave.  She stayed and she talked.

Q   Yes.

A   She said to me that you have to be sure because we don't want to arrest the wrong person.

THE COURT:  Did she tell you to look through the rest of the pictures?

THE WITNESS:  I don't remember.

Q   Did you look through the rest of the pictures?

A   I finish what I had on my lap, yes.

Q   After picking out that picture?

A   Yes.

Q   In the grocery store when you saw this man how long -- you were in the store before the man came in; is that right?

A   Yes, because me and the lady in the store was just talking.

Q   And this was about three, four a.m. in the morning?

A   Yes.

Q   And when the man came into the store -- withdrawn. When you came into the store the first time to get the beer was there anybody else in the store?

A   No, just the lady in the store.

Q   Just that lady?

Johnson - People - Cross                                    214

THE WITNESS: That is it.

THE COURT: That is what Mr. Segal is asking you.

Q    When the police came to see you at the hospital did they tell you they were from the Bronx Sex Crimes Task Force?

A    Yes, they did.

Q    And did they tell you that they're going to come back and show you pictures of people who have been involved in sex crimes?

A    No they didn't.

Q    You're sure?

A    They just told me they were going to bring some photos for me to look at.

Q    Did they tell you those are people who did these type of crimes?

A    No, they didn't.

Q    Never said that?

A    No, never.

Q    Do you think --

MS. FREUND: Objection.

THE COURT: Sustained.

MR. SEGAL: Do you know what I'm going to ask?